1          UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF OHIO
2                  WESTERN DIVISION

3  THEODORE LUCIO, et al.,     )
                               )
4         Plaintiffs,          )
                               )
5    vs.                       )      No. 2:12-CV-00613
                               )
6  EDW. C. LEVY CO., et al.,   )      Judge Helmick
                               )
7         Defendants.          )

8                      - - -

9

10           DEPOSITION OF ROCK MILLER

11

12       DATE:      November 6, 2015 at 9:30 a.m.

13       PLACE:     Gallon, Takacs, Boissoneault &
                    Schaffer
                    3516 Granite Circle
14                  Toledo, Ohio 43617

15       REPORTER:  Lauren Stamm
                    Notary Public
16
                       - - -
17

18

19

20

21

22

23

24

APPEARANCES:

On behalf of the Plaintiffs:

GALLON, TAKACS, BOISSONEAULT & SCHAFFER:
Kevin J. Boissoneault
3516 Granite Circle
Toledo, Ohio 43617
(419) 843-2001

On behalf of the Defendant North Star Bluescope Steel:

DINSMORE & SHOHL, LLP:
Charles E. Ticknor, III
191 West Nationwide Boulevard, Suite 300
Columbus, Ohio 43215
(614) 628-6880

On behalf of the Defendant EDW. C. Levy Co.:

EASTMAN & SMITH:
Stuart J. Goldberg
One SeaGate, 24th Floor
Toledo, Ohio 43604
(419) 241-6000

- - -

I N D E X

EXAMINATION

Witness:  ROCK MILLER                    Page      Line
        Examination by Mr. Boissoneault......4        5
        Examination by Mr. Ticknor..........74       24
        Re-Examination by Mr. Boissoneault..78       24

- - -

EXHIBITS

    Exhibit    Description                    Page      Line
    PX 1       Photograph of Tower 2...........33        7
    PX 2       Proposed Slag Processing Plant..35        6
    PX 3       Safety Department Safety Doc....46        7
    PX 4       Safety Handbook.................49        1
    PX 5       Mini Mill Division Uniform Rules
               And Regulations.................50        3
    PX 6       Levy Steel Mill Services Cardinal
               Rules...........................53       18
    PX 7       Fall Protection Standard 29 CFR
               1926.501........................54       18
    PX 8       Safety Flash Incident Details...57       12
    PX 9       Incident Report at Fulton Mill..71       19

- - -

OBJECTIONS

    Attorney                              Page      Line
    By Mr. Goldberg........................43       14
    By Mr. Goldberg........................45       23
    By Mr. Goldberg........................63       13
    By Mr. Goldberg........................68        1

- - -

                              ROCK MILLER,

a Witness herein, called by the Plaintiffs as if upon

examination, was by me first duly sworn, as hereinafter

certified, and deposed and said as follows:

                              EXAMINATION

BY MR. BOISSONEAULT:

        Q.    Mr. Miller, my name is Kevin Boissoneault and

I represent Ted Lucio in connection with a case, and you're

here to have your deposition taken in connection with that

matter, and I'm sure you've gone over that with counsel,

but --

        A.    Little bit, I've been retired for over a year.

        Q.    Okay.  Are you still living in the area?

        A.    No, I live in Indiana, northwest Indiana.

        Q.    All right.  And whereabouts?

        A.    A little town called Grovertown, Indiana.

        Q.    And are you from there?

        A.    Well, I grew up in Portage, so, Portage,

Indiana.

        Q.    Okay.  Did I see something where you had maybe

been at Gary, Indiana Steel Facility at one point?

        A.    I worked for National Steel for 33 years and

then went bankrupt and bought by U.S. Steel, and I worked

for them for two years before I came to work for Levy.

 1     Q.    And you've been retired for about a year?

 2     A.    Uh-huh.

 3     Q.    And have you ever had your deposition taken

 4  before?

 5     A.    No.

 6     Q.    Okay.  And I know you've gone through some

 7  ground rules, but let me just touch on a few things before

 8  we get under way, okay.  Just like I have been so far, I'm

 9  going to be asking you some questions and I'll need you to

10  answer those questions out loud, verbally unless you're

11  instructed by counsel not to do so, okay?

12     A.    Uh-huh.

13     Q.    And if the answer is a yes or no answer, we'll

14  need the "yes" or "no" rather than "uh-huh" or "huh-uh,"

15  shrugs, you and I would understand each other in everyday

16  conversation, but for the court reporter we want to make

17  sure we have a clear record, okay?

18     A.    Yes.

19     Q.    So if any of us get on you from time to time,

20  which I'm sure we will, we're only doing it for the record,

21  okay?

22     A.    Yes.

23     Q.    And if you don't understand a question that I

24  ask you, ask me to repeat it or rephrase it and I will do

1   so, okay?

2           A.      Uh-huh.

3           Q.      I want to make sure you understand the

4   question before you give an answer, okay?

5           A.      Yes.

6           Q.      And if you need to take a break, just let me

7   know and we'll do that, and the only exception to that is

8   if there's a question pending we'll need an answer to the

9   question first, okay?

10          A.      Uh-huh.

11          Q.      All right.  Let's start with the easy stuff,

12  what's your full name?

13          A.      Rockford Miller.

14          Q.      Middle name at all?

15          A.      M, Marion.

16          Q.      Marion, all right.  And your current address

17  in Grovertown, Indiana?

18          A.      2235 North, 700 East, Grovertown, Indiana

19  46531.

20          Q.      All right.  And who do you live there with?

21          A.      My wife and daughter.

22          Q.      And let's go all the way back to This Is Your

23  Life, where did you go to high school?

24          A.      Portage High School.

1       Q.    In Indiana?

2       A.    Yes.

3       Q.    And what year did you graduate?

4       A.    1969.

5       Q.    And that puts you at a difficult time, were

6 you in the Army or the military?

7       A.    No.

8       Q.    Okay.

9       A.    They did away with the draft and all that and

10 went to the lottery and I missed all that.

11      Q.    Okay.  No military service?

12      A.    No.

13      Q.    All right.  And who was your first major

14 employer, not the gas station down the street or the

15 landscaping crew, but your first major?

16      A.    That would be National Steel.

17      Q.    And you indicated just a little bit ago that

18 you worked for National for about 33 years?

19      A.    Correct.

20      Q.    And what did you do at National?

21      A.    I started off as a laborer with a broom and

22 paint brush and worked my way up to safety manager.

23      Q.    And what facility were you at when you left

24 there, what was your last facility?

```
 1          A.     When I left National, Midwest division.

 2          Q.     And in Gary, Indiana?

 3          A.     It's in Portage.

 4          Q.     And did you spend all your time at the same

 5   facility, your 33 years?

 6          A.     Yes.

 7          Q.     And what kind of a mill is the, was that

 8   facility?

 9          A.     Finishing.

10          Q.     Okay.  And just so we're clear, what do you

11   mean by finishing?

12          A.     We didn't actually produce steel, it was

13   brought in to us, we reduced it, coated it, whatever needed

14   to be done, sent to the customer.

15          Q.     Okay.  So you didn't have the furnaces there?

16          A.     No, not blast furnaces or electric arc

17   furnaces, no.

18          Q.     All right.  Furnaces for treating, heat

19   treating, something along those lines?

20          A.     Yeah, annealing furnaces.

21          Q.     Did that type of facility generate any slag?

22          A.     No.

23          Q.     You leave National Steel about when?

24          A.     2003.
```

```
 1          Q.    And in 2003 where do you go?
 2          A.    U.S. Steel Gary Works.
 3          Q.    And why did you leave National at that time?
 4          A.    National had filed for bankruptcy and was
 5   bought out by U.S. Steel.
 6          Q.    All right.  And so you go to work for U.S.
 7   Steel but to a different facility?
 8          A.    Yeah, yes.
 9          Q.    And how long were you with U.S. Steel?
10          A.    About two years.
11          Q.    And what did you do there?
12          A.    A safety engineer.
13          Q.    Do you have any post-high school education?
14          A.    Just a semester at Olivet Nazarene College.
15          Q.    And then you leave U.S. Steel and go to work
16   for Edward C. Levy Company?
17          A.    Yes.
18          Q.    And when did you come to work for Edward C.
19   Levy Company?
20          A.    April 1, 2005.
21          Q.    And why did you leave U.S. Steel?
22          A.    Levy made me a better offer.
23          Q.    And how were you familiar with Edward C. Levy
24   Company?
```

1       A.    The vice president of steel, of the mills and

2   the integrates, I had worked for him, he was a vice

3   president-general manager of National Steel, Midwest

4   Operations, so I worked for him approximately four years

5   prior and he called me and asked me to come to work for

6   him.

7       Q.    All right.  And what's his name?

8       A.    John Guydan.

9       Q.    Now --

10                  MR. GOLDBERG:  Can you spell his last

11          name?

12                  THE WITNESS:  G-u-y-d-a-n.

13                  MR. GOLDBERG:  G-u-y.

14                  THE WITNESS:  D-a-n.

15                  MR. GOLDBERG:  Thanks.

16  BY MR. BOISSONEAULT:

17      Q.    Now the U.S. Steel Works in Gary, Indiana that

18  you worked for for approximately two years, did they

19  generate slag?

20      A.    Yes, they did.

21      Q.    And what was done with that slag at that

22  facility?

23      A.    Well, the mill generated it and it was sent to

24  an on-site processor who turned it into aggregate.

1       Q.    And who was the on-site processor?

2       A.    It was called Levy Indiana Slag Company, Lis

3  Co, L-i-s, C-o.

4       Q.    And is that an Edward C. Levy company, steel

5  mill service company?

6       A.    It's part of the Levy organization, yeah.

7       Q.    And have you ever been to North Star Bluescope

8  Steel in Delta, Ohio?

9       A.    I have.

10      Q.    And is there a Levy company at North Star

11  Steel, or North Star Bluescope Steel in Delta, Ohio?

12      A.    It's not called Levy Company, but yes, there

13  is a business there that's affiliated with Levy.

14      Q.    Okay.  And what does that business do at North

15  Star Bluescope in Delta?

16      A.    They process slag and provide mill service to

17  North Star Bluescope.

18      Q.    All right.  So there's two activities that go

19  on with the Levy Company at North Star in Delta; is that

20  correct?

21      A.    Correct.

22      Q.    Did the Levy company at the U.S. Steel Gary

23  Works do the same type of work as the company in at North

24  Star Bluescope in Delta?

1       A.    Similar, yes.

2       Q.    Okay.  Was there a, my words, slag plant at

3  the Gary Works?

4       A.    Yes.

5       Q.    And what did that slag plant consist of?

6       A.    Screens, towers, conveyors, that's what its

7  makeup is.

8       Q.    Okay.  And do you know who constructed that

9  facility?

10      A.    I have no idea, that was long before my time.

11      Q.    All right.  Did you do anything in connection

12  with the Levy facility at the Gary Works?

13      A.    As far as I did some inspections, gave advice,

14  I was more or less a consultant, you know, loaned out to

15  the various sites.

16      Q.    Okay.

17      A.    I didn't manage any of the sites, I just made

18  recommendations and gave those recommendations to the site

19  manager.

20      Q.    Let's back up because that was a real poor

21  question on my part, I didn't give you any time frame

22  there.  I think what you were just talking about, correct

23  me if I'm wrong, is what you did when you worked for Edward

24  C. Levy Company?

```
 1          A.    Correct.

 2          Q.    Okay.  When you were at U.S. Steel working for

 3     U.S. Steel, did you have anything to do with the slag

 4     processing operation?

 5          A.    No.

 6          Q.    Okay.  So then you come to work for Levy in

 7     2000 -- April 1, 2005, correct?

 8          A.    Correct.

 9          Q.    And who do you report to, who's your boss at

10     Levy?

11          A.    Which time, when I first hired there it was,

12     John Guydan was my boss.

13          Q.    Okay.

14          A.    And later, and I couldn't tell you the actual

15     dates, John moved to a different position and somebody took

16     his place.

17          Q.    And who was that somebody?

18          A.    Brian Lasley.

19          Q.    Okay.  And is that who you worked for until

20     you retired?

21          A.    No, well, I had, I was assigned to two

22     different, Malcom and to Brian Lasley.

23          Q.    Okay.  And Malcom is Malcom Dunbar who is

24     sitting to your right?
```

```
 1        A.    Yes, that's correct.

 2        Q.    And do you know what Brian Lasley's position

 3   is with Edward C. Levy Company?

 4        A.    Vice president of steel mill services.

 5        Q.    And Mr. Dunbar is, do you know what his

 6   position is?

 7        A.    He's got a split, I can't speak for him

 8   because I know that he's, you know, safety director for

 9   Edward C. Levy Company but, is it okay if I, because I

10   don't --

11        Q.    That's all right, we'll ask him.  And to be

12   clear, Edward C. Levy Company was your employer, correct?

13        A.    Correct.

14        Q.    And why did you leave Edward C. Levy Company?

15        A.    Well, when I crunched the numbers I realized I

16   was working for almost nothing and so I retired.

17        Q.    The tax numbers, is that what you're talking

18   about, what numbers were you crunching?

19        A.    Just how much money, income I would have, you

20   know, on a, when I retired, and when I looked at that it

21   didn't seem hardly worth the difference.

22        Q.    Okay.  What is your understanding of what the

23   Edward C. Levy Company steel mill services is?

24        A.    Would you repeat that question?
```

1        Q.      Sure.   What's your understanding of what

2  Edward C. Levy Company's steel mill services is or are?

3        A.      They process slag and provide services to the

4  mill.

5        Q.      Anything else besides those two functions?

6        A.      Well, they do some recycling of materials.

7        Q.      And the recycling of materials, is that

8  something that is processed and then either sold back or

9  given back to the steel mills, what do you mean by

10 recycling?

11       A.      Well, they reclaim the metallics out of the

12 slag and that goes back to them, to the sites.

13       Q.      All right.

14       A.      And also they, like, furnace brick, they have

15 different kinds of furnace brick that they sort out and

16 then they sell that.

17       Q.      Refractory work?

18       A.      Yeah, they, some sites, and I couldn't tell

19 you if, I don't know the scope of work, I don't know their

20 contracts so I don't know if, to what extent they had the

21 refractory, I just know that they, somebody dumped it there

22 and it was sorted out and then sold.

23       Q.      Okay.   And when you say "dumped it there," do

24 you mean at any particular plant or are you just talking

1  generally?

2          A.     I'm just talking about North Star.

3          Q.     Okay.  So at North Star, is there recycling

4  operations that go on at North Star?

5          A.     I guess that's what, I mean, to the extent

6  that's what we do, recycling, we take slag and turn it into

7  an aggregate, that's recycling or repurposing so that's

8  what we do.

9          Q.     Okay.  I was just trying to get the scope of

10  the work as you know it, and one of the things you

11  mentioned was slag processing?

12          A.     Yes.

13          Q.     And then there was services to the mill?

14          A.     Correct.

15          Q.     And then there was recycling of materials and

16  that's where you talked about getting the metallics and

17  sending that back in; is that correct?

18          A.     That's correct.

19          Q.     And then there was maybe some furnace brick

20  maybe when they were redoing refractory work or it might

21  have even been coming in from off site, is that what you're

22  saying?

23          A.     No, they would have, just what was on-site.

24          Q.     Okay.  Now, other than those four activities,

1  any other activities that you're aware of?

2       A.    Nothing, nothing I'm aware of other than the

3  maintenance we do on our own equipment.

4       Q.    Okay.  Now --

5       A.    And hauling, hauling materials.

6       Q.    Off-site or just intra-site or inter-site?

7       A.    Inter-site, customers would come in and pick

8  up the slag.

9       Q.    Okay.  You didn't have a fleet of trucks, you

10 would assist them in loading or you would load their

11 trucks?

12      A.    Not for outside hauling, no.

13      Q.    Okay.  Did you do your own hauling?

14      A.    Internally.

15      Q.    Just on-site?

16      A.    Yes.

17      Q.    Okay.  All right.  Services to the mill, that

18 would be what, what falls into that category?

19      A.    Knocking a drain plug out of the bottom of the

20 furnace, putting a Grant machine up on top and busting out

21 some of the refractory.

22      Q.    Okay.  The knocking the drain plug out of the

23 furnace, what does that involve?

24      A.    A Grant machine going in with like a

1  jackhammer bit and chiseling away at it and breaking it up.

2       Q.    Okay.  I take it there's not a big wrench that
3  you unscrew it with?

4       A.    No.

5       Q.    It's kind of like a plug?

6       A.    Yeah.

7       Q.    Is that tapping the furnace or is that a
8  little bit different?

9       A.    Yeah, tapping the furnace is what the mill
10 does when they drain it or when they're pouring out the
11 steel.

12      Q.    And when you're, what did you call it, taking
13 the --

14      A.    Tap hole.

15      Q.    Tap hole?

16      A.    Yeah.

17      Q.    And you're trying to get the slag out, is that
18 what you're doing?

19      A.    Trying to clean the furnace, but in order to
20 get that out you got to open a bed, all the brick and stuff
21 falls through.

22      Q.    Okay.  And you said a Grant machine?

23      A.    Yeah, yes.

24      Q.    G-r-a-n-t?

1        A.      Correct.

2        Q.      And what does that look like?

3        A.      Looks like a little dozer with tracks with a

4   boom arm on it and a, like I said, a jackhammer attachment

5   to it.

6        Q.      Okay.  Does somebody go up in the air on that

7   piece of equipment?

8        A.      Well, they have a furnace top machine, but the

9   Grant machine I'm talking about goes from underneath.

10       Q.      Okay.  So nobody goes up with it?

11       A.      No.

12       Q.      All right.  Is the furnace in the air?

13       A.      Yes.

14       Q.      How high up?

15       A.      I don't know exactly.

16       Q.      All right.  And the, did you mention there's

17  another machine that's involved in this?

18       A.      It sits on top of the furnace.

19       Q.      And is that one of Levy's machines?

20       A.      I'm not sure, I don't know.

21       Q.      And what does that machine do?

22       A.      It breaks up the brick and the refractory from

23  the furnace itself.

24       Q.      And that goes through the hole?

1    A.    Yes.

2    Q.    And is somebody operating that machine?

3    A.    Yes.

4    Q.    Are they sitting in like a control or are they

5    operating it from a control room?

6    A.    It's, no, they don't operate from a control

7    room.

8    Q.    Okay.  They're on a machine?

9    A.    They walk, they walk the machine around and

10    they're standing on the outside, on the rim of the

11    furnace --

12    Q.    Okay.

13    A.    -- looking down into the furnace so you can

14    see where to position the bit.

15    Q.    All right.  And are they protected by any

16    guardrails from falling?

17    A.    The furnace, I don't --

18    Q.    Let me strike the question.  Is there a

19    catwalk system that goes around the furnace?

20    A.    No.

21    Q.    All right.  Is there any fall protection

22    issues for the person who is operating the machine to knock

23    the brick and other stuff out of the furnace?

24    A.    I would be guessing if I said yes, I don't.

```
 1         Q.    Is that Levy employees that do this?

 2         A.    Well, it's been back and forth so I, I really,

 3   I have watched that job done and at the time, yes, it was

 4   our employees.

 5         Q.    Okay.  And were they tied off, did they have a

 6   harness and lanyard and tied off to somewhere?

 7         A.    I don't recall.

 8         Q.    Is there a job breakdown safety analysis for

 9   that job?

10         A.    There is, there is a JBSA for darn near every

11   job that we do.

12         Q.    And what did you call that machine that you

13   were just describing?

14         A.    The furnace top machine.

15         Q.    Yes.  And --

16         A.    I believe that's --

17         Q.    Go ahead.

18         A.    No, I think it's a Grant machine too.

19         Q.    Okay.

20         A.    Made by Grant.

21         Q.    Is the person sitting in a seat or are they

22   standing while they're doing this work?

23         A.    I would be guessing if I said because I don't

24   remember, it's been a while since I've watched that job.
```

```
 1        Q.    When did you retire?

 2        A.    A year ago.

 3        Q.    And then you were there from '05 until '14?

 4        A.    Uh-huh.

 5        Q.    Okay.  What other jobs were there from mill

 6  services standpoint?

 7        A.    We would take small wheel loaders inside the

 8  mill, clean out drop-down chambers, scoop up material

 9  that's spilled over or it wasn't contained and haul it out,

10  haul it out of the inside of the mill.

11        Q.    Okay.  And any other jobs for mill services?

12        A.    None I can think of.

13        Q.    Now, slag processing, in a general picture

14  tell me about Levy slag processing at North Star in Delta,

15  Ohio.

16        A.    You want to know from beginning to end?

17        Q.    Yeah, the sequence.

18        A.    The sequence of things?

19        Q.    Yes.

20        A.    Okay.  The, they dump the slag into slag

21  boxes.

22        Q.    Okay.  That's inside the mill?

23        A.    Yes.

24        Q.    Okay.
```

1          A.     And then they, it's under the furnace, they
2   drain it off.

3          Q.     Okay.

4          A.     One of our cress carriers goes and picks it
5   up, hauls it to our slag dump where the molten material is
6   poured into a pit.

7          Q.     Okay.

8          A.     And cooled.

9          Q.     Let me stop you there.  Any fall hazards in
10  that process that you just went through?

11         A.     None.

12         Q.     Okay.  So now the molten slag is in a pit,
13  take it from there.

14         A.     Then the material is cooled and broken up,
15  when you hit it with water it fractures, and they'll scoop
16  it out of the pit with a front-end loader and stockpile it
17  based on what kind of slag it was, what did they have in
18  the furnace that day.

19         Q.     Okay.

20         A.     There's different types of slag.  So then they
21  take it to --

22         Q.     Different piles for different types of slag?

23         A.     Yes.

24         Q.     Okay.

1      A.      And then based on what the customer wants
2  they'll take that slag and process it and they'll put it
3  into a hopper, which shakes and sizes the material.
4      Q.      Okay.  Let me stop you right, there and I'll
5  be doing that so I can keep a clear understanding.  Is this
6  an electric arc furnace facility?
7      A.      Yes.
8      Q.      Is there any other kind of furnace in there to
9  your knowledge?
10     A.      No.
11     Q.      But even within the electric arc furnace or
12 furnaces at North Star they may be running different types
13 of steel; is that correct?
14     A.      Correct.
15     Q.      And that different types of steel gives off
16 different types of slag?
17     A.      Depending on the make-up of the steel, the
18 alloys that are added to it, et cetera.
19     Q.      All right.  And is it safe to say that some of
20 that slag is, has a certain type of use as an aggregate and
21 other type of slag has a different type of use?
22     A.      That's correct.
23     Q.      Okay.  So then the separate slag, once it's
24 cooled and treated in the pit, is put into piles, correct?

 1      A.    That is correct.

 2      Q.    And then is any of, does all of the slag that

 3 comes out get checked for metallics, things that can be

 4 recovered?

 5      A.    The, yes, as it, when they feed it into the

 6 conveyor system that either crushes it to size or screens

 7 it to the size there are magnets on it that will pull out

 8 the metallics.

 9      Q.    Okay.

10      A.    They call it over-band magnets and it runs

11 across the conveyor and just draws the metallics out.

12      Q.    Okay.  But I sort of jumped ahead with my

13 question, right, in the process -- well, strike that.

14           So you've got --

15      A.    Yes, yes, you did.

16      Q.    So you've got the piles of slag, right?

17      A.    Uh-huh.

18      Q.    And that's just a yes for --

19      A.    I'm sorry, yes.

20      Q.    That's okay.  And so the piles of slag, do all

21 the piles of slag go through this, what did you call it,

22 not a dumpster a --

23      A.    The hopper.

24      Q.    The hopper.

```
1          A.     Yeah, yes.

2          Q.     All right.  So everything goes in the hopper

3    but not at the same time, you run one type of slag at a

4    time, correct?

5          A.     That's correct.

6          Q.     But all of that slag will eventually go

7    through the hopper?

8          A.     Yes.

9          Q.     All right.  And the hopper is --

10         A.     Well, let me back up, we may need some of that

11   material on site to build a base of something, in which

12   case it may not be screened, it's just there for a base, so

13   not everything goes through the screening process.

14         Q.     All right.  So you may need to, if there's a

15   hole somewhere on the property you may need to fill it with

16   that?

17         A.     Yeah, or help build a layer of foundation for

18   something as well.

19         Q.     Okay.  And, but anything that's going to be

20   processed goes through the hopper?

21         A.     Correct.

22         Q.     All right.  Give us some understanding of the

23   size of this hopper.

24         A.     If you put two of these tables together --
```

1     Q.    All right.

2     A.    -- side by side, that would be about right for

3   a hopper.

4     Q.    20, 25 feet long and 10, 20 feet wide?

5     A.    Yeah, ballpark.

6     Q.    All right.  How about height?

7     A.    They're usually up high.

8     Q.    The hopper?

9     A.    Yeah, yes.

10     Q.    20 feet, 30 feet, I'm not looking for Navy

11   guidance precision here, I'm just looking for --

12     A.    I know but, because I was on so many different

13   sites --

14     Q.    Okay.

15     A.    Each site is configured differently.

16     Q.    Okay.

17     A.    I've actually got one site, may be North Star

18   that it's at ground level.

19     Q.    All right.  So is there some kind of conveyor

20   system that gets the slag to the hopper or is it by end

21   loaders?

22     A.    End loaders get it to the hopper.

23     Q.    Okay.

24     A.    Conveyor belts move it to the crusher or the

1  screening process to make the right size of material.

2          Q.      All right.

3          A.      The screens determine the sizing.

4          Q.      All right.  Now, I've lost myself, so the slag

5  is brought over to the hopper; is that correct?

6          A.      Correct.

7          Q.      Is there a crusher in the hopper?

8          A.      Not in the hopper itself, it's, it will go up

9  a conveyor.

10          Q.      Okay.

11          A.      And depending on what they're trying to get

12  from the material, it may go just to a screen --

13          Q.      Okay.

14          A.      -- and bypass the crusher, or it may go

15  through the crusher and then go through the screen.

16          Q.      Okay.  So the hopper is just what it's dumped

17  in?

18          A.      Yes.

19          Q.      And then from there it goes out on conveyors?

20          A.      To whatever process it needs to go to, yes.

21          Q.      Okay.  Now, how many conveyors meet at the

22  hopper, is there just one conveyor?

23          A.      Just one.

24          Q.      All right.

1          A.     That goes, that takes the raw materials and

2    feeds it into the, onto the conveyor, just one.

3          Q.     Okay.  So there's, there's one conveyor coming

4    out of the hopper?

5          A.     Yes.

6          Q.     Okay.  I'm just trying to, the hopper doesn't

7    do anything, right, there's no grinding or anything going

8    on?

9          A.     No, it just contains the material.

10         Q.     All right.

11         A.     And some, some of them shake so it shakes the

12   material down so it gets it onto the conveyor, because the

13   big pieces will fall out, it sorts out the bigger pieces

14   and throws them into a pile, and if it won't fit into the

15   crusher naturally it gets discarded.

16         Q.     Okay.  What determines if the slag goes into

17   the crusher or somewhere else?

18         A.     Just the demand of the customer or, you know,

19   the State, they want a certain size.

20         Q.     Okay.

21         A.     The customer determines what the sizing is and

22   some of the material will have, will be of the right size

23   but a small percentage, so when it goes in the crusher,

24   most of the big pieces, some of the stuff will just be the

1   right size.

2          Q.    All right.

3          A.    Because it fractures unevenly.

4          Q.    Is there any fall hazards with respect to work

5   that's done on a regular basis with the crusher, I'm not

6   talking about maintenance work, I'm talking about just job

7   activities with the crusher?

8          A.    No.

9          Q.    I'm sorry, with the hopper?

10         A.    No.

11         Q.    All right.  Let's say that material goes to

12  the crusher because a customer wants it smaller, okay,

13  what's the height of the crusher?

14         A.    It varies.

15         Q.    At North Star?

16         A.    Well, it goes up from the hopper.

17         Q.    All right.

18         A.    To feed up to the crusher.

19         Q.    All right.

20         A.    But I don't know exactly how many feet.

21         Q.    Is the crusher one of the four towers at North

22  Star?

23         A.    Yes.

24         Q.    All right.  Do you know which tower it is?

```
 1        A.    No.
 2        Q.    All right.  So does all the material go on the
 3   conveyor from the hopper to the crusher tower to begin
 4   with?
 5        A.    Not necessarily, it may go right to the
 6   screen.
 7        Q.    All right.  Is there a screen on the crusher
 8   tower?
 9        A.    The screen deck is separate from the crusher.
10        Q.    Okay.
11        A.    It will go out of the crusher, because, again,
12   the crusher don't, it don't make it the perfect size.
13        Q.    Right.
14        A.    And when it comes out of the crusher it will
15   go up the conveyor to another tower, a screen that, you
16   know, like, well, screens it and allows the right size
17   material to fall through the holes in the screen.
18        Q.    Right.  What I'm trying to get the picture of
19   here is there's one conveyor, there's four towers, correct,
20   at North Star, the slag plant?
21        A.    Like I said, it's been a while, I don't know
22   the answer to that.
23        Q.    All right.  Well, according to everything I
24   have and depositions of Levy Environmental employees,
```

1  there's four towers, you don't know that one way or the

2  other?

3      A.    No.

4      Q.    All right.

5      A.    I wasn't assigned to that particular site, my

6  job was just to consult, I was, I worked out of, my boss or

7  who I worked for was the Edward C. Levy Company.

8      Q.    Right.  And you would be sent to facilities

9  that Levy had, Edward C. Levy Company had steel mill

10  operations on, correct?

11      A.    Correct.

12      Q.    All right.  And you are a competent person in

13  the area of fall protection; is that correct?

14      A.    I am.

15      Q.    A certified competent person?

16      A.    Through Rose Manufacturing who certified me

17  some years ago, yes.

18      Q.    The who?

19      A.    Rose Manufacturing, they made fall protection,

20  they were kind of the forerunner in fall protection.

21      Q.    Okay.

22      A.    And I went to Colorado for a week-long

23  certification class.

24      Q.    Okay.  Have you gone through any OSHA

1  certification process?

2      A.    Sure, I was an, OSHA doesn't authorize but

3  they, I mean, they don't approve anything but they

4  authorize things, I went through their 40-hour class that

5  gave me the authorization to teach a 10-and 30-hour OSHA

6  class.

7                  (Court Reporter marked Plaintiff's

8          Exhibit 1.)

9  BY MR. BOISSONEAULT:

10     Q.    I'm going to hand you what's been marked as

11  Exhibit No. 1 in your deposition, do you recognize what

12  Exhibit No. 1 is?

13     A.    That's the scene deck right there

14  (indicating).

15     Q.    Okay.  And Exhibit No. 1 is tower number 2, do

16  you know that to be the case?

17     A.    By number?

18     Q.    Yes.

19     A.    No.

20     Q.    All right.  Well, assume that that's tower

21  number 2.

22     A.    Okay.

23     Q.    All right.  There's a lot of conveyors around

24  there, do you see those?

```
 1          A.    I do.

 2          Q.    All right.  Can you -- strike that.  Do you

 3     see any part of the crusher in that photograph?

 4          A.    No.

 5          Q.    Have you ever been up on tower number 2?

 6          A.    I have been.

 7          Q.    That's in this photograph?

 8          A.    Yes.

 9          Q.    Okay.  Prior to the incident involving

10     Mr. Lucio?

11          A.    Yes.

12          Q.    Okay.  Did you have anything to do with the

13     job breakdown safety analysis for the changing of the

14     screens on the screen deck of tower 2?

15          A.    No, I did not write that document.

16          Q.    Okay.  You're familiar with the document?

17          A.    Somewhat.

18          Q.    What was your purpose for being up on the

19     tower number 2 prior to Mr. Lucio's incident?

20          A.    Whenever I go to a site and, provided they

21     were down, because material falls off up here.

22          Q.    Right.

23          A.    I would walk the catwalks, you know, all the

24     stairs and stuff to make sure everything was intact, you
```

1  know, if there was electrical up there that was tied into,

2  just a general inspection.

3          Q.    Safety inspection?

4          A.    Correct.

5          Q.    All right.

6                      (Court Reporter marked Plaintiff's

7              Exhibit 2.)

8  BY MR. BOISSONEAULT:

9          Q.    I'm going to hand you what's been marked as

10 Exhibit 2, it may not be the easiest thing to read given

11 its size.  This is a drawing that says proposed slag

12 processing plant for North Star Steel down in the lower

13 right-hand corner.  Just let me know when you've oriented

14 yourself with this.

15         A.    Okay.

16         Q.    Does this help orient where the various

17 equipment is located at for the slag plant at North Star?

18         A.    Pretty much the layout, yeah, I can make --

19         Q.    What's a raw slag surge pile?

20         A.    Overflow.

21         Q.    Just extra piles?

22         A.    Yes.

23         Q.    Okay.  What's the grizzly?

24         A.    It's, grizzly is that hopper that I talked

1    about.

2          Q.    That's the --

3          A.    It's got big, it's like a screen but it's got

4    real big holes in it, like.

5          Q.    All right.  So the grizzly is the hopper there

6    on Exhibit 2; is that correct?

7          A.    I'm looking to see where that is.

8          Q.    It's right sort of to the bottom right of the

9    raw slag --

10         A.    Oh, yeah.

11         Q.    -- surge pile, see that?

12         A.    Yes.

13         Q.    And then it looks like there's maybe a crane

14   there, do you see that, now, my son who is big into

15   military history would say, that looks like a tank, dad,

16   but that looks like a crane, does that make sense to you,

17   is there a crane by the grizzly?

18         A.    Not that I'm aware of, the crane would be out

19   here at the drop-ball area which is over, there would be a

20   crane here perhaps the larger pieces of steel.

21         Q.    And, by golly, there's the same little crane

22   thing there, do you see that?

23         A.    Yeah.

24         Q.    And then there's also a crane thing over by

1  the grizzly; do you see that?

2       A.    I do.

3       Q.    Now, going from the grizzly to the right, is

4  that a conveyor, I think it's conveyor number 9?

5       A.    Yes.

6       Q.    Okay.  And then that looks like it's going up

7  to tower number 3, does that make sense?

8       A.    Yes.

9       Q.    And then what is tower number 3 to your

10 understanding, is that the crusher?

11      A.    It's, there's a magnet right there, that's

12 where the material is, the metallics come out.

13      Q.    In tower 3?

14      A.    Yeah, if you look right underneath it says --

15      Q.    Yeah, I see that.  And then it looks like

16 there's a conveyor dropping straight down from there, do

17 you see that?

18      A.    Uh-huh, goes to a scalping screen.

19      Q.    Scalping screen, and the scalping screen is

20 actually the upper screen deck on tower 2, right?

21      A.    I'm looking here.

22      Q.    If you look right below you'll see it says?

23      A.    Tower 2.

24      Q.    Tower 2 scalping screen, correct?

```
 1        A.    Yes.
 2        Q.    So we now know that it goes from the grizzly
 3   to tower 3 which is, there's a magnet, correct?
 4        A.    Uh-huh, correct.
 5        Q.    And then it also looks like there's a magnet
 6   in tower 2 as well, do you see that?
 7        A.    Yes.
 8        Q.    Okay.  And then, so are there screens in tower
 9   3 to your knowledge, is there a screen deck?
10        A.    No, you said to my knowledge?
11        Q.    Right, to your knowledge.
12        A.    No.
13        Q.    But then there is a screen deck on tower 2,
14   correct?
15        A.    I'm looking for tower 2, yes.
16        Q.    It's directly below tower 1, right?
17        A.    Yes, and if you see where it says number 2, it
18   says, 5 by 12, that would be the size of the material that
19   could go through that scalping screen.
20        Q.    Okay.  5-foot by 12-foot material?
21        A.    No, 5-inch by 12-inch.
22        Q.    I think that's indicating, if I'm not mistaken
23   though, isn't that indicating the size of the deck, 5-feet
24   wide by 12-feet long?
```

```
 1          A.    It's possible, but I know that they screen
 2    there on the --
 3          Q.    About 25 feet in the air?
 4          A.    It's up there, yeah.
 5          Q.    Okay.  Now, there's no fall hazard associated
 6    with the grizzly; is that correct?
 7          A.    Correct.
 8          Q.    And then is there any fall hazards associated
 9    with the work that's done on a daily basis on tower number
10    3, the magnet there?
11          A.    On a daily basis?
12          Q.    Yeah, any type or on a regular basis, any type
13    of work that's done by employees on tower 3, is there a
14    fall hazard component to that work?
15          A.    Yes, but that work, to work on that magnet,
16    guys would do that from a man basket, from a --
17          Q.    All right.  Cherry picker or something?
18          A.    Man lift.
19          Q.    A man lift, all right.  So in a man lift you
20    would be surrounded by a guardrail, you would be tied off
21    to a guardrail, correct?
22          A.    Correct.
23          Q.    With a harness and at least one lanyard?
24          A.    Correct.
```

1      Q.    So they would go up and do work on tower 3 in
2  that kind of a situation, correct?

3      A.    To work on the magnet, yes.

4      Q.    Okay.  So they would be protected to work on
5  the magnet on tower 3 by both the guardrail, that's part of
6  the man lift, correct?

7      A.    Yes.

8      Q.    And by a fall arrest system, a personal fall
9  arrest system; is that correct?

10      A.    That's correct, yes.

11      Q.    All right.  Now, so the material then goes by
12  conveyor into, into tower number 2; is that correct?

13      A.    Yes.

14      Q.    And then, is there some kind of a, almost a
15  hopper that the material falls into off the conveyor in
16  tower number 2 that it then it goes, that goes through onto
17  the screen deck or does it just dump right off the conveyor
18  onto the screen deck?

19      A.    I don't know the answer to that.

20      Q.    Okay.  Now, is there any fall protection
21  issues with work that's done on a regular basis on tower
22  number 2?

23      A.    The only way I would know the answer to that
24  is if I had the job breakdown, the JBSA to review for the

1   work or the tasks that would be performed there.

2          Q.     Screen changing?

3          A.     Inside a screen deck?

4          Q.     Yes, on a screen deck.

5          A.     Take me back to the question.

6          Q.     Is there any fall hazards associated with any

7   work that goes on on a regular basis on tower number 2, was

8   really the original question.

9          A.     Okay.  I don't know the scope of the work well

10  enough to answer that question.

11         Q.     Do you know who Ted Lucio is?

12         A.     Yes.

13         Q.     And who is Ted Lucio?

14         A.     He was a gentleman who was working with a

15  couple guys on the screen deck and fell.

16         Q.     All right.  Now, did you know Ted Lucio before

17  that incident?

18         A.     Just the name, I didn't really know him

19  personally.

20         Q.     Okay.  Did, were you involved at all with the

21  investigation as to what happened?

22         A.     Yes, sir.

23         Q.     Okay.  And did you write any reports as a

24  result of that investigation?

1          A.     Yeah, that was, it was a committee that did

2     all the work, we had a record keeper and, you know,

3     somebody that took the notes and stuff.

4          Q.     Who was the head of the inspection committee?

5          A.     Our VP general manager.

6          Q.     And who was that?

7          A.     Brian Lasley.

8          Q.     Okay.  And did you write up any report

9     yourself?

10         A.     I did.

11         Q.     And was that report called the incident report

12    at Fulton Mill Services?

13         A.     It was an incident report that the site would

14    have written, their incident report, I did not write that,

15    there's an incident report and then there's a daily safety

16    report and I, I don't write either one of them, that

17    report, I didn't write either one of them, that report

18    would have gone to Detroit to the main office and then

19    disseminated throughout Levy to say, here's what happened

20    and here's our recommendations.

21         Q.     Did you write a report I think was the earlier

22    question that I think you said you did?

23         A.     I did write a report, it's called a safety

24    flash.

```
 1         Q.    Safety flash, the safety flash is your report?
 2         A.    Yes.
 3         Q.    Okay.  So you do know the scope of the work
 4    that goes on on tower 2, right, based on your --
 5         A.    After the fact, yes, after this incident I
 6    became pretty intimate with it.
 7         Q.    Okay.  You weren't intimate with the -- well,
 8    let's, let me withdraw that.
 9              I need you to tell me all of the fall hazards
10    associated with the slag plant at North Star Steel during
11    your time working at Edward C. Levy Company.
12         A.    Tell you all the fall hazards?
13         Q.    Correct.
14                   MR. GOLDBERG:  Objection.  Form of the
15              question.  Go ahead.
16                   THE WITNESS:  That's impossible to say,
17              unless you want me to sum up to say that anytime
18              you're on a work platform more than 4 feet you
19              need a handrail or some kind of personal fall
20              arrest system, and that comes out of 191023,
21              which is the OSHA standard for walking working
22              surfaces, or 1926, which is the actual fall
23              protection standard that says 6 feet, if you're
24              going to work above 6 feet that you have to have
```

1          fall protection.  Our, that, that's how I would

2          define any fall hazards on that, any work that's

3          performed above 4 feet needs some kind of fall

4          protection.

5    BY MR. BOISSONEAULT:

6          Q.    Okay.  Is the slag plant at North Star

7    Bluescope Steel exempt from OSHA requirements?

8          A.    No, sir.

9          Q.    Does it have some sort of special materials or

10   mining or any exemptions from OSHA?

11         A.    No, sir.

12         Q.    Okay.  It's subject to OSHA?

13         A.    Absolutely.

14         Q.    It's subject to OSHA fall protection

15   requirements?

16         A.    Yes.

17         Q.    It's subject to Edward C. Levy Company fall

18   protection requirements?

19         A.    That is correct.

20         Q.    Okay.  And part of your job as the competent

21   person on fall protection at Edward C. Levy Company for

22   their steel mill services were to go to the various

23   locations where there were steel mill services going on for

24   Edward C. Levy Company; is that correct?

1          A.    Correct.

2          Q.    And part of your job was to inspect those

3    facilities and the work being done by the employees that

4    worked for the various Edward C. Levy companies; is that

5    correct?

6          A.    Yes.

7          Q.    And part of your job in that capacity was to

8    determine what areas required fall protection for the

9    Edward C. Levy Company's employees; is that correct?

10         A.    To the extent that if fall protection was

11   needed in a particular place and that I was, that I had

12   taken a job procedure out and monitored against what was

13   actually being performed but I wouldn't be the qualified

14   person in that, that would be our engineering group for

15   them to say this beam is, can withstand 5,000 pounds of

16   dynamic force, that's not my expertise.

17         Q.    I'm not sure that was the question, I wasn't

18   talking about beams, I was just talking about, in a general

19   sense, part of your job was to make sure that the employees

20   of the various Edward C. Levy companies that were

21   performing work at Edward C. Levy Company slag plants were

22   properly trained in the use of fall protection.

23                    MR. GOLDBERG:  Objection.

24   BY MR. BOISSONEAULT:

1    Q.    Is that correct?

2                    MR. GOLDBERG:  You can answer.

3                    THE WITNESS:  It wasn't, the training

4          material, it was the responsibility of the site

5          to do that training, the corporate office sent

6          out training packages on a monthly basis.

7                    (Court Reporter marked Plaintiff's

8          Exhibit 3.)

9    BY MR. BOISSONEAULT:

10   Q.    I'm going to hand you what's been marked as

11   Exhibit No. 3 and ask you to take a look at that and just

12   let me know when you've done so.  Had a chance to look at

13   it?

14   A.    Yes.

15   Q.    All right.  Exhibit 3 consists of three pages

16   Levy Bates stamped 16 through 18; is that correct, lower

17   right-hand corner?

18   A.    That is correct.

19   Q.    All right.  The first page up at the top says

20   Edward C. Levy Company, see that?

21   A.    Yes.

22   Q.    8800 Dix Avenue, Detroit, Michigan, see that?

23   A.    Yes.

24   Q.    And it says safety department, right?

1     A.    Correct.

2     Q.    So Edward C. Levy Company has a safety

3 department; is that correct?

4     A.    Yes.

5     Q.    And did you work for the Edward C. Levy

6 Company safety department?

7     A.    Yes.

8     Q.    And that Edward C. Levy Company safety

9 department is involved with identifying hazards and

10 training employees of the Edward C. Levy group of companies

11 on safety issues; is that correct?

12     A.    We didn't do the training, we just provided

13 the training materials to the site.

14     Q.    Do you agree with what's written in this

15 document or what's contained in the document?

16     A.    You want me to go over it line by line?

17     Q.    Have you ever seen the document before?

18     A.    Yes.

19     Q.    Sure, okay.  Do you have any problems with

20 what's stated in the document?

21     A.    No.

22     Q.    Okay.  Who is Terry Wagaman?

23     A.    He was employed, he was the safety manager

24 15 years before I came to work for Levy.

1    Q.    Okay.  And then the second page, Bates stamped
2  17, safety is everybody's business at Edward C. Levy
3  Company, do you see that up at the top?
4    A.    Yes.
5    Q.    All right.  And then there's different
6  sections that have headings, safety equipment, proper work
7  attire, equipment, and then onto Bates stamped page 18, you
8  have general; do you see that?
9    A.    Yes.
10    Q.    And this would be another document that is
11  coming out of the Edward C. Levy Company safety department;
12  is that correct?
13    A.    Yes.
14    Q.    And this is something that was provided to and
15  signed by Ted Lucio; is that correct?
16    A.    It has his name at the bottom.
17    Q.    And his signature as well?
18    A.    Yes.
19    Q.    And it is dated 11/30/09, is that correct?
20    A.    Yes.
21    Q.    All right.  So this Edward C. Levy Company
22  safety department safety document was provided to and
23  signed for by Mr. Lucio; is that correct?
24    A.    Yes.

1          (Court Reporter marked Plaintiff's

2     Exhibit 4.)

3  BY MR. BOISSONEAULT:

4     Q.   I'm going to hand you what I'm having marked

5  as Exhibit 4.  And while you're looking at it I'll indicate

6  for the record that it begins with the table of contents at

7  Levy Bates stamp 303 and it ends at Levy Bates stamp 417.

8  Are you familiar with Exhibit 4?

9     A.   Yes.

10    Q.   And what is Exhibit 4?

11    A.   It's the contents of our, of the safety

12 handbook.

13    Q.   The Edward C. Levy Company safety handbook?

14    A.   Yes.

15    Q.   That's provided to employees of the Edward C.

16 Levy group of companies?

17    A.   Yes.

18    Q.   And it contains such things as general safety

19 rules, clothing, jewelry, walkways, roadways, stairs,

20 housekeeping, welding, cutting, burning, fall protection,

21 right?

22    A.   Correct.

23    Q.   Okay.  And if you'll look at the last page,

24 Bates stamped Levy 417, this document was also signed for

1    by Ted Lucio on November 30, 2009; is that correct?

2         A.    That's correct.

3                    (Court Reporter marked Plaintiff's

4         Exhibit 5.)

5    BY MR. BOISSONEAULT:

6         Q.    I'm going to hand you what's been marked for

7    identification purposes as Exhibit 5.  And when you've had

8    a chance to look at that just let me know.

9         A.    Okay.

10        Q.    All right.  Have you ever seen this document

11   before?

12        A.    Yes.

13        Q.    And this is the Edward C. Levy Company mini

14   mill division uniform rules and regulations; is that

15   correct, up at the top of the first page Bates stamped 418?

16        A.    This is an HR document.

17        Q.    Okay.

18        A.    That safety department didn't have anything to

19   do with that document.

20        Q.    Well, let's take a look at the second-to-last

21   page Bates stamped Levy 420, second-to-last page of

22   Exhibit 5.

23        A.    Oh, okay.  Second-to-last page.

24        Q.    It's Bates stamped 427 at the bottom.

1            MR. GOLDBERG:  Second-to-last page is

2        27.

3            MR. BOISSONEAULT:  Well, mine must have

4        been produced at two different times because I

5        have it at 420, you guys have it at 427?

6            MR. GOLDBERG:  No, just 27.

7            MR. BOISSONEAULT:  You have it at 027,

8        okay, we'll go with 027 because that's what's

9        marked, that's the one marked, yeah.

10  BY MR. BOISSONEAULT:

11       Q.    And at the top it says cardinal rules; is that

12  correct?

13       A.    Yes.

14       Q.    And then number 4, fall protection must be

15  utilized where required, correct?

16       A.    Correct.

17       Q.    And the "where required" would be spelled out

18  in the manual and the other documents that we've gone over?

19       A.    Actually these rules were revised, after --

20       Q.    After what?

21       A.    These, after 2009 they were revised.

22       Q.    Okay.  Well, those haven't been provided to

23  me, I'm just using what's been provided to me.

24       A.    Okay, we had a, not only did we have a

1   cardinal rules revision because we added to it as we went

2   along, but we added some verbiage to things to clarify.

3          Q.    Okay.  I'm not sure what that has to do

4   with --

5          A.    Well, it, this is not up to date.

6          Q.    That's not up to date, so there's another

7   version of that?

8          A.    Yes.

9          Q.    Okay.

10         A.    And it was sent to all the sites for them to

11  train their employees on the new cardinal rules.

12         Q.    Okay.

13         A.    Or the additional cardinal rules and clarify

14  the old.

15         Q.    Okay.  Well, maybe I have that version coming

16  up, but nonetheless, this particular version has under

17  cardinal rules, fall protection, or fall protection must be

18  utilized where required; is that correct?

19         A.    That's correct.

20         Q.    And the "where required" is spelled out in the

21  safety manual?

22         A.    And in the training.

23         Q.    And in the training.  And the training is

24  based on the safety manual, correct?

```
 1        A.    Yes.

 2        Q.    All right.  And then just to look at the last

 3  page of Exhibit 5, that too was signed for by Ted Lucio on

 4  November 30, 2009; is that correct?

 5        A.    Yeah, looks like the scribble of his

 6  handwriting on the others.

 7        Q.    Yeah, and do you recognize the supervisor's

 8  signature?

 9        A.    Tim Lazarus.

10        Q.    And who is he?

11        A.    He was the site manager at that particular

12  time.

13        Q.    At North Star?

14        A.    Yes, he was not the site manager the day Ted

15  fell.

16        Q.    Right.  All right.  Let's take a look at

17  Exhibit 6.

18                    (Court Reporter marked Plaintiff's

19          Exhibit 6.)

20  BY MR. BOISSONEAULT:

21        Q.    And just let me know when you've had a chance

22  to look at that.

23        A.    Yeah, this is the revised copy that I

24  mentioned a minute ago.
```

1       Q.   All right.  So this is the revised copy that

2  you mentioned before and it says, revised 4/22/2010, is

3  that correct, lower left-hand corner?

4       A.   That is correct.

5       Q.   All right.  And this is something that was

6  apparently signed for by Ted Lucio on February 15, 2011?

7       A.   Yes.

8       Q.   And this was, this is the revised cardinal

9  rules from Edward C. Levy Company to the employees of the

10  Steel Mill Services group of companies?

11      A.   That is correct.

12      Q.   All right.  And paragraph number 5, "Employees

13  must utilize fall protection when working at unprotected

14  heights above 4 feet."  Was the place where Ted Lucio fell

15  an unprotected height above 4 feet?

16      A.   Yes.

17      Q.   All right.

18             (Court Reporter marked Plaintiff's

19      Exhibit 7.)

20  BY MR. BOISSONEAULT:

21      Q.   I'm going to hand you what's going to be

22  marked as Exhibit 7.  Just take a look at this document and

23  when you're done, just let me know.

24      A.   Okay.

 1          Q.    Have you ever seen this document before?

 2          A.    Yes.

 3          Q.    All right.  And what is this document,

 4    Exhibit 7?

 5          A.    This is from Edward C. Levy safety manual.

 6          Q.    Okay.  So Exhibit 7 is from the Edward C. Levy

 7    Company safety manual; is that correct?

 8          A.    Correct.

 9          Q.    All right.  And it deals in particular with

10    fall protection; is that right?

11          A.    Yes, sir.

12          Q.    And it references standard 29 CFR 1926.501; is

13    that correct, on the front cover page?

14          A.    Yes.

15          Q.    All right.  And this covers the Edward C. Levy

16    Company group of employees or group of company employees

17    for Steel Mill Service; is that correct?

18          A.    That is correct.

19          Q.    All right.  And then page 2, the purpose is to

20    document fall protection rules and requirements for Edward

21    C. Levy Company Steel, Mill Services; is that correct?

22          A.    Yes, that's correct.

23          Q.    Did you have anything to do with this document

24    in terms of drafting?

1          A.     I do not remember.

2          Q.     Okay.  Well, looking at page 3 at the top

3    under section 12, fall protection, scope and purpose, it

4    looks like the last two, let's take a look at the last two

5    sentences, "Currently, all questions relative to working at

6    heights will be directed to Mr. Rock Miller, safety, Steel

7    Mill Services," that's you, right?

8          A.     That's me.

9          Q.     And then the last sentence in that particular

10   paragraph, "Mr. Miller is a certified competent person for

11   working at heights," is that correct?

12         A.     That is correct.

13         Q.     All right.  And this document talks about

14   general procedures and it has paragraphs under that,

15   correct?

16         A.     Yes.

17         Q.     All right.  And it talks about training, is

18   that correct?

19         A.     Yes.

20         Q.     It's got definitions?

21         A.     Yes.

22         Q.     And this is obviously something that's given

23   to those Steel Mill Services Company employees, correct?

24         A.     That's correct.

```
 1        Q.    And this is what they're trained off of and
 2   have to know and have to abide by?
 3        A.    It's only one of.
 4        Q.    That whole group that we've gone through?
 5        A.    Yeah.
 6        Q.    Okay.
 7        A.    But yes, this, they would be trained on this
 8   document.
 9        Q.    Okay.  Now you mentioned earlier that you
10   authored the safety flash; is that correct?
11        A.    Correct.
12                    (Court Reporter marked Plaintiff's
13            Exhibit 8.)
14   BY MR. BOISSONEAULT:
15        Q.    Now I'm going to hand you what's going to be
16   marked as Exhibit 8, and it also has a Plaintiff's
17   Exhibit 7 sticker from a prior deposition at the top just
18   for --
19                    MR. GOLDBERG:  Oh, Plaintiff's
20            Exhibit 7, I apologize.
21                    MR. BOISSONEAULT:  I think our sticker
22            is 8 for this one.
23                    MR. GOLDBERG:  Okay.  Good.  Are you
24            waiting for a question?
```

1                    THE WITNESS:  Yeah.

2  BY MR. BOISSONEAULT:

3          Q.    Okay.  Did you take these photographs?

4          A.    No, sir.

5          Q.    Do you know who took the photographs?

6          A.    No.

7          Q.    Did you provide the corrective action points,

8  corrective action tracking form, is that something you

9  created on page 2?

10         A.    Yes.

11         Q.    And page 1 is something that you completed as

12 well?

13         A.    Yes.

14         Q.    Gary Frisinger testified under oath in his

15 deposition that he reported to you and to Malcom Dunbar and

16 to a woman whose name he could not remember at corporate, I

17 guess my first question is, do you disagree with that?

18         A.    That he reported to --

19         Q.    That, and the question was, "And who at

20 corporate did you report to," and his answer was, "Malcom

21 Dunbar, Rock Miller, and then there was recently a new girl

22 and I'm not sure of her name".

23         A.    He did not report to us.

24         Q.    So in your opinion --

1    A.    He reported to the site manager.

2    Q.    So you disagree with what he testified to?

3    A.    Inasmuch as he did not report to us, yes.

4    Q.    Okay.  Though he felt apparently that under

5 oath he was, that he reported to you, to Mr. Dunbar and to

6 the girl whose name he couldn't remember?

7    A.    Well, here's the way, he didn't report to us

8 on a day-to-day basis.

9    Q.    Okay.

10    A.    But what he would have, what he would have

11 reported to us is this here (indicating), he would have

12 sent this in as proof that he completed the corrective

13 actions.

14    Q.    Well we, you wouldn't know this necessarily

15 but we weren't talking about Mr. Lucio's incident at that

16 time, we were just talking about his general day-to-day

17 activities.

18    A.    His day-to-day activity was instructed by a

19 site manager, as a matter of fact, he worked at the site

20 and performed, in addition to his safety duties he

21 performed work with the crew.

22    Q.    Well, he felt apparently that he reported to

23 you as the, do you know what his position was?

24    A.    He was a lead man as far as I know.

1       Q.    Gather Frisinger?

2       A.    Yeah, lead man and then, I don't, and then he

3  was a safety coordinator.

4       Q.    Okay.  So he was safety coordinator for Levy

5  Environmental Services, correct?

6       A.    Yes.

7       Q.    And as safety coordinator he was asked who he

8  reported to, and what he indicated was on page 9 of his

9  deposition that he reported to Malcom Dunbar, Rock Miller

10  and a new woman whose name he wasn't sure of, do you know

11  who that woman's name is?

12       A.    There's been a couple of them hired.

13       Q.    In the safety department at Edward C. Levy

14  Company?

15       A.    Let me think, a woman hired, yes, at that

16  particular time it would have been Nicole Platt.

17       Q.    Okay.  Nicole Platt?

18       A.    Yes.

19       Q.    Is she still there?

20       A.    Yes, well, you know what, she was there when I

21  left in 2000 -- last year.

22       Q.    And he goes on to say that you would come down

23  anytime he had any questions and would help, would, quote,

24  "help me out," and you would do that, correct?

1      A.     Correct.

2      Q.     And as part of these documents that we've seen

3  before, you were the go-to person, especially on fall

4  protection, correct?

5      A.     Correct.

6      Q.     And so you would help out Mr. Frisinger with

7  any questions he would have on fall protection; is that

8  correct?

9      A.     That's correct.

10     Q.     And you, as the, the competent person in fall

11  protection assigned to the Steel Mill Services, you would

12  make sure that the safety coordinators at the various

13  locations would understand their duties and

14  responsibilities with respect to safety, including fall

15  hazards and safety; is that correct?

16     A.     Yes.

17     Q.     Did you put on road shows at the various steel

18  mill services locations?

19     A.     I attended some of the road shows, I was, I

20  was not one of the presenters.

21     Q.     Who put on the road shows, the safety road

22  shows?

23     A.     That would have been the, when they first

24  started it would have been John Guydan and Brian Lasley.

1      Q.    Okay.  From Edward C. Levy Company?

2      A.    Correct.  And then later when Brian became the

3 vice president it was Brian Lasley and Malcom Dunbar.

4      Q.    And is there, are there videos, are there

5 documents that accompany these road shows?

6      A.    There were slides and presentations, but...

7      Q.    And who would have those at the office up at

8 Edward C. Levy Company?

9      A.    Malcom could get those for you.

10             MR. GOLDBERG:  Can we take a quick

11     break?

12             (Brief recess was had.)

13 BY MR. BOISSONEAULT:

14      Q.    Did you have a counterpart at North Star

15 Bluescope Steel that you dealt with?

16      A.    Their safety person.

17      Q.    And who was that?

18      A.    There were two and I'm trying to think which

19 one was there.  Melissa Dotson was there when I first came

20 to work for Levy.

21      Q.    What's the name again, please?

22      A.    Melissa Dotson.

23      Q.    Okay.

24      A.    But I can't remember her predecessor's name.

1      Q.    Do you know Gary Pierce?

2      A.    I couldn't tell you if I do or not, that

3 doesn't sound familiar.

4      Q.    Was there any fall protection problems

5 uncovered as a result of the investigation into Mr. Lucio's

6 incident?

7      A.    After the fact, you know, after the incident.

8      Q.    I think that probably presupposed in the

9 question, but the question was, was there any, was there

10 any fall protection issue uncovered in the investigation

11 into Mr. Lucio's --

12      A.    Yes.

13             MR. GOLDBERG:  Object.  But you can go

14        ahead and answer.

15 BY MR. BOISSONEAULT:

16      Q.    When you say "after the fact," what do you

17 mean after the fact?

18      A.    Well, after Ted fell, I guess I misunderstood

19 your question a little bit, but after Ted fell we, we were

20 all over that tower looking for anything and everything,

21 and not just there but at all our sites.

22      Q.    Well, let's just talk about tower number 2,

23 the scalping screen deck, okay, are you with me?

24      A.    Uh-huh, yes.

1    Q.    Now, in order to get up to that level you walk
2  up stairs, right?

3    A.    Correct.

4    Q.    And those stairs have guardrails on the sides
5  of them, correct?

6    A.    Correct.

7    Q.    And those guardrails are in compliance with
8  OSHA?

9    A.    Yes, they are.

10   Q.    And the steps are in compliance with OSHA, to
11 your knowledge?

12   A.    Yes.

13   Q.    And then, so somebody that's climbing up those
14 stairs to get up to the screen deck would be protected from
15 falling by guardrails and steps that are in compliance with
16 OSHA; is that correct?

17   A.    That's correct.

18   Q.    And then you would get up to the level of the
19 scalping screen deck, correct?

20   A.    Yes.

21   Q.    And then there was a, on the, would be the
22 north side of the screen deck there would be an elevated
23 platform that you would go up a few steps to, correct?

24   A.    I don't remember.

```
 1          Q.    Okay.
 2                      MR. GOLDBERG:  That's okay.  Let him
 3          ask the next question.
 4   BY MR. BOISSONEAULT:
 5          Q.    How long have they been changing screens on
 6   the scalping deck at, on tower 2 on the North Star
 7   Bluescope Steel in Delta, Ohio at the Edward C. Levy
 8   Company group of company Steel Mill Service slag plant?
 9          A.    How often?
10          Q.    How long.
11          A.    Since the very beginning when the slag plant
12   was in operation.
13          Q.    All right.  And how did somebody -- well,
14   strike that.
15                Is there any other screen deck on tower number
16   2?
17                      MR. GOLDBERG:  And that question, you
18          mean any other screen deck besides the one that
19          Lucio fell from, Kevin?
20                      MR. BOISSONEAULT:  Yes, the scalping
21          screen.
22                      THE WITNESS:  I don't remember.
23   BY MR. BOISSONEAULT:
24          Q.    How did somebody, prior to Mr. Lucio's
```

1  incident, how did somebody get up onto the screen deck?

2          A.    They climbed up a ladder or a, and went over

3  the side.

4          Q.    Prior to and at the time of Mr. Lucio's

5  incident they climbed up a ladder and went over the side?

6          A.    No, that was after, there was a walkway and

7  then there was a place where a guy would step up onto the

8  structure and just climb on into the screen.

9          Q.    You were aware of the screen deck prior to

10  Lucio's incident, correct?

11          A.    Only if it was there.

12          Q.    You inspected it every year, correct?

13          A.    I inspected, when I did my inspection it was

14  determined what I could inspect by, were they running that

15  day or not or what they were working on because my focus

16  would be on, if they were working on something to see if

17  they were doing it according to procedure and if there were

18  any other hazards that needed to be identified, and I would

19  do a general walk-around on the platforms if it was running

20  and had, that's just what I did, I had, prior to that event

21  I had never been inside that screen deck.

22          Q.    And after the event you've been inside the

23  screen deck?

24          A.    Yes.

```
 1          Q.    And what did you discover?
 2          A.    That there was one spot that was vulnerable in
 3    the corner, which is where Ted fell from.
 4          Q.    When you say "vulnerable," what do you mean?
 5          A.    That there was no protection, there was no
 6    standard handrail to contain or to contain them, however
 7    there was a place for them to tie off, fall protection, and
 8    the procedure said they needed to but they didn't.
 9          Q.    Where was the place to tie off at?
10          A.    It's on a beam inside the screen deck.
11          Q.    And what was that tie-off point, what did it
12    look like?
13          A.    It was a hole cut into the structure.
14          Q.    And who cut the hole into the structure?
15          A.    I have no idea.
16          Q.    And is that an OSHA-approved tie-off point?
17          A.    If, I couldn't authorize it, it would have,
18    that would have to come from a structural engineer.
19          Q.    And in fact, a structural engineer looked at
20    it afterwards, correct?
21          A.    Afterwards, yes.
22          Q.    Yeah, an Edward C. Levy engineer?
23          A.    Yes.
24          Q.    And what did they do?
```

1          MR. GOLDBERG:  Objection.  Go ahead.

2          THE WITNESS:  They added some

3      additional fall protection on the outside and on

4      the inside of the screen deck.

5  BY MR. BOISSONEAULT:

6      Q.    They welded a whole slew of pad eyes, correct?

7      A.    Correct.

8      Q.    In other words, they welded anchor points?

9      A.    Correct.

10     Q.    Okay.  And so it's your belief that to be in

11 compliance with OSHA and the Edward C. Levy fall protection

12 standard, somebody has to be tied off up on that screen

13 deck?

14     A.    Yes.

15     Q.    Okay.  And there were no guardrails, correct?

16     A.    Not around the screen deck, no.

17     Q.    Correct, where they would be standing.

18     A.    Right, no, there was not.

19     Q.    All right.  And who built that slag plant?

20     A.    Before my time, I have no idea.

21     Q.    Okay.  Edward C. Levy Company through one of

22 its divisions, Wayne Engineering, ever hear of --

23     A.    Yeah, I've heard of Wayne Engineering but I

24 have no idea who did it.

1      Q.    Okay.  Did you review anything for your

2  deposition today, did you look at any documents, any

3  photographs?

4      A.    Nothing.

5      Q.    At any time prior to your deposition?

6      A.    I haven't seen an Edward C. Levy document,

7  with the exception of these, since I retired last October.

8      Q.    Did you keep records of your inspections at

9  the various mills that you were assigned to, clearly you

10 documented your inspections?

11     A.    Oh, absolutely, I'm trying to remember where

12 they would be, but...

13     Q.    Go out on a limb, are they at the Edward C.

14 Levy Company safety department?

15     A.    I couldn't answer that because my office

16 wasn't up there, my office was in Indiana Harbor, well, in

17 Port of Indiana.

18     Q.    That's where your office was?

19     A.    Yes.

20     Q.    And why was your office there?

21     A.    Because I, because I lived nearby and we

22 initially had two sites that were right there in Indiana,

23 in Port of Indiana and I was mobile, I, there were no sites

24 where I lived so I traveled all the time so it didn't

1  really matter where I lived or resided.

2       Q.    Where would you stay when you came to North

3  Star, where did you stay overnight at?

4       A.    At the Holiday Inn in Wauseon.

5       Q.    Did you keep track of where you were visiting

6  and when?

7       A.    I turned in an itinerary to a secretary in

8  Detroit.

9       Q.    And --

10      A.    And I kept it on my calendar and weekly I

11 would send what I was doing, where I was going to her.

12      Q.    What would you call your inspection documents,

13 would you make reports, what would you do?

14      A.    A list of the items and put it on a tracking

15 sheet.

16      Q.    Say that again, please.

17      A.    I would list the items that were deficient and

18 put it on a tracking sheet or give them the list, they

19 would put it on a safety issues tracking log or their CIA

20 log which is a, I think it was their quality assurance log,

21 but the site kept track of it on their logs and I kept my

22 notes and everything from the inspection.

23      Q.    And would you write up a report?

24      A.    Yes, in addition to a safety inspection twice

1  a year we would look at, make sure the training and that

2  had been done and a couple other, make sure people are

3  getting trained on the stuff we sent.

4          Q.    All right.  So you do twice a year safety

5  inspections and then you would also do sort of audits to

6  see that the training that you had required was being done?

7          A.    Correct.

8          Q.    And that would include fall protection

9  training?

10          A.    Yes, anything that was sent out had a monthly

11  topic and so they, they kept a spreadsheet, each of the

12  sites, and I would review the spreadsheet to make sure

13  everybody was checked off on it.

14          Q.    And so you were checking to see that everybody

15  was following the Edward C. Levy Company rules and

16  regulations, safety rules and regulations?

17          A.    Yeah, that they completed the training that

18  was sent from Edward C. Levy Company.

19                          (Court Reporter marked Plaintiff's

20              Exhibit 9.)

21  BY MR. BOISSONEAULT:

22          Q.    I'm going to hand you what's been marked as

23  Exhibit No. 9.  Take a moment and look at that and let me

24  know if you know what this document is.

        A.      Yeah, this is an internal report that was put
out by, that was issued by our site manager.

        Q.      And who was your site manager?

        A.      At the time was Craig Lambert.

        Q.      And how do you know this was put out by him?

        A.      Because it's his responsibility to see to it
that this got to North Star.

        Q.      That this got to North Star?

        A.      Yeah, they, they had a requirement to send,
send, you know, anytime there's an incident to send those
kind of incident reports to North Star.

        Q.      Who had a requirement?

        A.      North Star wanted copies of.

        Q.      Was North Star, any North Star personnel
involved in the investigation of this incident, to your
knowledge?

        A.      Not that I recall.

        Q.      What kind of safety training or orientation
did North Star provide to any Edward C. Levy group of
company employees to your knowledge?

        A.      They had their own safety orientation and I
couldn't tell you what all that entailed, it was a
contractor because it was for the site and the employees
to, you know, adhere to North Star rules and regulations.

```
 1          Q.     Have you ever seen those rules and
 2    regulations?
 3          A.     To say yes or no would be, I don't remember.
 4          Q.     So how many days a week would you be going to
 5    North Star or -- strike that -- would you be going to
 6    facilities where Edward C. Levy Company had steel mill
 7    services?
 8          A.     I was on the road most of the time, so it
 9    would be anywhere from three to five days a week.
10          Q.     And what was your position again when you
11    retired?
12          A.     Safety manager.
13          Q.     For the steel?
14          A.     For Steel Mill Services.
15          Q.     All right.  So you were employed by Edward C.
16    Levy Company?
17          A.     Correct.
18          Q.     And you were the safety manager for their
19    Steel Mill Services?
20          A.     Correct.
21          Q.     And so you would travel around to the various
22    locations where there would be an Edward C. Levy Company
23    performing steel mill services; is that correct?
24          A.     Correct.
```

1      Q.     And you would be responsible to make sure that

2  the Edward C. Levy Company safety rules and regulations

3  were being, were, A, provided to the employees, correct?

4      A.     Yes.

5      Q.     To the supervisors?

6      A.     Yes.

7      Q.     B, were being implemented by the supervisors;

8  is that correct?

9      A.     That's correct.

10     Q.     And being implemented correctly by the

11  supervisors?

12     A.     Yes.

13     Q.     And that the employees were following those

14  safety rules and regulations?

15     A.     Yes.

16     Q.     Is that correct?

17     A.     That's correct.

18          MR. BOISSONEAULT:  Okay.  That's all

19       the questions I have.

20          MR.  TICKNOR:  Mr. Miller, my name is

21       Chuck Ticknor, I represent North Star Bluescope

22       Steel and I just have a couple questions based on

23       your testimony this morning.

24                      EXAMINATION

BY MR. TICKNOR:

    Q.    You just indicated that, I think that the incident report relating to Mr. Lucio was provided to North Star Bluescope Steel; is that correct?

    A.    I don't know if that incident report was, but I know that an incident report is filed with North Star Bluescope.

    Q.    Provided to them by --

    A.    Yes, by our management, they're required to, any event, you know, that's significant event they wanted documentation.

    Q.    Okay.  That's what I thought I heard you say, and what I want to ask you is about the word "required" and your understanding of what is required --

    A.    Yes.

    Q.    -- by North Star Bluescope.  How, you've expressed an understanding that North Star Bluescope requires some type of report when something happens at the Levy site, how is it you have that understanding?

    A.    Well, because North Star did a, let me think what it was called, they had a special process that they had trained everybody in and they had investigative committees and people with different possibilities and they had a name for it, which escapes my mind, but, and our guys

1    participated in that and they did one for this event.

2         Q.    Okay.

3         A.    So I know there was a report, a joint report

4    that was done in addition to the one, the initial report

5    that would have came from our site to North Star.

6         Q.    Okay.  And I'm talking about something that,

7    my question is more general, it seems like there was at

8    least one, perhaps other reports done with respect to this

9    incident, but I'm asking you about your understanding with

10   respect to what's required more generally by North Star

11   Bluescope Steel, how is it that you have an understanding

12   that they require reports be provided to them?

13        A.    Because I had heard the manager saying that

14   they had to get a report off to the mill.

15        Q.    Okay.  You've never seen anything in writing

16   that says that North Star Bluescope Steel requires a report

17   be provided?

18        A.    No, just word of mouth and it wasn't, there's

19   a process that North Star has where you go in the computer

20   and put, input the stuff so that it went across their desk

21   as I --

22        Q.    Other than this incident, the incident

23   regarding Mr. Lucio, are you aware of any other reports

24   that were provided by, during your tenure that were

1   provided by Levy to North Star Bluescope Steel relating to

2   incidents?

3        A.    Environmental and safety, yes.

4        Q.    Okay.  And your understanding with respect to

5   the requirement that North Star Bluescope Steel has of

6   Levy, that, your understanding of that is based on word of

7   mouth from other employees of Levy?

8        A.    I never saw it in writing if that's what

9   you're asking.

10       Q.    That's really all I'm asking.

11       A.    Okay.  I never saw it in writing.

12       Q.    But that's your understanding?

13       A.    That's my understanding.

14       Q.    Okay.  And then you also were asked a couple

15   questions relating to whether North Star provides safety

16   training to Levy personnel, and maybe that's not what the

17   question was but I'm just going to, and I'll start over and

18   that's the topic I want to address.  Is it your

19   understanding that North Star Bluescope Steel provided

20   safety training to Levy employees?

21       A.    It is my understanding, every site that I was

22   responsible for had a customer requirement by whoever our

23   customer was that we set in a safety orientation.

24       Q.    Okay.

1        A.      And North Star was one of those.

2        Q.      And you have personal knowledge of that?

3        A.      Yes.

4        Q.      And how often would those training events

5    occur?

6        A.      I don't remember how often, I don't remember

7    how often.

8        Q.      But you do recall at least during your tenure

9    at Levy that North Star did have them?

10       A.      Yes.

11       Q.      And that Levy employees did attend them?

12       A.      Yes.

13                   MR. GOLDBERG:  I think he referred to

14          orientations.

15   BY MR. TICKNOR:

16       Q.      Orientations?

17       A.      Yeah.

18       Q.      Do you know if Mr. Lucio attended any of those

19   orientations?

20       A.      I have no idea.

21                   MR. TICKNOR:  That's all the questions

22          I have, thank you.

23                   THE WITNESS:  Sure.

24                   RE-EXAMINATION

1  BY MR. BOISSONEAULT:

2       Q.    Just a couple in follow-up.  You mentioned a

3  joint report, what were you referring to there regarding

4  this incident?

5       A.    A joint report, they had a process, I was

6  trying to remember the name of it and --

7       Q.    They being North Star?

8       A.    Yes, and it, they had a certain name for it,

9  but anyway, they had time restrictions on when it had to be

10 closed and all that kind of stuff and we participated in

11 some of those, not just with, not our stuff even just our

12 stuff, but with stuff that happened at the mill.

13      Q.    Did they, to your knowledge did they have, did

14 they, did North Star have safety personnel that would drive

15 around in vehicles?

16      A.    Yeah, we had a couple guys kicked off the site

17 for speeding and not coming to a complete stop at a stop

18 sign, so somebody was out there.

19      Q.    Did you ever see these people in these safety

20 vehicles?

21      A.    No.

22      Q.    You also mentioned something about entering

23 something into a computer, a process about entering

24 something into the computer that North Star would see, did

1  I hear that right?

2         A.    It's, it was just an electronic report.

3         Q.    Okay.  What computer, where?

4         A.    It would have came out of the, whoever the

5  site manager was.

6         Q.    Their office?

7         A.    Their office, yes.

8         Q.    And this was something that was software that

9  connected to North Star computers?

10        A.    As I recall.

11        Q.    And what type of information, what type of

12  process?

13        A.    Just generally what happened and --

14        Q.    So it would be an incident?

15        A.    An incident report.

16        Q.    That would be --

17        A.    It wouldn't be a formal report with all the

18  corrective action, just this happened today type thing.

19        Q.    Okay.  That would go to North Star?

20        A.    Yeah.

21        Q.    Okay.  Did you ever make any such entries?

22        A.    No.

23        Q.    You mentioned also in response to an answer

24  that both environmental and safety incident reports would

1    have gone to North Star during your tenure in a different,

2    in addition to the Lucio matter; is that correct?

3         A.    Correct.

4         Q.    Can you think of any of those safety incidents

5    as opposed to the environmental?

6         A.    Nothing that stands out.

7                    MR. BOISSONEAULT:  That's all I have.

8                    MR. GOLDBERG:  You have the right to

9              review the deposition transcript before it

10             becomes an official part of the record.  If you

11             do you could fill out what's called an errata

12             sheet with corrections, you have about 30 days to

13             do that, the transcript could be provided to you,

14             if you thought something was taken down wrong, or

15             you can waive that right.  These days, you know,

16             it's okay to reserve it and then later waive it

17             by not doing anything, so you can preserve the

18             right, is that what you want to do?

19                    THE WITNESS:  Yes.

20                    MR. GOLDBERG:  Okay.

21                    (Deposition concluded and witness

22             excused at 11:30 a.m.)

23                    (Signature reserved.)

24

1                          SIGNATURE PAGE

2    Date of Deposition:   November 6, 2015

3    Correction page(s) enclosed?  Yes ____   No ____

4    How many correction pages? _____

5

6
                         _____
7                        ROCK MILLER          Date

8                                  - - -

9

10

11

12

13

14

15

16

17            Please return this signed signature page

18               along with correction page(s) to:

19

20            COLLINS REPORTING SERVICE, INC.
                    405 North Huron Street
21                   Toledo, Ohio 43604
                      (419) 255-1010
22
     Worksheet No. LS15-3413
23

24

C E R T I F I C A T E

I, Lauren Stamm, a Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within-named witness was by me first duly sworn to tell the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given was by me reduced to stenotype in the presence of said witness and afterwards transcribed; that the foregoing is a true and correct transcription of the testimony so given as aforesaid.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified.

I do further certify that I am not a relative, employee of or attorney for any of the parties in this action; that I am not a relative or employee of an attorney of any of the parties in this action; that I am not financially interested in this action, nor am I or the court reporting firm with which I am affiliated under a contract as defined in the applicable civil rule.

1          IN WITNESS WHEREOF, I have hereunto set my

2   hand and affixed my seal of office at Toledo, Ohio on this

3   13th day of November 2015.

4

5

6

7                              _____
                                    LAUREN STAMM
                                    Notary Public
8                              In and for the State of Ohio

9   My Commission expires December 5, 2020

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**A**

**abide** 57:2
**absolutely** 44:13 69:11
**accompany** 62:5
**action** 58:7,8 80:18 83:17,18,19
**actions** 59:13
**activities** 11:18 16:24 17:1 30:7 59:17
**activity** 59:18
**actual** 13:14 43:22
**added** 24:18 52:1,2 68:2
**addition** 59:20 70:24 76:4 81:2
**additional** 52:13 68:3
**address** 6:16 77:18
**adhere** 72:24
**advice** 12:13
**affiliated** 11:13 83:20
**affixed** 84:2
**aforesaid** 83:7,11
**aggregate** 10:24 16:7 24:20
**ago** 7:17 22:2 32:17 53:24
**agree** 47:14
**ahead** 21:17 25:12 43:15 63:14 68:1
**air** 19:6,12 39:3
**al** 1:3,6
**allows** 31:16
**alloys** 24:18
**analysis** 21:8 34:13
**anchor** 68:8
**annealing** 8:20
**answer** 5:10,13,13 6:4,8 31:22 40:19
  40:23 41:10 46:2 58:20 63:14
  69:15 80:23
**anytime** 43:17 60:23 72:10
**anyway** 79:9
**apologize** 57:20
**apparently** 54:6 59:4,22
**APPEARANCES** 2:1
**applicable** 83:21
**approve** 33:3
**approximately** 10:4,18
**April** 9:20 13:7
**arc** 8:16 24:6,11
**area** 4:13 32:13 36:19
**areas** 45:8
**arm** 19:4
**Army** 7:6
**arrest** 40:8,9 43:20
**asked** 10:5 60:7 77:14
**asking** 5:9 76:9 77:9,10
**assigned** 13:21 32:5 61:11 69:9
**assist** 17:10
**associated** 39:5,8 41:6 43:10
**assume** 33:20
**assurance** 70:20
**attachment** 19:4
**attend** 78:11
**attended** 61:19 78:18
**attire** 48:7
**attorney** 3:16 83:16,18
**audits** 71:5
**authored** 57:10
**authorization** 33:5
**authorize** 33:2,4 67:17
**Avenue** 46:22
**aware** 17:1,2 36:18 66:9 76:23
**a.m** 1:11 81:22

**B**

**B** 74:7
**back** 6:22 12:20 15:8,9,12 16:17 21:2

  26:10 41:5
**ballpark** 27:5
**bankrupt** 4:23
**bankruptcy** 9:4
**base** 26:11,12
**based** 23:17 24:1 43:4 52:24 74:22
  77:6
**basis** 30:5 39:9,11,12 40:21 41:7 46:6
  59:8
**basket** 39:16
**Bates** 46:16 48:1,7 49:7,7,24 50:15,21
  50:24
**beam** 45:15 67:10
**beams** 45:18
**bed** 18:20
**beginning** 22:16 65:11
**begins** 49:6
**behalf** 2:2,6,11
**belief** 68:10
**believe** 81:16
**belts** 27:24
**better** 9:22
**big** 18:2 29:13,24 36:3,4,14
**bigger** 29:13
**bit** 4:12 7:17 18:1,8 20:14 63:19
**blast** 8:16
**Bluescope** 2:6 11:7,11,15,17,24 44:7
  62:15 65:7 74:21 75:4,7,16,17
  76:11,16 77:1,5,19
**Boissonneault** 1:12 2:3,3 3:3,4 4:6,7
  10:16 33:9 35:8 44:5 45:24 46:9
  49:3 50:5 51:3,7,10 53:20 54:20
  57:14,21 58:2 62:13 63:15 65:4,20
  65:23 68:5 71:21 74:18 79:1 81:7
**boom** 19:4
**boss** 13:9,12 32:6
**bottom** 17:19 36:8 48:16 50:24
**bought** 4:23 9:5
**Boulevard** 2:9
**boxes** 22:21
**break** 6:6 62:11
**breakdown** 21:8 34:13 40:24
**breaking** 18:1
**breaks** 19:22
**Brian** 13:18,22 14:2 42:7 61:24 62:2
  62:3
**brick** 15:14,15 16:19 18:20 19:22
  20:23
**Brief** 62:12
**broken** 23:14
**broom** 7:21
**brought** 8:13 28:5
**brush** 7:22
**build** 26:11,17
**built** 68:19
**burning** 49:20
**business** 11:13,14 48:2
**busting** 17:20
**bypass** 28:14

**C**

**C** 1:6 2:11 9:16,18,23 11:4 12:24 14:3
  14:9,12,14,23 15:2 32:7,9 43:11
  44:17,21,24 45:4,9,20,21 46:20
  47:2,5,8,10 48:2,11,21 49:13,15
  50:13 54:9 55:5,6,15,21 60:13 62:1
  62:8 65:7 67:22 68:11,21 69:6,13
  71:15,18 72:19 73:6,15,22 74:2
  83:1,1
**calendar** 70:10

**call** 18:12 21:12 25:10,21 70:12
**called** 4:2,16 10:5 11:2,12 42:11,23
  75:21 81:11
**capacity** 45:7
**caption** 83:13
**cardinal** 3:10 51:11 52:1,11,13,17
  54:8
**carriers** 23:4
**case** 4:8 26:12 33:16
**category** 17:18
**catwalk** 20:19
**catwalks** 34:23
**cause** 83:7
**certain** 24:20 29:19 79:8
**certification** 32:23 33:1
**certified** 4:4 32:15,16 56:10
**certify** 83:5,12,15
**cetera** 24:18
**CFR** 3:11 55:12
**chambers** 22:8
**chance** 46:12 50:8 53:21
**changing** 34:13 41:2 65:5
**Charles** 2:8
**checked** 35:7 71:13
**checking** 71:14
**Cherry** 39:17
**chiseling** 18:1
**Chuck** 74:21
**CIA** 70:19
**Circle** 1:13 2:4
**civil** 83:21
**clarify** 52:2,13
**class** 32:23 33:4,6
**clean** 18:10 72:18
**clear** 5:17 8:10 14:12 24:5
**clearly** 69:9
**climb** 66:8
**climbed** 66:2,5
**climbing** 64:13
**closed** 79:10
**clothing** 49:19
**coated** 8:13
**College** 9:14
**COLLINS** 82:20
**Colorado** 32:22
**Columbus** 2:9
**come** 9:18 10:5 13:6 17:7 37:12 60:22
  67:18
**comes** 25:3 31:14 43:20
**coming** 16:21 29:3 48:11 52:15 79:17
**Commission** 84:9
**commissioned** 83:4
**committee** 42:1,4
**committees** 75:23
**companies** 45:4,20 47:10 49:16 54:10
**company** 9:16,19,24 11:2,4,5,10,12
  11:19,22,23 12:24 14:3,9,12,14,23
  32:7,9 43:11 44:17,21,24 45:21
  46:20 47:2,6,8 48:3,11,21 49:13
  50:13 54:9 55:7,16,16,21 56:23
  60:14 62:1,8 65:8,8 68:21 69:14
  71:15,18 72:20 73:6,16,22 74:2
**Company's** 15:2 45:9
**competent** 32:12,15 44:20 56:10
  61:10
**complete** 79:17
**completed** 58:11 59:12 71:17
**compliance** 64:7,10,15 68:11
**component** 39:14
**computer** 76:19 79:23,24 80:3
**computers** 80:9

**concluded** 81:21
**configured** 27:15
**connected** 80:9
**connection** 4:8,9 12:11
**consist** 12:5
**consists** 46:15
**constructed** 12:8
**consult** 32:6
**consultant** 12:14
**contain** 67:6,6
**contained** 72:9 47:15
**contains** 29:9 49:18
**contents** 49:6,11
**contract** 83:21
**contractor** 72:23
**contracts** 15:20
**control** 20:4,5,6
**conversation** 5:16
**conveyor** 25:6,11 27:19,24 28:9,22
  29:2,3,12 31:3,15,19 37:4,4,16
  40:12,15,17
**conveyors** 12:6 28:19,21 33:23
**cooled** 23:8,14 24:24
**coordinator** 60:3,4,7
**coordinators** 61:12
**copies** 72:13
**copy** 53:23 54:1
**corner** 35:13 46:17 54:3 67:3
**corporate** 46:5 58:16,20
**correct** 7:19 11:20,21 12:22 13:1,7,8
  14:1,12,13 16:14,17,18 19:1 24:13
  24:14,22,24 25:1 26:4,5,21 28:5,6
  31:19 32:10,11,13 35:4 36:6 37:24
  38:3,4,14 39:6,7,21,22,24 40:2,6,9
  40:10,12,14 43:6 44:19,24 45:1,5,9
  46:1,16,18 47:1,3,11 48:12,15,19
  48:23 49:22 50:1,2,15 51:12,15,16
  52:18,19,24 53:4 54:3,4,11 55:7,8
  55:13,17,18,21,22 56:11,12,15,18
  56:23,24 57:10,11 60:5,24 61:1,4,5
  61:8,9,15 62:2 64:3,5,6,16,17,19,23
  66:10,12 67:20 68:6,7,9,15,17 71:7
  73:17,20,23,24 74:3,8,9,16,17 75:4
  81:2,3 83:10
**correction** 82:3,4,18
**corrections** 81:12
**corrective** 58:7,8 59:12 80:18
**correctly** 74:10
**counsel** 4:10 5:11
**counterpart** 62:14
**couple** 41:15 60:12 71:2 74:22 77:14
  79:2,16
**court** 1:1 5:16 33:7 35:6 46:7 49:1
  50:3 53:18 54:18 57:12 71:19
  83:20
**cover** 55:13
**covers** 55:15
**Craig** 72:4
**crane** 36:13,16,17,18,20,21,24
**created** 58:9
**cress** 23:4
**crew** 7:15 59:21
**crunched** 14:15
**crunching** 14:18
**crusher** 27:24 28:7,14,15 29:15,17,23
  30:5,7,12,13,18,21 31:3,7,9,11,12
  31:14 34:3 37:10
**crushes** 25:6
**current** 6:16
**Currently** 56:5
**customer** 8:14 24:1 29:18,21 30:12

77:22,23
customers 17:7
cut 67:13,14
cutting 49:20
C-o 11:3

**D**

D 3:1
dad 36:15
daily 39:9,11 42:15
darn 21:10
date 1:11 52:5,6 82:2,7
dated 48:19
dates 13:15
daughter 6:21
day 23:18 53:14 66:15 84:3
days 73:4,9 81:12,15
day-to-day 59:8,16,18
deals 55:9
dealt 62:15
December 84:9
deck 31:9 33:13 34:14 37:20 38:9,13
  38:23 40:17,18 41:3,4,15 63:23
  64:14,19,22 65:6,15,18 66:1,9,21
  66:23 67:10 68:4,13,16
Defendant 2:6,11
Defendants 1:7
deficient 70:17
define 44:2
defined 83:21
definitions 56:20
Delta 11:8,11,15,19,24 22:14 65:7
demand 29:18
department 3:8 46:24 47:3,6,9 48:11
  48:22 50:18 60:13 69:14
depending 24:17 28:11
deposed 4:4
deposition 1:10 4:9 5:3 33:11 57:17
  58:15 60:9 69:2,5 81:9,21 82:2
  83:12
depositions 31:24
describing 21:13
Description 3:6
desk 76:20
Details 3:12
determine 28:3 45:8
determined 66:14
determines 29:16,21
Detroit 42:18 46:22 70:8
difference 14:21
different 9:7 13:15,22 15:15 18:8
  23:20,22,22 24:12,15,16,21 27:12
  48:5 51:4 75:23 81:1
differently 27:15
difficult 7:5
DINSMORE 2:8
directed 56:6
directly 38:16
director 14:8
disagree 58:17 59:2
discarded 29:15
discover 67:1
disseminated 42:19
DISTRICT 1:1,1
division 1:2 3:9 8:1 50:14
divisions 68:22
Dix 46:22
Doc 3:8
document 34:15,16 47:15,15,17,20
  48:10,22 49:24 50:10,16,19 54:22

55:1,3,20,23 56:13 57:8 69:6 71:24
documentation 75:11
documented 69:10
documents 51:18 61:2 62:5 69:2
  70:12
doing 5:20 18:18 21:22 24:5 66:17
  70:11 81:17
Dotson 62:19,22
dozer 19:3
draft 7:9
drafting 55:24
drain 17:19,22 18:10 23:2
drawing 35:11
draws 25:11
drive 79:14
dropping 37:16
drop-ball 36:19
drop-down 22:8
duly 4:3 83:4,5
dump 22:20 23:5 40:17
dumped 15:21,23 28:16
dumpster 25:22
Dunbar 13:23 14:5 58:15,21 59:5
  60:9 62:3
duties 59:20 61:13
dynamic 45:16
D-a-n 10:14

**E**

E 2:8 3:1 83:1,1
earlier 42:21 57:9
easiest 35:10
East 6:18
EASTMAN 2:12
easy 6:11
education 9:13
EDW 1:6 2:11
Edward 9:16,18,23 11:4 12:23 14:3,9
  14:12,14,23 15:2 32:7,9 43:11
  44:17,21,24 45:4,9,20,21 46:20
  47:2,5,8,10 48:2,11,21 49:13,15
  50:13 54:9 55:5,6,15,20 60:13 62:1
  62:8 65:7 67:22 68:11,21 69:6,13
  71:15,18 72:19 73:6,15,22 74:2
either 15:8 25:6 42:16,17
electric 8:16 24:6,11
electrical 35:1
electronic 80:2
elevated 44:22
employed 47:23 73:15
employee 83:16,17
employees 21:1,4 31:24 39:13 45:3,9
  45:19 47:10 49:15 52:11 54:9,12
  55:16,16 56:23 72:20,23 74:3,13
  77:7,20 78:11
employer 7:14 14:12
enclosed 82:3
ends 49:7
engineer 9:12 67:18,19,22
engineering 45:14 68:22,23
entailed 72:22
entering 79:22,23
entries 80:21
environmental 31:24 60:5 77:3 80:24
  81:5
equipment 17:3 19:7 35:17 48:6,7
errata 81:11
escapes 75:24
especially 61:3
et 1:3,6 24:18

event 66:20,22 75:10,10 76:1
events 78:4
eventually 26:6
everybody 71:13,14 75:22
everybody's 48:2
everyday 5:15
exactly 19:15 30:20
examination 3:2,3,4 4:3,5 74:24
exception 6:7 69:7
excused 81:22
exempt 44:7
exemptions 44:10
Exhibit 3:6 33:8,11,12,15 35:7,10
  36:6 46:8,11,15 49:2,5,8,10 50:4,7
  50:22 53:3,17,19 54:19,22 55:4,6
  57:13,16,17,20 71:20,23
EXHIBITS 3:6
expertise 45:16
expires 84:9
expressed 75:17
extent 15:20 16:5 45:10
extra 35:21
eyes 68:6

**F**

F 83:1
facilities 32:8 45:3 73:6
facility 4:21 7:23,24 8:5,8,21 9:7
  10:22 12:9,12 24:6
fact 43:5 59:19 63:7,16,17 67:19
fall 3:11 20:21 23:9 29:13 30:4 31:17
  32:13,19,20 39:5,8,14 40:8,8,20
  41:6 43:9,12,19,22 44:1,2,3,14,17
  44:21 45:8,10,22 49:20 51:14
  52:17,17 54:13 55:10,20 56:3 61:3
  61:7,10,14 63:4,10 67:7 68:3,11
  71:8
falling 20:16 64:15
falls 17:18 18:21 34:21 40:15
familiar 9:23 34:16 49:8 63:3
far 5:8 12:13 59:24
February 54:6
feed 25:5 30:18
feeds 29:2
feet 27:4,4,10,10 30:20 39:3 43:18,23
  43:24 44:3 54:14,15
fell 41:15 53:15 54:14 63:18,19 65:19
  67:3
felt 59:4,22
filed 9:4 75:6
fill 26:15 81:11
financially 83:19
finishing 8:9,11
firm 83:20
first 4:3 6:9 7:13,15 13:11 46:19
  50:15 58:17 61:23 62:19 83:5
fit 29:14
five 73:9
flash 3:12 42:24 43:1,1 57:10
fleet 17:9
Floor 2:13
focus 66:15
following 71:15 74:13
follows 4:4
follow-up 79:2
force 45:16
foregoing 83:9,13
forerunner 32:20
form 43:14 58:8
formal 80:17

forth 21:2
foundation 26:17
four 10:4 16:24 30:21 31:19 32:1
fractures 23:15 30:3
frame 12:21
Frisinger 58:14 60:1 61:6
front 55:13
front-end 23:16
full 6:12
Fulton 3:12 42:12
functions 15:5
furnace 15:14,15 16:19 17:20,23 18:7
  18:9,19 19:8,12,18,23 20:11,13,17
  20:19,23 21:14 23:1,18 24:6,8,11
furnaces 8:15,16,17,18,20 24:12
further 83:12,15

**G**

Gallon 1:12 2:3
Gary 4:21 8:2 9:2 10:17 11:22 12:3
  12:12 58:14 63:1
gas 7:14
Gather 60:1
general 22:13 35:2 42:5 45:18 48:8
  49:18 56:14 59:16 66:19 76:7
generally 16:1 76:10 80:13
generate 8:21 10:19
generated 10:23
gentleman 41:14
getting 16:16 71:3
girl 58:21 59:6
give 6:4 12:21 26:22 70:18
given 15:9 35:10 56:22 83:8,11
gives 24:15
go 6:22,23 9:1,6,15 11:18 16:4 19:6
  21:17 25:21 26:6 28:8,12,14,15,20
  31:2,5,11,15 34:20 38:19 40:1
  43:15 44:22 47:16 51:8 63:13
  64:23 68:1 69:13 76:19 80:19
goes 15:12 19:9,10,24 20:19 23:4
  26:2,13,20 28:19 29:1,16,23 30:11
  30:16 37:18 38:2 40:11,16,16 41:7
  43:4 60:22
going 5:9 17:24 26:19 29:7 33:10
  35:9 37:3,6 43:24 44:22 46:10 49:4
  50:6 54:21,21 57:15,15 70:11
  71:22 73:4,5 77:17
Goldberg 2:13 3:17,17,18,18 10:10
  10:13,15 43:14 45:23 46:2 51:1,6
  57:19,23 62:10 63:13 65:2,17 68:1
  78:13 81:8,20
golly 36:21
Good 57:23
go-to 61:3
graduate 7:3
Granite 1:13 2:4
Grant 17:20,24 18:22 19:9 21:18,20
grew 4:18
grinding 29:7
grizzly 35:23,24 36:5,17 37:1,3 38:2
  39:6
ground 5:7 27:18
group 45:14 47:10 49:16 54:10 55:16
  55:16 57:4 65:8 72:19
Grovertown 4:16 6:17,18
guardrail 39:20,21 40:5
guardrails 20:16 64:4,7,15 68:15
guess 16:5 58:17 63:18
guessing 20:24 21:23
guidance 27:11

**guy** 66:7
**Guydan** 10:8 13:12 61:24
**guys** 39:16 41:15 51:5 75:24 79:16
**G-r-a-n-t** 18:24
**G-u-y** 10:13
**G-u-y-d-a-n** 10:12

**H**

**hand** 33:10 35:9 46:10 49:4 50:6
  54:21 57:15 71:22 84:2
**handbook** 3:8 49:12,13
**handrail** 43:19 67:6
**handwriting** 53:6
**happened** 41:21 42:19 79:12 80:13
  80:18
**happens** 75:18
**Harbor** 69:16
**harness** 21:6 39:23
**haul** 22:9,10
**hauling** 17:5,5,12,13
**hauls** 23:5
**hazard** 39:5,6
**hazards** 23:9 30:4 39:8 41:6 43:9,12
  44:2 47:9 61:15 66:18
**head** 42:4
**headings** 48:6
**hear** 68:22 80:1
**heard** 68:23 75:12 76:13
**heat** 8:18
**height** 27:6 30:13 54:15
**heights** 54:14 56:6,11
**Helmick** 1:6
**help** 26:17 35:16 60:23,24 61:6
**hereinafter** 4:3
**hereunto** 84:1
**high** 6:23,24 19:14 27:7
**hired** 13:11 60:12,15
**history** 36:15
**hit** 23:15
**hole** 18:14,15 19:24 26:15 67:13,14
**holes** 31:17 36:4
**Holiday** 70:4
**hopper** 24:3 25:23,24 26:2,7,9,20,23
  27:3,8,20,22 28:5,7,8,16,22 29:4,6
  30:9,16 31:3 35:24 36:5 40:15
**housekeeping** 49:20
**HR** 50:16
**huh-uh** 5:14
**Huron** 82:20

**I**

**idea** 12:10 67:15 68:20,24 78:20
**identification** 50:7
**identified** 66:18
**identifying** 47:9
**III** 2:8
**implemented** 74:7,10
**impossible** 43:16
**Inasmuch** 59:3
**incident** 3:12,12 34:9,19 41:17 42:11
  42:13,14,15 43:5 59:15 63:6,7 66:1
  66:5,10 72:10,11,15 75:3,5,6 76:9
  76:22,22 79:4 80:14,15,24
**incidents** 77:2 81:4
**include** 71:8
**including** 61:14
**income** 14:19
**Indiana** 4:14,14,16,19,21 6:17,18 7:1
  8:2 10:17 11:2 69:16,17,22,23
**indicate** 49:5

**indicated** 7:17 60:8 75:2
**indicating** 33:14 38:22,23 59:11
**information** 80:11
**initial** 76:4
**initially** 69:22
**Inn** 70:4
**input** 76:20
**inside** 22:7,10,22 41:3 66:21,22 67:10
  68:4
**inspect** 45:2 66:14
**inspected** 66:12,13
**inspection** 35:2,3 42:4 66:13 70:12,22
  70:24
**inspections** 12:13 69:8,10 71:5
**instructed** 5:11 59:18
**intact** 34:24
**integrates** 10:2
**interested** 83:19
**internal** 72:1
**Internally** 17:14
**inter-site** 17:6,7
**intimate** 43:6,7
**intra-site** 17:6
**investigation** 41:21,24 63:5,10 72:15
**investigative** 75:22
**involve** 17:23
**involved** 19:17 41:20 47:9 72:15
**involving** 34:9
**issue** 63:10
**issued** 72:2
**issues** 20:22 40:21 47:11 70:19
**items** 70:14,17
**itinerary** 70:7

**J**

**J** 2:3,13
**jackhammer** 18:1 19:4
**JBSA** 21:10 40:24
**jewelry** 49:19
**job** 21:3,8,9,11,24 30:6 32:6 34:13
  40:24 44:20 45:2,7,12,19
**jobs** 22:5,11
**John** 10:8 13:12,15 61:24
**joint** 76:3 79:3,5
**Judge** 1:6
**jumped** 25:12

**K**

**keep** 24:5 69:8 70:5
**keeper** 42:2
**kept** 70:10,21,21 71:11
**Kevin** 2:3 4:7 65:19
**kicked** 79:16
**kind** 8:7 18:5 23:17 24:8 27:19 32:20
  40:2,14 43:19 44:3 72:11,18 79:10
**kinds** 15:15
**knock** 20:22
**knocking** 17:19,22
**know** 5:6 6:7 12:8,14 14:2,5,8,8,20
  15:19,19,20,21 16:10 19:15,20
  22:16 27:12 29:18 30:20,24 31:16
  31:21 32:1 33:16 34:23 35:1,13
  38:2 39:1 40:19,23 41:9,11,16,18
  42:2 43:3 46:12 50:8 53:21 54:23
  57:2 58:5 59:14,23,24 60:10,20
  63:1,7 71:24,24 72:5,10,24 75:5,6
  75:10 76:3 78:18 81:15
**knowledge** 24:9 38:9,10,11 64:11
  72:16,20 78:2 79:13

**L**

**laborer** 7:21
**ladder** 66:2,5
**Lambert** 72:4
**landscaping** 7:15
**lanyard** 21:6 39:23
**larger** 36:20
**Lasley** 13:18,22 42:7 61:24 62:3
**Lasley's** 14:2
**Lauren** 1:15 83:3 84:7
**layer** 26:17
**layout** 35:18
**Lazarus** 53:9
**lead** 59:24 60:2
**leave** 8:23 9:3,15,21 14:14
**left** 7:23 8:1 60:21
**left-hand** 54:3
**let's** 6:11,22 12:20 30:11 43:8 50:20
  53:16 56:4 63:22
**level** 27:18 64:1,18
**Levy** 1:6 2:11 3:10 4:24 9:16,19,22
  9:23 11:2,4,6,10,12,13,19,22 12:12
  12:24 13:6,10 14:3,9,12,14,23 15:2
  21:1 22:14 31:24 32:7,9,9 42:19
  43:11 44:17,21,24 45:4,9,20,21
  46:16,20 47:2,5,8,10,24 48:2,11,21
  49:7,7,13,16,24 50:13,21 54:9 55:5
  55:6,15,21 60:4,13 62:1,8,20 65:7
  67:22 68:11,21 69:6,14 71:15,18
  72:19 73:6,16,22 74:2 75:19 77:1,6
  77:7,16,20 78:9,11
**Levy's** 19:19
**Life** 6:23
**lift** 39:18,19,19 40:6
**limb** 69:13
**line** 3:3,6,16 47:16,16
**lines** 8:19
**Lis** 11:2
**list** 70:14,17,18
**little** 4:12,16 7:17 18:8 19:3 36:21
  63:19
**live** 4:14 6:20
**lived** 69:21,24 70:1
**living** 4:13
**LLP** 2:8
**load** 17:10
**loader** 23:16
**loaders** 22:7 27:21,22
**loading** 17:10
**loaned** 12:14
**located** 35:17
**locations** 44:23 61:13,18 73:22
**log** 70:19,20,20
**logs** 70:21
**long** 9:9 12:10 27:4 38:24 65:5,10
**look** 19:2 37:14,22 46:11,12 49:23
  50:8,20 53:2,16,22 54:22 56:4
  67:12 69:2 71:1,23
**looked** 14:20 67:19
**looking** 20:13 27:10,11 36:7 37:21
  38:15 49:5 56:2 63:20
**looks** 19:3 36:13,15,16 37:6,15 38:5
  53:5 56:4
**lost** 28:4
**lot** 33:23
**lottery** 7:10
**loud** 5:10
**lower** 35:12 46:16 54:3
**LS15-3413** 82:22
**Lucio** 1:3 4:8 34:10 41:11,13,16

  48:15,23 50:1 53:3 54:6,14 65:19
  75:3 76:23 78:18 81:2
**Lucio's** 34:19 59:15 63:5,11 65:24
  66:4,10
**L-i-s** 11:3

**M**

**M** 6:15
**machine** 17:20,24 18:22 19:8,9,17,21
  20:2,8,9,22 21:12,14,18
**machines** 19:19
**magnet** 37:11 38:3,5 39:10,15 40:3,5
**magnets** 25:7,10
**main** 42:18
**maintenance** 17:3 30:6
**major** 7:13,15
**makeup** 12:7
**make-up** 24:17
**Malcom** 13:22,23,23 58:15,20 60:9
  62:3,9
**man** 39:16,18,19,19 40:6 59:24 60:2
**manage** 12:17
**management** 75:9
**manager** 7:22 10:3 12:19 42:5 47:23
  53:11,14 59:1,19 72:2,3 73:12,18
  76:13 80:5
**manual** 51:18 52:21,24 55:5,7
**Manufacturing** 32:16,19
**Marion** 6:15,16
**marked** 33:7,10 35:6,9 46:7,10 49:1,4
  50:3,6 51:9,9 53:18 54:18,22 57:12
  57:16 71:19,22
**material** 22:8 23:5,14 24:3 26:11
  28:1,12 29:9,12,22 30:11 31:2,17
  34:21 37:12 38:18,20 40:11,14,15
  46:4
**materials** 15:6,7 16:15 17:5 29:1 44:9
  47:13
**matter** 4:10 59:19 70:1 81:2
**mean** 8:11 15:9,24 16:5 33:3 63:17
  65:18 67:4
**meet** 28:21
**Melissa** 62:19,22
**mention** 19:16
**mentioned** 16:11 53:24 54:2 57:9
  79:2,22 80:23
**metallics** 15:11 16:16 25:3,8,11 37:12
**Michigan** 46:22
**Middle** 6:14
**Midwest** 8:1 10:3
**military** 7:6,11 36:15
**mill** 3:9,10,12 8:7 10:23 11:5,16 14:4
  14:23 15:2,4 16:13 17:17 18:9 22:5
  22:8,10,11,22 32:9 42:12 44:22,23
  50:14 54:10 55:7,21 56:7,23
  61:11,18 65:8 73:6,14,19,23 76:14
  79:12
**Miller** 1:10 3:3 4:1,7 6:13 56:6,10
  58:21 60:9 74:20 82:7
**mills** 10:1 15:9 69:9
**mind** 75:24
**mine** 51:3
**mini** 3:9 50:13
**mining** 44:10
**minute** 53:24
**missed** 7:10
**mistaken** 38:22
**misunderstood** 63:18
**mobile** 69:23
**molten** 23:5,12

moment 71:23
money 14:19
monitored 45:12
monthly 46:6 71:10
morning 74:23
mouth 76:18 77:7
move 27:24
moved 13:15

**N**

N 3:1
name 4:7 6:12,14 10:7,11 41:18
48:16 58:16,22 59:6 60:10,11
62:21,24 74:20 75:24 79:6,8
National 4:22 7:16,18,20 8:1,23 9:3,4
10:3
Nationwide 2:9
naturally 29:15
Navy 27:10
Nazarene 9:14
near 21:10
nearby 69:21
necessarily 31:5 59:14
need 5:9,14 6:6,8 26:10,14,15 43:9,19
needed 8:13 45:11 66:18 67:8
needs 28:20 44:3
never 66:21 76:15 77:8,11
new 52:11 58:21 60:10
Nicole 60:16,17
north 2:6 6:18 11:7,10,11,14,17,19
11:23 16:2,3,4 22:14 24:12 27:17
30:15,21 31:20 35:12,17 43:10
44:6 53:13 62:14 64:22 65:6 70:2
72:7,8,11,13,14,14,19,24 73:5
74:21 75:3,6,16,17,20 76:5,10,16
76:19 77:1,5,15,19 78:1,9 79:7,14
79:24 80:9,19 81:1 82:20
NORTHERN 1:1
northwest 4:14
Notary 1:15 83:3 84:7
notes 42:3 70:22
November 1:11 50:1 53:4 82:2 84:3
number 33:15,17,21 34:5,19 37:4,7,9
38:17 39:9 40:12,16,22 41:7 51:14
54:12 63:22 65:15
numbers 14:15,17,18

**O**

oath 58:14 59:5
Object 63:13
Objection 43:14 45:23 68:1
OBJECTIONS 3:15
obviously 56:22
occur 78:5
October 69:7
offer 9:22
office 42:18 46:5 62:7 69:15,16,18,20
80:6,7 84:2
official 81:10
Off-site 17:6
Oh 36:10 50:23 57:19 69:11
Ohio 1:1,14 2:4,9,14 11:8,11 22:15
65:7 82:21 83:4 84:2,8
okay 4:13,20 5:6,8,11,17,21 6:1,4,9
7:8,11 8:10,15 11:14 12:2,8,16
13:2,6,13,19,23 14:9,22 15:23 16:3
16:9,24 17:4,9,13,17,22 18:2,22
19:6,10 20:8,12 21:5,19 22:5,11,20
22:22,24 23:3,7,12,19,24 24:4,23
25:9,12,20 26:19 27:14,16,23

old 52:14
Olivet 9:14
once 24:23
on-site 10:24 11:1 16:23 17:15
open 18:20
operate 20:6
operating 20:2,5,22
operation 13:4 65:12
operations 10:4 16:4 32:10
opinion 58:24
opposed 81:5
order 18:19 64:1
organization 11:6
orient 35:16
orientation 72:18,21 77:23
orientations 78:14,16,19
oriented 35:13
original 41:8
OSHA 32:24 33:2,5 43:21 44:7,10,12
44:14 64:8,10,16 68:11
OSHA-approved 67:16
outside 17:12 20:10 68:3
Overflow 35:20
overnight 70:3
over-band 25:10

**P**

packages 46:6
pad 68:6
page 3:3,6,16 46:19 48:1,7 49:23
50:15,21,21,23 51:1 53:3 55:13,19
56:2 58:9,11 60:8 82:1,17
pages 46:15 82:4
page(s) 82:3,18
paint 7:22
paragraph 54:12 56:10
paragraphs 56:14
part 11:6 12:21 34:3 40:5 44:20 45:2
45:7,19 61:2 81:10
participated 76:1 79:10
particular 15:24 32:5 45:11 52:16
53:11 55:9 56:9 60:16
parties 83:16,18
pending 6:8
people 71:2 75:23 79:19
percentage 29:23
perfect 31:12
performed 41:1 44:3 45:13 59:20,21
performing 45:21 73:23
person 20:22 21:21 32:12,15 44:21
45:14 56:10 61:3,10 62:16
personal 40:8 43:19 78:2
personally 41:19
personnel 72:14 77:16 79:14
photograph 3:7 34:3,7
photographs 58:3,5 69:3
pick 17:7
picker 39:17
picks 23:4

picture 22:13 31:18
piece 19:7
pieces 19:13,13,24 36:20
Pierce 63:1
pile 29:14 35:19 36:11
piles 23:22 24:24 25:16,20,21 35:21
pit 23:6,12,16 24:24
place 1:12 13:16 45:11 54:14 66:7
67:7,9 83:13
Plaintiffs 1:4 2:2 4:2
Plaintiff's 33:7 35:6 46:7 49:1 50:3
53:18 54:18 57:12,16,19 71:19
plant 3:7 12:2,5 15:24 31:20 35:12,17
43:10 44:6 65:8,11 68:19
plants 45:21
platform 43:18 64:23
platforms 66:19
Platt 60:16,17
please 62:21 70:16 82:17
plug 17:19,22 18:5
point 4:21 67:11,16
points 58:7 68:8
poor 12:20
Port 69:17,23
Portage 4:18,18 6:24 8:3
position 13:15 14:2,6 20:14 59:23
73:10
possibilities 75:23
possible 39:1
post-high 9:13
pounds 45:15
poured 23:6
pouring 18:10
precision 27:1
predecessor's 62:24
presence 83:8
presentations 62:6
presenters 61:20
preserve 81:17
president 10:1 14:4 62:3
president-general 10:3
presupposed 63:8
pretty 35:18 43:6
prior 10:5 34:9,19 57:17 65:24 66:4,9
66:20 69:5
probably 63:8
problems 47:19 63:4
procedure 45:12 66:17 67:8
procedures 56:14
process 11:16 15:3 23:10 24:2 25:13
26:13 28:1,20 33:1 75:21 76:19
79:5,23 80:12
processed 15:8 26:20
processing 3:7 13:4 16:11 22:13,14
35:12
processor 10:24 11:1
produce 8:12
produced 51:4
proof 59:12
proper 48:6
properly 45:22
property 26:15
proposed 3:7 35:11
protected 20:15 40:4 64:14
protection 3:11 20:21 32:13,19,20
40:20 43:23 44:1,4,14,18,21 45:8
45:10,22 49:20 51:14 52:17,17
54:13 55:10,20 56:3 61:4,7,11 63:4
63:10 67:5,7 68:3,11 71:8
provide 11:16 15:3 58:7 72:19
provided 34:20 47:12 48:14,22 49:15

51:22,23 74:3 75:3,8 76:12,17,24
77:1,19 81:13
provides 77:15
Public 1:15 83:3 84:7
pull 25:7
purpose 34:18 55:19 56:3
purposes 50:7
put 24:2,24 26:24 61:17,21 70:14,18
70:19 72:1,5 76:20
puts 7:5
putting 17:20
PX 3:7,7,8,8,9,10,11,12,12

**Q**

qualified 45:13 83:4
quality 70:20
question 5:23 6:4,8,9 12:21 14:24
20:18 25:13 41:5,8,10 42:22 43:15
45:17 57:24 58:17,19 63:9,9,19
65:3,17 76:7 77:17
questions 5:9,10 56:5 60:23 61:7
74:19,22 77:15 78:21
quick 62:10
quote 60:23

**R**

R 83:1
raw 29:1 35:19 36:9
read 35:10
real 12:20 36:4
realized 14:15
really 21:2 41:8,18 70:1 77:10
recall 21:7 72:17 78:8 80:10
recess 62:12
reclaim 15:11
recognize 33:11 53:7
recommendations 12:18,18 42:20
record 5:17,20 42:2 49:6 81:10
records 69:8
recovered 25:4
recycling 15:6,7,10 16:3,6,7,15
redoing 16:20
reduced 8:13 83:8
references 55:12
referred 78:13
referring 79:3
refractory 15:17,21 16:20 17:21
19:22
regarding 76:23 79:3
regular 30:5 39:12 40:21 41:7
regulations 3:9 50:14 71:16,16 72:24
73:2 74:2,14
relating 75:3 77:1,15
relative 56:5 83:16,17
remember 21:24 56:1 58:16 59:6
62:24 64:24 65:22 69:11 73:3 78:6
78:6 79:6
repeat 5:24 14:24
rephrase 5:24
report 3:12 13:9 42:8,11,13,14,15
42:16,17,17,21,23 43:1 58:20,23
59:3,7 70:23 72:1 75:3,5,6,18 76:3
76:3,4,14,16 79:3,5 80:2,15,17
reported 58:15,18 59:1,5,11,22 60:8
60:9
reporter 1:15 5:16 33:7 35:6 46:7
49:1 50:3 53:18 54:18 57:12 71:19
reporting 82:20 83:20
reports 41:23 70:13 72:11 76:8,12,23
80:24

represent 4:8 74:21
repurposing 16:7
require 76:12
required 45:8 51:15,17 52:18,20 71:6 75:9,13,14 76:10
requirement 72:9,12 77:5,22
requirements 44:7,15,18 55:20
requires 75:18 76:16
reserve 81:16
reserved 81:23
resided 70:1
respect 30:4 61:14 76:8,10 77:4
response 80:23
responsibilities 61:14
responsibility 46:4 72:6
responsible 74:1 77:22
restrictions 79:9
result 41:24 63:5
retire 22:1
retired 4:12 5:1 13:20 14:16,20 69:7 73:11
return 82:17
review 40:24 69:1 71:12 81:9
revised 51:19,21 53:23 54:1,2,8
revision 52:1
Re-Examination 3:4 78:24
right 4:15 6:11,16,20 7:13 8:18 9:6 10:7 11:18 12:11 13:24 14:11 15:13 17:17 19:12,16 20:15,21 24:4,19 25:13,16 26:2,9,14,22 27:1 27:2,6,19 28:1,2,4,24 29:7,10,22 30:1,2,11,17,19,24 31:2,5,7,13,16 31:18,23 32:4,8,12 33:13,20,23 34:2,22 35:5 36:5,8,8 37:3,11,14 37:20,22 38:11,16 39:17,19 40:11 40:17 41:16 43:4 46:15,19,24 48:5 48:21 49:21 50:10 53:2,16,16 54:1 54:5,12,17 55:3,9,10,15,19 56:7,13 56:17 64:2 65:13 68:18,19 69:22 71:4 73:15 80:1 81:8,15,18
right-hand 35:13 46:17
rim 20:10
road 61:17,19,21,21 62:5 73:8
roadways 49:19
Rock 1:10 3:3 4:1 56:6 58:21 60:9 82:7
Rockford 6:13
room 20:5,7
Rose 32:16,19
rule 83:21
rules 3:9,10 5:7 49:19 50:14 51:11,19 52:1,11,13,17 54:9 55:20 71:15,16 72:24 73:1 74:2,14
run 26:3
running 24:12 66:14,19
runs 25:10

S

safe 24:19
safety 3:8,8,8,12 7:22 9:12 14:8 21:8 34:13 35:3 42:15,23 43:1,1 46:24 47:2,6,8,11,23 48:2,6,11,22,22 49:11,13,18 50:18 52:21,24 55:5,7 56:6 57:10 59:20 60:3,4,7,13 61:12 61:14,15,21 62:16 69:14 70:19,24 71:4,16 72:18,21 73:12,18 74:2,14 77:3,15,20,23 79:14,19 80:24 81:4
saw 77:8,11
saying 16:22 76:13
says 35:11 37:14,22 38:17,18 43:23

46:19,24 51:11 54:2 76:16
scalping 37:18,19,19,24 38:19 63:23 64:19 65:6,20
scene 33:13
Schaffer 1:13 2:3
school 6:23,24 9:13
scoop 22:8 23:15
scope 15:19 16:9 41:9 43:3 56:3
screen 28:12,15 31:6,7,9,15,17 34:14 36:3 37:18,19,19,20,24 38:9,13,19 39:1 40:17,18 41:2,3,4,15 63:23 64:14,19,22 65:15,18,21 66:1,8,9 66:21,23 67:10 68:4,12,16
screened 26:12
screening 26:13 28:1
screens 12:6 25:6 28:3 31:16 34:14 38:8 65:5
scribble 53:5
SeaGate 2:13
seal 84:2
seat 21:21
second 48:1
second-to-last 50:20,21,23 51:1
secretary 70:7
section 56:3
sections 48:6
see 4:20 20:14 33:24 34:3 36:7,11,14 36:22 37:1,15,17,22 38:6,11 46:20 46:22 48:3,8 66:16 71:6,14 72:6 79:19,24
seen 47:17 50:10 55:1 61:2 69:6 73:1 76:15
sell 15:16
semester 9:14
send 70:11 72:9,10,10
sending 16:17
sense 36:16 37:7 45:19
sent 8:14 10:23 32:8 46:5 52:10 59:12 71:3,10,18
sentence 56:9
sentences 56:5
separate 24:23 31:9
sequence 22:17,18
service 7:11 11:5,16,15 55:17 65:8 82:20
services 3:10 14:4,23 15:2,3 16:13 17:17 22:6,11 42:12 44:22,23 54:10 55:21 56:7,23 60:5 61:11,18 73:7,14,19,23
set 77:23 84:1
shake 39:11
shakes 24:3 29:11
sheet 70:15,18 81:12
SHOHL 2:8
shows 61:17,19,21,22 62:5
shrugs 5:15
side 27:2,2 64:22 66:3,5
sides 64:4
sign 79:18
signature 48:17 53:8 81:23 82:1,17
signed 48:15,23 49:24 53:3 54:6 82:17
significant 75:10
Similar 12:1
sir 41:22 44:8,11 55:11 58:4
site 12:18 16:21 26:11 27:15,17 32:5 34:20 42:13 46:4 47:13 53:11,14 59:1,19,19 70:21 72:2,3,23 75:19 76:5 77:21 79:16 80:5
sites 12:15,17 15:12,18 27:13 52:10 63:21 69:22,23 71:12
sits 19:18

sitting 13:24 20:4 21:21
situation 40:2
size 25:6,7 26:23 28:1 29:19,22 30:1 31:12,16 35:11 38:18,23
sizes 24:3
sizing 28:3 29:21
slag 3:7 8:21 10:19,21 11:2,16 12:2,5 13:3 15:3,12 16:6,11 17:8 18:17 22:13,14,20,20 23:5,12,17,20,22 24:2,16,20,21,23 25:2,16,20,21 26:3,6 27:20 28:4 29:16 31:20 35:11,17,19 36:9 43:10 44:6 45:21 65:8,11 68:19
slew 68:6
slides 62:6
small 22:7 29:23
smaller 30:12
SMITH 2:12
software 80:8
sold 15:8,22
somebody 13:15,17 15:21 19:6 20:2 42:3 64:13 65:13,24 66:1 68:12 79:18
Somewhat 34:17
son 36:14
sorry 25:19 30:9
sort 15:15 25:12 36:8 44:9 71:5
sorted 15:22
sorts 29:13
sound 63:3
speak 14:7
special 44:9 75:21
specified 83:14
speeding 79:17
spell 10:10
spelled 51:17 52:20
spend 8:4
spilled 22:9
split 14:7
spot 67:2
spreadsheet 71:11,12
stairs 34:24 49:19 64:2,4,14
Stamm 1:15 83:3 84:7
stamp 49:7,7
stamped 46:16 48:1,7 49:24 50:15,21 50:24
standard 3:11 43:21,23 55:12 67:6 68:12
standing 20:10 21:22 68:17
standpoint 22:6
stands 81:6
Star 2:6 11:7,10,11,15,17,19,24 16:2 16:3,4 22:14 24:12 27:17 30:15,22 31:20 35:12,17 43:10 44:6 53:13 62:14 65:6 70:3 72:7,8,11,13,14,14 72:19,24 73:5 74:21 75:4,6,16,17 75:20 76:5,10,16,19 77:1,5,15,19 78:1,9 79:7,14,24 80:9,19 81:1
start 6:11 77:17
started 7:21 61:24
State 29:19 83:4 84:8
stated 47:20
STATES 1:1
station 7:14
stay 70:2,3
steel 2:7 3:10 4:21,22,23 7:16 8:12,23 9:2,5,7,9,15,21 10:1,3,17 11:4,8,11 11:11,22 12:3 14:4,23 15:2,9 18:11 24:13,15,17 32:9 35:12 36:20 43:10 44:7,22,23 54:10 55:17,21 56:6,23 61:11,17 62:15

65:7,8 73:6,13,14,19,23 74:22 75:4 76:11,16 77:1,5,19
stenotype 83:8
step 66:7
steps 64:10,15,23
sticker 57:17,21
stockpile 23:16
stop 23:9 24:4 79:17,17
straight 37:16
street 7:14 82:20
strike 20:18 25:13 34:2 65:14 73:5
structural 67:18,19
structure 66:8 67:13,14
Stuart 2:13
stuff 6:11 18:20 20:23 29:24 34:24 42:3 71:3 76:20 79:10,11,12,12
subject 44:12,14,17
Suite 2:9
sum 43:17
supervisors 74:5,7,11
supervisor's 53:7
sure 4:10 5:17,20 6:3 15:1 19:20 33:2 34:24 45:17,19 47:19 52:3 58:22 60:10 61:12 71:1,2,12 74:1 78:23
surfaces 43:22
surge 35:19 36:11
surrounded 39:20
sworn 4:3 83:6
system 20:19 25:6 27:20 40:8,9 43:20

T

T 83:1,1
table 49:6
tables 26:14
Takacs 1:12 2:3
take 6:6 16:6 18:2 22:7 23:13,21 24:2 41:5 46:11 50:20 53:16 54:22 56:4 58:3 62:10 71:23
taken 4:9 5:3 45:12 81:14 83:13
takes 29:1
talk 63:22
talked 16:16 35:24
talking 12:22 14:17 15:24 16:2 19:9 30:6,6 45:18,18 59:15,16 76:6
talks 56:13,17
tank 36:15
Tap 18:14,15
tapping 18:7,9
tasks 41:1
tax 14:17
teach 33:5
Ted 4:8 41:11,13,16 48:15 50:1 53:3 53:14 54:6,14 63:18,19 67:3
tell 13:14 15:18 22:14 43:9,12 63:2 72:22 83:6
tenure 76:24 78:8 81:1
terms 55:24
Terry 47:22
testified 58:14 59:2
testimony 74:23 83:7,10
thank 78:22
Thanks 10:15
THEODORE 1:3
thing 35:10 36:22,24 80:18
things 5:7 16:10 22:18 25:3 33:4 49:18 52:2
think 12:22 21:18 22:12 37:4 38:22 42:21,22 57:21 60:15 62:18 63:8 70:20 75:2,20 78:13 81:4
thought 75:12 81:14

three 46:15 73:9
throws 29:14
Ticknor 2:8 3:4 74:20,21 75:1 78:15 78:21
tie 67:7,9
tied 21:5,6 35:1 39:20 68:12
tie-off 67:11,16
Tim 53:9
time 5:19,19 7:5 8:4 9:3 12:10,21 13:11 21:3 26:3,4 43:11 53:12 59:16 60:16 66:4 68:20 69:5,24 72:4 73:8 79:9 83:13
times 51:4
today 69:2 80:18
Toledo 1:14 2:4,14 82:21 84:2
top 17:20 19:8,18 21:14 46:19 48:3 50:15 51:11 56:2 57:17
topic 71:11 77:18
touch 5:7
tower 3:7 30:24 31:3,8,15 33:15,20 34:5,14,19 37:7,9,13,20,23,24 38:3 38:6,8,13,15,16 39:9,13 40:1,5,12 40:16,21 41:7 43:4 63:20,22 65:6 65:15
towers 12:6 30:21 31:19 32:1
town 4:16
track 70:5,21
tracking 58:8 70:14,18,19
tracks 19:3
train 52:11
trained 45:22 57:1,7 71:3 75:22
training 46:3,5,6 47:10,12,13 52:22 52:23,23 56:17 71:1,6,9,17 72:18 77:16,20 78:4
transcribed 83:9
transcript 81:9,13
transcription 83:10
travel 73:21
traveled 69:24
treated 24:24
treating 8:18,19
trucks 17:9,11
true 83:10
truth 83:6,6,7
trying 16:9 18:17,19 28:11 29:6 31:18 62:18 69:11 79:6
turn 16:6
turned 10:24 70:7
twice 70:24 71:4
two 4:24 9:10 10:18 11:18 13:21 15:5 26:24 51:4 56:4,4 62:18 69:22
type 8:21 11:23 24:20,21,21 26:3 39:12,12 75:18 80:11,11,18
types 23:20,22 24:12,15,16

**U**

uh-huh 5:2,12,14 6:2,10 22:4 25:17 37:18 38:4 63:24
uncovered 63:5,10
underneath 19:9 37:14
understand 5:15,23 6:3 61:13
understanding 14:22 15:1 24:5 26:22 37:10 75:14,17,19 76:9,11 77:4,6 77:12,13,19,21
unevenly 30:3
uniform 3:9 50:14
UNITED 1:1
unprotected 54:13,15
unscrew 18:3
upper 37:20

**V**

use 24:20,21 45:22
usually 27:7
utilize 54:13
utilized 51:15 52:18
U.S 4:23 9:2,5,6,9,15,21 10:17 11:22 13:2,3

**V**

varies 30:14
various 12:15 35:16 44:22 45:4,20 61:12,17 69:9 73:21
vehicles 79:15,20
verbally 5:10
verbiage 52:2
version 52:7,15,16
vice 10:1,2 14:4 62:3
videos 62:4
visiting 70:5
VP 42:5
vs 1:5
vulnerable 67:2,4

**W**

Wagaman 47:22
waiting 57:24
waive 81:15,16
walk 20:9,9 34:23 64:1
walking 43:21
walkway 66:6
walkways 49:19
walk-around 66:19
want 5:16 6:3 22:16 29:19 43:17 47:16 75:13 77:18 81:18
wanted 72:13 75:10
wants 24:1 30:12
wasn't 22:9 32:5 45:17 46:3 60:10 69:16 76:18
watched 21:3,24
water 23:15
Wauseon 70:4
way 5:8 6:22 7:22 32:1 40:23 59:7
Wayne 68:22,23
week 73:4,9
weekly 70:10
week-long 32:22
welded 68:6,8
welding 49:20
went 4:23 7:10 23:10 32:22 33:4 52:1 66:2,5 76:20
weren't 43:7 59:15
West 2:9
WESTERN 1:2
we'll 5:13 6:7,8 14:11 51:8
we're 5:20 8:10
we've 51:18 57:4 61:2
wheel 22:7
whereabouts 4:15
WHEREOF 84:1
wide 27:4 38:24
wife 6:21
withdraw 43:8
within-named 83:5
withstand 45:15
witness 3:3 4:2 10:12,14 43:16 46:3 58:1 65:22 68:2 78:23 81:19,21 83:5,9 84:1
woman 58:16 60:10,15
woman's 60:11
word 75:13 76:18 77:6
words 12:2 68:8

**W** (cont.)

work 4:24 9:6,15,18 10:5 11:23 13:6 15:17,19 16:10,20 21:22 30:4,6 39:9,13,14,15,15 40:1,3,4,21 41:1,7 41:9 42:2 43:3,18,24 44:2 45:3,21 47:5,24 48:6 59:21 62:20
worked 4:22,23 7:18,22 10:2,4,18 12:23 13:19 32:6,7 45:4 59:19
working 13:2 14:16 41:14 43:11,21 54:13 56:5,11 66:15,16
Works 9:2 10:17 11:23 12:3,12
Worksheet 82:22
worth 14:21
wouldn't 45:13 59:14 80:17
wrench 18:2
write 34:15 41:23 42:8,14,16,17,21 42:23 70:23
writing 76:15 77:8,11
written 42:14 47:14
wrong 12:23 81:14

**X**

X 3:1

**Y**

yeah 8:20 9:8 11:6 15:18 18:6,9,16,23 22:17 26:1,17 27:5,9 35:18 36:10 36:23 37:14,15 39:4,12 42:1 51:9 53:5,7,23 57:5 58:1 60:2 67:22 68:23 71:17 72:1,17 78:17 79:16 80:20
year 4:12 5:1 7:3 22:2 60:21 66:12 71:1,4
years 4:22,24 7:18 8:5 9:10 10:4,18 32:17 47:24

**0**

027 51:7,8
05 22:3

**1**

1 3:7,8,18 9:20 13:7 33:8,11,12,15 38:16 58:11
10 27:4
10-and 33:5
11/30/09 48:19
11:30 81:22
12 3:12 38:18 56:3
12-feet 38:24
12-foot 38:20
12-inch 38:21
13 3:18
13th 84:3
14 3:17 22:3
15 47:24 54:6
16 46:16
17 48:2
18 3:10,11 46:16 48:7
19 3:12
191 2:9
191023 43:20
1926 43:22
1926.501 3:11 55:12
1969 7:4

**2**

2 3:7,7 33:15,21 34:5,14,19 35:7,10 36:6 37:20,23,24 38:6,13,15,17 40:12,16,22 41:7 43:4 55:19 58:9 63:22 65:6,16

**2:12-CV-00613** 1:5
20 27:4,4,10
2000 13:7 60:21
2003 8:24 9:1
2005 9:20 13:7
2009 50:1 51:21 53:4
2011 54:6
2015 1:11 82:2 84:3
2020 84:9
2235 6:18
23 3:17
24 3:4,4
24th 2:13
241-6000 2:14
25 27:4 39:3
255-1010 82:21
27 51:2,6
29 3:11 55:12

**3**

3 3:8,9 37:7,9,13 38:3,9 39:10,13 40:1 40:5 46:8,11,15 56:2
30 27:10 50:1 53:4 81:12
30-hour 33:5
300 2:9
303 49:7
33 3:7 4:22 7:18 8:5
35 3:7
3516 1:13 2:4

**4**

4 3:3,8 43:18 44:3 49:2,5,8,10 51:14 54:14,15
4/22/2010 54:2
40-hour 33:4
405 82:20
417 49:7,24
418 50:15
419 2:5,14 82:21
420 50:21 51:5
427 50:24 51:5
43 3:17
43215 2:9
43604 2:14 82:21
43617 1:14 2:4
45 3:17
46 3:8
46531 6:19
49 3:8

**5**

5 3:3,9 38:18 50:4,7,22 53:3 54:12 84:9
5,000 45:15
5-feet 38:23
5-foot 38:20
5-inch 38:21
50 3:9
53 3:10
54 3:11
57 3:12

**6**

6 1:11 3:7,10 43:23,24 53:17,19 82:2
614 2:10
628-6880 2:10
63 3:18
68 3:18

| 7 |
|---|
| **7** 3:7,8,11 54:19,22 55:4,6 57:17,20 |
| **700** 6:18 |
| **71** 3:12 |
| **74** 3:4 |
| **78** 3:4 |

| 8 |
|---|
| **8** 3:12 57:13,16,22 |
| **843-2001** 2:5 |
| **8800** 46:22 |

| 9 |
|---|
| **9** 3:12 37:4 60:8 71:20,23 |
| **9:30** 1:11 |



PLF. 1
DATE 11|4|15
LS
RPTR
Collins Reporting



## DEDICATED TO SAFE PRODUCTION

As a new employee, workplace safety is one of the most important parts of your job. It has to be part of everything you do.

We want you to have the understanding and knowledge you need to prevent accidents. As you learn each part of your job, you'll learn about any potential hazards or risks. And you'll learn how to work safely. But safety is more than specific procedures; it's really a way of life. Safety protects you from injuries or from illness resulting from exposure to hazardous substances.

- Safety protects the community we live in. When we prevent fires, explosions, spills, and other emergencies—or respond to them quickly and properly—we help to ensure the safety of people in the area and the quality of the air we breathe and water we drink.
- Safety requires a commitment by everyone in the company. Even one person acting unsafely can put many others at risk.
- Safety is learning about risks, being alert to possible problems, reacting quickly and taking the necessary corrective action.

### Identifying Hazards

As you participate in our safety training programs, you'll learn how to identify potential hazards on the job. It's up to all of us working together to make sure you have the training and knowledge needed to identify hazards and improve our safe work environment.
Your attitude toward safety is essential to our workplace safety. You have to take safety seriously and be safety conscious in everything you do. This is what it takes to be Dedicated to Safe Production.

### Safety Procedures

The safety program here at the Edw. C. Levy group of companies can only be effective if every employee makes safety his or her responsibility. You will get a great deal of site specific training in order to help you achieve this goal. Welcome to the company and we hope that your experience here will be rewarding and safe.

Terry Wagaman, CMSP
Corporate Safety Manager
Edw. C. Levy Company

G:\HRESOUCE\Employment\New Hire Forms\Safety Production.doc

PLF. 3
DATE 11/6/15
RPTR LS
Collins Reporting

**Levy-000016**

# SAFETY IS EVERYONE'S BUSINESS
## AT

EDW. C. **LEVY** CO.

## SAFETY EQUIPMENT

As a safety precaution, all personnel must have safety boots with the following requirement: Metatarsal steel-toed, leather, over the ankle. These must be worn at all times.

Hard hats are to be worn by all personnel in all plant areas. A hard hat is not required while in the office or other enclosed building.

Safety glasses with side shields are to be worn by all personnel in all plant areas when required.

Gloves must be worn as required by the job.

"Greens" must be worn as required by the job.

Make use of all safety devises and equipment required by the job.

## PROPER WORK ATTIRE

All personnel should come to work properly dressed and with all required safety equipment. Dress for the weather conditions as well as for the type of work performed. Be cautious of loose fitting garments, which could become caught in machinery.

During warm weather, certain summer clothes such as shorts, working without a shirt or sleeveless shirts can be hazardous in the workplace. Proper clothing protects from hot sparks, sunburn, skin abrasions and bites. Good quality cotton or cotton blends offer best all around protection. Clothing made from polyester fabrics and other synthetics will melt if ignited, causing potentially painful skin burns.

During cold weather, dress in layers of clothing. Natural fabrics will allow moisture from perspiration to pass through them, keeping you drier and warmer.

## EQUIPMENT

Never walk or drive on the blind side of mobile equipment.

If mobile equipment has only one seat, *only one person* shall ride on that piece of equipment.
Never work out of a loader bucket.

Never get on or off a moving machine.

Only qualified, trained personnel are to operate equipment and/or tools.

All machines or equipment shall be locked out and tagged prior to service, maintenance or adjustments.

## GENERAL

Use extreme caution at all railroad crossings within the scope of our operation.

Never remove or make safety devices inoperable.

Housekeeping is everyone's responsibility. A job is never complete until the work area is clean.

Inspect your work area daily and correct or report and hazards.

Make proper use of stairways, catwalks, and handrails.

Know the location and operation of all fire extinguishers in work area. Locate all exits, in case of emergency situation, and the quickest routes to them.

Report all injuries immediately.

Report all unsafe conditions immediately.

---

I have read and understand the "Safety is Everyone's Business" rules and will follow them at all times.

TED Lucio
Name

Signature

11/30/09
Date

Levy-000018

# TABLE OF CONTENTS

| | Page |
|---|---|
| Safety & Health Policy Statement | 1 |
| Levy Mission Statement | 3 |
| Introduction | 5 |
| General Safety Rules | 6 |
| Clothing/Jewelry | 15 |
| Personal Protective Equipment | 17 |
| Hearing Conservation | 21 |
| Accident Prevention Tags | 24 |
| Walkways, Roadways & Stairs | 26 |
| Housekeeping | 29 |
| Welding, Cutting & Burning | 32 |
| Fire Prevention & Firefighting | 40 |
| Conveyors | 49 |
| Ladders | 52 |
| Scaffolding | 56 |
| Fall Protection | 58 |
| Personal Flotation Devices | 62 |
| Respirators | 63 |
| Mobile Equipment Operation | 64 |

PLF. 4
DATE 11/6/15
RPTR LS
Collins Reporting

Levy-000303

Hoist Safety ........................................................69
Lifting Hand Signals .........................................74
Confined Space Entry.........................................80
Use & Care of Hand Tools ................................81
Powered Hand Tools & Equipment....................84
Electrical Safety.................................................90
Lockout/Tagout .................................................94
Blood Borne Pathogens .....................................96
Office Safety......................................................97
Motor Vehicles..................................................98
Hazard Communication Program....................100

Levy-000304

# SAFETY AND HEALTH POLICY
## STATEMENT

Employees are our companies' greatest assets. We are concerned about our employees' health and well being. Therefore, we must do all that we can to protect our employees from injuries and illnesses.

Management will provide a safe place to work. We will accomplish this by providing safe equipment, proper training and safe methods and procedures. No job is so important that it cannot be accomplished without injury.

Efficiency depends upon the uninterrupted completion of tasks. Accidents interrupt operations. We must integrate hazard control into every operation. We will comply with every applicable standard and government regulation.

Management and employees must work together for the common goal of preventing accidents and providing a safe place to work. All employees are responsible for safety and health. Safety equipment must not be damaged, removed, altered or abused. Employees will observe all

Levy-000305

safety rules and procedures, and adhere to all Company Policies.

Supervisors will see that all rules, procedures, approved practices and policies are observed by their crews. They are responsible for maintaining safe work conditions.

Everyone must accept an interest in the safety and health program. Together we can control hazards and prevent accidents. We require full cooperation and help in making our Companies' Safety Program successful.

_____   _____
Edward C. Levy Jr., C.E.O   S. Evan Weiner, C.O.O.

Levy-000306

# LEVY MISSION STATEMENT

*The Edw. C. Levy companies will:*

- Supply our employees with a safe and secure work environment and equip them with the tools to enable them to meet their individual objectives.

- Enrich our culture through trust, teamwork, individual initiative, high expectations, active involvement, and open communications.

- Promote innovation and harvest ideas at all levels of the organization to foster personal growth and continuous corporate improvement.

- Grow our business through marketing, research, and technological advances, while recycling and using the earth's natural resources in a manner, which enhances the quality of life.

- Repay the communities that support us by operating safe and environmentally sound

Levy-000307

businesses while sharing our success with worthy charitable causes.

- Observe standards of moral and ethical conduct, which will easily withstand any public or private scrutiny.

- Always treat others the way we would wish to be treated and work hard to gain the same treatment from them.

Levy-000308

# INTRODUCTION

This booklet has been adopted to help you in assuring the general safety, health and well being of yourself and all others who may come in contact with our company. This booklet does not cover all specific rules, regulations, and policies found at our individual work sites.

You, as an employee, are not only responsible for your own safety, but also the safety of other employees around you. Last, but not least, you are also responsible for the safety of the public, who may find themselves in your area, unknowing of the hazards that exist.

By signing the acknowledgment page of this booklet, you agree to comply not only with the Safety Rules and Safe Practices contained herein, but also any Federal, State and Local codes, whenever applicable.

Your safety is everyone's concern and everyone's safety is your concern.

Levy-000309

## GENERAL SAFETY RULES

1.1 For your own safety, the safety of those around you, KNOW AND FOLLOW THESE GENERAL SAFETY AND HEALTH RULES. If you always plan and think of how to safely do your job, you will always act and work safely. Safety is everyone's responsibility - on and off the job.

1.2 All accidents, incidents or injuries, no matter how slight, must be reported to your supervisor immediately.

1.3 Anticipate possible dangers in your operation and make every effort to avoid these dangers or hazards.

1.4 All unsafe conditions, such as tools, equipment, work areas and structures are to be reported to your supervisor immediately. These conditions shall include all existing and predictable physical, health, and ergonomic hazards.

Levy-000310

1.5 Watch out for the safety of visitors, new employees, and co-workers. Never hesitate to tell them if they are not working safely.

1.6 Observe all safety rules and warning signs in the area or plant where you work.

1.7 Get full instructions on work to be performed before starting the job.

1.8 Make sure you know the Emergency plan at each plant site you may work.

1.9 Never remove or make safety devices inoperative.

1.10 Horseplay, practical jokes, throwing of objects, scuffling, fighting, or distracting another employee is strictly prohibited.

1.11 Inspect daily any equipment to which you are assigned to make certain that it is in safe operating condition.

1.12 Leave repair work to those who are trained and qualified to make repairs.

Levy-000311

1.13 Never lean against or sit on temporary or permanent hand railings of any kind or any other unstable structure.

1.14 Rain, snow, ice or over-hanging icicles may represent slipping or struck-by hazards.

   *1.14.1* When such hazards exist in your work area, take care of them or report them immediately.

1.15 PA systems and two-way radios are to be used for business purposes only. Non-essential communication and inappropriate language is prohibited.

1.16 Use of headphones with portable radios, disk players and/or tape players with are strictly prohibited.

1.17 Personal cell phone use is prohibited while working except in an emergency. If you must talk on a phone, stop the equipment and pull off to the shoulder to make or answer a call.

Levy-000312

1.18 All personnel must wear protective apparel appropriate to the tools or equipment being used.

### 1.19 Smoking

*1.19.1* No person shall smoke or use an open flame within 25 feet of any flammable liquid, material, gas or explosive.

*1.19.2* At no time shall anyone smoke in a restricted area or in an area where there is a possibility of a combustible or explosive mixture of vapors or gases (e.g., gas pumps, cylinder storage areas, solvent and paint storage areas.)

*1.19.3* Smoking is allowed in designated areas only. Dispose of materials in proper receptacles.

1.20 Always lift correctly. Use your legs to take the strain, not your back.

Levy-000313

*1.20.1* Never lift beyond your capacity. If in doubt, get help or use a lifting device.

1.21 Stay clear of blind spots around equipment, loaders, trucks, cranes, conveyors and pot haulers.

1.22 It is the duty of every employee to see that their work area meets the best standards of safety, cleanliness and neatness.

1.23 Check all cords on electrical tools to be sure they are properly grounded and not frayed or broken. Do not use if found to be defective.

1.24 Know where fire extinguishers are located and how to use them.

1.25 Secure in an upright position all tanks and cylinders of oxygen, acetylene, propane or other compressed gases.

Levy-000314

1.26 Transport all tanks of oxygen, acetylene, propane or other compressed gases upright with the gauges removed and safety caps on the tanks.

1.27 Check all hand tools for safe condition before using them. Do not use if defective.

1.28 Do not use defective ladders.

1.29 Ladders should be stored properly and not be placed in passageways or any other location where they may be displaced unless protected by barricades or guards.

1.30 Be alert for moving vehicles.

1.31 Never hitch a ride or pick up riders on moving equipment.

1.32 Always use the right tool for the job. The engineering department must approve of any makeshift, improvised, or modified tool.

Levy-000315

1.33 Never adjust or service equipment that is in operation, unless it has adequate safeguards to permit such work safely.

1.34 Do not store or transport cans of gasoline or other flammable liquids in the cab of any equipment or motor vehicle.

> *1.34.1* Store flammable liquids in approved containers only. Portable gasoline cans must be metal with spring closing type lids, not plastic.

1.35 After a job is finished, replace guards, clean up debris, return any left over parts and put tools away.

1.36 When using an overhead hoist or crane, make sure you know how to operate them safely and watch out for other personnel in the area.

> *1.36.1* Any area with an overhead crane in operation is a hardhat required area.

1.37 Never direct compressed air towards yourself or anyone else for any reason.

Levy-000316

*1.37.1* Compressed air for cleaning purposes shall not exceed 30 PSI and then only with proper guarding and personal protective equipment.

1.38 Equipment should be operated only by a qualified and authorized employee, and in a safe and efficient manner.

1.39 Do not pass under any suspended load or bucket.

1.40 Do not work under any piece of equipment held only by a jack. The equipment must be stable and rest on hard wood sufficient blocking, cribbing, fixed stands, or similar configurations.

1.41 Any equipment capable of being raised must stay a minimum of 10 feet from any overhead wire. **Note:** Higher voltage requires distances greater than 10 feet to be maintained. 10 feet minimum for the first 50,000 volts, and 1 additional foot for each 30,000 volts thereafter.

Levy-000317

1.42 The manufacture, distribution, possession, testing positive for, use of, or under the influence of any controlled substance while in the employ of the company is strictly prohibited. The term "controlled substance" refers to drugs and chemical substances such as, but not limited to, alcohol, marijuana, cocaine, opiates, amphetamine, phencyclidine, etc.

    *1.42.1* Employees having prescribed drugs in their possession or who must use prescribed drugs are required to inform their supervisor.

    *1.42.2* The employer reserves the right to deny any employee permission to work if, in the opinion of the supervisor, the employee's condition may adversely affect his or other's work performance or safety.

    *1.42.3* Violation of this policy shall be cause for immediate dismissal.

Levy-000318

## CLOTHING/ JEWELRY

2.1 The wearing of shorts, cutoffs, sleeveless T-shirts, etc. is against company policy. Light colored, loose weave clothing that promotes evaporative cooling and protects the extremities from abrasions, cuts, sunburn, etc. is recommended.

2.2 Pants must extend at least to the ankle.

2.3 Shirts must at a minimum cover the shoulder. Where burning, cutting and welding are taking place, and in any other operations where plant rules specify, flame resistant clothing shall be worn. Do not wear synthetic clothing when performing any hot work.

2.4 Do not wear clothing that is loose fitting, torn or ragged to avoid being caught on projections or being caught in moving machinery. Do not wear gloves or loose clothing around moving machinery.

Levy-000319

2.5 Wearing of finger rings, loose-fitting wrist bracelets, exposed dangling necklaces, and earrings that dangle is prohibited in all operating areas.

2.6 In all operating facilities, open toe, platform, and high heal shoes are not permitted.

Levy-000320

# PERSONAL PROTECTIVE EQUIPMENT
## (PPE)

3.1 Personal protective equipment includes all clothing and other work accessories designed to create a barrier against workplace hazards. Personal protective equipment should <u>not</u> be used as a substitute for engineering, work practice, and/or administrative controls.

3.2 The basic element of any management program for personal protective equipment should be an in-depth evaluation of the equipment needed to protect against hazards in the workplace. Personal protective equipment should be used in conjunction with engineering controls to provide for employee safety and health in the workplace.

3.3 Personal protective equipment can be effective only if the equipment is selected based on its intended use, employees are trained in its use, and the equipment is properly tested and maintained, and worn.

Levy-000321

3.4 You are responsible for the proper use and care of all personal protective equipment issued to you. Any alteration of personal protective equipment in any way is prohibited. Always check your equipment before each use and replace if needed. Report defects to your supervisor immediately.

3.5 All persons must wear suitable hard hats at any plant location, construction site, or where company policy requires. The only exceptions are when in an office area, or in a vehicle.

3.6 Protective hard hats conforming to ANSI Z-89.1 Industrial Standard must be worn:
   a) With bill to the front unless otherwise authorized by your supervisor.
   b) Without altering or wearing anything that would effect the suspension system.
   c) Without painting, drilling, or otherwise altering helmet shell.
   d) With long hair tied back or tucked up and worn under the hard hat. Hair shall

Levy-000322

be considered long when it hangs to the shoulder.

*3.6.1* Cracked, chipped, burnt, or otherwise damaged hard hats shall be taken out of service immediately and replaced.

3.7 All employees must wear suitable protective footwear when working in an area where a potential hazard exists which could cause injury to the feet.

*3.7.1* Only approved hard toed leather safety boots, over the ankle (with metatarsal guards where required) conforming to ANSI Z-41 Industrial Standard, in good repair, may be worn in the plants or maintenance garage.

3.8 All employees must wear suitable eye protection when working in an area where a hazard exists which could cause an injury to unprotected eyes.

*3.8.1* Only approved safety glasses can be worn in the plant. Safety glasses

Levy-000323

with permanently attached side shields must meet the ANSI Z.87 Industrial Standard. The safety department will specify which frame styles are acceptable for non-prescription and prescription safety glasses. Additional eye protection, such as face shields, welding helmets, goggles, etc., may be required for specific jobs. Always wear the eye protection prescribed for the job.

3.8.2 Sunglasses such as Tru Color, Photogrey or photo-sun, etc. are not permitted for inside enclosed building use without a medical condition documented in writing by the employee's doctor and approved by Plant Medical, the Plant designated physician and/or the Safety Department. Employees performing jobs requiring dark lenses will be provided the appropriate clip-ons, goggles, face shields, or hoods.

Levy-000324

## HEARING CONSERVATION

4.1   All employees must wear suitable hearing protection when working in designated areas. The purpose of the Hearing Conservation Program is to protect employees from occupationally related hearing loss and to meet the federal and state health and safety standards.

4.2   All employees included in the Hearing Conservation Program must use approved hearing protection. The Safety & Health Department will utilize noise-monitoring results to determine which employees shall be included in the Hearing Conservation Program.

4.3   All work areas that have sound levels above 85 dBA for a full shift dose shall be posted with signs indicating "Hearing Protection Required." Everyone entering these areas must wear approved hearing protection, which can be obtained from your supervisor.

Levy-000325

4.4 In addition to specific work areas, specific tasks or jobs (like operating pneumatic jackhammer) require the use of hearing protection. The hearing protection requirement is to be included in the written work instructions for the task or job.

4.5 All employees identified as being in the Hearing Conservation Program must have yearly audiometric exams.

4.6 Employees shall be allowed to choose hearing protection from the approved hearing protection equipment for the job or task.

4.7 The Safety Department will furnish a list of the various types of hearing protection with suitable noise reduction for each level of noise exposure.

4.8 Employees are responsible for the maintenance of their hearing protection equipment.

Levy-000326

4.9 Only hearing protection suitable for the job/task noise shall be used.

4.10 If hearing protection is not required, individuals may choose to use hearing protection on an individual, voluntary basis. Employee who voluntarily wish to use hearing protection will be provided with suitable hearing protection equipment.

Levy-000327

# ACCIDENT PREVENTION TAGS

## 5.1 Danger Signs

Example: **DANGER HIGH VOLTAGE**

Danger signs are used only where immediate hazards exist, warn of specific hazards and indicate special precautions are necessary.

## 5.2 Caution Signs

Example: **CAUTION TRUCK TRAFFIC**

Caution signs warn of potential hazards or unsafe practices and indicate that proper precautions should be taken.

## 5.3 Safety Instruction Signs

Example: **SAFETY FIRST**
**EYEWASH**

Safety Instruction signs are used where there is a need for general instructions and suggestions relative to safety measures. The color of the background is white and the panel is green with white letters. Any letters used against the white

Levy-000328

background are black. The word(s) in the panel may say "Think", "Be Careful", "Safety First", etc.

## 5.4 Accident Prevention Tags

Example: **DANGER! DO NOT OPERATE**

Temporary warning tags may be used on valves, switches on equipment found to be unsafe, etc. They are not intended to be a substitute for other established safety precautions, e.g. lock-outs.

In areas where health or safety hazards exist that are not immediately obvious to all employees, barricades and/or signs must be posted at all approaches to that area.

Levy-000329

# WALKWAYS, ROADWAYS, HANDRAILS & STAIRS

6.1 Walkways will be kept clean and orderly at all times.

6.2 Where walkways are adjacent to conveyors, all nip points and pinch points must be guarded.

6.3 Handrails are required along elevated walkways and must have a toprail positioned 42 inches and mid-rail. A toe-board would also be required if there is a potential for tools, equipment, materials, etc. to fall from an elevated walkway onto traffic below.

6.4 Follow designated walkways and aisles to and from your work area. Do not use shortcuts. Walk, don't run. Be alert for moving vehicles. Look where you are going. Do not walk backward. Always glance at the walking surface ahead of you. Look both ways before crossing haulage roads or railroad tracks.

DEDICATED TO SAFE PRODUCTION                    26

Levy-000330

6.5 Driving your car on company premises is a privilege. Do not abuse the privilege by making unauthorized trips, speeding, reckless operation, or parking in an unauthorized area. The driver and all passengers must wear safety seat belts while driving in the plant and whenever driving outside of the plant while on company business. For your own safety, wear you seat belt at all times while driving.

6.6 Use stairways and walkways as provided. Do not take shortcuts through any posted restricted areas. Go around or use crossover walkways where they have been provided. Do not climb over handrails or equipment.

6.7 When walking on or alongside roadways, walk facing oncoming traffic. Move to the side; do not force a vehicle to swerve to avoid striking you.

6.8 Use handrails when going up or down stairs. If carrying an object, one hand must

Levy-000331

be free for the handrail. Walk, do not run. Do not go up or down more than one step at a time.

6.9 When walking along conveyor ramps and inclines maintain your balance and use handrails to assure that you do not come in contact with moving machinery or belts.

6.10 When coming out of buildings adjacent to roadways, be extremely cautious to avoid being struck by any approaching vehicle. Always look both ways before stepping onto the roadway.

6.11 Report any unsafe conditions to your supervisor immediately.

Levy-000332

## HOUSEKEEPING

7.1 Housekeeping is everyone's responsibility. One of the best ways of avoiding accidents is by working and handling materials and equipment in a neat and orderly way. Every operation will give specific details on housekeeping assignments for your job.

7.2 Keep your work area clean and clear. Pick up and dispose of debris as it accumulates. Return hand tools and equipment to their proper storage places when finished with them.

7.3 All work areas including passageways, storage areas and service rooms are to be maintained in a clean and orderly manner and free of debris and in a sanitary condition.

7.4 Keep all walkways, aisles, stairs, and platforms clear of obstructions. Do not pile materials in any area where people must walk. Be sure that materials, which are stacked or piled near walkways, do not

Levy-000333

project into aisles, stairs or platforms and that they are properly stacked so they will not topple or fall.

7.5 Do not obstruct access to emergency exits, fixed ladders, stairways, electrical switches, and safety eyewash fountains or safety showers. Do not store any material in, on, or in front of switch boxes or other electrical equipment.

7.6 Keep floors and travel areas clean and clear. Clean up oil, grease, water and other liquids which can cause slips or falls.

7.7 When you have completed repair, construction, or maintenance work of any kind, take time to clean the area. Pick up and remove all waste and salvaged materials. Return all hand tools and equipment to proper storage. Remove all loose objects after completing overhead work. Replace all covers, guards and/or access panels.

7.8 Oily, greasy rags must be deposited in designated and properly marked, closed

Levy-000334

containers to prevent spontaneous combustion. Never dispose of oily rags in paper or trash containers.

7.9 Containers shall be provided for the collection and separation of waste, trash, and other refuse. Containers used for garbage, oily, flammable, or hazardous waters (such as caustics, acids, etc.) shall be equipped with covers and labeled. Garbage and other waste shall be disposed of at frequent and regular intervals.

7.10 Construction materials of all kinds will be stored in an orderly manner while work is in progress. Scrap lumber, pieces of pipe, conduit, metal, and all other debris shall be kept clear of work areas, passageways, stairs, and from around buildings or other plant structures.

Levy-000335

## WELDING, BURNING & CUTTING

8.1 Only trained and authorized personnel are permitted to use gas cutting or electric welding equipment.

8.2 Warn employees in the area before starting. Check above, below and around you.

8.3 Appropriate welders' hoods, goggles, and/or face shields must be worn for protection from flashes or sparks. An approved flame retardant jacket, burning/welding gloves, ear protection, and flame retardant clothing that covers both the upper and lower body must be worn when burning or welding.

8.4 Work must be shielded when welding or burning to protect others from the arc, flash, or ultraviolet rays.

8.5 Provide adequate ventilation and avoid inhalation of metallic fumes or acetylene. Local exhaust ventilation is required when burning or welding in enclosed buildings.

Levy-000336

8.6 Always check burning equipment for leaks before use.

8.7 Make periodic soap tests for leaks on all connections.

8.8 Repair of cutting and welding equipment must be done only by authorized personnel.

8.9 When torches are not in use, all pressure shall be bled from the lines and regulator by closing the tank valve first, then opening the torch valve and finally opening the regulator valve.

8.10 Maximum acetylene pressure through the gauge is 15 p.s.i.g.

8.11 Keep hoses coiled and off the ground to avoid damage, contamination, and tripping hazards.

8.12 Hoses, which are damaged shall be cut in two and taken out of service to prevent injury. Branching or using T-fittings in oxygen or fuel gas hoses is prohibited.

Levy-000337

8.13 Hot Work Permit – Specific areas will be designated for hot work such as burning, welding, and grinding. If an area is not designated for hot work, a hot work permit must be filled out before hot work can begin. The permit may require the use of fire blanket, other means of spark containment, removal of fire hazards, air quality tests, fire watch, etc. to protect other employees and surrounding property.

8.14 Supervision will designate an individual responsible for authorizing burning, welding, grinding, and other hot work operations in areas not specifically approved for such operations. The work area must be inspected, and the hot work permit signed before work can begin.

8.15 If it is necessary for you to be in an area where welding or cutting is being done, exercise caution. Never look directly at the intense light generated by welding or cutting. Check your clothing to be sure you are not carrying sparks, which might set your clothing afire. Grease and/or oil on your clothes are especially dangerous if you

Levy-000338

are working around oxygen. Oxygen can cause the grease or oil to ignite.

8.16 Cylinders Containing Compressed Gases – Oxygen, acetylene, and other compressed gases must be considered dangerous fire hazards because they support or increase the rate of combustion. When handling cylinders containing any kind of compressed gas, observe the following rules and specific instructions of your supervisor. If clothes are contaminated with grease, oil, or solvents, they must be changed before performing any burning or welding.

### 8.16.1 Transporting cylinders:

*8.16.1.1* Suitable carts shall be provided and used for conveying cylinders.

*8.16.1.2* Caps shall be in place on compressed gas cylinders unless they are in use. Always replace the caps on full or empty cylinders after regulators have been removed.

Levy-000339

It is especially important to have the caps in place while transporting cylinders to protect the valve.

8.16.1.3 Compressed gas cylinders must be transport in special containers or carriers provided for that purpose. At a minimum the carriers shall have toe guards and a retainer system to secure the cylinder from falling during transport. Do not handle cylinders with crane slings or magnets. Use good judgment when handling or moving cylinders and do not lift beyond your capabilities.

8.16.1.5 Compressed gas cylinders must always be securely tied off in a vertical position.

8.16.2 **Storage:**

8.16.2.1 Compressed gas cylinders shall be stored with regulators

Levy-000340

removed and the cylinder caps installed and tightened.

*8.16.2.2* Compressed gas cylinders shall not be stored near any source of heat or any area where unexpected contact with electrical equipment or conductors if they should slip, roll, or fall. Do not store cylinders in entrance/exit areas, or in stairwells.

*8.16.2.3* Oxygen cylinders must not be stored in a confined or enclosed space with acetylene, liquid flammables, oils, or grease. A leaking cylinder can cause spontaneous combustion of these materials.

*8.16.2.4* Acetylene cylinders must always be stored vertically and used vertically with the valve end up.

*8.16.2.5* Oxygen shall be separated from fuel-gas cylinders or

Levy-000341

combustible materials at a minimum of 20 feet or by a noncombustible barrier at least five feet high having a one-half hour fire resistance rating.

*8.16.2.6* Storage areas shall have signs posted stating "NO SMOKING", AUTHORIZED USE ONLY", and "ACETYLENE", "OXYGEN" to identify each area.

## *8.16.3* Using Cylinders:

*8.16.3.1* Never use oil or grease to lubricate any part of an oxygen, acetylene or other gas cylinder or regulator. Do not touch them if you have oil or grease on your hands or gloves.

*8.16.3.2* If a leaking cylinder is found, remove it to the outside immediately and keep it away from any flames or

Levy-000342

combustible materials. Notify your supervisor.

*8.16.3.3* Hoses for Acetylene-Oxygen Rigs – GREEN hose is for oxygen; RED hose is for all fuel gas. Never use compressed air to blow out these hoses. To prevent tripping hazards and hose damage, keep excess hose lengths coiled and lines arranged in orderly fashion.

*8.16.3.4* Never bring cylinders into or store cylinders in confined spaces, unventilated rooms, or other closed quarters. Storage areas must be open or ventilated to prevent a buildup of gas.

*8.16.3.5* All torches must have either flashback arrestors built into the torch or units connected between the hoses and the torch.

Levy-000343

proper signage will be displayed marking its location.

9.1.5  Articles shall not be placed on, or in front of, any fire fighting equipment or in a position that will obstruct its accessibility or hinder its use.

9.1.6  Never use water on or near electrical equipment.

9.1.7  Fire Department phone numbers shall be conspicuously posted at all telephones.

9.1.8  Always obey smoking regulations. Smoking is permitted in approved smoking areas only. Smoking is not permitted within 50 feet of any flammable liquid or gas storage area.

9.1.9  Do not allow rubbish or flammable materials to accumulate. Oily waste, rags, gloves, etc., shall always be placed in receptacles provided for them.

Levy-000345

*9.1.10* Never pour gasoline, kerosene, oil, etc., or other flammable liquids down drains or sewers. Flammable liquids are to be kept in self-closing, properly labeled containers. Never use flammable liquids on materials around open flames.

*9.1.11* Change your clothes immediately if they become soaked with oil, gasoline, kerosene, naphtha, or other flammable or combustible materials. Stay far away from salamanders, heating stoves, welding sparks, hot metal, and other sources of fire if your clothing has been exposed to flammable or combustible liquids.

*9.1.12* Do not light oil or gas furnaces, stoves, salamanders, or other heating equipment unless you have been properly instructed and authorized. Never deviate from specific written procedures when lighting furnaces, stoves, salamanders, and heaters.

Levy-000346

*9.1.13* Flammable liquids (flash point under 100°F) may be used only where there are no open flames or other sources of ignition within any possible path of a vapor trail. Do not dispense a flammable liquid into another container unless the nozzle and container are properly grounded. Flammable liquids shall be dispensed from approved safety cans only.

*9.1.14* Flammable liquids must be stored in a building, cabinet, or area specifically designed and approved for such storage and remote from general access or traffic. The storage area must be properly identified and have a fire extinguisher readily accessible.

## 9.2 Firefighting Equipment

*9.2.1* Firefighting Equipment must not be used for any purpose except to put out fires. Do not obstruct aisles or block the paths to fire plugs,

Levy-000347

extinguishers, and other firefighting equipment.

9.2.2   Learn the location of the nearest fire extinguisher in the area where you work. Learn how to operate them and which type of fire extinguisher to use on different types of fires, in the incipient or early stages.

9.2.3   All Fire Extinguishers must have metal tops and be mounted with metal brackets. Plastic tops and brackets are not approved for use.

### 9.2.4   Fire Classes:

9.2.4.1   **Class A** fires involve ordinary combustibles like paper, wood, cloth. Water is recommended, but any extinguisher rated A B C can be used with reasonable success.

9.2.4.2   **Class B** fires involve grease, flammable liquids, and flammable gas. They require the use of a blanketing or

Levy-000348

smothering type of extinguisher such as foam, carbon dioxide ($CO_2$), dry chemical, or water fog. Use any extinguisher rated B or multipurpose A-B-C.

*Caution*: Never pour water from containers or use an ordinary water hose on these fires.

9.2.4.3 **Class C** fires involve electrical equipment. Use non-conductive extinguishers such as dry chemical or carbon dioxide ($CO_2$). Use any extinguisher rated C or multipurpose A-B-C.

*Caution:* Never use foam or water; they can be very dangerous and may cause electrocution. If possible, always pull the main electrical control switch before fighting any electrical fire.

9.2.4.4 **Class D** fires involve combustible metals such as magnesium, Titanium, certain suspended metal powders, or finely divided iron or steel

Levy-000349

dust. Use only extinguishers rated D. (Special Dry Compound extinguishing agents.)

9.2.4.5 The PASS method shall be used when using a fire extinguisher – Pull, Aim, Squeeze, and Sweep.

9.2.5 If there are flammable liquids in containers, or pipe lines supplying gas or oxygen in the area where a fire breaks out, make every effort within the bounds of safety to remove the containers and shut off the valve controlling the gas or oxygen supply to keep the fire from spreading or exploding.

9.2.6 If a fire extinguisher is used, do not replace it on a hanger or in a cabinet. Notify your supervisor, who will have the extinguisher checked and refilled.

9.2.7 Automatic sprinkler systems: If you are in an area protected by a

Levy-000350

sprinkler system, do not tamper with the equipment. Do not pile materials close to the sprinkler valves or heads.

### 9.2.8 In case of fire:

9.2.8.1 Only do what you can do safely to control or contain the fire. Notify your supervisor as soon as possible and alert other personnel in the area of the situation. Call the fire department immediately if there is any doubt about the situation.

9.2.8.2 Be sure to give the exact location, speak clearly, and answer any questions that may be asked. Do not hang up until the communication is complete and you are told to do so.

9.2.8.3 If possible, send someone to the roadway or door of a building to direct the firemen

Levy-000351

when they arrive. In a major fire event, go to a prearranged known safe area and report to your supervisor.

9.2.8.4 If your clothing should catch fire STOP, DROP and ROLL. If possible, smother the flame with a blanket, coat, or anything available.

Levy-000352

## CONVEYORS

10.1 Only designated authorized persons are allowed to operate conveyors.

10.2 Conveyor systems shall be equipped with an audible warning siren that must be sounded 30 seconds prior to starting the conveyor, when the operator does not have a full view of the conveyor.

10.3 Conveyors should not be loaded or put into motion until:
   a) A check is made to verify that all employees are clear of the conveyor.
   b) All guards are in place.

10.4 All conveyors with walkways shall be equipped with guards to enclose all nip or pinch points.

10.5 At any area where employees or equipment passes under a conveyor, suitable guards shall be provided to protect employees from falling material.

Levy-000353

10.6 All conveyors with adjacent travelways shall be equipped with emergency stop cords or a railing positioned to prevent persons from falling on or against the conveyor.

   *10.5.1* Railings shall be constructed and maintained as to not create a hazard and able to with stand the shock, vibrations, and wear of normal operations.

10.7 Conveyors shall be locked out and tagged out with a "Do Not Operate" tag during repairs and when operation is hazardous to employees performing maintenance work.

10.8 Never attempt to oil, grease, or clean parts while a conveyor is in use unless grease fittings are piped to an area away from guarded nip points.

10.9 The use of or purchase of belt dressing of any type is prohibited.

10.10 Never operate machinery without all guards in place and in good repair.

Levy-000354

10.11 All machine guards must be replaced after removal for repair <u>before</u> machine is re-started.

10.12 Never ride or walk on a moving conveyor belt.

10.13 Always stop belts to adjust skirts and scrapers.

10.14 All walkways must be kept clean and free of debris.

Levy-000355

# LADDERS

11.1 Always inspect ladders before use. Defective ladders shall be tagged and immediately removed from service. Notify your supervisor for a replacement.

11.2 Only portable ladders of industrial quality and meeting ANSI standards may be used.

11.3 Portable metal ladders including aluminum shall not be approved for use.

11.4 Never paint or use painted wooden ladders. Paint will hide cracks, knots, rot, or other defects.

11.5 Use only company provided ladders. Never construct one or use contractor's ladders.

11.6 Inspect the safety feet before using the ladder and be sure the safety feet are positioned on a firm level surface.

11.7 Straight, portable ladders, extension ladders or non self-supporting portable ladders,

Levy-000356

shall extend at least three feet above the top access level and be placed so the distance from the base of the ladder to the wall or other supporting structure is about one-quarter the length of the ladder from the floor to the top support point. These ladders are to be tied in place, or held by a coworker whenever someone is working on the ladder.

11.8 Only one (1) man at a time should be on a ladder and only the tools required should be taken to the overhead repair area.

11.9 Both rails of the extension ladder must be tied off to a structure capable of stabilizing and supporting the ladder from falling. A ground person must be used to hold the ladder until it is properly tied off.

11.10 The ladder must be tied off as described above, or ground person must be holding the ladder during climbing and working activities.

Levy-000357

11.11 Another person does not need to hold a stepladder if they are used with all 4 legs on a level and even surface. The legs of stepladders shall be fully opened and locked. Never stand on top of a stepladder. Work from a point at least two feet or two steps from the top.

11.12 When climbing any ladder (portable or stationary), hold on with both hands and always face the ladder. Use a hand line to raise or lower tools that you will needs. Do not overreach. Move the portable ladder as work progresses or, if necessary, use another ladder to avoid overreaching. Never exceed the maximum intended load of the ladder.

11.13 Never place a ladder against equipment, which may move or rotate unexpectedly or in the path of equipment that may move unless such equipment is locked out.

11.14 Never extend an extension ladder full length. The overlap should be at least four rungs.

Levy-000358

11.15 Wherever practical, rope off the areas at the base of a ladder while in use.

11.16 Ladders shall not be placed in front of doors opening toward the ladder unless the door is blocked open, locked, or guarded.

11.17 Ladders shall not be placed on boxes, barrels or other unstable bases to obtain additional height.

11.18 When raising or lowering an extension ladder, take extreme care to keep your hands and fingers clear of pinch points.

11.19 Ladders must be stored properly when not in use.

Levy-000359

## SCAFFOLDING

12.1 Employees who perform work while on a scaffold shall be trained by a qualified person to recognize the hazards associated with the type of scaffold being used, the nature of any electrical hazards, fall hazards, and falling object hazards in the work area.

12.2 A qualified person shall assemble scaffolds and their components.

12.3 Scaffolds and their components shall be capable of supporting without failure at least four times the maximum intended load.

12.4 Any scaffold damaged or weakened from any cause shall be immediately repaired or replaced and shall not be used until repairs have been completed.

12.5 Scaffolds shall not be loaded in excess of the working load for which they are intended.

Levy-000360

12.6 Tools, materials, and debris shall not be allowed to accumulate in quantities to cause a hazard when working on a scaffold.

12.7 All scaffold planking must be approved and identified as scaffold grade.

12.8 Access to a scaffold shall be by secured ladder, or an equivalent safe access shall be provided. Climbing the side of scaffolding is not permitted.

12.9 Scaffolding greater than four feet in height must be equipped with handrails, mid-rails, toe boards, and be tightly planked.

12.10 Fall protection equipment including a body harness and deceleration devices shall be worn and connected to an approved anchorage point or lifeline when working on any scaffold platform greater than four feet in height and not equipped with standard top rails and mid-rails.

Levy-000361

prevents a person from an exposure to a fall. The length of the lanyard must prevent the person from reaching the free fall hazard.

13.4 Work Positioning is a system consisting of a body harness, lanyards, and anchorage devices rigged to allow a person to be supported on an elevated vertical surface, such as a wall or fixed ladder, and work with both hands free.

13.5 All fall protection equipment shall be visually inspected for damage and defects prior to each use. Employees are responsible for the care and maintenance of their personal fall protection.

13.6 Fall protection equipment shall be adjusted to minimize the drop in case of a fall. The potential free fall distances should never exceed 6 ft. The anchorage point for tie off should be at or above the D-ring level on the body harness whenever possible.

Levy-000363

13.7 In considering the most desirable anchorage for tie-off, any sharp object that the lanyard may contact while at the work location or during a possible fall must be avoided. Lanyards must never be tied off to shafts or other parts of machinery, which are subject to movement or rotation.

13.8 Anchorage Points must be capable of supporting 5,000 lb. per employee attached. If there is any doubt about the strength of the anchorage point, do not tie off; notify your supervisor and find an alternative anchorage point.

13.9 Anchorage locations should; reduce possible free fall distance, prevent swing fall hazards, and provide clear space in the potential fall path to avoid striking an object.

13.10 Use caution while wearing a body harness and lanyard when you are not tied off. Wear the lanyard in such a manner that it will not get caught on or in equipment, structures, or moving machinery.

Levy-000364

*13.10.1* All adjustment straps of the body harness shall be kept snug against the body.

*13.10.2* No part of the lanyard shall be allowed to dangle freely when not tied off. The lanyard shall be secured tightly against the user's body.

Levy-000365

## PERSONAL FLOTATION DEVICES

14.1 While working where there is a danger of falling into water, employees must wear a Coast Guard approved flotation device. A life ring with rope attached (or similar rescue device) must be in the immediate area and accessible.

Levy-000366

# RESPIRATORS

15.1 Respirators should always be worn when spray painting or in any other operation that may contaminate the air with dust or fumes and foreign particles. Consult your supervisor if in doubt.

15.2 If wearing a respirator is required, you must be medically evaluated, fit tested and properly trained. Facial hair, including stubble, is never permitted between the sealing surface and the skin on tight fitting respirators. Anyone using a paper dust mask must receive a copy of the Appendix D 1910.134, which regards voluntary use of respiratory equipment. (The facial hair policy does not apply to the use of paper dust masks.)

Levy-000367

## MOBILE EQUIPMENT OPERATION

16.1 Only trained and qualified operators shall operate mobile equipment.

16.2 Seatbelts shall be worn at all times while operating mobile equipment designed with a seat and seatbelt and equipped with a roll over protective structure (R.O.P.'s).

16.3 All mobile equipment shall have an operating back up alarm that can be heard above surrounding noise. Strobe lights shall only be used for night work when authorized.

16.4 Before operating any piece of equipment, perform a walkaround inspection and immediately report any problems found to the mechanic. After shift is complete, use form provided for any work to be done on equipment.

16.5 Employees performing maintenance or repairs on mobile equipment shall remove the ignition key, chock the wheels, lower

Levy-000368

all hydraulics, and tag the steering mechanism to prevent accidental starting or moving of the equipment.

16.6 On any equipment used in a warm or hot operation, check for oil leaks, hydraulic leaks, etc. every time you get in the vehicle.

16.7 All road trucks will have mud flaps and/or rock ejectors on rear wheels. These are to be anchored so no rocks can be thrown out from between dual tires.

16.8 Speeding, recklessness, thoughtless actions or horseplay will not be permitted under any circumstances. Transporting of passengers on the outside of mobile equipment, in buckets, fenders, in platforms, or on crane or hoist lines will not be permitted.

16.9 Cabs of mobile equipment shall be kept free of pop cans, bottles, starting fluid containers, etc.

Levy-000369

16.10 Never walk on the blind side of running mobile equipment.

16.11 Operators of mobile equipment shall sound horn before moving mobile equipment, any palace where vision is obscured, or any time a warning is appropriate.

16.12 Never get on or off a moving machine.

16.13 When mounting equipment, always follow the three-point system (i.e., 2 hands and 1 foot, 2 feet and 1 hand in contact with equipment).

16.14 All mobile equipment with hydraulic seats shall be tethered to prevent over extension with the exception of maintenance checks.

16.15 Extreme care shall be used by vehicles dumping on storage piles to make sure that material has not been loaded out below, which would cause the top edge of the pile to slough off and upset the equipment.

Levy-000370

16.16 Always operate mobile equipment perpendicular to any cut bank or stockpile and never parallel.

16.17 Never operate equipment or allow foot traffic in a bank or stockpile that has a vertical face or overhanging material.

16.18 When backing up to any elevated dumpsite, a properly placed berm, spotter, or both shall be used.

>  *16.18.1* When using a ground guide, confirm before operation the equipment what type of signals you will use and who will be giving them. Use only one ground guide.

16.19 Never work directly under loader buckets or raised truck beds unless they are securely blocked.

16.20 Loader buckets are not to be used as a work platform.

Levy-000371

16.21 Front-end loader buckets, dozer blades, crane buckets, etc. shall rest on the ground when not in use.

16.22 No riders are allowed on any moving equipment unless the equipment has a seat designed for that purpose.

16.23 Only authorized and trained employees who have successfully completed the Forklift Operator Safety Training Program shall be authorized to operate a powered industrial truck or forklift.

Levy-000372

## HOIST SAFETY

17.1 Hoisting, if done improperly, can present hazards to the operator and other workers in the vicinity. But, if proper precautions and techniques for operation, inspection, maintenance, and repair are followed, the risks can be controlled.

### 17.2 Hoist operators should:

17.2.1 Know and not exceed the safe load limit of hoisting equipment. The weight capacity must be prominently displayed (e.g. maximum load 10 tons).

17.2.2 Check controls to verify proper function.

17.2.3 Check pendant cables for cuts, kinking, or signs of wear.

17.2.4 Check swaged sockets for damage and pins for excessive wear.

17.2.5 Visually check hoist cables for fraying, kinking, crushing and

Levy-000373

twisting of the cables between the cable and the drum.

17.2.6   Visually inspect the hook for cracks, bending or distortion.

17.2.7   Do not attempt to lengthen or repair the load chain.

17.2.8   Position the hoist directly over the load.

17.2.9   Avoid the swinging of a load or hook when moving the hoist.

17.2.10   Pull in a straight line so that neither hoist body nor load chain or rope is angled around anything.

17.2.11   After the hook is placed in the lifting ring, apply slight pressure to the hoist to ensure that the lifting ring is seated in the bottom of the hook and that the hook is properly aligned.

17.2.12   Between lifts check to see that the rope is properly reeved on the drum.

Levy-000374

*17.2.13* Attach sufficient guide ropes to control the unit being moved.

*17.2.14* Check the intended movement path to see that it is clear of people and obstructions and to see if the intended destination is ready to receive the load.

*17.2.15* Do not make any repairs or adjustments on any part of the hoist unless you are authorized to do so.

*17.2.16* Check brakes for excessive drift.

*17.2.17* Be positioned on the pendant side of the hoist to get maximum clearance from the load and to prevent entanglement of cables.

*17.2.18* Avoid sudden starts, stops, or reverses to avoid shock loading.

*17.2.19* Raise the load only high enough to avoid obstructions.

*17.2.20* Do not hoist loads over workers, wait until the area is clear.

Levy-000375

17.2.21 Do not permit the operator or guide rope handlers to become distracted.

17.2.22 Be alert for any variation of operation.

17.2.23 Alert supervision of any malfunctions and tag hoists stating malfunction.

17.2.24 Never leave a load suspended in the air unless it is attended.

17.2.25 Do not allow unqualified personnel to operate hoists.

17.2.26 Never carry anyone on the hook or load.

17.2.27 Never use the hoist rope or chain as a sling.

17.2.28 Never use hoist chain or rope as a ground for welding nor touch a live welding electrode to the chain or rope.

17.2.29 Chains and slings must be tagged with their weight capacity.

Levy-000376

*17.2.30* Inspection records must be kept on chains, hooks, etc. in accordance with Federal guidelines.

*17.2.31* Never replace a clevis pin with a bolt.

*17.2.32* Each hoist and crane must be labeled with its lifting capacity and the label is to be visible from the ground.

Levy-000377

## STANDARD HAND SIGNALS FOR CONTROLLING
## CRANE OPERATIONS



HOIST: With forearm vertical, forefinger pointing up, move hand in small horizontal circles.



LOWER: With arm extended downward, forefinger pointing down, move hand in small horizontal circles.



USE MAIN HOIST: Tap fist on head, then use regular signals.



USE WHIPLINE (Auxiliary Hoist): Tap elbow with one hand, and then use regular signals.

Levy-000378





RAISE BOOM: Arm extended, fingers closed, thumb pointing upward.

LOWER BOOM: Arm extended, fingers closed, thumb pointing downward.





MOVE SLOWLY: Use one hand to give any motion signal and place other hand motionless in front of hand giving the motion signal.

RAISE THE BOOM & LOWER THE LOAD: With arm extended, thumb pointing up, flex fingers in and out as long as load movement is desired.

Levy-000379




RAISE THE BOOM & LOWER THE LOAD: With arm extended, thumb pointing up, flex fingers in and out as long as load movement is desired.

SWING: Arm extended, point with finger in direction of swing of boom




STOP: Arm extended, palm down, move arm back and forth horizontally

Both arms extended, palms down, move arms back and forth horizontally.

Levy-000380



TRAVEL: Arm extended forward, hand open and slightly raised, make pushing motion in direction of travel.



DOG EVERYTHING: Clasp hands in front of body.



TRAVEL (Both tracks): Use both fists in front of body, making a circular motion about each other, indicating direction of travel, forward or backward



TRAVEL (One track): Lock the track on side indicated by raised fist. Travel opposite track in direction indicated by circular motion of other fist, rotated vertically in front of the body (Land cranes only)

Levy-000381



EXTEND BOOM (Telescoping booms): Both fists in front of body with thumbs pointing outward.



RETRACT BOOM (Telescoping booms): Both fists in front of body with thumbs pointing toward each other.

Levy-000382

| Size of Cable | | Average Weight per Foot in Pounds | Rated Capacity – Tons | |
| --- | --- | --- | --- | --- |
| | | | 1– sling vertical | 1 sling choker hitch |
| | 1/4" | .10 | 1/2 | 3/8 |
| | 5/16" | .16 | 3/4 | 1/2 |
| 6' × 19' Construction | 3/8" | .23 | 1 1/4 | 3/4 |
| | 7/16" | .31 | 1 1/2 | 1 1/4 |
| | 1/2" | .40 | 2 | 1 1/2 |
| | 9/16" | .51 | 2 1/2 | 1 3/4 |
| | 5/8" | .63 | 3 1/4 | 2 3/8 |
| | 3/4" | .90 | 4 1/2 | 3 3/8 |
| | 7/8" | 1.23 | 5 5/8 | 4 1/4 |
| | 1" | 1.23 | 7 3/8 | 5 1/2 |

Levy-000383

## CONFINED SPACE ENTRY

18.1 Never enter any confined space unless you are authorized to do so. All identified permit-required confined spaces shall be labeled, and will require Entry Permits to be completed and filed.

18.2 "Permit only" confined spaces require corrective action before they can be entered.

18.3 Do not enter any "permit only" confined space when an engulfment hazard or an oxygen deficient atmosphere exists.

18.4 If any process is performed, such as welding, burning, grinding, cleaning, etc., that may change the atmosphere within the confined space, continuous monitoring is required.

18.5 Never enter any confined space that has not had the energy controls locked out.

18.6 Do not enter any permit required confined space without an attendant stationed outside in communication with you.

Levy-000384

## USE & CARE OF HAND TOOLS

19.1 All hand tools must be inspected each time before use. Mushroomed, cracked, or chipped heads and rough, splintered or badly worn handles must be turned in for repair or replacement. Never use a defective tool or leave defective tools where others might use them.

19.2 If you use your own personal tools, repair or replace them as soon as they become worn or defective. All tools are subject to periodic inspection by supervision and must be replaced or repaired if found to be unsafe.

19.3 Use the right tool for the job and keep tools clean. Never use tools and equipment for purpose for which they were not designed or intended.

19.4 Tools shall be transported in toolboxes, tool belts, tool pouches, etc. designed for such use. Do not carry hand tools in pants or shirt pockets.

Levy-000385

19.5 Never throw tools, equipment, or parts from one location to another, from one employee to another, or from one level to another level.

19.6 Do not leave tools, equipment, or materials in elevated places from which they may fall or be knocked off.

19.7 Maintain secure footing and balance, and position yourself while applying pressure on a wrench or other tool, so that you won't fall if the tool suddenly moves or slips from its bite. When possible grasp something that is firmly secure with your free hand to assist in maintaining your balance. If necessary, reposition yourself and coworkers out of the working path of the tool.

19.8 Do not force tools beyond their capacity or use "cheaters" to increase their capacity.

19.9 Do not fabricate hand tools. Do not modify or in any way alter the design of existing hand tools.

Levy-000386

19.10 Only approved lock blade pocketknives are permitted in the plant. Always cut in the direction away from yourself. Kevlar gloves or Kevlar lined leather gloves must be worn when cutting with a pocketknife.

19.11 Wire stripping tools shall be used when preparing electrical wire.

19.12 Alternate tools, other than open blade knives, shall be used to cut materials whenever possible.

Levy-000387

## POWERED HAND TOOLS & EQUIPMENT

20.1 All powered tools and equipment must be inspected before each use. All tools must be physically and mechanically sound, and appropriate for the job. If any defects are detected, the tool must be removed from service immediately. *Only properly trained and authorized personnel are permitted to operate these types of equipment power tools.*

20.2 Electric tools or equipment with broken three-prong grounding plugs must be replaced or repaired before use.

20.3 All power tools must either be double insulated or have a proper ground plug.

20.4 Double insulated portable electric tools must be identified as double insulated so they will not be confused with grounded tools. All portable cord and plug electric tools must be connected to G.F.C.I. (Ground Fault Circuit Interrupter).

Levy-000388

20.5 Electrical power tools are not to be used in hazardous locations as defined by the National Electric Code unless the tool is approved for service in that environment.

20.6 Guards or Shields specifically designed for portable power tools must be installed before use. Never use tools and equipment when guards or shields are defective or have been removed. Report the condition to your supervisor immediately.

20.7 Temporary electric extension cords must be of the three-wire type and shall be designed for industrial usage.

    *20.7.1* Temporary electric cords must be inspected for kinks, worn insulation, and exposed strands of wire before use.

    *20.7.2* Temporary electric cords must be protected from physical damage and installed to be out of walkways, stairways, aisles, and areas where they present a trip hazard.

Levy-000389

*20.7.3*    Temporary electric cords must be protected by G.F.C.I. (Ground Fault Circuit Interrupters).

*20.7.4*    Temporary work lighting must be protected by G.F.C.I. (Ground Fault Circuit Interrupters) and shall be protected from accidental contact or breakage.

20.8  Pneumatic Power Tools and Hose.  Tools shall be secured to the hose by a positive means to prevent the tool from becoming accidentally disconnected.  Safety clips or retainers shall be installed on pneumatic tools to prevent the attachments from flying off.  When you are finished with air-powered tools, disconnect the air hose, and release the air in the tool by pressing the trigger.

*20.8.1*    All hoses, fittings, and clamps must be of specific design for the use of pneumatic power tools and follow manufacturers' recommendations for their assembly.  Automotive radiator

Levy-000390

type hose clamps are not permitted on air hoses.

*20.8.2*  Pneumatic hose sections must be wired together at each coupling connection.

20.9 Cup-type goggles or mono-goggles or cup-type side shield safety glasses with full-face shield must be worn when using air operated drills, jackhammers, grinders, sanders, and cut-off saws, and power washers.

20.10 Compressed Air – Never direct compressed air toward yourself or anyone else for any reason. Never connect, or allow others to connect, to plant air as a source of breathing air unless it is connected through an approved breathing air purification system.

*20.10.1*  Compressed air used for cleaning parts or machinery shall not exceed 30 PSI and then only with effective chip guarding and personal protective equipment.

Levy-000391

*20.10.2* Never use compressed air to clean your person, clothing being worn, or that of another person.

20.11 Never use fixed or portable grinders without the use of protective shielding and proper eye protection (face shield with safety glasses, or goggles). A pedestal grinder tool rest must not be more than 1/8" away from the grinding wheel and the upper tongue guard not more then ¼" from the grinding wheel.

    *20.11.1* Prior to mounting, all grinding wheels shall be inspected for damage by a trained and authorized person. This inspection will include a ring test when appropriate.

    *20.11.2* The spindle speed of the machine shall be checked before mounting of the wheel to be certain that it does not exceed the maximum operating speed marked on the wheel.

Levy-000392

*20.11.3* You should not use any grinding wheel unless you have been properly trained in its use and authorized by your supervisor.

*20.11.4* Gloves should not be worn when using a pedestal or bench grinder.

20.12 Hydraulic powered tools and jacks are required to be visually inspected before and after each use.

*20.12.1* Hydraulic powered tools and jacks shall have a documented thorough inspection every 6 months by a competent person. Maintain all documents for at least 2 years.

*20.12.2* The rated load shall be legibly and permanently marked in a prominent location on the jack.

*20.12.3* Hydraulic powered tools and jacks shall not be used in a manner that will exceed the rated load to any other capacity of the tool.

Levy-000393

## ELECTRICAL SAFETY

21.1 Only qualified and trained personnel are allowed to perform electrical maintenance or repair.

21.2 All portable electrical tools must be fully grounded or be double insulated for employee protection.

21.3 Inspect any electrical extension cords and portable electric tools prior to use. Do not use any damaged equipment.

21.4 Follow all lockout procedures before performing any work on energized equipment.

21.5 Only authorized and qualified personnel are allowed to make electrical connections or repair electrical equipment and wiring. Before beginning work, always use a testing device to determine if lines or equipment are live. The proper PPE, including dielectric gloves and face shield, must be worn while making these tests. All

Levy-000394

jewelry and metallic belt buckles are prohibited when working on energized parts.

**Caution:** Make sure the testing device is properly rated for the voltage being tested, and that it is working properly.

    *21.5.1*    Only qualified and authorized employees may work in areas containing unguarded, un-insulated energized lines or parts of equipment at 50 volts or more.

    *21.5.2*    Only qualified and authorized employees may work on energized parts that must be worked on in an energized state, or do not have the capability of being locked out.

21.6 Consider all wires live until it is positively known that they are dead. Do not touch any exposed or dangling wires. Report exposed wires and open electrical components to your supervisor.

Levy-000395

21.7 Do not use extension cords that are defective. Examine them carefully for worn insulation and exposed strands of wire before use. Connect extension cords to G.F.C.I. outlets or adapters. Do not place extension cords over sharp edges or across aisles where mobile equipment can damage them. Do not create a tripping hazard with extension cords.

21.8 Extension cords may not be used as a substitute for fixed wiring; run through holes in walls, ceilings doors, windows or floors; attached to building surfaces.

21.9 Do not overload electric circuits. When fuses blow continually, or circuit breakers kick out, report the condition to your supervisor.

21.10 Heed all warning signs and signals concerning the hazards of electrical equipment or lines.

21.11 Unauthorized personnel are not permitted to enter rooms or vaults containing live

Levy-000396

electrical lines or equipment, such as supply stations, substations, motor rooms, control houses, or any room containing high voltage equipment unless instructed to do so by Supervision and accompanied by a trained and authorized individual.

Levy-000397

# LOCKOUT/TAGOUT

22.1 No employee is allowed to adjust, service, repair or perform maintenance on machines or equipment without first bringing the source or sources of energy to a zero energy state, relieving any potential energy and then locking-out the source of energy to prevent accidental start-up.

22.2 Review the procedure for lockout and shutdown specific to that piece of equipment before performing the work.

22.3 Only employees trained and authorized may perform lockout procedure.

22.4 Every employee involved in work on a machine or piece of equipment must be part of the lockout procedure and must use his or her own lock.

22.5 The company will supply locks and tags that will be used exclusively for equipment lockout.

Levy-000398

22.6 Only the employee that installed the lock is allowed to remove it. If it needs to be removed, and that employee cannot be found, attempt to locate the employee who left the lock in place.

Levy-000399

## BLOOD BORNE PATHOGENS

23.1 An inherent risk in rendering first aid is contact with bodily fluids (blood, etc.). When assisting an injured person take precautions to protect yourself by avoiding direct contact with blood, etc. Use approved bandaging materials or cloth to stop bleeding, and an approved CPR rescue mask for rescue breathing.

23.2 Wash your hands using soap and water after helping someone and refer to the Blood Borne Pathogen policy book for decontamination of the scene.

Levy-000400

## OFFICE SAFETY

24.1 Be careful going around corners or opening doors.

24.2 In multi - drawer file cabinets, place heaviest loads in lower drawers to avoid tipping entire cabinet when top drawer is opened.

24.3 Don't leave desk, cabinet, or file drawers open.

24.4 Be sure electrical cords and phone lines are secured out of the way of traffic.

24.5 Don't lift or carry equipment that is too heavy for you; get help to avoid an injury.

24.6 There is no smoking allowed in any office building.

Levy-000401

## MOTOR VEHICLES

25.1 All employees operating Company vehicles must have the appropriate license for the vehicle they are operating.

25.2 All operators of Company vehicles shall use due care and caution.

25.3 Check your vehicle carefully before leaving the garage or Company location.

25.4 Take into account not only your own shortcomings, but also those of the other drivers on the road.

25.5 Consider other drivers, anticipate and be prepared for any unsafe act.

25.6 Know and observe all motor vehicle laws.

25.7 Be constantly alert and observant.

25.8 All occupants of any company owned vehicles shall wear Seatbelts.

Levy-000402

25.9 Drivers of company owned vehicles must observe all traffic regulations on public roads and plant properties.

25.10 Speed must be governed by posted limit or existing road conditions.

25.11 Use extra precautions during wet and icy weather.

25.12 Avoid distractions such as eating or using hand held cell phones while driving.

25.13 Report all accidents immediately.

Levy-000403

# HAZARD COMMUNICATION PROGRAM

## 26.1 Policy

*26.1.1*  It is the intent of the Edw. C. Levy Co. and subsidiaries to comply with the requirements of the OSHA Hazard Communication Standard as set forth in 29 CFR 1910.1200, 29 CFR 1926.59, MSHA Part 62, and any state or local regulations as applicable.

## 26.2 General

*26.2.1*  The Hazard Communication Standard requires employers to inform their employees of any chemical hazards to which they may be exposed during normal working conditions or in a foreseeable emergency. Chemical manufacturers and distributors are required to evaluate the hazards of their products and provide the purchasers with the information

Levy-000404

necessary to ensure safe handling, use and storage of the chemicals. Employers are required to communicate this information to employees through the use of material safety data sheets, labels and other forms of warning and employee information and training so employees are able to protect themselves.

## 26.3 Hazard Determination

*26.3.1*  Whenever possible, the Edw. C. Levy Co. will rely on the hazard evaluation of purchased materials, by the manufacturer or distributor, as required under the standard. This evaluation is to provide information on a chemical's potential to cause adverse health effects or potential to pose a physical hazard.

*26.3.2*  For those materials that are produced, processed and sold under a Levy company name, the

Levy-000405

appropriate hazard evaluation will be performed, with proper information and documentation going to all customers in a timely manner.

## 26.4 Material Safety Data Sheets (MSDS)

26.4.1 A material safety data sheet (MSDS) is required for employee access for each potentially hazardous chemical that is used stored or produced at the workplace. The purchasing department shall ensure that suppliers provide a material safety data sheet on or before delivery of the first shipment of the material.

26.4.2 The plant manager or designated representative is responsible for compiling and maintaining the file of material safety data sheets.

26.4.3 Employees are to have access to any MSDS of a product they may be exposed to while at the job site during their work shift.

Levy-000406

*26.4.4* The content of a material safety data sheet is specified under the standard. All MSDS in our possession are to meet this standard.

*26.4.5* A workplace inventory of hazardous chemicals must be maintained and routinely updated to ensure compliance with this section. Each plant shall compile an inventory of the materials that are used, stored or produced at that location.

## 26.5 Labels And Other Forms Of Warning

*26.5.1* Containers of hazardous chemicals shall have an appropriate label to ensure employee protection. These labels are to contain the following information:
- Identity of the chemical.
- Name and address of the manufacturer, importer or other responsible party.
- Appropriate hazard warnings.

Levy-000407

26.5.2    All incoming and outgoing containers must be labeled. Any containers with damaged or missing labels shall have the labels replaced. Existing containers that have deteriorated or missing labels will also receive new labels.

26.5.3    Company policy requires that all plant piping systems that contain hazardous chemicals be labeled at access points and where piping is 8 feet or closer to employee contact.

## 26.6  Employee Information And Training

26.6.1    Employee training is one of the most important parts of the Hazard Communication program. Since this program is performance oriented, as are most under OSHA, employee knowledge and actions provide the feedback to the quality and success of the training.

Levy-000408

26.6.2    An employee cannot adequately protect himself or herself from potential harm from the materials routinely worked with without the necessary information. The training must explain the chemical hazards that an employee may be exposed to during normal working conditions or during a foreseeable emergency.

26.6.3    Training must be provided to any employee working in an area where hazardous chemicals are present, when a new hazard is introduced into the work area or when he is transferred to a new job where hazardous chemicals are present.

26.6.4    Training records must be maintained at each site.

26.6.5    The training program must be site or work area specific as determined by the materials on

Levy-000409

hand. But, all employees must be trained in the following areas:

1. The requirements of the Hazard Communication Standard.

2. Which operations in their work area may contain hazardous materials.

3. The location and availability of the written hazard communication program, the list of hazardous chemicals and the location and availability of the material safety data sheets.

4. Methods and observations that may be used to detect the presence or release of a hazardous chemical in the work area.

5. The physical and health hazards of the chemicals in the work area.

6. The measures employees can take to protect themselves from these hazards, including

Levy-000410

information on work practices, emergency procedures and personal protection equipment.

7. Details of the written Hazard Communication Program, including an explanation of the labeling system, how to read and interpret material safety data sheets and how employees can obtain and use the appropriate hazard information on the labels and in the MSDS.

## 26.7 Trade Secret Information

*26.7.1* Chemical information may be withheld from disclosure as a trade secret to protect a competitive advantage. There are a series of requirements that must be met in order to claim the information as a trade secret.

*26.7.2* This information is to be made available under certain

Levy-000411

circumstances to various individuals or groups as provided in the standard.

## 26.8 Hazardous Non-Routine Tasks

*26.8.1*   Each location must compile a list of tasks or activities which employees may perform on a non-routine or periodic basis that may expose the employees to potentially hazardous chemicals.

*26.8.2*   The standard requires that any employee performing a hazardous, non-routine task be trained prior to starting the task. The training is to provide the employees with appropriate safety information concerning the hazards involved and how to protect themselves.

*26.8.3*   It is company policy that no employee will begin work in a confined space or on any hazardous non-routine task without first receiving the

Levy-000412

appropriate safety information from the supervisor.

## 26.9 Education Of Contractors

*26.9.1*   Any outside contractors and their employees must be informed of any hazardous chemicals to which they might be exposed while working at a Levy location. This information must be presented prior to the contractor's employees entering the location to begin work.

*26.9.2*   The information that must be supplied is as follows:

1. Hazardous chemicals to which the contractor's employees may be exposed while at our site.
2. Measures the contractor's employees may take to lessen the risks of an exposure.
3. Steps the company has taken to lessen the risks.

Levy-000413

4. The location of the MSDS notebook for the site and any other written materials required under the standard.
5. Medical or first-aid procedures to follow in the event of an exposure.
6. The labeling system used at the location.

26.9.3　Naturally, if a contractor brings hazardous chemicals onto a Levy site, the contractor must provide the same information to the Levy manager so our employees can be informed and trained as required.

## 26.10 Other Information

26.10.1　There are other sections contained in our site's written Hazard Communication such as:
1. Personal Protective Equipment (PPE).
2. Emergency Procedures.
3. Industrial Hygiene Practices.
4. Definitions.

Levy-000414

I acknowledge receiving a copy of the Edw. C. Levy group of companies Employee Safe Work Guidelines effective _____, 20____.

I understand that I must keep this book and that I must know and follow the safety rules and regulations while performing my job and do all possible to prevent accidents to myself and others.

_____     _____
Date                          Employee No.

_____
Signature

_____
Job Classification

This receipt will be filed in your personnel file.

Levy-000415

# SAFETY IS EVERYONE'S BUSINESS
## AT

EDW. C.  CO.

## SAFETY EQUIPMENT

As a safety precaution, all personnel must have safety boots with the following requirement: Metatarsal steel-toed, leather, over the ankle. These must be worn at all times.

Hard hats are to be worn by all personnel in all plant areas. A hard hat is not required while in the office or other enclosed building.

Safety glasses with side shields are to be worn by all personnel in all plant areas when required.

Gloves must be worn as required by the job.

"Greens" must be worn as required by the job.

Make use of all safety devises and equipment required by the job.

## PROPER WORK ATTIRE

All personnel should come to work properly dressed and with all required safety equipment. Dress for the weather conditions as well as for the type of work performed. Be cautious of loose fitting garments, which could become caught in machinery.

During warm weather, certain summer clothes such as shorts, working without a shirt or sleeveless shirts can be hazardous in the workplace. Proper clothing protects from hot sparks, sunburn, skin abrasions and bites. Good quality cotton or cotton blends offer best all around protection. Clothing made from polyester fabrics and other synthetics will melt if ignited, causing potentially painful skin burns.

During cold weather, dress in layers of clothing. Natural fabrics will allow moisture from perspiration to pass through them, keeping you drier and warmer.

## EQUIPMENT

Never walk or drive on the blind side of mobile equipment.

If mobile equipment has only one seat, *only one person* shall ride on that piece of equipment.
Never work out of a loader bucket.

Never get on or off a moving machine.

Only qualified, trained personnel are to operate equipment and/or tools.

All machines or equipment shall be locked out and tagged prior to service, maintenance or adjustments.

## GENERAL

Use extreme caution at all railroad crossings within the scope of our operation.

Never remove or make safety devices inoperable.

Housekeeping is everyone's responsibility. A job is never complete until the work area is clean.

Inspect your work area daily and correct or report and hazards.

Make proper use of stairways, catwalks, and handrails.

Know the location and operation of all fire extinguishers in work area. Locate all exits, in case of emergency situation, and the quickest routes to them.

Report all injuries immediately.

Report all unsafe conditions immediately.

---

I have read and understand the "Safety is Everyone's Business" rules and will follow them at all times.

_TED LUCIO_
Name

_72 Lui_
Signature

_11/30/09_
Date

# EDW. C. LEVY CO.

## MINI MILL DIVISION

### UNIFORM RULES AND REGULATIONS

#### January 2008

## 1. ACCIDENTS

A. Major chargeable accident after full investigation
- Subject to discharge

B. Minor chargeable accidents
- 1st Offense- Written Reprimand
- 2nd Offense- Final Written
- 3rd Offense- Subject to Discharge

C. Failure to report all accidents promptly and personal injury (to self or others) or major accidents immediately
- 1st Offense- Final Written
- 2nd Offense- Subject to Discharge

D. Failure to report unsafe actions/conditions promptly to management
- 1st Offense- Written Reprimand
- 2nd Offense- Final Written
- 3rd Offense- Subject to Discharge

## 2. EQUIPMENT

A. Failure to keep equipment in neat and proper running order (fuel, grease, proper oil levels, etc.)
- 1st Offense- Written reprimand
- 2nd Offense- Final Written
- 3rd Offense- Subject to Discharge

B. Operating equipment in unsafe and/or negligent manner
- Subject to Discharge

C. Unauthorized use of Company premises or Company owned motor vehicles or equipment
- Subject to Discharge

D. Unauthorized carrying of passengers
- Subject to Discharge

## 3. GENERAL RULES

A. Dishonesty, deliberate falsification of reports or timesheets, punching or tampering with own or another employee's time card
- Discharge

B. Deliberate abuse or destruction of company equipment, tools, or property; or the property of any employee
- Subject to Discharge



PLF. 5
DATE 11/10/15
RPTR LS
Collins Reporting

Levy-000025

C. Assaulting, striking, or threatening another individual, initiating a fight, or possession of a weapon while on duty or on company and/or customer property
- Subject to Discharge

D. Wasting time, horse play, or interfering with production or others while on duty
- Subject to Discharge

E. Employees off work as a result of disciplinary action shall refrain from entering company and/or customer property without a scheduled appointment with a company representative
- Subject to Discharge

F. Flagrant disobeying of orders and/or Insubordination (defined as less than refusing work assignment)
- 1st Offense- Final Written
- 2nd Offense- Immediate Discharge

G. Conviction for driving recklessly while on duty.
- 1st Offense- Final Written
- 2nd Offense- Discharge.

H. Refusal to perform assigned work
- Voluntary Quit.

I. Sleeping while on duty
- 1st Offense- Final Written
- 2nd Offense- Immediate Discharge.
-

J. Any type of sexual harassment (i.e. pictures, language, touching). (Refer to Company Policy on Sexual Harassment)
- Subject to Discharge

## 4. WORK PERFORMANCE

A. Failure to follow posted Company Safety Rules
- 1st Offense- Final Written
- 2nd Offense- Subject to Discharge

B. Quality of work does not meet Company Standards
- 1st Offense- Written Reprimand
- 2nd Offense- Final Written
- 3rd Offense- Subject to Discharge

C. Time required for specific jobs does not meet Company Standards
- 1st Offense- Written Reprimand
- 2nd Offense- Final Written
- 3rd Offense- Subject to Discharge

## DRUG/ALCOHOL POLICY
See attached policy

## ATTENDANCE POLICY
See attached policy

G:\HRESOUCE\Employment\MM Manager Reference Manual\Rules & Regulations\MM Rules 2008 Draft.doc5/9/2008

Levy-000026

## CARDINAL RULES

### Failure to follow these rules will lead to discipline up to and including discharge.

1. Lockout, tag-out, and tryout, and the release of stored energy must be performed before beginning any maintenance or servicing activity on equipment. This includes mobile equipment.

2. When working on or near hydraulic and mechanical equipment, the equipment and implements must be properly brought to rest. Examples are, but are not limited to: on the ground, set on appropriate jack stands, set on adequate blocking or cribbing etc.

3. Confined space entry procedures and policy must be followed for all confined space entry.

4. Fall protection must be utilized where required.

5. Safety devices and/or warning signs must never be tampered with or made inoperable or unreadable.

6. Tools and equipment must be inspected prior to use. Report any defective equipment to your Supervisor immediately.

7. Never cross railroad tracks if flashing lights, gates, or other warning signals are activated unless signaled by an uniformed representative of the railroad or the steel mill. Crossing tracks in areas where no lights or signals are present must be done with extreme caution and as spelled out in applicable written job procedures or rules.

## 5. SUNDRY

A. Penalty for three (3) minor offenses in separate categories in a sixty (60) day period. (See Note 2).
- Final Written

B. Penalty for three (3) major offense in separate categories in a nine (9) month period. (See Note 3).
- Subject to Discharge

Note 1: It is recognized that extenuating circumstances alter conditions and time elements. Each case to be heard on its own merits.

Note 2: A minor offense is defined as one for which the penalty is a reprimand.

Note 3: A major offense is defined as one for which the penalty is final written warning.

Note 4: Offenses that are over 12 months old shall not be used towards progressive disciplinary actions. A prompt warning notice in writing must be given for infractions of any rules or regulations. Discharge must be by proper written notice.

Levy-000027

I have received the January 2008 Mini Mill Uniform Rules and Regulations for my file. I understand and will comply with all provisions. I also understand that if I am in violation of this policy, the Company could apply discipline up to and including discharge.

_____   _____
Employee Signature                                        Date   11/30/08

_____   _____
Supervisor Signature                                      Date   11-30-09

Levy-000028

# Levy Steel Mill Services Cardinal Rules

Failure to follow these rules may lead to discipline up to and including discharge

1. Employees must immediately report all incidents and accidents to their Supervisor or Lead Person. This includes: minor damage, major damage, near hits and all injuries both minor and major.

2. Employees must perform lockout, tag-out, tryout and the release of stored energy before beginning any maintenance or servicing activity on equipment, including mobile equipment.

3. Employees working <u>on or near</u> hydraulic and mechanical equipment must properly bring the equipment and implements to rest. Some examples include, but are not limited to: on the ground, set on appropriate jack stands, set on adequate blocking or cribbing, etc.

4. Employees must follow all confined space entry procedures and policies.

5. Employees must utilize fall protection when working at unprotected heights above four (4) feet. If continuous positioning is required while working at unprotected heights, continuous tie-off must also be maintained. The following tasks do <u>not</u> require fall protection: walking or working on ladders, vehicles or trailers on which employees must be located in order to perform their duties. If you are not certain of the specific requirement for any task, contact your supervisor for direction.

6. Employees must never tamper with, make unreadable or make inoperable, any safety devices or warning signs.

7. Employees must inspect all tools and equipment prior to use, and immediately report defective equipment to their Supervisor.

8. Employees must never cross railroad tracks if flashing lights, gates, or other warning signals are activated. The only exceptions are if signaled to cross by a uniformed Police Officer, a representative of the railroad, or by a member of the railroad crew if on customer site. Use extreme caution, as spelled out in applicable written job procedures or rules, when crossing tracks in areas where no lights or signals are present.

Employee Name: _T/ED LUCID_
(Print)

Employee Signature: _T. D. Lucid_
(Print)

Date: _2/15/11_

Revised 4-22-2010
Version 6


PLF. ___
DATE _11/11/15_
RPTR _LS_
Collins Reporting

Levy-000269

# Edw. C. Levy Co. Steel Mill Service

# Fall Protection

# Standard *29 CFR 1926.501*

# Section 12

# Revised 7/2010





PLF. 7
DATE 11/u/15
RPTR LS
Collins Reporting

Levy-000296

| PURPOSE: | To document Fall Protection rules and requirements at Edw. C. Levy Co. Steel Mill Service. |
|---|---|
| SCOPE: | All employees covered under OSHA regulations and any on-site contractor. |
| Procedure: | Edw. C. Levy Co. Steel Mill Service's written Fall Protection rules and requirements procedure will cover all the individual aspects of this regulation in detail. |

**Section 12 Fall Protection**
SCOPE AND PURPOSE

It is the policy of EDW. C. LEVY CO. STEEL Mill Service to permit only employees trained in fall protection procedures to work in areas where fall hazards exist; to reduce the likelihood of fall accidents and to help ensure a safe work environment. Currently, all questions relative to working at heights will be directed to Mr. Rock Miller, Safety, Steel Mill Services. Mr. Miller is a certified "Competent Person for Working at Heights"

## 12.1 GENERAL PROCEDURES

A thorough understanding of the fall hazards in your workplace is the first step in fall prevention. Once potential fall hazards are identified, steps to eliminate or control them will occur. Engineering methods, including guardrails or scaffolds, are to be used first. If engineering controls are not possible, personal fall protection will be used. Levels of six (6) feet or higher require fall protection.

One hundred percent (100%) fall protection will be provided for all employees who are working near the edge of a building, a platform, an open shaft, or any area that poses a possibility of falling six feet or more. Only equipment that meets ANSI standards shall be used.

Floor openings will be planked over or barricaded and slab edges of an open building will be protected by standard railing and toe boards. These protective barriers will be maintained and will not be disturbed or removed except as directed by a supervisor. If temporary removal is required, persons who remove these barriers will be responsible for their replacement as soon as circumstances permit.

In the event an employ falls or some other related, serious incident occurs, a prompt rescue will be deployed if the employee is unable to rescue themselves and a investigation shall be conducted to examine the circumstances of the incident to determine if the fall protection plan needs to be changed (e.g. new practices, procedures, or training) and shall implement those changes to prevent similar types of falls or incidents.

## 12.2 TRAINING

12.2.1 The Company will train all affected employees to recognize fall hazards and how to minimize these hazards, the use of personal fall protection including the limits of the equipment, the proper anchoring and tie-off techniques, methods of use, and the proper equipment inspection and storage.

12.2.2 Employees must be trained to visually inspect their equipment before each use and to have it inspected every 6 months by a "competent person."

Employees are responsible for the care and maintenance of their personal fall protection equipment.

12.2.3 Documentation of this training must be kept on file. Training records must include the following: 1) Who was trained, when, dates of training, 2) Signature of person providing training and date management determined training was deemed adequate.

12.2.4 Retraining shall be provided when the following are noted: 1) Deficiencies in training. 2) Work place changes. 3) Fall protection systems or equipment changes that would render previous training obsolete.

## 12.3 Definitions

12.3.1 Personal Fall Protection is a system that is used to arrest a fall from an elevated level. Fall protection equipment must consist of a full body harness, a shock absorbing lanyard or a retractable lanyard, and an anchorage point or lifeline.

12.3.2 Travel Limiting is a fall protection system consisting of a full body harness, an anchorage point, and a lanyard that prevents a person from approaching an exposure to a fall.

12.3.3 Work Positioning is a system consisting of a full body harness, lanyard, and anchorage devices rigged to allow a person to be supported on an elevated vertical surface, such as a wall, a pole, a fixed ladder, and have both hands free.

12.4    Utilization of Fall Protection

12.4.1  All employees must use fall protection when working in an area where a hazard exists of a fall from a height, entrapment, or engulfment. Employees working at any elevation greater than 6 feet above the floor, deck, platform, or ground level, and not protected by standard hand rails, or equivalent shall be required to use personal fall protection.

12.4.2  Employees working in an aerial lift or on scaffolding not equipped with standard hand rails shall be required to use personal fall protection.

12.4.3  Fall protection equipment shall be adjusted to minimize the drop in case of a fall. Free fall distance must not exceed 6 feet.

12.4.4  Use caution while wearing a body harness and lanyard when you are not tied off. Wear the lanyard in such a manner that it will not get caught on or in equipment, structures, or moving machinery.

12.4.5  All adjusting straps of the body harness shall be kept snug against the body and shall not be allowed to hang free.

12.4.6  No part of the lanyard shall be allowed to dangle freely when not tied off. The lanyard shall be secured tightly against the user's body

12.4.7  The use of Safety Belts is strictly forbidden.

12.4.8  Employee shall  use fall protection equipment supplied by the company. All fall protection equipment purchased and supplied to the employees will meet applicable ANSI, ASTM, and OSHA requirements.

12.4.9  Whenever possible, employees should work in teams while working at heights or have 2-way radios so that in the event of a fall, rapid rescue, if required, can be initiated.

12.5    Anchorage Points

12.5.1 Anchorage points must be capable of supporting 5,000 pounds per employee
attached. If there is any doubt about the strength of proposed anchorage point, do
not tie off. Contact your supervisor and and/or find another tie-off point.

12.5.2 The anchorage point should be at or above the D-ring level on the body harness
whenever possible.

12.5.3 Anchorage locations should reduce possible free fall distance, prevent pendulum
swing hazard, and provide clear space in the potential fall path to avoid striking ant
object below.

12.5.4 In considering the most desirable anchorage point for tie-off, avoid any sharp edge
or object that the lanyard might contact while at the work location or in the event
of a fall.

12.5.5 Lanyards must not be attached to shafts which may be subject to un expected
rotation.

NOTE: The scope of work done at this location that requires fall protection is done
utilizing fall prevention equipment  at a height above floor level of 11 ½ feet
therefore, Controlled Access Zones are not utilized.







PLAINTIFF'S
EXHIBIT

7
JnP   2/24/15
COLLINS REPORTING

## Incident Details
### SF 1-13

SERIOUS NON-FATAL INJURY:                    DATE: 2-25-2013

**Fall from Elevated Work Position**

OCCUPATION: Slag Plant Employee

## DESCRIPTION OF INJURY INCIDENT

Two (2) employees were performing work inside the screen deck on the slag plant. They had just unhooked a screen from the mobile crane when the injured employee fell from inside the screen deck to the ground hitting several parts of the plant on the way down.

### KEY POINTS

OSHA requires protection where this is a fall hazard greater than 4 feet. Employee fell 25 feet.
Employees had received fall protection training as recent as December 2012.
A JBSA (job breakdown safety analysis) was completed for the job.
The employees were following the JBSA at the time of the incident.
The fall hazard was not recognized in the JBSA or by the Employees performing the work.



PLF. 8
DATE 11/6/15
RPTR LS
Collins Reporting

1

# Corrective Action Tracking Form

Each site must maintain a file with all corrective actions along with proof of completion.

## SF – 1-13

| Safety Issue | NA | Priority 1 is High 3 is Low | Projected Completion Date | Actual Date of Completion | Responsible Person |
|---|---|---|---|---|---|
| 1. Notify all employees of this event | | | 3/1/13 | 3/1/13 | G. Frisinger |
| Status | | | | | |
| 2. Every site must assess their site to ensure all fall hazards have been mitigated either by use of fall protection system or standard hand railings. | | | 3/28/13 | 3/10/13 | Greg & Walt |
| Status | | | | | |
| 3. Revise JBSA's to require fall protection where required based on the site assessment. | | | 5/28/13 | 5/6/13 | G. Frisinger |
| Status | | | | | |
| 4. Train all affected employees on any procedural changes. | | | 3/28/13 | 3/15/13 | Greg & Walt |
| Status | | | | | |

Ground View



The 3 Diamond Shapes are the structure points that the employee contacted during the fall

Employee fell from here

Landed on ground here

Top View



Inside Deck View



# Incident Report at Fulton Mill Service

## Fall Incident on 25-Feb-2013

This report contains the findings from the investigation of Ted Lucio's fall from Screen Deck 2 of the EAF Plant. This report will comprehensively cover the timeline of the event. It will discuss the findings that came out of the investigation. It will then close with the key learning points that came about as a result of the investigation and the implementation of necessary corrective actions.



PLF. _____

DATE _____

RPTR _____

Collins Reporting

**Levy-000135**

# Incident Report at Fulton Mill Service

Fall Incident on 25-Feb-2013

## Executive Summary

On Feb 25th at approximately 7 a.m. EST Ted Lucio fell from the top screen deck of the slag plant. Ted fell 25 feet to the ground below. He was in the process of doing a routine screen change with two co-workers. Ted was new to the position of plant operator and was performing OJT with one of the co-workers. Ted was taken to the hospital as a result of his fall and ultimately suffered life threatening injuries which have kept him from returning to work.

Ted's fall was a result of a failure to recognize an existing hazard. The investigation of this incident has brought to light a failure within our process to properly train employees transferred from one department to another, perform sufficient observations, and identify critical safety hazards. As a result of this incident and investigation, key learning points and corrective actions have been established. A better process has been constructed to ensure those deficiencies that existed in the past are remedied company wide.

## Immediate Timeline



Levy-000136

## Investigative Findings

The following findings came about as a result of the investigation.

### Employee and Training

- The employee was hired on 11-30-09 as a mill crew operator.
- Employee was transferred to the job of plant operator on 01-01-13.
- Employee was being trained but more thru OJT and less formal documentation and procedure.
- The job task was assisting in changing screens for a different batch of material that was scheduled to be run thru the plant that day.
- There was an informal tool box talk between the employee and his co-workers.
- While he was working he was being talked thru each step as the job went along. With statements such as, "now you'll need to and "next you're going to".
- Employee had done this job before prior to this incident.
- Job Breakdown Safety Analysis (JBSA) was written for this job, *JBSA FMS PL-008*. However, it did not specifically define fall protection hazards for this job.
  - o  Employee had yet to sign off on the JBSA.

### Working Environment

- Employee was working at an elevation of appx. 25-30 feet above the ground (See Pic 4, Pg. 6).
- Employee was working inside a Deister triple deck screen, on the top screen.
- The temperature at the time of the accident was just over 20°.
- Ground was frozen.
- The pitch of the deck was appx 20° falling from East to West and the floor was comprised of screens with 2 ½" grated openings.
- Employee was working with a partner up on the same deck and one operating the crane on the ground.
- It's presumed that some unnoticeable frost may have built up on the screens that were being installed. This however, cannot be confirmed.
- The side rail of the screen was comprised of a piece of rebar with rubber skirting attached and was not certified as a safety handrail. (See Pic 1, Pg. 4).
- There was no area for the employees to safely ingress or egress the work area. They were using the screen deck motor mount cover (See Pic 2, Pg. 4).
- The deck above acted as a cover for appx 2/3's of the screen deck. However, it did not hang over the entire West portion of the deck. (See Pic 3a and 3b, Pg. 5).
- One hole had been "blown" into the beam above the screen deck to act as a make shift tie off point.

### PPE

- All employees were wearing hardhats, safety glasses, gloves, reflective clothing and metatarsal boots.
- The two employees working up on the screen deck were not wearing any type of fall protection equipment.

**Levy-000137**

## Key Learning Points and Corrective Actions

The following key learning points and corrective actions came about as a result of the investigation.

*Key Learning Points*
- Tie off was considered optional for this job as the employees felt they were protected inside the screen deck work area.
- No certified ties off points were located on the plant.
- No safe egress or ingress routes to the screen deck.
- Catwalks were in need of being cleaned.
    - Build up on the decks reduced the distance between the employee's feet and the top of the handrails, giving a false sense of security.
- No defined training process for an employee who is transferred internally from one department to another.
- JBSA was poorly written with vague clarity as to the proper PPE requirements.
- Lack of focused safety observations performed on this particular job task.
- Responding on site EMT was not familiar with the layout of FMS's property. Had he not been guided in he would not have known the location.
- FMS should have its own backboard on site in the event it's needed.

*Corrective Actions*
- Enacted an immediate safety stand down with all employees to address what had just happened.
- Utilized engineering to identify tie off points on the plant and design properly rated tie off structures and an ingress/egress ladder for the screen deck.
- Decks are scheduled to be shoveled each Friday after the plant shuts down or as needed to maintain the proper height and protection of the handrails.
- Training process is being redeveloped to focus on what's needed when an employee laterals from one department to another.
    - Perform follow up safety observations to validate the training is both correct and effective.
- Continue to perform observations to verify that the job is being done properly and according to the JBSA.
- Identify Subject Matter Experts (SME) who will be an integral part of the JBSA creation process.
- Purchase a backboard.
- Work closely with onsite EMT's so they better understand specific site locations when called to respond, such as jaw crusher, cutting shed, etc.




PIC 1 – Brown arrow indicates the rebar that was used to hang the belting seen in this picture.



PIC 2 – Motor guard with scuff marks showing improper entry into the screen deck.

Incident Report at Fulton Mill Service

o o o



PIC 3a – Overhang that covers 2/3 of the working platform, ground view.



PIC3b – Exposed 1/3 of the working platform not covered by the overhang, overhead view.



The 3 Diamond Shapes are the structure points that the employee contacted during the fall

employee fell from here

Landed on ground here

PIC 4 – Overall scene shot showing areas where employee fell and landed, Ground view.