IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

* * *

THEODORE LUCIO, et al.,

     Plaintiffs,

    vs.              CASE NO. 3:15-cv-0613-JJH

EDW. C. LEVY CO., et al.,

     Defendants.

* * *

     Deposition of MICHAEL C. WRIGHT, Witness herein, called by the Defendant Edw. C. Levy Company for cross-examination pursuant to the Rules of Civil Procedure, taken before me, Kathy S. Wysong, a Notary Public in and for the State of Ohio, at the offices of Dungan & LeFevre, 210 West Main Street, Troy, Ohio, on Thursday, April 7, 2016, at 9:33 a.m.

* * *

1                EXAMINATIONS CONDUCTED        PAGE

2    BY MR. GOLDBERG:......................     5

3    BY MR. TICKNOR:......................    135

4    BY MR. GOLDBERG:......................    156

5

6                    EXHIBITS MARKED

7    (Thereupon, Defendant's Exhibit A,

8    fall protection outline, was marked

9    for purposes of identification.)......    14

10   (Thereupon, Defendant's Exhibit B,

11   Edw. C. Levy Company, mini mill

12   division, uniform rules and

13   regulations, was marked for purposes

14   of identification.)...................    27

15   (Thereupon, Defendant's Exhibit C,

16   PowerPoint slides, was marked for

17   purposes of identification.)..........    55

18   (Thereupon, Defendant's Exhibit D,

19   steel mill expert witness case

20   history, was marked for purposes of

21   identification.)......................    81

22   (Thereupon, Defendant's Exhibit E,

23   Michael Wright's professional

24   experience, was marked for purposes

25   of identification.)...................   101

1    (Thereupon, Defendant's Exhibit F,

2    invoice, was marked for purposes of

3    identification.)...................... 157

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 4

 1   APPEARANCES:

 2       On behalf of the Plaintiffs:

 3           Gallon, Takacs, Boissoneault &
             Schaffer Co., L.P.A.
 4
         By:  Kevin J. Boissoneault
 5            Attorney at Law
              2020 Hogback Road
 6            Suite 3
              Ann Arbor, Michigan  48105
 7
         On behalf of the Defendant Edw. C. Levy
 8       Company:

 9           Eastman & Smith Ltd.

10       By:  Stuart J. Goldberg
              Attorney at Law
11            One SeaGate, 24th Floor
              Toledo, Ohio  43699-0032
12
         On behalf of the Defendant North Star BlueScope
13       Steel:

14           Dinsmore & Shohl

15       By:  Charles E. Ticknor, III
              Attorney at Law
16            191 West Nationwide Boulevard
              Suite 300
17            Columbus, Ohio  43215

18                        *   *   *

19

20

21

22

23

24

25

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 5

```
 1              MICHAEL C. WRIGHT
 2   of lawful age, Witness herein, having been first
 3   duly cautioned and sworn, as hereinafter
 4   certified, was examined and said as follows:
 5              CROSS-EXAMINATION
 6   BY MR. GOLDBERG:
 7        Q.   Good morning.  For the record, my
 8   name is Stu Goldberg and I represent Edw. C. Levy
 9   Company.  I know that you are Michael Wright.
10   Please introduce yourself.
11        A.   Michael C. Wright.
12        Q.   Okay.  And you're an engineer?
13        A.   Yes.  I'm a --
14        Q.   Your hourly rate is?
15        A.   Four hundred dollars -- four fifty an
16   hour.
17        Q.   Four hundred, four fifty, which?
18        A.   I'm sorry.  Four fifty.
19        Q.   Okay.  And do you have more than one
20   hourly rate?
21        A.   It's three fifty for field
22   inspections, report, review of documents; and then
23   depositions and trial is four fifty.
24        Q.   Okay.  And the time you've worked on
25   the file for plaintiff, Mr. Lucio, in this case so
```

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 6

1    far?

2            A.    How many hours or the course or

3    either?

4            Q.    Well, you can start with the time.

5    Approximately.  You have your invoices there?

6    What are you looking for?

7            A.    Invoices I thought was here.  Oh,

8    here they are.  So the approximate cost is

9    twenty-eight thousand five hundred.

10           Q.    Have you billed for that already?

11           A.    Yes.

12           Q.    And have you been paid for that

13   already?

14           A.    Yes.

15           Q.    Okay.  This shows you had a retainer

16   of four thousand dollars and then you billed an

17   additional twenty-four thousand five hundred

18   fifteen?

19           A.    Yes.

20           Q.    And you're telling me that you were

21   paid for that?

22           A.    To my knowledge, yes.

23           Q.    And how many hours does that show,

24   without me having to thumb through the whole

25   thing?  Just the total number of hours you've

1    spent, is there a total at the end, sir?

2          A.   Well, there is minus --

3          Q.   How about the total at the end, how

4    about that?

5          A.   That includes my administrative

6    assistant's total.  It is approximately

7    thirty-eight hours.

8          Q.   And that was billed at three hundred

9    and fifty dollars an hour?

10         A.   Yes.

11         Q.   Okay.  Thank you.

12         A.   You're welcome.

13         Q.   Is there any work you're still doing

14   for plaintiff in this case other than today's

15   deposition?

16         A.   That's all I know of as I sit here

17   today.

18         Q.   Okay.  You've not been asked to do

19   anything that you haven't done already?

20         A.   Correct.

21         Q.   Okay.  Is there anything that you've

22   done since writing your report of whatever it was

23   dated, the one that you submitted in this case --

24         A.   I've received the deposition --

25         Q.   -- February 19, 2016?  Is there

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 8

1    anything you've done since then?

2         A.   I've received the deposition, volume

3    two, of the plaintiff and some summary judgment

4    motions yesterday.

5         Q.   Okay.  Has any -- have you read those

6    documents already?

7         A.   Yes.

8         Q.   And did you change any opinions as a

9    result of reading that second deposition or

10   reading those motions?

11        A.   No.

12        Q.   Okay.  Did you see one motion or two?

13        A.   Two.

14        Q.   Okay.  Is there anything that you've

15   asked to do that counsel has told you not to do?

16        A.   No.

17        Q.   Is there anything that you wanted to

18   see that you haven't seen yet?

19        A.   No.

20        Q.   Okay.  Would you agree with the

21   statement that OSHA compliance is the

22   responsibility of employers to employees?

23        A.   In general terms, OSHA Act applies to

24   employers and employees.

25        Q.   Okay.  And for ease of reference, and

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 9

1   you probably saw it in the motion, Levy

2   Environmental was referred to Fulton Mill

3   Services --

4           A.   Correct.

5           Q.   -- which is its local company there

6   where -- out of the North Star facility, right?

7           A.   Correct.

8           Q.   So I might refer to that as FMS.

9           A.   Or Fulton's.

10          Q.   Fulton Mill?

11          A.   Is that okay?

12          Q.   Yeah, that's fine.  As opposed to

13  Levy because I know you in your report referred to

14  Levy Company --

15          A.   Levy Environment.

16          Q.   -- and Levy Environment.  So we can

17  say Edw. C. Levy and we can say Fulton Mill?

18          A.   Yeah.

19          Q.   Now, you read the OSHA investigation

20  in this case?

21          A.   Yes.

22          Q.   And was there a citation issued, to

23  your understanding?

24          A.   Yes.

25          Q.   And that was issued to Fulton Mill?

1        A.    Yes.

2        Q.    And was there any citation issued to

3    anybody else?

4        A.    No.

5        Q.    You understand that Edw. C. Levy

6    Company through its divisions designed and

7    constructed the slag plant?

8        A.    Yes.  At Fulton Mill.  Yes.

9        Q.    At Fulton Mill.  Thank you.  And you

10   understand that prior to Mr. Lucio's accident

11   there was no history of falls or complaints or

12   near misses at that facility?

13       A.    On the subject tower number two,

14   correct.

15       Q.    On any of the towers at the slag

16   plant were you aware of any history of falls,

17   complaints, or near misses?

18       A.    My record is silent on that.

19       Q.    Okay.  Thank you.  Are you aware of

20   any contracts that were entered into between

21   Fulton Mill and Edw. C. Levy Company relating to

22   safety?

23       A.    There's a design-build contract

24   of '96 to North Star -- between North Star and

25   Levy, and then there's also a service agreement

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                Michael C. Wright

Page 11

1    between North Star and Fulton.

2         Q.   Why don't you pull out those

3    documents that you're referring to.  I know you're

4    very well organized there in your files.

5              All right.  You referred to a

6    design-build contract.  Is there a design-build

7    contract that you've put out here?

8         A.   Well, it's to design and to provide

9    the Tower 2.  That would be the original

10   agreement, 1996, to --

11        Q.   Okay.  That's called a -- what you've

12   brought out here that you've said would be to

13   design and build --

14        A.   And to install or construct.

15        Q.   -- you said that was between --

16        A.   Well, it's Levy and --

17        Q.   Edw. C. Levy?

18        A.   Yes.  And North Star.

19        Q.   Okay.

20        A.   It was between Fulton and North Star

21   and Levy backed it up.

22        Q.   All right.  The document that you've

23   brought out is actually a slag handling and mill

24   services agreement, correct?

25        A.   Yes.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 12

1          Q.   Okay.  It's not a design to build

2     contract of any kind, is it?

3          A.   From an engineering point of view, it

4     is.

5          Q.   Well, it's not labeled as that?

6          A.   It's not labeled as that.  The

7     performance was that.

8          Q.   But this was between Fulton Mill

9     Service and North Star, right?

10          A.   Yes.

11          Q.   Okay.  And what was the other

12     contract that you said there was?

13          A.   These two.

14          Q.   But you referred to it as something.

15     I don't remember what you called it.

16          A.   Service agreement maybe.

17          Q.   Okay.

18          A.   I don't remember.

19          Q.   And the -- this is just a second

20     amended and restated slag handling and mill

21     service agreement and a first amended and restated

22     slag handling and mill service agreement, right?

23          A.   Correct.

24          Q.   So those are just reiterations of the

25     first document, the first contract between Fulton

1   Mill and North Star, correct?

2            A.   You can look at it that way.

3            Q.   Well, is that what they are -- that's

4   what they're -- those are the parties that they're

5   between, right?

6            A.   They are the parties between.

7            Q.   And it's --

8            A.   The first one was under construction

9   and then the other two is ongoing.

10           Q.   Okay.  It was under -- the slag plant

11  was under construction?

12           A.   Correct, design build.

13           Q.   And Fulton Mill Service agreed with

14  North Star to provide slag handling and mill

15  services and they indicated that it was their job

16  that they were going to put up the slag plant,

17  right?

18           A.   Right.

19           Q.   Okay.

20           A.   You want me to put them back?

21           Q.   Yes.  My question to you, Mr. Wright,

22  was whether there were any contracts between

23  Fulton Mill and Edw. C. Levy Company.  There were

24  no contracts between Fulton Mill and Edw. C. Levy

25  Company, correct?

1        A.    Levit company had --

2        **Q.    Levy?**

3        A.    Levy, sorry.  Levy Company had an

4  agreement -- performance agreement, performance

5  warrant, whatever, to back up Fulton Mill in the

6  performance to North Star, assurance agreement or

7  financial agreement, whatever you call it.

8        **Q.    I understand you're not a lawyer but**

9  **I'm just asking, there was no contract signed**

10  **by -- as between Fulton Mill and Edw. C. Levy --**

11        A.    No.

12        **Q.    -- correct?**

13        A.    Correct.

14        **Q.    Okay.**

15        A.    If you don't call that a performance

16  guarantee of their providing the services.

17        **Q.    Mr. Wright, you're aware that**

18  **Mr. Lucio was provided fall protection safety**

19  **training by Fulton Mill about two months before**

20  **his fall?**

21        A.    He went through a safety training

22  meeting, yes.

23             (Thereupon, Defendant's Exhibit A,

24  fall protection outline, was marked for purposes

25  of identification.)

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 15

 1   BY MR. GOLDBERG:

 2          Q.   Just take a look at Defendant's

 3   Exhibit A, which is, you'll agree with me, Levy

 4   Bates stamp documents 35 through 40, and have you

 5   seen those pages before?

 6          A.   Yes.

 7          Q.   Okay.  And when you agreed with me

 8   that Mr. Lucio was provided fall protection

 9   training by Fulton Mill about two months before,

10   that reflects that, in fact, he was?

11               MR. BOISSONEAULT:  Objection.  That's

12   not what his testimony was.

13               MR. GOLDBERG:  Okay.

14   BY MR. GOLDBERG:

15          Q.   Will you agree with me that he was,

16   in fact, given fall protection training about two

17   months before the incident?

18          A.   There was a fall protection meeting

19   and PowerPoint that was done by the plant.

20          Q.   According to Mr. Lucio's testimony,

21   right?

22          A.   Right.

23          Q.   Okay.  And Exhibit A shows that there

24   was fall protection training given to him about

25   two months before?  And I'll just refer you to one

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 16

1    of the latter pages which has signatures dated

2    December 18, 2012.  That would be about a couple

3    months before the February incident?

4         A.   Yes.

5         Q.   And that includes Ted Lucio's

6    signature, right?

7         A.   Yeah.  That's a safety meeting, yeah.

8    It's some -- it's some form -- usually safety

9    meetings are not in-depth safety training.

10        Q.   Okay.  Well, whether they usually are

11   or whether they usually aren't, if the material

12   that is included in Levy 35 through 40 was

13   presented on or about December 18, 2012, you would

14   agree with me that there was some level of fall

15   protection training that day that Mr. Lucio

16   participated in?

17        A.   I would agree that --

18        Q.   Okay.

19        A.   -- there was some level of training

20   that was spoken.  I can't get into Mr. Lucio's

21   mind, if he understood it.  A lot of people have

22   to actually put it on and do it before they

23   understand.

24        Q.   I don't know whether they do or they

25   don't --

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 17

        1          A.    Right.

        2          Q.    -- and are you a psychologist?

        3          A.    No, I'm just --

        4          Q.    And you don't get into people's

        5    minds, do you?

        6                MR. BOISSONEAULT:  Stu, you've got to

        7    let him finish.  You keep cutting him off

        8    repeatedly, and we're just getting started.

        9    Please let him finish.

       10                THE WITNESS:  I do a lot of fall

       11    protection training, and at that level -- at-risk

       12    worker level you have to actually teach it

       13    verbally and then actually do it and show how it's

       14    being used because most of the guys don't

       15    comprehend how it all fits together.

       16    BY MR. GOLDBERG:

       17          Q.    I understand.  And I understand that

       18    you do and have done a lot of fall protection

       19    training, and I do want to get into that with you

       20    in a little bit.  For our purposes today, I would

       21    ask if you agree with the proposition that if

       22    Mr. Lucio followed the fall protection training

       23    that's reflected on Exhibit A, would you agree

       24    that he would not have fallen that day?

       25                MR. BOISSONEAULT:  Objection.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 18

 1                    THE WITNESS:  Well, there's two

 2    things, if it's given and if it's understood.

 3    BY MR. GOLDBERG:

 4         **Q.   Understood.  If he understood it --**

 5                    MR. BOISSONEAULT:  Wait.  Were you

 6    finished?

 7                    THE WITNESS:  No.

 8    BY MR. GOLDBERG:

 9         **Q.   My question assumes that he's going**

10    **to have understood it; but if the information**

11    **conveyed on Exhibit A was passed on to him and he**

12    **understood it, would you agree with me that this**

13    **accident would not have happened?**

14                    MR. BOISSONEAULT:  Objection.

15                    THE WITNESS:  The accident would have

16    happened.  There's no safety means and methods for

17    him to properly use the fall protection

18    equipment --

19    BY MR. GOLDBERG:

20         **Q.   Okay.**

21         A.   -- at the subject time of the

22    accident.

23         **Q.   Okay.  You're aware that there was a**

24    **hole drilled in a beam above the screen deck?**

25         A.   Yes.

1          Q.   And you're aware that that had been

2    used as a tie-off point for lanyards and harnesses

3    in the past?

4               MR. BOISSONEAULT:  Objection.

5               THE WITNESS:  It's mostly been used

6    as a connection of a come-along, and there was

7    some testimony that in the early 1997 to around

8    2005 that they would sometimes use fall

9    protection.  The record was unclear what they

10   connected to.

11   BY MR. GOLDBERG:

12         Q.   Okay.  Did you go out to the site?

13         A.   Did not.

14         Q.   Okay.  Do you know whether a lanyard

15   could have been attached to the hole in the beam?

16         A.   A lanyard could not have been

17   attached to a hole in the beam --

18         Q.   Okay.

19         A.   -- as a direct connection, no.

20         Q.   Physically it couldn't have fit, is

21   that what you're saying?

22         A.   Physically it could not fit.  It

23   would be out of ANSI standard compliance, it would

24   be out of OSHA compliance.

25         Q.   Are you aware of clips that can be

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 20

1  used to attach lanyards to harnesses as well?

2          A.   That job -- I'm aware.

3          Q.   Pardon me?

4          A.   I'm aware.

5          Q.   Okay.  And looking at the structure

6  that was there from the photographs you've seen

7  anyway, are you aware whether or not lanyards

8  could have been clipped onto the structure?

9          A.   Lanyards could have not been clipped

10 onto the structure and the single anchor -- single

11 hole would have to be certified as an anchor point

12 and one anchor point would not have sufficed for

13 the location he fell.

14         Q.   For the location what?

15         A.   He fell.

16         Q.   Because?

17         A.   The angle between the -- if it was

18 hypothetically certified and if it was

19 hypothetically connected properly, the angle would

20 have been too large and going across a sharp edge

21 would have severed his lanyard.  So all that would

22 have been out of compliance with OSHA and ANSI.

23         Q.   Sharp edge would have -- of what

24 would have severed his lanyard?

25         A.   Sharp edge of the objects.  It's

1    called leading edge.  Sharp edge -- steel sharp

2    edge would have cut a nylon or a polyester

3    lanyard.

4         Q.   Have you tested that?

5         A.   It's nationally known through ANSI

6    and OSHA.

7         Q.   So you have not tested that?

8         A.   Not me physically.  I'm on the ANSI

9    committee and there's been a lot of talk about

10   that.

11        Q.   Okay.  But you've not done any

12   testing?

13        A.   I've reviewed other people's testing

14   but I've not done any.

15        Q.   And do you know the method of testing

16   lanyards to see if they can sever on a sharp edge,

17   on a leading edge?

18        A.   What's your question?

19        Q.   Are you aware of the method of

20   testing a lanyard to see if it will sever on a

21   leading edge, as you described?

22        A.   There's protocols in ANSI Z359

23   standards that would show you the protocols of the

24   sharp edge.  The sharp edge doesn't have to be

25   what you think is a sharp edge typically.  It's

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 22

1  like three-eighths of an inch in radius going

2  across a three inch radius would sever the

3  lanyard.

4          Q.   So what's the sharp edge you're

5  talking about here?

6          A.   The steel edge of the framing of the

7  screen, and it's too far away from the proposed

8  anchor point.  It's more than six feet away.

9          Q.   You didn't measure it?

10         A.   I could tell by the drawings.  I

11  could tell by the photographs.

12         Q.   You didn't measure it?

13         A.   I did not physically measure it.

14         Q.   Okay.

15         A.   I'm a structural engineer.  I can

16  tell by --

17         Q.   Okay.  So how far is it from the

18  anchor point that was drilled into the beam to the

19  place where Mr. Lucio was standing at the time he

20  lost his balance?

21              MR. BOISSONEAULT:  Objection to the

22  form of the question and foundation.

23              THE WITNESS:  From the photographs, I

24  would estimate it was between ten and twelve feet.

25  BY MR. GOLDBERG:

1          Q.   Okay.  Now, Mr. Lucio didn't know

2     where he was standing at the time he lost his

3     balance?

4          A.   That's correct.

5          Q.   So how would it be possible to know

6     how far he was standing from that hole at the time

7     he lost his balance?

8          A.   There's a photograph with an X

9     showing where he was approximately located at the

10    time of the accident, a red X.

11         Q.   Do you remember his testimony that he

12    didn't know where he was standing?

13         A.   I do.

14         Q.   Okay.  So the X shows someplace

15    within the screen deck?

16         A.   It was from the OSHA reviews and

17    interviews with the people that were there at the

18    time.

19         Q.   Right.  You heard testimony from

20    Mr. Deeds -- or you read testimony from Mr. Deeds?

21         A.   And Griffith, yes.

22         Q.   And Griffith -- Griffin or Griffith?

23         A.   Griffin.

24         Q.   Yeah -- saw him after he was flying

25    out of the screen deck, right?

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 24

1          A.   I believe he saw him on a forty-five

2    degree similar -- in approach to the fall, in the

3    act of falling at the time.

4          **Q.   He didn't claim -- from your reading,**

5    **he didn't claim to see his feet on the screen deck**

6    **floor, right?**

7          A.   No.

8          **Q.   Okay.  And Mr. Deeds had his back to**

9    **him, correct?**

10          A.   Correct.

11          **Q.   You got that?  So he didn't see**

12    **him --**

13          A.   Correct.

14          **Q.   -- fall?  And Mr. Lucio is unaware of**

15    **where he was when he lost his balance?**

16          A.   Correct.

17          **Q.   Okay.**

18          A.   And it --

19          **Q.   And in fairness, we don't really know**

20    **where he was at the time he lost his balance?**

21              MR. BOISSONEAULT:  Objection.

22              THE WITNESS:  In fairness to OSHA

23    compliance officers, they would see the impact

24    locations of those impacts where they also marked

25    on the drawing and they can take from the

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 25

1    interviews and get an approximate location, and

2    that's what I'm using the range from ten to

3    twelve, that's the approximate location.

4    BY MR. GOLDBERG:

5         **Q.    Okay.  Do you know the dimensions of**

6    **the screen deck?**

7         A.    It was estimated four to six feet.

8         **Q.    Okay.**

9         A.    And there's a --

10        **Q.    How could the distance from the beam**

11   **be ten to twelve feet if the dimensions are only**

12   **four to six feet?**

13        A.    The location of the torch-cut hole in

14   the beam is up underneath the roof, and the

15   location of the fall was out beyond the roof and

16   the projected -- and the OSHA has the yellow area

17   of where that working surface is at.  So you have

18   a roof and then out beyond a roof you have an

19   overhang, and he was way beyond the -- he was out

20   in the overhang area and that distance is greater

21   than forty-five degrees off the vertical and it's

22   also greater than six feet so it would be outside

23   of OSHA and ANSI compliance to use a lanyard on an

24   angle that severe because you'd have swing fall

25   issues and also, you physically couldn't do it

1    because it would not give you enough length to do

2    it -- do your work activity.

3            Q.   All right.  Now, the work activity

4    was being done by Mr. Deeds and he was observing,

5    according to the testimony?

6            A.   Right.

7            Q.   Okay.  By the way, you did make some

8    comments about a ladder.  The ladder didn't have

9    anything to do with Mr. Lucio's fall on this

10   occasion, correct?

11           A.   Correct.

12           Q.   Okay.

13           A.   The ladder shows that there was --

14           Q.   I understand.

15           A.   -- proper means and methods to get up

16   on the -- on the --

17           Q.   Screen?

18           A.   -- screen guard, and then it also was

19   designed for -- to remove the screen guard.  It

20   just shows lack of structural detail.

21           Q.   Okay.  You're aware that Mr. Lucio

22   was provided with cardinal rules by Fulton Mill?

23           A.   Yes.

24                MR. BOISSONEAULT:  I'll just note an

25   objection to the foundation to your last question.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 27

1              MR. GOLDBERG:  Okay.

2              (Thereupon, Defendant's Exhibit B,

3    Edw. C. Levy Company, mini mill division, uniform

4    rules and regulations, was marked for purposes of

5    identification.)

6    BY MR. GOLDBERG:

7         Q.   I'm showing you what's been marked as

8    Defendant's Exhibit B, and it's actually headed

9    Edw. C. Levy Co., mini mill division, uniform

10   rules and regulations dated January '08, correct?

11        A.   Yes.

12        Q.   And then it has a number of pages

13   that are Levy 418 through Levy 421, correct?

14        A.   Yes.

15        Q.   And on page 421 of this exhibit it

16   shows a signature line by Mr. Lucio on November

17   30, 2009?

18        A.   Yes.

19        Q.   And those rules include one that I

20   highlighted here, that's my highlighting on item

21   four that just says what?  Can you read that?

22        A.   Fall protection must be utilized

23   where required.

24        Q.   Okay.  Would fall protection have

25   been required in this instance, Mr. Wright?

1        A.    Fall protection would have been

2    required.  Fall protection wasn't provided.

3        **Q.    Okay.  If it was provided, which we**

4    **have an issue with with you, then it would have**

5    **been required in this instance?**

6        A.    Fall protection was required to

7    protect our employees when you're working four

8    feet or higher.

9        **Q.    Yeah.**

10       A.    It wasn't.

11       **Q.    And employees have responsibility,**

12   **too?**

13       A.    If it was provided, they do have a

14   responsibility.

15       **Q.    Okay.  And the responsibility is to**

16   **use it?**

17       A.    If it's -- if you physically can.

18       **Q.    Right.**

19       A.    You have to have an anchor point.

20       **Q.    Right.**

21       A.    Just to wear a harness and a lanyard

22   is not in compliance with OSHA.  You have to

23   physically be connected to a certified anchor, not

24   just a hole in the beam.

25       **Q.    Is there ever a situation where an**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 29

1    employee should hook on to something that is not a

2    certified anchor point?

3            A.    From OSHA and ANSI's point of view,

4    no.  A competent person -- the supervisor should

5    distinguish all the anchor points.  So a worker,

6    which is called an authorized worker or worker at

7    heights -- an authorized worker has to be

8    supervised by a competent person that can

9    recognize existing and foreseeable fall protection

10   hazards and control them -- stop work and control

11   them and then tell the authorized worker how to

12   connect or how to wear or don't do it that way,

13   here's a better way to do it.

14           Q.    Is there ever a situation where a

15   worker would be expected to hook a lanyard to

16   something that is not a certified anchor point?

17           MR. BOISSONEAULT:  Objection.  Asked

18   and answered.

19           THE WITNESS:  It would be the same

20   answer.  There's no -- there's no circumstance

21   that OSHA and ANSI gives you permission to anchor

22   to anything.  It's up to the competent person, the

23   supervisor, to distinguish where that's at and

24   identify that this is a certified anchor point,

25   this is a guardrail, here's how you wear your

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 30

1    equipment, here's how you don't wear your

2    equipment, here's how you attach, here's how you

3    don't attach.  The competent person is with his

4    crew and making sure his crew is doing it

5    properly.

6    BY MR. GOLDBERG:

7         **Q.   Okay.  Now, have you ever been the**

8    **competent person on site at a work site?**

9         A.   I've been the qualified person quite

10   often on the work site.

11        **Q.   What does that mean, the qualified --**

12   **a moment ago you used the term competent person.**

13   **So what's the qualified person in the scheme of**

14   **things?**

15        A.   The scheme of things is -- a

16   qualified person is an engineer or has engineering

17   experience and training that can distinguish fall

18   protection hazards and the proper means -- safety

19   means and methods to provide an abatement or

20   control of that hazard or eliminate that hazard is

21   what we try to do.

22        **Q.   Is that after an incident or --**

23        A.   No.

24        **Q.   -- after a citation or what?**

25        A.   That's before they even go up in

1    heights.

2         **Q.   Oh, okay.  So what's the difference**

3    **between -- what's the difference between a**

4    **competent person and a qualified person I guess is**

5    **what I'm trying to understand?**

6         A.   A competent person typically has at

7    least forty hours of training and experience in

8    that one subject matter, which is fall protection

9    in this case.  There's competent persons in

10   excavating, competent persons in scaffolding, and

11   competent persons in confined space.  So a

12   competent person in fall protection has to at

13   least know the limits of the equipment they're

14   using.  If it's DBI, Miller Rose, whatever fall

15   protection manufacturer they're using, there's

16   about fifty-four different types of manufacturers

17   out there now, and has to have an understanding of

18   the limitations, how to inspect the equipment, how

19   to instruct the people how to use the equipment

20   and has the authority to stop work.  A qualified

21   person doesn't have the authority to stop work for

22   their employees that they're watching.  So a

23   qualified person would work with a competent

24   person.

25         **Q.   Is the qualified person the competent**

1    **person's boss?**

2          A.    Not necessarily.  A qualified person

3    typically is the competent person's consultant.  A

4    qualified person sets up the program.  A qualified

5    person sets up the training, and then the

6    competent person is like the sergeant that

7    implements the training, implements the program,

8    and then the qualified person would review and

9    make sure it's on track.

10          Q.    **So you've done that as a consultant,**

11    **I take it?**

12          A.    Yes.

13          Q.    **Okay.  You've never worked for,**

14    **say -- been an employee of a slag plant?**

15          A.    Never an employee of anybody.

16          Q.    **Never an employee of a steel mill?**

17          A.    No.

18          Q.    **Never an employee of --**

19          A.    A paper mill.

20          Q.    **-- a paper mill or a car manufacturer**

21    **or anybody else?**

22          A.    Or military or anything.

23          Q.    **All right.  All you've done in this**

24    **area is consult with companies like that?**

25          A.    Set up programs like that.

1          Q.   Okay.  And so how long are you --

2     when you're the qualified person, how long are you

3     involved, usually, in setting up a program like a

4     fall protection program and setting up the

5     training when all you're doing is being the

6     qualified person?

7          A.   Usually I try to phase myself out

8     within eighteen months.

9          Q.   Okay.

10         A.   Then they'll call me in if there's

11    some special thing that was created after the

12    program got started that they didn't know how to

13    handle.

14         Q.   Is it fair to say that during that

15    eighteen months you're not on the site every day

16    eight hours a day but you're spending some time on

17    the phone with them and you're spending some time

18    in person with them in a meeting room?

19         A.   What I typically did is we would

20    interview the management, we would train the

21    management, and the management understands the

22    program with the OSHA requirements or the ANSI

23    requirements.

24              Then we go out and do a wall-to-wall

25    inspection, identify all the hazards and how to

Page 34

1    abate those hazards.  That's called an audit.

2              And then we would also implement all

3    the possible anchor points in the entire facility,

4    and that's an anchor point plan.  We generate

5    drawings and show you where the drawings are.

6              And then the employer would implement

7    and install the anchor points using their

8    competent persons to do that.

9              And then we would set up the training

10   program, train all the competent persons, and then

11   we would help the competent person train the first

12   thirty people, typically, within the authorized

13   users, the workers.

14        Q.   You say authorized users.  You're

15   talking about the laborers that are going to be

16   exposed?

17        A.   Yes.

18        Q.   So you walk them through how the

19   training is supposed to be done?

20        A.   The competent person.  It's called

21   train the trainer program, and we would help train

22   the competent persons, get them comfortable

23   training.

24        Q.   And the way you would -- or part of

25   the way you would do that after going through what

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 35

1    they need to do is you'd actually walk them

2    through doing it with the first thirty or so

3    laborers?

4         A.   Right.  And then we would go out on

5    the sites and make sure they're using the

6    equipment right; and then if they weren't, we

7    would tell -- we're training the competent person

8    what to look for.  So we would tell the competent

9    person what's wrong with this scenario, he's too

10   far out, he's beyond the thirty degrees of the

11   anchor point, he's got the wrong equipment on,

12   whatever.

13        Q.   Have you ever been sued?

14        A.   Not on this -- not on worker issues.

15   I have sued my employee who took confidential

16   information.

17        Q.   Okay.  What kind of confidential

18   information, without telling me what the

19   information was?

20        A.   Design formulas, design methods,

21   stuff that we created in-house.

22        Q.   Okay.  I wasn't asking you whether

23   you sued anybody, though.  I asked if you've ever

24   been sued.

25        A.   Well, it was a counter.  He sued and

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.          Michael C. Wright

                                                              Page 36

 1    then I sued back.

 2              Q.    What were you sued for?

 3              A.    I don't know -- that I didn't -- I

 4    don't know.  It all got dissolved.  I honestly

 5    don't remember.  They always -- like, I didn't

 6    give him a nice room or some environment or --

 7              Q.    An employee?

 8              A.    Yes.

 9              Q.    Okay.

10              A.    A managing partner.

11              Q.    So some kind of contract -- breach of

12    contract claim?

13              A.    Unfortunately I didn't have a

14    contract.  I knew him for twenty years and his

15    mind changed.

16              Q.    Okay.  What was the name of the

17    company then?  Was that --

18              A.    STE.

19              Q.    STE, Safety Through Engineering?

20              A.    Yes.

21              Q.    And where was your lawsuit?

22              A.    Montgomery County, Ohio.

23              Q.    And when was that?

24              A.    2009 maybe.  It went on for a couple

25    years.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 37

1          Q.    Ultimately resolved?

2          A.    Yeah.

3          Q.    Not through trial or motion but some

4     kind of other resolution?

5          A.    Yes.

6          Q.    Okay.

7          A.    Steve was our attorney.

8          Q.    Pardon?

9          A.    Steve was our attorney.

10         Q.    Steve Justice whose office we're

11    using today?

12         A.    Yes.

13         Q.    Okay.  So you've never been sued in

14    connection with training is really what I was

15    getting at?

16         A.    No, never been sued in connection.

17         Q.    So I think I understand what you've

18    done as a qualified person.  You've never actually

19    been the competent person?

20         A.    Right.  I don't want to be.

21         Q.    Okay.  You've never actually been a

22    laborer?

23         A.    Correct.

24         Q.    And you've never actually been a

25    foreman supervising laborers, right?

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.          Michael C. Wright

Page 38

```
 1          A.   Correct.
 2          Q.   You've never walked on a screen
 3   deck --
 4          A.   I've walked --
 5          Q.   -- true?
 6          A.   Well, I walked on grizzlies, which is
 7   a screen deck.
 8          Q.   Okay.  What's a grizzly?
 9          A.   Grizzly is just a screen deck.  A
10   grizzly is typically a six-by-six opening.
11   They're all different sizes, a two-by-two opening,
12   a six-by-six opening, an eight-by-eight opening.
13          Q.   When you say opening, you mean grate?
14          A.   Big heavy grates.  Sometimes semis go
15   across it, dozers go across it.  A lot of times
16   they dump steel on it, they dump coal on it.
17   Sometimes paper clippings, wood chips.
18          Q.   And you've walked on one of those at
19   height?
20          A.   Not at height.
21          Q.   Oh, okay.
22          A.   I walked on those, designed those for
23   a semi to pull over across at grade level.  It
24   falls into a pit and then there would be conveyors
25   that take it up.
```

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 39

1         **Q.  Have you ever walked on a screen deck**

2  **at height?**

3         A.  As I sit here today, I've not walked

4  on grading at height.  Usually grizzlies are not

5  at height.  Usually grizzlies are at a dumping.

6         **Q.  Right.  And you -- so --**

7         A.  Dumping elevations.

8         **Q.  Okay.  With dumping elevations do you**

9  **have to wear fall protection?**

10        A.  Well, if it's dumping at ground

11  level, no.

12        **Q.  All right.  I didn't know if there**

13  **was some kind of --**

14        A.  No.

15        **Q.  -- ditch below you or something.**

16        A.  No.  It's usually some mechanism to

17  dump out of a semi or dump out of a dump truck.

18        **Q.  Fair enough.  Again, with respect to**

19  **the cardinal rules set forth on Exhibit B, if**

20  **those were communicated to Mr. Lucio prior to his**

21  **accident in a way that he could understand them,**

22  **would you agree with me that this accident would**

23  **not have happened?**

24        MR. BOISSONEAULT:  Objection.  Asked

25  and answered and foundation.

1          THE WITNESS:  Even -- even if he

2     understood it and even if it was spoken to him in

3     an understandable way, you still have to have

4     safety means and methods of the worker to safely

5     connect, to safely do his job.

6     BY MR. GOLDBERG:

7          Q.   Okay.

8          A.   If you have no certified anchor

9     points, no guardrails, no safety means and methods

10     of doing his job, then he could understand them

11     but if the culture was to keep going, then he was

12     a trainee, as he said.  He saw all these other

13     guys doing it since '97.

14          Q.   Well, he hadn't been there doing it

15     in '97 or watching other guys in '97, right?

16          A.   Correct.

17          Q.   So since whenever he started going up

18     there with them?

19          A.   Yeah.  The culture was there.

20          Q.   Well, he just started going up there

21     with them, like, within the prior six weeks, if I

22     remember?

23          A.   Similar to that.

24          Q.   Okay.

25          A.   You had Walt Deeds --

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 41

1          Q.   Shawn Griffin?

2          A.   -- Shawn Griffith -- Griffin and then

3     you had also the plant operation manager all had

4     been there '97, '99, and typically they wouldn't

5     be using fall protection.  They'd use it sometimes

6     but not all the time.

7          Q.   Right.  And when they used it, you

8     understand they used the hole on the beam?

9          A.   The question wasn't really asked.

10         Q.   Okay.  So they could have either used

11    the hole on the beam or they could have used

12    clips?

13         A.   Or they could have just put on the

14    fall protection harness and did nothing.

15         Q.   Well, if they're saying they used it

16    from time to time --

17         A.   That's what I understand.

18         Q.   -- you don't know?

19         A.   From all my experience, construction

20    and general industry, when management says wear

21    the harness, they wear the harness; and I've

22    seen -- I've been on sites where they've drug the

23    lanyard on the ground behind them because there

24    was no place to connect to.

25         Q.   But you did read testimony that

Page 42

1   **Mr. Deeds did use the harness and hook into that**

2   **hole that was put there by apparently, according**

3   **to him, a cousin of Mr. Lucio?  Did you read that**

4   **testimony?**

5          A.    I don't remember hooking to the hole.

6   I do remember him wearing the harness -- or

7   wearing the full body harness.

8          **Q.    And you remember the testimony that**

9   **Mr. Deeds said that the hole was put in there by**

10  **Mr. Lucio's cousin.**

11         A.    The hole was torched in there by the

12  cousin.

13         **Q.    Okay.**

14         A.    But you can't physically get a snap

15  hook into the hole.

16         **Q.    Okay.  When you were describing the**

17  **responsibility of -- strike that.**

18                **Before I go there, you said you can't**

19  **physically get the hook into the hole.  You didn't**

20  **test that yourself, did you?**

21         A.    I --

22         **Q.    Did you?**

23         A.    I did not test it.

24         **Q.    And you didn't have anybody test that**

25  **for you, did you?**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 43

1          A.    I did not test that.

2          **Q.    Okay.**

3          A.    But from my experience and ANSI

4    committee safety training, I use those as examples

5    where you can't physically get the snap hook into

6    the hole and close the snap hook gate.  You may

7    get the top hook of the snap hook into the hole

8    but unless you get the keeper closed, it's not

9    safe.

10          **Q.    Right.**

11          A.    And that geometry -- if you could do

12    both, that geometry would blow out that keeper.

13    It's called a roll-out failure.  So, in other

14    words, if you can get the material that's been

15    torched out on the bottom flange to touch the

16    gatekeeper, OSHA calls that roll-out, ANSI calls

17    that roll-out, some of the training manuals would

18    call that blow-out but that -- the snap hook it's

19    rated for five thousand pounds.  The side gate is

20    only rated for like two hundred to two fifty.

21          **Q.    I understand.  It's important that**

22    **the mechanism that you're using functions properly**

23    **and that you're not damaging it along the way,**

24    **right?**

25          A.    Right.  So you can't --

1          Q.   And is it true that even with proper

2   use, sometimes you can cause damage to your

3   mechanism as you're snapping it in?

4          A.   Not with proper use.  In use the

5   workers can damage the hook.

6          Q.   That's what I meant.  That's all I'm

7   saying.

8          A.   And then the competent person has to

9   evaluate it and take it out of service.

10          Q.   Right.  So occasionally they're going

11   to wear out and somebody needs to be looking to

12   make sure they are functioning okay?

13          A.   Yes.

14          Q.   On some kind of regular basis?

15          A.   Yes.  OSHA --

16          Q.   And is there a specific regular basis

17   that a competent person is supposed to be checking

18   those hooks to make sure they're in good shape?

19          A.   Yes.

20          Q.   How often is that?

21          A.   OSHA is twelve months.  ANSI is six

22   months to three months.  And depending on what

23   type of service they're doing, it could be

24   monthly.

25          Q.   Okay.  And are you aware of any of

1    **the lanyard hooks at Fulton Mill being -- having**

2    **broken mechanisms at the time of this incident?**

3           A.    The record is silent.

4           **Q.    Okay.**

5           A.    There's no inspections of record at

6    all.

7           **Q.    Right.  Okay.  Next question, does**

8    **the employee or laborer have any responsibility,**

9    **sort of like a preflight check, to check his**

10   **mechanisms on his lanyard to see if it is**

11   **functioning properly, if it's going to work in the**

12   **anchor point?**

13          MR. BOISSONEAULT:  Just note an

14   objection as to foundation and relevance.  You can

15   go ahead and answer.

16          THE WITNESS:  If the authorized

17   workers are properly trained, which in this case I

18   have not seen any evidence where the competent

19   persons were even trained, let alone the at-risk

20   worker person is trained, but OSHA requires

21   that -- there's two levels of inspections.  The

22   competent person does a very detailed inspection

23   and then the authorized person does a performance

24   inspection right before he uses it every eight

25   hours of the shift.

Page 46

1    BY MR. GOLDBERG:

2         **Q.   So --**

3         A.   The snap hook --

4         **Q.   -- in the normal circumstance, the**

5    **laborer who is going to be using the lanyard is**

6    **checking it too?**

7         A.   Just in a very overview.  If the snap

8    hook closes, that's about it.

9         **Q.   Yeah.  But that was the function you**

10   **were talking about a few minutes ago?**

11        A.   But that function I was talking about

12   a few minutes ago is when you actually connect to

13   an incompatible hole and then that incompatible

14   hole destroys the gate.

15        **Q.   Right.**

16        A.   So the worker upon -- before

17   connecting, the snap hook would be fine.  But when

18   you connect it, the worker wouldn't know that it's

19   not fine.

20        **Q.   Understood.**

21        A.   And then he could fall to his death

22   thinking that he was connected when he really

23   wasn't.

24        **Q.   But he should check to see at least**

25   **that the hook is on there and that the snap**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 47

1  **hook --**

2       A.   Keeper.

3       **Q.   -- keeper is properly positioned?**

4       A.   If he's trained that way.

5       **Q.   Right.  Right.**

6       A.   But I haven't seen any documents that

7  say they've been properly trained or through the

8  depositions.

9       **Q.   Okay.  Is there any common sense**

10  **involved in that, or no?**

11       A.   Well, no, that's a standard that just

12  came out in 1995; and I still see today

13  contractors and general do not understand it so

14  it's not common sense.  It's something that is

15  trained in -- every manufacturer's fall protection

16  system is different from their competitor by

17  copyright -- or trade -- yeah, copy -- products

18  are different so they can't be exactly the same.

19  Miller, DBI, Rose, RTC, all those products are not

20  the same and one may not function the way another

21  one functions.

22       **Q.   Okay.**

23       A.   So that's why you need a competent

24  person to do the training and a qualified person

25  to make sure the competent person is doing it

1    right.

2          Q.    Do you know whether Mr. Lucio would

3    have known how to put the lanyard hook into

4    position?  Do you know whether he would have known

5    how to do that?

6          A.    From Rock Miller being the competent

7    person that was supposed to relay all this

8    information, and in my opinion he's not a

9    competent person, so I think it's a noncompetent

10   person trying to tell another noncompetent person

11   of Fulton how to do that, then that other

12   noncompetent person trying to tell their

13   authorized workers how to do it, I think there's

14   no program at all.

15         Q.    Okay.  But the hook is a pretty

16   simple mechanism?

17         A.    No.  No, that hook is very dangerous.

18         Q.    I didn't say whether it's dangerous

19   or not, but it's like a hook on a necklace --

20         A.    No.

21         Q.    -- and it's -- I mean, it has a

22   snapping catch?  No?

23         A.    That thing has been the root cause of

24   many deaths.  The snap hook can disengage when

25   it's not properly attached.  The snap hook can

1   disengage when it's not properly used.  When the

2   angle is beyond the manufacturer's recommendation.

3   If it wasn't properly connected to the angle.

4   There's a lot of elements there that that snap

5   hook may appear to be a necklace kind of a snap

6   hook but it's not.

7          **Q.   Okay.  You're aware that Fulton Mill**

8   **did have something called GBSAs?**

9          A.   Yeah.

10         **Q.   And that they did have a GBSA with**

11  **respect to the screen deck change?**

12         A.   Yes.

13         **Q.   And you're aware that this -- the**

14  **GBSA for the screen deck change called for fall**

15  **protection?**

16         A.   It called for using a manlift and --

17         **Q.   A harness?**

18         A.   -- a harness.  Yes.

19         **Q.   And lanyard?**

20         A.   Yes.

21         **Q.   Okay.**

22         A.   And an anchor point.

23         **Q.   Well, it didn't actually say anchor**

24  **point, did it?**

25         A.   It didn't, but a manlift would have,

1    by definition, an anchor point.

2          Q.   Okay.  You're aware of the changes

3    made after the incident, right?

4          A.   Yes.

5          Q.   Okay.  And they added certified

6    anchor points, right?

7          A.   Yes.

8          Q.   And that was with OSHA's agreement,

9    right?

10          A.   That was their settlement agreement.

11   They came back and put in anchor points, yes, and

12   it was done by an engineering firm.

13          Q.   And there were no guardrails added,

14   correct?

15          A.   Correct.

16          Q.   Okay.  You've worked with OSHA

17   before, not for OSHA, right?

18          A.   Both.

19          Q.   You did work for OSHA?

20          A.   Not as an employee.  As a consultant.

21          Q.   Okay.

22          A.   Against and for OSHA depending on

23   what the case facts were.

24          Q.   Okay.

25          A.   About fifty percent either way.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 51

1          Q.   Mr. Wright, I'm not sure I asked you

2     this so I apologize if I did; but you saw some

3     testimony about using clips on beams or lanyards

4     as well?

5          A.   I saw testimony.

6          Q.   Okay.  Does OSHA provide for the use

7     of lanyards with clips for fall protection from

8     height?

9          A.   That is a product that was first

10    developed by DBI and then Miller and Rose has

11    simulated the same kind of results.  The --

12         Q.   DBI is what?

13         A.   Buck and Duncan Industries.  Just DBI

14    dot com.

15         Q.   What is it?

16         A.   Buck and Duncan, two last names,

17    Industries.

18         Q.   Oh, you said DBI, so it's BDI?

19         A.   Buck and Duncan Industries.  BDI.

20    Yeah.

21         Q.   Thank you.  Yeah, you had said DBI.

22         A.   Yeah.

23         Q.   All right.  So BDI is the name of the

24    company?

25         A.   For some reason they go by DBI --

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 52

1          Q.   All right.  So --

2          A.   -- but the guy's name is Buck, so I

3     don't know.

4          Q.   All right.  Have you worked with them

5     before?

6          A.   Yeah.

7          Q.   You're a consultant for that company,

8     whatever -- whosever name comes first?

9          A.   Not a consultant.  More of an outside

10    nonpaying consultant.

11         Q.   And did they develop the clips with

12    your involvement?

13         A.   No.

14         Q.   Before your involvement?  Did you

15    have anything to do with the clips?

16         A.   No.

17         Q.   Okay.  But, anyway, it's been

18    developed, and my question is whether the ones

19    done by Buck and his group or by anybody else,

20    have they been approved for use by OSHA?

21         A.   OSHA doesn't approve any type of

22    product.  That is a connector -- anchor connector,

23    and OSHA wants a certified anchor point, which is

24    the structure.  So if they use this clip and if

25    the clip was tested and it makes -- meets the

1    standard of ANSI, OSHA would look at that as an

2    anchor connector that met ANSI but then they would

3    still ask the question, does the structure where

4    it was connected to, is it capable of withstanding

5    five thousand pounds.  So you just can't use it

6    anywhere and think it's great.  So if you clamp

7    that to a guardrail, it's still not safe.  That's

8    what's misleading about it.

9            Q.   Sure.  But knowing where they put the

10   anchor points -- added the anchor points with the

11   engineering firm on Tower 2 at the slag plant of

12   Fulton Mill, would you agree that there would have

13   been locations to use a clip-type lanyard back at

14   the time of Mr. Lucio's accident?

15           A.   No.

16           Q.   Okay.  Did they add a beam that they

17   put the certified anchor points?

18           A.   No.

19           Q.   Okay.  Please explain.

20           A.   The clamps -- clips are designed for

21   a horizontal beam.  Where they were attaching to

22   was on a slope.  So, in other words, it would

23   slide down the slope upon a fall and create a

24   greater hazard.  So a competent person, qualified

25   person would never use that.  It would slide down

1    the bottom flange of the beam.

2         **Q.   Okay.  So there needs to be a**

3    **horizontal beam?**

4         A.   Well, there needs to be what they

5    finally did, which was to weld on lugs to connect

6    a carabiner to the lug and then connect the

7    carabiner to the snap hook of the lanyard in that

8    sequence.  If you connect the snap hook to the lug

9    opening, you would still have incompatible and

10   still be dangerous, and that's where a competent,

11   qualified needs to train the people, don't just

12   directly to that hole but you've got to use a nine

13   inch carabiner and then clip to the snap hook.

14        **Q.   Okay.  Do you know what carabiners**

15   **they had at Fulton Mill back after this incident?**

16        A.   I didn't see any either before or

17   after.

18        **Q.   And same -- thank you.  You're aware**

19   **that Mr. Lucio received what's called contractor**

20   **induction training from North Star?**

21        A.   His awareness orientation training,

22   yes.

23        **Q.   And --**

24        A.   It was two days, approximately.  A

25   few days he actually used the word.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 55

1          Q.   And you're aware that that also

2     included fall protection or at least a brief

3     discussion of fall protection?

4          A.   The agenda shows a brief discussion.

5     I wasn't there and the question wasn't asked.

6          Q.   Right.  But you're aware that there

7     was a slide show that included slides on fall

8     protection?

9          A.   I thought the slide show was from

10     Levy Corporation.  There's two slide shows?  I

11     remember the agenda from North Star.

12               MR. GOLDBERG:  Off the record.

13               (Thereupon, an off-the-record

14     discussion was had.)

15               (Thereupon, Defendant's Exhibit C,

16     PowerPoint slides, was marked for purposes of

17     identification.)

18     BY MR. GOLDBERG:

19          Q.   Mr. Wright, I'm showing you what's

20     been marked for identification as Defendant's

21     Exhibit C.  It's also marked confidential, and

22     counsel and I off the record have agreed that this

23     document will not be part of the regular file but

24     it will be marked sealed -- produced under seal to

25     the extent that anything needs to be protected

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 56

1    down the road.  All of our concern had more to do

2    with other items than what was in here; but since

3    it is marked confidential, we're going to try to

4    treat it that way until otherwise.  Okay?

5          A.   Okay.

6          Q.   First of all, I'm just showing you

7    what's been marked as Defendant's Exhibit C, which

8    is also NSBS_212 and 213.  It's just two pages of

9    a slide show that was produced by North Star and

10   ask you if you saw all of that slide show before

11   or that part of it that I'm putting in front of

12   you?

13         A.   I've seen this page and I've seen

14   this page.

15         Q.   Okay.  Very good.  So all I was

16   asking you a moment ago and asked you if you would

17   agree that if this contractor induction training

18   was given to Mr. Lucio, it would also have

19   included some further emphasis on fall protection?

20         A.   I wasn't in the training when it was

21   going on.  If they just read the bullets --

22         Q.   Yeah.

23         A.   -- and not explained what it meant to

24   the authorized workers, that the lights are turned

25   off and talking to them, that wouldn't be adequate

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 57

1    awareness training.  It would be an orientation

2    but not enough to use it safely.

3         **Q.   But it does just give some further**

4    **emphasis about fall protection, right?**

5         A.   If all they did was read that, it

6    doesn't give hardly anything.  I don't know.

7         **Q.   It gives some --**

8         A.   Enough to blow up the lab but you

9    don't know why the lab got blown up.

10        **Q.   Or enough to save the lab and you**

11   **don't know why the lab was saved, in some cases?**

12   **Your example.**

13        A.   Yeah.

14        **Q.   All right.**

15        A.   With fall protection, it's just like

16   confined space, there's so many little elements

17   that have to be right or you die.

18        **Q.   Okay.  That's fair enough.**

19        A.   So if you do an overview and say you

20   need more training and this is just giving you an

21   awareness but you need more training, then that's

22   good awareness training.  I don't know what was

23   said.

24        **Q.   That's fair.  If one has awareness**

25   **training, he should at least know when to ask a**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 58

1  question?

2       A.   To a competent person that is

3  competent, yes.

4       **Q.   Okay.  Did you read anything about**

5  **Mr. Lucio asking any questions about how he should**

6  **use fall protection?**

7       A.   No.  He said he --

8       **Q.   Okay.**

9       A.   He said he was following the lead of

10  Deeds.

11       **Q.   Did you read that he acknowledged**

12  **that he received fall protection and that he knew**

13  **the OSHA rule regarding when to use fall**

14  **protection?**

15       A.   Yes.

16       **Q.   Okay.**

17       A.   He said what he said.

18       **Q.   All right.**

19       A.   But once again, if he doesn't

20  understand what is said, it's meaningless to him.

21       **Q.   And you don't know whether he**

22  **understood it or not, you just know that he**

23  **didn't -- he clearly didn't follow it, right?**

24       A.   Well, at the time of the accident, no

25  one had fall protection on, no one had lanyards,

1   and no one had certified anchor point connection,

2   so he was following his trainers.

3          Q.   **He's the one that fell, right?**

4          A.   Correct.  And Deeds was his trainer.

5   Or Deed.

6          Q.   **Everybody individually, every**

7   **authorized worker has their own duty to follow**

8   **instructions if they understand them, fair?**

9          A.   If they understand them, if they were

10  properly trained in accordance with OSHA, then

11  they have a duty to follow their employer's

12  instructions.

13         Q.   **Okay.  Thank you.**

14         A.   That's different than what you said.

15         Q.   **Okay.  Your answer is fine.**

16         A.   Okay.

17         Q.   **You answered before that you think**

18  **that employees do have some personal**

19  **responsibility for their own safety, right?**

20         A.   OSHA says you have to follow your

21  employer's training and instructions, and then

22  OSHA assumes that your employer has properly

23  trained and properly instructed you so then they

24  say to authorized workers, you follow -- you have

25  to follow your employer's training and

1  instructions, assuming that they were in

2  compliance with OSHA requirements.

3         **Q.   Bigger question, though, or a more**

4  **general question, do you agree that employees have**

5  **some responsibility for their own personal safety?**

6              MR. BOISSONEAULT:  Objection.  Asked

7  and answered.

8              THE WITNESS:  It is not common sense

9  at heights.

10  BY MR. GOLDBERG:

11         **Q.   I'm not --**

12         A.   It's not a yes or no.

13         **Q.   Whatever knowledge they might have,**

14  **do they have personal responsibility for their own**

15  **safety to act in accordance with what they do**

16  **know?**

17         A.   On a worker site, they have

18  responsibility to follow their employer's

19  instructions and training requirements, that's it.

20         **Q.   Yeah, but you're answering --**

21         A.   OSHA.

22         **Q.   -- something that I'm not asking you.**

23  **I'm asking you a specific question, not about**

24  **whether they have a responsibility to follow what**

25  **they're taught or follow what they're told, I'm**

Page 61

1    asking whether they have personal responsibility

2    for their own safety?

3                    MR. BOISSONEAULT:  Objection.  Asked

4    and answered.

5                    THE WITNESS:  Their own personal

6    safety comes through the knowledge, training, and

7    experience of their employer.

8    BY MR. GOLDBERG:

9        Q.    And then they have to act in

10   accordance with that?

11       A.    Yes, if they --

12       Q.    Okay.

13       A.    If they were trained properly, which

14   they weren't, if they had exposure of proper skill

15   sets from their competent persons, which they

16   didn't, then they have to follow that example.

17       Q.    And if they had no training but they

18   just were really smart like you --

19       A.    No.

20       Q.    -- do -- would you have

21   responsibility?  If you were trained by nobody

22   when you went on this work site but you got a job

23   at Fulton Mill, would you have personal

24   responsibility, do you believe, for your own

25   safety?

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 62

1          A.   With fifteen years experience over

2    fifteen hundred hours of classroom training by

3    OSHA, based on that, then I would have

4    responsibility --

5          **Q.   Okay.**

6          A.   -- because I'm a qualified person.

7    He's not a qualified person.

8          **Q.   So you think you either have to be a**

9    **qualified person or a competent person or -- in**

10   **order to know to use fall protection equipment?**

11         A.   No.

12         **Q.   Okay.**

13         A.   You have to be an authorized person

14   that has been properly trained, shown the proper

15   safety means and methods of using it, and then you

16   have a responsibility to follow your employer's

17   directions.

18         **Q.   All right.  So an authorized worker**

19   **does have responsibility to follow rules?**

20         A.   Once they were properly trained in

21   accordance with OSHA, yes.

22         **Q.   And he has a responsibility to follow**

23   **training he's been given?**

24         A.   If the training was in accordance

25   with OSHA, yes.

1          Q.   Okay.  And he has responsibility to

2     use available safety equipment?

3          A.   If the available safety equipment --

4     safety means and methods are available and safe to

5     use and his competent person employer trained him

6     to do it that way, then he has a responsibility to

7     follow his employer's instructions.  It all goes

8     back to employer's training.

9          Q.   So you do believe that if the rules

10    and training call for it, a person has

11    responsibility to use available safety equipment

12    consistent with that training?

13               MR. BOISSONEAULT:  Objection.  Asked

14    and answered.

15               THE WITNESS:  In theory, consistent

16    with that training.

17    BY MR. GOLDBERG:

18          Q.   Okay.

19          A.   But you have to have a certified

20    anchor point, which in this case we don't have --

21          Q.   Okay.  Aside from whether you

22    think --

23          A.   -- so you can't use it.

24          Q.   Oh, pardon me.

25          A.   You can't use it.  I'm sorry.

1    There's no place to connect your lanyard to.

2         Q.   I know that that's your belief and I

3    know that you haven't been there; but if it is

4    capable of being used, it is the responsibility of

5    the employee to use available safety equipment?

6              MR. BOISSONEAULT:  Objection.  Form

7    and foundation.

8              THE WITNESS:  Hypothetically, if

9    there's a safety means and methods to use fall

10   protection equipment in accordance with OSHA, an

11   employee has a responsibility to do as his

12   employer has instructed and trained him to do.  So

13   if it's there -- hypothetically, if it's all

14   there, he has a responsibility to use it as he's

15   been trained.

16   BY MR. GOLDBERG:

17        Q.   Okay.  That's all I'm asking.  It's

18   not really a complicated question for you.

19        A.   It's a complicated --

20        Q.   Mr. Wright, do you ever believe that

21   an employee should use common sense?  I'm not

22   asking you to define common sense.

23        A.   You have to define it.

24        Q.   You know what common sense is.  Do

25   you have an understanding of what common sense is

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 65

1    without giving me a definition?

2          A.    Common sense --

3          Q.    No, without giving me a definition,

4    do you have an understanding of what you think it

5    is?

6          A.    Common sense to me is not common

7    sense to you.

8          Q.    That's fine.  Do you have an

9    understanding of what common sense is?

10               MR. BOISSONEAULT:  Just note an

11   objection.

12   BY MR. GOLDBERG:

13         Q.    Yes or no?

14               MR. BOISSONEAULT:  Foundation.

15   Relevance.

16               THE WITNESS:  I have a definition of

17   what I think common sense is.

18   BY MR. GOLDBERG:

19         Q.    Great.  Okay.  Do you think that

20   people have a responsibility to use their common

21   sense -- their own common sense?

22         A.    Their own common sense comes from

23   historical events, either training or accidents.

24         Q.    Right.

25         A.    That's common sense.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 66

1          Q.    Okay.

2          A.    So if I didn't go through those

3    historical trainings or accident events, I

4    wouldn't have that common sense.  Common sense is

5    not common.

6          Q.    Okay.  You don't know what

7    Mr. Lucio's common sense was, right?

8          A.    Only from the record.

9          Q.    Well, is it -- in your understanding

10   of common sense, do you agree that some people

11   don't have it?  Have you ever said that guy may be

12   smart but he has no common sense?  You ever heard

13   that expression?

14         A.    Those are usually professors.  Yes.

15         Q.    Do you believe that people have a

16   responsibility -- a personal responsibility to be

17   careful?

18              MR. BOISSONEAULT:  Objection.

19   Foundation.

20              THE WITNESS:  You've asked that

21   before, and it's based on their training level --

22   in an employee setting it's based on their

23   training, experience, application, and supervision

24   of their employer and the enforcement of the

25   employer and the training that your employer had.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 67

1    BY MR. GOLDBERG:

2          Q.    And based on whatever it is that they

3    do know and whatever training they received, they

4    should be careful?  They're duty-bound to be

5    careful, in your mind?

6          A.    Your hypothetical assumes that they

7    were in compliance with OSHA -- all the training

8    was in compliance with OSHA.  If it was in

9    compliance with OSHA and in compliance with ANSI

10   and there was proper supervision by the competent

11   person, then they have a duty to be in compliance

12   with their competent person's directions.

13         Q.    Okay.  Never worked at a slag plant,

14   true?

15         A.    I have not.

16         Q.    You've never worked at a job as a

17   laborer where your job required you to wear a

18   safety harness, true?

19         A.    I wore a safety harness many times

20   but not --

21         Q.    Not as a laborer?

22         A.    Not as a laborer.

23         Q.    Never worked as a foreman or a

24   supervisor on a job site, true?

25         A.    Correct.  You've asked me that.

1          Q.    Never designed a slag plant, true?

2                MR. BOISSONEAULT:  Objection.

3    Relevance.

4                THE WITNESS:  I designed a Gary,

5    Indiana plant that Rock came from, I believe.

6    BY MR. GOLDBERG:

7          Q.    What design -- what Gary, Indiana

8    plant did you design?

9          A.    Well, if you look at Rock's

10   deposition.

11         Q.    No, I'm asking you.  I don't have

12   Rock here.  What Gary, Indiana plant did you

13   design?

14         A.    I don't know.  From what Rock Miller

15   described where he previously worked at, that's a

16   similar definition of the location where I

17   designed the grizzlies, the elevator, the mixing

18   tower of U.S. Steel in Gary, Indiana back in the

19   late '80s, I think.  But I'm not sure if it's the

20   same one.  U.S. Steel is massive.  I've never been

21   to the site.

22         Q.    Okay.

23                MR. GOLDBERG:  What question did I

24   ask?

25                (Record read.)

Page 69

1    BY MR. GOLDBERG:

2         Q.    Was that facility at U.S. Steel a

3    slag plant?

4         A.    It was a part of making steel.

5         Q.    Okay.

6         A.    So I don't know if you want to call

7    that part a slag part, but it was a part of this

8    massive long -- mile long facility.

9         Q.    And you designed the whole thing?

10        A.    No.  Just the --

11        Q.    So did you ever design a slag plant

12   within this whole U.S. Steel facility?

13        A.    Well, see, that was back in my early

14   days in the '90s.  It was U.S. Steel and it was a

15   part of the steel making process, and it had

16   grizzlies, it had elevators, it had pits, it had

17   multiple levels of conveyors that dump into other

18   pits and hoppers, but I don't know if that was in

19   the beginning of making steel or the back end of

20   the slag process.

21        Q.    Okay.  So you're not sure if you

22   designed a slag plant?

23        A.    I'm not sure.

24        Q.    Okay.

25        A.    I've designed something in the steel

1    industry.

2            Q.    But if you did, it was in the late

3    1980s at U.S. Steel in Gary, Indiana?

4            A.    Yeah.

5            Q.    Thank you.

6            A.    You're welcome.  It's called the

7    mixer building if that helps.

8            Q.    It was inside of the building?

9            A.    No, it's all outside.  It's all open.

10   You see all the structure but it's called a mixer

11   building.  Building doesn't mean it has to be

12   enclosed.  Maybe a mixing structure instead of a

13   building, but I think they used mixer building.

14           Q.    And who were you employed by at the

15   time you did your design work?  What was the name

16   of your firm?

17           A.    Lockwood, Jones & Beals.

18           Q.    Is that still in business?

19           A.    Yes.

20           Q.    Lockwood, Jones & --

21           A.    Beals, B E A L S, in Dayton, Ohio.

22           Q.    Are you still involved in that

23   company?

24           A.    No.

25           Q.    When did you discontinue working at

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 71

1    Lockwood, Jones & Beals?

2         A.   December 2003.

3         Q.   That's when you started consulting on

4    your own?

5         A.   Yes.  I was one of the major owners

6    of that company previously.

7         Q.   When you say major, you know, what

8    does that mean percentagewise?

9         A.   I mean, I don't know.  Fifteen to

10   nineteen percent, somewhere in there.

11        Q.   Okay.

12        A.   There were eighteen owners.

13        Q.   And it was an engineering firm or

14   architecture and engineering?

15        A.   It was a major engineering firm and

16   we started doing architecture.  So I guess in

17   theory it's an engineer/architecture firm.

18        Q.   Back in the '80s when you did your

19   design work on the mixing building at U.S. Steel,

20   was there architecture involved by your firm or

21   was it just engineering work?

22        A.   Just structural engineering, that's

23   all.

24        Q.   And when I say just, I just mean as

25   distinguished from architecture.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 72

1          A.    Yeah, just structural engineering.

2          Q.    Okay.  Thanks.

3          A.    Yeah.

4          Q.    You've never designed a screen deck

5     for a hopper at a slag plant, can we at least

6     agree on that?

7          A.    Yes.

8          Q.    Okay.  Have you ever designed any

9     residential buildings?

10          A.    Yes.

11          Q.    For?

12          A.    Typically for doctors.  Usually for

13     an architect.  And it's usually a piece of the

14     buildings.  The architect does most of it and if

15     it's something unusual an architect didn't know

16     how to do, then I would do that piece, like a

17     basement or a major cathedral ceiling or caissons

18     to the building because it was too close to a

19     river and it would be eroded and slide down the

20     hill.

21          Q.    Cool.

22          A.    The more fun part.

23          Q.    I understand you haven't been to the

24     slag plant at Fulton Mill.  Have you ever been to

25     any slag plant?  And I don't mean what might have

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 73

1    been part of a steel process.  Have you -- do you

2    know of any slag plants you've ever visited?

3              A.   I have a list of all the steel

4    facilities I've worked at.  Most of those have

5    slag divisions, but I don't remember being

6    specifically on the slag issue.

7              Q.   Okay.  So have you ever had a case

8    before, as a consultant, where you've had a

9    criticism of somebody with respect to an injury or

10   death from someone falling at a slag plant?

11             A.   As I sit here one way or another, I'm

12   not sure about slag plant.  I have with steel

13   plants which would include slag, and I have a

14   CV --

15             Q.   Okay.  That's where we'll break.

16   Nothing with slag plants but you have with steel

17   plants, and we'll talk about those?

18             A.   Yeah, I'm not sure with slag plants.

19             MR. GOLDBERG:  Let's break.

20             (Pause in proceedings.)

21   BY MR. GOLDBERG:

22             Q.   What steel plants have you had --

23   have you worked -- strike that.

24             You mentioned that you've consulted

25   on some falls at steel plants so why don't you

1    **just tell me the names of the plants, the**

2    **companies?**

3              A.    I either consulted as an expert

4    witness or been there as a design and structural

5    engineer.  You want a list of them?

6              **Q.    You mean before an accident?**

7              A.    Before an accident it would be a

8    design and structural engineer; and then as an

9    expert witness, it would be after the accident.

10              **Q.    All right.  Let's start with the ones**

11    **where you did work as a design and structural**

12    **engineer.  That was U.S. Steel in Gary?**

13              A.    U.S. Steel.  Temkin in maybe Canton,

14    Ohio.  A steel mill down in Middletown.  What's

15    that called?

16              **Q.    We'll just say Middletown, Ohio?**

17              MR. BOISSONEAULT:  Nucor?

18              THE WITNESS:  No.  Whatever that was

19    called.  And then there's a steel mill in Kentucky

20    and along the Ohio River that I was involved in by

21    Nova Steel.  Nova Steel was involved.  I'm not

22    sure who owned what.

23    BY MR. GOLDBERG:

24              **Q.    Okay.  So your -- are those the only**

25    **ones that you worked as a structural design**

1    **engineer?**

2            A.    I'm thinking.  Those are the ones

3    that come to my mind right now.

4            **Q.    Okay.  Very good.  And --**

5            A.    AK Steel in Middletown.

6            **Q.    Case?**

7            **MR. TICKNOR:  AK.**

8    BY MR. GOLDBERG:

9            **Q.    Oh, AK Steel.**

10           A.    Yeah.

11           **Q.    And did you design something that was**

12   **later allegedly involved in a fall?**

13           A.    No.

14           **Q.    Oh, okay.  I guess I misunderstood.**

15           A.    Most of those steel mills that I

16   mentioned I was either doing structural analysis

17   of decks -- of their existing decks, is it strong

18   enough to walk on steel.  Some of the decks you

19   could actually see daylight through and they were

20   concerned people were going to fall.  Some of the

21   mills were installing additional crane systems or

22   machine foundations that they wanted structural

23   engineering provided.

24           **Q.    Were there resulting falls at any of**

25   **those facilities?**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 76

1          A.    No.

2          Q.    Okay.  I misunderstood --

3          A.    No.

4          Q.    -- what you were saying before.  You

5     were just saying you worked at steel mills as a

6     structural --

7          A.    Engineer.

8          Q.    -- engineer; whether there were falls

9     or not down the road, you don't know, I guess?

10         A.    Correct.

11         Q.    Okay.  And you've also worked as a

12    consultant or potential expert witness with steel

13    mill accidents?

14         A.    Yes.

15         Q.    And what companies have those

16    involved as far as the steel mills?

17         A.    I have --

18         Q.    And just limit it to falls from

19    height.  That's all I'm really interested in.

20         A.    Okey-doke.  Falls from objects at

21    height?

22         Q.    Where there should have been either

23    anchor points or -- and the use of harnesses or

24    there should have been a guardrail and there

25    wasn't or there was and somebody fell anyway?

1         A.    One case was for OSHA in Colorado.

2    It was a steel mill at a blast furnace and there

3    should have been guardrails.

4         **Q.    What was the name of the case?**

5         A.    I don't know yet.  I just wanted to

6    say it so I would not forget it.

7         **Q.    Thank you.**

8         A.    Republic Steel was a fall, lack of

9    guardrails.

10         **Q.    Name of the plaintiff?**

11         A.    Bottom one.

12         **Q.    Feltner, F E L T N E R, right?**

13         A.    Yes.

14         **Q.    Versus Republic Engineered Products,**

15    **August of 2010, you were for plaintiff, and it was**

16    **Timothy Feltner.  And you said that was in**

17    **Colorado but it was an Ohio attorney?**

18         A.    No, that's a different topic.

19    Colorado, I don't know that yet.

20         **Q.    Oh, okay.**

21         A.    So this one is in Ohio.

22         **Q.    Okay.**

23         A.    And the guy was in a confined space

24    and they opened up the door and there wasn't

25    supposed to be water in the door and there was

1   water behind the door and it got washed -- that

2   guy got washed away as a subcontractor to Republic

3   and he fell twenty feet onto steel tracks.  Okay.

4          Q.   Was it the guardrail that caused him

5   to die -- the lack of a guardrail that caused him

6   to die, in your opinion?

7          A.   It was a couple things.

8          Q.   Did you testify that --

9          A.   No.

10         Q.   -- he died because of a lack of a

11  guardrail?

12         A.   The case got settled on -- after my

13  report.  I didn't get -- I don't even think I did

14  a deposition.

15         Q.   Did you give the opinion that he died

16  because of the lack of a guardrail?

17         A.   The guardrail wasn't adequate.  The

18  confined space was a problem.  The host employer

19  didn't check out the confined space properly.

20  There wasn't any restraint system for him to not

21  get washed over the existing guardrail.

22         Q.   By restraint system, you're talking

23  about a fall protection harness and lanyard of

24  some kind?

25         A.   Yes.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 79

1          Q.    There was nothing available for that?

2          A.    Correct.

3          Q.    Okay.  What other cases?  Something

4     in Colorado you were looking for I know, too.

5          A.    Let's see.  This one I believe is

6     falling off one of those massive dump trucks, Eucs

7     they're called, in a steel mill area when they're

8     dumping into a grizzly and there wasn't any

9     guardrail on the machine.

10         Q.    Was it a dump truck or was it a

11    machine?

12         A.    They're called Eucs.  It looks like a

13    massive dump truck that's illegal to drive on a

14    road.

15         Q.    Okay.

16         A.    I don't know if you've seen those.

17    They're like ten foot high tires and four foot

18    wide tires.  They're massive.  And then the bed,

19    it holds like four dump truck loads.

20         Q.    Okay.

21         A.    And it goes back and forth, back and

22    forth.  And the operator got out and slipped and

23    there were no guardrails around him to catch him.

24         Q.    Got out of a driver's seat?

25         A.    Yeah.  He got out and he's elevated,

1    I don't know -- I don't remember all the facts

2    now.  He's elevated --

3             Q.    Did you testify in that case?

4             A.    No, just a report.

5             Q.    And that's Stamps versus Mittal

6    Steel.  And that was where?

7             A.    Indiana.

8             Q.    Where?

9             A.    I don't know.  The attorney is there.

10             Q.    Okay.  Any -- did you find -- Jeff

11    Wrage, W R A G E?

12             A.    I didn't know if you need that or

13    not.

14             Q.    No, I didn't need it, but thank you.

15    Well, let me look at it for a second.  Well, the

16    very bottom one it says Colorado, doesn't it?

17             A.    I thought it said Oregon.

18             Q.    Oh, the lawyer is from Colorado.

19             A.    It's an OSHA case.  I'm not sure if

20    it's even on there.  It should be but it may not

21    be.

22             Q.    But you don't remember the name of

23    it?

24             A.    I think it was Colorado Steel or

25    Colorado Republic Steel or something like that.

1    It was around Denver.

2            Q.   Is there an extra copy of this list

3    of steel mill expert witness case history?

4            A.   Yes.

5            Q.   Okay.  May I take it and we'll mark

6    it as Exhibit D?

7                 (Thereupon, Defendant's Exhibit D,

8    steel mill expert witness case history, was marked

9    for purposes of identification.)

10   BY MR. GOLDBERG:

11           Q.   Mr. Wright, showing you what's been

12   marked as Defendant's Exhibit D, this is a list of

13   seventeen cases that you have labeled steel mill

14   expert witness case history, right?

15           A.   Yes.

16           Q.   And that's what you were just looking

17   at a moment ago?

18           A.   Yes.

19           Q.   You identified whether you were on

20   the plaintiff's side or the defendant's side and

21   there are a few of each, mostly plaintiff, right?

22           A.   Yeah.

23           Q.   Okay.  And I guess right offhand as

24   you look at this quickly, you don't know what

25   involved a fall from height specifically?

1        A.    Not -- not all of them.  As I said --

2        Q.    And I won't ask you to go through it

3   and try to search your memory.

4        A.    Yeah.

5        Q.    Have you ever been involved in the

6   design of a shaking screen deck that has

7   vibrations like the one in this case when it's in

8   operation?

9        A.    I've been involved in shaking

10  grizzlies.  The one at Inland -- General Motors,

11  Inland in Dayton on Third Street.

12       Q.    Tell me about that case.

13       A.    It wasn't a case.  I designed it.

14       Q.    Oh, you designed it.  Tell me what's

15  a shaking grizzly.

16       A.    Well, it comes in two phases, just

17  like this one does.  You'd have a grizzly.  I

18  think that grizzly was six-by-six.  It might have

19  been eight-by-eight but I think it was six-by-six

20  openings, and a semi dump truck comes back and

21  dumps into the grizzly and then the grizzly has

22  hoppers below and the hoppers shake and then when

23  it goes through the hoppers, it goes up the

24  conveyor into the feeding chamber where it dumps

25  the coal into the furnace to make electricity.

1          Q.   Was there any fall protection that

2     you designed in that or was that the -- I thought

3     you said the grizzly was something at ground

4     level?

5          A.   Typically they are.

6          Q.   Okay.  So no fall protection in that

7     situation?

8          A.   Not that situation.

9          Q.   Okay.  Any vibrating decks that are

10     designed to vibrate that you've ever been involved

11     in designing that are above ground level or more

12     than four feet over ground level?

13          A.   There's HVAC scrubber hoppers for

14     General Motors that vibrate to collect the EPA

15     particles and they vibrate, and I designed the

16     platforms to sit their vibrating scrubbers on and

17     it has a guardrail around it, on top of roofs,

18     throughout GM.  Like fifty -- no more than

19     fifty-three plants of GM.  GM has got like a

20     hundred and thirty, but I only worked at about

21     fifty-three plants.

22          Q.   And that was around what did you call

23     it?  HVAC what?

24          A.   Well, they're EPA scrubbers with a

25     platform.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 84

1        Q.   Do you have pictures of that or

2   drawings that you've done?

3        A.   No.  I wish I -- a lot of the

4   buildings have been tore down through the GM

5   remodeling.

6        Q.   Okay.  You're not aware of any EPA

7   scrubbers you've designed --

8        A.   That survived --

9        Q.   -- platforms that still exist?

10        A.   There may still be some in Delco GM

11   on Woodman Street in Dayton, Ohio.  When GM --

12        Q.   What street?

13        A.   Woodman.  When GM went through their

14   restructuring bankruptcy in 2008, a lot of the

15   plants got either decommissioned, destroyed, or

16   sold.

17        Q.   Okay.  And do you know of a frequency

18   at which these rubber decks, platforms were

19   vibrating?

20        A.   Huh-uh.  No.

21        Q.   Okay.

22        A.   I did at the time of the design but I

23   don't remember now.

24        Q.   Sure.  And you said these were on the

25   roofs of buildings?

1          A.   Yes.

2          Q.   And was the guardrail -- how high up

3    was the platform above the roof surface?

4          A.   Six feet, typically.  Not high.  Then

5    you have a platform, a guardrail around that with

6    stairs going up to it.

7          Q.   Okay.  So the platform is where the

8    guardrail was?

9          A.   Yes, around the vibrator.

10         Q.   Okay.  And the vibrating thing, is

11   that what it's called, the scrubber?

12         A.   Yes.

13         Q.   Was it a -- separated from the

14   platform itself?

15         A.   Well, it was --

16         Q.   Separate structure?

17         A.   It was isolated on the structure I

18   designed by springs.  So basically their unit sat

19   on my platform with springs, very similar to what

20   this unit is.

21         Q.   Okay.  Do you have any knowledge as

22   to whether the guardrails on any of the scrubber

23   platforms that you designed, whether they ever

24   failed or whether they always functioned without

25   requiring maintenance?

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 86

1       A.    They all --

2       **Q.    Do you know?**

3       A.    Yes.

4       **Q.    Okay.**

5       A.    I'm always the first to know if

6  something fails that I designed.

7       **Q.    Not if you're not there anymore.**

8       A.    If it's got a record who designed it,

9  I'm usually one of the first to know.  I was an

10 outside consultant for General Motors for, like,

11 thirty-five years and still -- actually, forty

12 years, I'm still an outside consultant with

13 General Motors, and there's never been a failure.

14      **Q.    Reported to you?**

15      A.    Reported to me.

16      **Q.    Okay.  Thank you.**

17      A.    Yes.

18      **Q.    Has there ever been a failure**

19 **reported to you on anything you've designed?  You**

20 **said you're always the first to know.**

21      A.    Yeah.  I've never -- nothing comes to

22 mind that I've ever designed that was a failure.

23 I've been accused of overdesigning many times.

24      **Q.    Okay.  Fair to say that you've never**

25 **been retained to test the vibrations on a slag**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 87

1    plant tower?

2          A.   Say one more time.

3          Q.   **You have never been retained to**

4    **test --**

5          A.   Test.

6          Q.   **-- vibrations on a slag plant tower;**

7    **is that fair?**

8          A.   That's fair.

9          Q.   **Okay.  And you have not done any**

10   **testing on the vibrations of the slag plant at**

11   **Fulton Mill, true?**

12         A.   Correct.

13         Q.   **Okay.  As part of your preparation**

14   **for this case, did you look for other slag plants**

15   **around the country or around the world to see how**

16   **they were designed?**

17         A.   Other than what my familiarity of how

18   the previous plants were designed, I didn't go

19   beyond that.

20         Q.   **Okay.  Do you have photographs or**

21   **documentation of any slag plant screen deck towers**

22   **that had guardrails around the screen deck itself?**

23         A.   No.

24         Q.   **Okay.**

25         A.   Most plants you weren't allowed to

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                Michael C. Wright

Page 88

1    have cameras.

2        Q.   Okay.  But are you aware of any slag

3    plant screen deck on a tower that you've seen that

4    does have a guardrail around the screen deck?

5        A.   As I sit here today, all the

6    facilities that I have listed and all the

7    facilities that I mentioned I have never seen one

8    that wasn't protected by guardrails.  Typically

9    always guardrails.  There may have been fall

10   protection anchor points in addition if they had

11   to take the guardrails down for whatever reason

12   for maintenance, but I've never seen -- if it's a

13   working surface, I've never seen one without

14   protection on it.

15       Q.   I think you said you've never looked

16   at a -- been at a slag plant personally so you're

17   looking at just the steel mill itself, right?

18       A.   I'm looking at these -- Exhibit D,

19   those -- all those sites --

20       Q.   Right.

21       A.   -- and then all the sites I

22   previously talked about which I said I cannot

23   distinguish the slag phase to the whole phase.

24       Q.   Right.  I understand.

25       A.   So all those --

Page 89

1          Q.   I understand by and large you've seen

2     guardrails on working surfaces except where you

3     said they were lacking?

4          A.   No, I didn't say that.

5          Q.   I thought one of the cases you

6     testified in was there was no guardrail and no

7     tie-off?

8          A.   There was a guardrail, no tie-off,

9     and the guardrail wasn't high enough.  The water

10    pushes him up and over.  The guardrail should have

11    been like forty-eight inches.  The whole thing was

12    they shouldn't have had that tank filled with

13    water when they opened up the door, the door

14    flushed --

15         Q.   Yeah, that seems to be --

16         A.   -- it through.  Weird.

17         Q.   That seems to be what you called the

18    root cause, I think?

19         A.   Yes.  Definitely.

20         Q.   But as you sit here right now,

21    there's not one of your seventeen or so steel mill

22    list that involved a fall from a slag plant screen

23    deck?

24         A.   Correct.

25         Q.   And as you sit here right now, you

1    can't tell me that you personally saw a guardrail

2    around a slag plant screen deck?

3         A.   Correct.

4         Q.   Okay.  And just to close the loop,

5    rather, what you did say is that with respect to

6    all of the items listed on Exhibit D --

7         A.   Steel mills.

8         Q.   -- at the steel mills involving the

9    surfaces where there were falls -- and not all of

10   those involved falls, the steel mill?

11        A.   Broader than that.  All the steel

12   mills that I've seen either through cases or

13   through design, working surfaces had guardrails.

14        Q.   Right.  Okay.  Let's go on to

15   training because I know earlier you said if the

16   trainer is trained properly, the trainees are

17   trained properly.  And you've been involved in

18   training both trainers and trainees?

19        A.   Right, and qualified -- and

20   engineers.

21        Q.   You've done a lot of training?

22        A.   Yes.

23        Q.   You've done a lot of fall protection

24   training?

25        A.   Yes.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 91

1          Q.   When did you start doing fall
2    protection training?
3          A.   I started getting into fall
4    protection and all the elements within fall
5    protection probably in '88 or '89.
6          Q.   And did you do that on behalf --
7    initially, because I know you started your company
8    in 2003 -- or your current company, did you do
9    that with --
10         A.   Lockwood, Jones & Beals.  Yes.
11         Q.   -- Lockwood?
12         A.   Yes.
13         Q.   Starting in what year were you with
14   Lockwood?
15         A.   '78.
16         Q.   Okay.  So if you got into fall
17   protection in '88 or '89, that would have been
18   with Lockwood?
19         A.   Yes.
20         Q.   Anybody else that you -- by whom you
21   were employed that you did fall protection
22   training other than as an employee of Lockwood
23   consulting, another company?
24         A.   I lost you there.
25         Q.   Have you worked for anybody else

1    other than Lockwood?

2          A.   No.

3          Q.   And up until 2003?

4          A.   Correct.  December.  Yes.

5          Q.   And can you estimate for me how many

6    times you've done fall protection training?  Many,

7    many?

8          A.   At least a hundred.  Maybe two

9    hundred.

10          Q.   Have you done it at any companies

11    more than once?

12          A.   Yes.

13          Q.   Give me some examples.

14          A.   Like Honda, it's a whole program so

15    you have multiple training.  They'd have maybe

16    three hundred people and you train thirty at a

17    time.  Danis Construction Company in Dayton, I

18    trained a hundred and fifty-two of their foremen

19    for construction, fall protection.  General

20    Motors, off and on through all their plants I

21    would train them in groups of thirty.  I don't

22    want to train any more than thirty at a time.

23          Q.   Okay.  So when you said a hundred and

24    fifty at Dana in Dayton, that was of groups of

25    thirty or less?

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                Michael C. Wright

Page 93

1          A.    Yes.  And the same way with Honda.

2          Q.    **I didn't mean to interrupt you,**

3     **though.  You were on GM off and on.**

4          A.    All their plants, sometimes they'd

5     have to pull in additional plants to get a class

6     of thirty, but I would train thirty at a time.  It

7     was always at GM.  And all the previous ones I

8     told you was competent person training so they

9     would in turn train their authorized workers.

10         Q.    **And when you did that, you did your**

11    **best to make sure the competent person was well**

12    **enough trained by training the first thirty with**

13    **the competent person?**

14         A.    I trained the competent persons and

15    then they became trained -- trainers for all their

16    users, authorized workers, and then I would train

17    them and go to the site and make sure they're

18    training properly for all their authorized users.

19         Q.    **So that would involve you watching**

20    **the competent person do some training?**

21         A.    Yes.

22         Q.    **And that would involve you --**

23         A.    Critiquing.

24         Q.    **-- doing training of the authorized**

25    **persons in the presence of the competent person as**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 94

1  well?

2          A.   Sometimes.  I try not to do that

3  because it takes away their power.

4          **Q.   Okay.  Anybody other than Honda,**

5  **Dana, and GM?**

6          A.   Ford.

7          **Q.   Okay.  And how often for Ford?**

8          A.   Ford, I set up their video training.

9  They had eight hours of video training.  I wrote

10  the script on Ford.  GM I wrote the -- some of the

11  manuals for GM.  Honda I --

12          **Q.   Same -- and this is for fall**

13  **protection?**

14          A.   Yes.

15          **Q.   Okay.**

16          A.   Honda I wrote their entire program.

17          **Q.   So that would mean videos and**

18  **manuals?**

19          A.   Yes, and training procedures.  And

20  Proctor & Gamble, I wrote their entire program

21  globally for them.

22          **Q.   And when you wrote it, did you also**

23  **again train --**

24          A.   Yes.

25          **Q.   -- the competent person and make sure**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 95

1    that they knew how to train the employees?

2         A.    Yes.

3         Q.    And you did that with Ford, too?

4         A.    Ford was limited to their highest

5    level competent persons and qualified persons, and

6    then they would take it from there.  I probably

7    only trained about thirty of Ford's, and then they

8    would turn around and grab thirty more people to

9    bring them up to competent person and then they

10   would take it from there.  Ford was kind of

11   independent.  They wanted to do it themselves.

12        Q.    Okay.  Anybody else?

13        A.    Yes.  Boeing in Washington, I trained

14   thirty-five qualified design engineers.  I brought

15   them up to qualified person level to design fall

16   protection systems on their 747, their 777,

17   their -- what is that?  Is that 657, 777?

18        Q.    Bunch of airplanes?

19        A.    Big monster airplanes.

20        Q.    All right.  Got it.  Anybody else?

21        A.    United Airlines out of San Diego, a

22   lady named Wendy, I forget her last name, she was

23   the competent person that I trained.  Then I

24   helped her review how to train other workers

25   within their facility in San Diego -- San

1    Francisco.  Sorry, San Francisco.

2          **Q.    When was that?**

3          A.    2000 maybe.

4          **Q.    Wendy must have made an impression on**

5    **you?**

6          A.    Well, she kept getting married and I

7    kind of lost the last name.

8          **Q.    Okay.  I just mean you didn't mention**

9    **anybody else's name at the other companies.**

10          A.    Oh, Boeing was --

11          **Q.    That's all right.**

12          A.    I could go through all the --

13          **Q.    That's all right.  What year was**

14    **Boeing or years?**

15          A.    '96 and '97.

16          **Q.    All right.  And Procter & Gamble?**

17          A.    '98 through 2000.

18          **Q.    Every year?**

19          A.    It's global.

20          **Q.    So every year you've done --**

21          A.    I went to all the plants and trained

22    in the United States and a little bit in Canada

23    for Boeing and then they brought in all their

24    internationals and I trained all their

25    internationals in Mexico.

1          Q.   Did you do videos for them, too?

2          A.   That's all part of the training.

3     It's all hands on.  Yeah.

4          Q.   I don't know what part of the

5     training, so that's why I'm asking you.  You

6     mentioned you did eight hours of videos for Ford

7     so I'm asking if you did videos for P&G, too?

8          A.   I did not do -- Ford wanted only

9     video training.

10          Q.   Right.

11          A.   And I said typically you've got to do

12     hands-on training for people to get it.  That's

13     all they wanted to do and they're going to take it

14     themselves to do hands-on training.

15               With Procter & Gamble I did video

16     training, hands-on training, equipment training,

17     and application training.  So I would actually set

18     up scenarios where the equipment wouldn't work and

19     show them why it didn't work and do drop tests and

20     blow off those side gates we were talking about

21     before.  So showing that they thought it was all

22     safe and we dropped a two hundred and twenty pound

23     headache ball, crane ball, blew it right off and

24     broke the lanyards and said that's why you can't

25     do what you were thinking was safe, that's why you

Page 98

1    can't do it.  So my training is forty hours

2    competent person, qualified is typically eighty

3    hours, and authorized person is typically two

4    days.

5         **Q.    And you said GM it's been on and off**

6    **for thirty-five, forty years?**

7         A.    I've worked for GM for thirty-five,

8    forty years.  Fall protection I worked for them

9    since '88, and there was a big push up

10   through '97 --

11        **Q.    Okay.**

12        A.    -- then it leveled off.

13        **Q.    Okay.  Dana, what years was that?**

14        A.    Danis, D A N I S.

15        **Q.    Oh, I'm sorry.**

16        A.    That was in '96.

17        **Q.    And Honda?**

18        A.    Maybe 2001, 2002.  That's still going

19   on.

20        **Q.    And Ford?**

21        A.    Ford was '98.  '98.

22        **Q.    Just '98?**

23        A.    Yeah.  They just wanted a series of

24   videos and review their manual -- their training

25   manual.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 99

1          Q.   Okay.  Any other companies that

2    you've done fall protection training of one kind

3    or another?

4          A.   We did fall protection training for

5    Steel Dynamics, Inc. in Indiana in 2013

6    maybe, '14.  2013, '14, in that window.  Just for

7    their high levels.  Each plant was represented and

8    we trained their highest level safety

9    representative for forty hours competent person.

10         Q.   Any others?

11         A.   We did some training for Navy in fall

12   protection as awareness training, maybe eight

13   hours awareness training at Washington state, I

14   think.

15         Q.   What?  In Washington state for the

16   Navy?

17         A.   Yeah.  Just that one branch.  Puget

18   Sound, I think, was the area.

19         Q.   Anywhere else?

20         A.   I think that's the -- oh.  U.S. --

21   no, what was it?  Muscle Shoals, Alabama

22   Aluminum -- I guess it's called Muscle Shoals

23   Aluminum in Muscle Shoals, Alabama.  I trained

24   maybe ninety of their safety and engineers to

25   competent person level, and then we went on and

1    did another qualified person training for their

2    engineers, maybe twenty of those.

3         Q.    In what years?

4         A.    I would say '99.  '98, '99, somewhere

5    in there.

6         Q.    Any others you remember?

7         A.    International Harvester, IH, where

8    they make semis.  We trained their entire

9    facility, multiple trainings of competent persons.

10   Did a training tower for them.  Designed a

11   training tower so they actually could practice

12   with all the equipment.

13        Q.    When did you do that?

14        A.    '98 maybe.  We did Georgia Pacific

15   fall protection training to just one plant in, I

16   think, Alabama.  Maybe 2001.

17        Q.    Anywhere else?

18        A.    I'm going through all the different

19   types of industries.  Proctor and -- or Mead Paper

20   we did awareness training in Chillicothe, Ohio to

21   their upper management and safety department to

22   get them to understand the OSHA and ANSI

23   regulations probably '96, and then they took it

24   from there.  That's all I can think of.

25        Q.    That's what you remember now?

1          A.   Yeah.  I could try to get more if you

2    want me to keep looking.  Those come to my mind.

3               (Thereupon, Defendant's Exhibit E,

4    Michael Wright's professional experience, was

5    marked for purposes of identification.)

6    BY MR. GOLDBERG:

7          Q.   Showing you what's been marked as

8    Defendant's Exhibit E --

9          A.   Yes.

10         Q.   -- and I pulled this out of your

11   report in this case which includes some of your

12   professional experience.  It's pages fifty through

13   sixty -- strike that -- it's page fifty and then

14   pages fifty-six through sixty of your report which

15   includes something at the beginning called

16   professional experience, correct?

17         A.   Yes.

18         Q.   Okay.  And this includes some of the

19   folks that you identified and it also shows some

20   years, breaking it down to maritime safety -- and

21   maritime safety, based on what you told me about

22   the Navy, I take it that did include some fall

23   protection training?

24         A.   Yes.

25         Q.   And would that -- are they subject to

1    OSHA, too, or is it a different section actually?

2           A.   Well, it's -- maritime is a different

3    section.

4           Q.   Okay.  But it's the same concept?

5           A.   Same concept.

6           Q.   Okay.  Got it.  And on that first

7    page it shows anchorage points for fall arrest

8    programs --

9           A.   Yes.

10          Q.   -- that you provided consulting for

11   each of the companies listed there on page fifty?

12          A.   Yes.

13          Q.   And for the companies you listed that

14   I recognize, Boeing, you mentioned Ford --

15          A.   Yes.

16          Q.   -- GM, Honda?

17          A.   Yes.

18          Q.   Navy?

19          A.   Yes.

20          Q.   P&G?

21          A.   Saturn.

22          Q.   But the ones that you mentioned,

23   those would be in the years that you identified a

24   minute ago?

25          A.   Yes.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 103

```
 1          Q.   Okay.

 2          A.   Approximate years.

 3          Q.   All right.  And if you go to page

 4   fifty-six at the bottom spilling over to the next

 5   through fifty-nine, that shows your involvement at

 6   steel mills --

 7          A.   Yes.

 8          Q.   -- with training as well as with the

 9   motor companies, Ford and GM?

10          A.   Yes.

11          Q.   And it gives, again, the years that

12   you provided that training?

13          A.   Yeah.

14          Q.   So when you listed a whole

15   different -- when you listed a group of different

16   topics that you trained on, for example, with GM

17   Defiance, GM Saginaw, it lists a whole bunch of

18   stuff and over a period of years.  Did you do

19   different trainings in different years or did you

20   do each of these things in each of those years?

21          A.   It would be probably yes to both of

22   those.

23          Q.   Okay.  Some in each year?

24          A.   Yes.

25          Q.   Okay.
```

Page 104

1          A.    It's usually what drives the

2     accident.  The guy gets caught in the machine,

3     okay, let's do lockout/tagout.  Okay.  The guy got

4     caught in the machine, the machine guarding was

5     missing, okay, let's do machine guarding.  The guy

6     falls off the roof, okay, let's do fall protection

7     again.  It usually drives that, the training.

8          **Q.    Did each of these contracts that had**

9     **you doing training result from an accident that**

10    **had already happened?**

11         A.    Sometimes.  Sometimes it's a citation

12    with no accident, and sometimes it's proactive.

13         **Q.    Which is the best, right?**

14         A.    Yes.

15         **Q.    All right.  So --**

16         A.    Proctor & Gamble was always

17    proactive.  The rest of them was citation or

18    something happened.

19         **Q.    Okay.  And then, of course, your goal**

20    **as a trainer is that once you train them, they**

21    **know what they're doing?**

22         A.    Yes.  I show them how to fish and

23    then they fish thereafter.

24         **Q.    And if you're doing your job, then**

25    **accidents don't happen?**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.          Michael C. Wright

Page 105

```
 1          A.    Correct.

 2          Q.    Are you perfect?

 3          A.    No.

 4          Q.    Okay.  Have you had places where

 5     you've performed training where there have been

 6     accidents after you did the training?

 7          A.    Not that I know of.

 8          Q.    Okay.  With the design work you've

 9     done, you said you would always be the first to

10     know and you've never heard anything?

11          A.    No.

12          Q.    But with the training, you don't know

13     whether --

14          A.    It would still be the same story.

15          Q.    Theoretically --

16          A.    It would be --

17          Q.    -- if they wanted to blame you as the

18     trainer --

19          A.    Right, you'd be the first to know.

20          Q.    And you've -- no one has ever called

21     you as a witness about training that you did give

22     at a facility?

23          A.    No.  They've called me as a witness

24     that the training was adequate or that the --

25          Q.    Hold on.  I get it.
```

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 106

```
 1          A.    Okay.

 2          Q.    Did they ever call you as a witness

 3    about training that you had given?

 4          A.    No.

 5          Q.    Okay.  Do you have -- and I -- do you

 6    have copies of the videos that you have done as

 7    part of fall protection training for any of these

 8    companies?

 9          A.    No.  The video is usually by an

10    outside vendor that I edit their videos and they

11    gave me credit for being the behind-the-scenes

12    editor, make sure it was in compliance with OSHA

13    and ANSI, and then you would buy those.  As I sit

14    here, I can't think of the name of the company.

15          Q.    It doesn't matter --

16          A.    Yeah.

17          Q.    -- but the --

18          A.    I don't produce videos.

19          Q.    Oh, okay.

20          A.    Okay.

21          Q.    You just look at other people's --

22          A.    I edit.  A lot of times I'll -- like,

23    if there's a video --

24          Q.    Now, hold on.  I don't care about a

25    lot of times.
```

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 107

     1          A.   Okay.

     2          Q.   You mentioned Ford that you did eight

     3     hours of video --

     4          A.   Yes.

     5          Q.   -- for them.  You didn't produce any

     6     of the videos?

     7          A.   Correct.

     8          Q.   You did edit all of the videos?

     9          A.   Most of the videos.

    10          Q.   Okay.  So that meant you took

    11     somebody else's work --

    12          A.   No.

    13          Q.   -- and then you said well, here's how

    14     we want to do -- you're like the --

    15          A.   I wrote the story.

    16          Q.   -- cinematographer or something?

    17          A.   I wrote the story.

    18          Q.   Oh, okay.  And then they went out --

    19          A.   And did it.

    20          Q.   -- and made the video according to

    21     what you told them to do?

    22          A.   Yeah.  They got the models and made

    23     it happen.

    24          Q.   Cool.  And are you on the scene when

    25     they actually do the shooting or --

 1          A.    No.

 2          Q.    Okay.  You see it after and then you

 3     tell them I like this, I don't like that --

 4          A.    Yes.

 5          Q.    -- do that over again, whatnot?

 6          A.    Yes.

 7          Q.    So ultimately the final product on

 8     the video that you shared with Ford, the video

 9     you've shared with Honda, P&G, GM has been

10     something that you scripted and you approved?

11          A.    For Ford, yes.  For the rest of them

12     some of it I've scripted that an outside vendor

13     made and I got credit for it, or sometimes the

14     outside vendor would just use somebody else's, my

15     competition, and it was very close and I would use

16     that video and as I train, I would say what's

17     wrong with this video, what's wrong with that

18     picture, what's wrong with that, and then I would

19     use it that way.

20          Q.    Perfect.

21          A.    Yeah.

22          Q.    For the videos that you did write and

23     edit --

24          A.    Ford.

25          Q.    Just Ford?

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 109

1        A.    Yeah.

2        **Q.    Okay.**

3        A.    Yeah.   Procter & Gamble I did a

4    little bit of -- they did their own video camera

5    and stuff and they created it up in Wisconsin and

6    then I edited it after I saw it.

7        **Q.    So you thought those were pretty good**

8    **videos, whatever, the ones that you at least**

9    **scripted and edited?**

10       A.    By the time we got done with it, they

11   were very good.

12       **Q.    Okay.  And for P&G and Ford, those**

13   **were when?**

14       A.    It would be that time frame.

15       **Q.    I think you said '98 for Ford?**

16       A.    Yeah, that's about right.   P&G was

17   around 2000, 2001.

18       **Q.    You said '98 to 2000 for P&G.**

19       A.    Yeah.

20       **Q.    I don't know --**

21       A.    I mean, it's my best as I sit here

22   today.

23       **Q.    Okay.  But you also said that you**

24   **did -- where training is listed for these**

25   **companies, you would have done it each year?**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 110

1          A.   As required.  I wouldn't do it each

2    year.  It's as required.  Because a lot of times

3    those competent persons that trained would move on

4    and all of a sudden where I had ten competent

5    persons in one plant, they're all gone so then

6    they'd have new competent persons and I'd come in

7    and retrain all those guys.

8          Q.   Okay.  Fair enough.

9          A.   And then a lot of times those

10   competent persons that I trained went to

11   competition, then I got into that plant because of

12   the competition.

13         Q.   So how many times did you have to

14   train competent persons at these companies?  Was

15   it almost every year?

16         A.   No.  Probably once every five years

17   they would all be phased out.  They would move on,

18   retire, whatever.

19         Q.   Okay.  Do you remember with P&G how

20   often you did training there in the two, three

21   years?

22         A.   That particular plant was up and

23   running and then their president came -- a new

24   president came out of Spain and dissolved

25   basically the whole safety department.  So it was

1  probably the best in the world and it went to

2  zero.

3          Q.   And with Ford --

4          A.   I did that as a one-time deal with

5  Ford.

6          Q.   Okay.  And was it at a particular

7  plant or was it a meeting of all the plants or

8  what?

9          A.   It was in Detroit, and it was hosted

10 at the foundry in Detroit, the big foundry as you

11 go up I-75 that's got the baseball painted -- the

12 big tower.  What's that thing called?

13          Q.   Did it smell really badly as you

14 drove by?

15          A.   Yeah.

16              MR. BOISSONEAULT:  River Rouge.

17              THE WITNESS:  Yeah.  It's the

18 original Henry Ford plant, yes.  That's where it

19 was held at.

20 BY MR. GOLDBERG:

21          Q.   Okay.  And so was the idea that all

22 the people that would be qualified and competent

23 were going to be there for you to train?

24          A.   Yes.  And with Honda it was training

25 about every five years.

1          Q.    Okay.  But Ford was just one time?

2          A.    One time.

3          Q.    Do you remember the specific year you

4    did it?

5          A.    Not the specific.

6          Q.    Okay.  Because you list for Ford 1996

7    to 2002.

8          A.    During that time it was anchor points

9    I think you're under.

10         Q.    Safety and engineering services for

11    steel manufacturing and processing facilities.

12         A.    Yeah, engineering.  There's a lot

13    of --

14         Q.    It says confined space safety audits,

15    fall hazard risk assessment?

16         A.    Yeah.

17         Q.    Fall protection for roof, building,

18    and machinery --

19         A.    Yeah.

20         Q.    -- fall protection training programs,

21    and it goes on.

22         A.    Yeah.

23         Q.    But --

24         A.    Some were training.  Some were

25    engineering.  And most were driven by the plant,

Page 113

1    not the corporation.  So if a plant, somebody

2    would fall off of a big crown press, then they

3    want fall protection on all twenty presses.  Or if

4    someone would fall off of a crane, then they want

5    crane protection.

6         Q.    Okay.

7         A.    I'm pretty sure I only did training

8    once there.  I wanted to do it more but they take

9    it from there.

10        Q.    And who was your Wendy at Ford?

11        A.    It was another lady.  When the --

12   when that plant that we just talked about that has

13   an odor, that powerhouse blew up and killed eight

14   people, she was the corporate safety directive and

15   then she got suspended with pay and I don't know

16   who the replacement was.  But after that there

17   wasn't any fall protection that I was involved in.

18        Q.    But that was in what year?

19        A.    That's why I was using the reference

20   of when the plant blew -- when the powerhouse blew

21   up because that made national news.

22        Q.    Well, who was the person that you

23   dealt with that got let go?

24        A.    I don't know her name.

25        Q.    Oh, okay.

1          A.   She was --

2          **Q.   But she was the person who was let go**

3    **after the powerhouse blew up at Rouge River?**

4          A.   Yeah.  She was in charge of that.

5    She retired with pay is what the rumor was.  I

6    don't know one way or the other.  But it made

7    news.

8                MR. GOLDBERG:  Off the record.

9                (Thereupon, an off-the-record

10   discussion was had.)

11   BY MR. GOLDBERG:

12         **Q.   Is your framework for training OSHA?**

13         A.   It's OSHA and ANSI --

14         **Q.   Okay.**

15         A.   -- and I show them the differences

16   and I show them they have to take the highest

17   road.

18         **Q.   Good enough.  Is there anything wrong**

19   **with, I'm going to call it an outline, with the**

20   **materials headed fall protection on Exhibit A?  Is**

21   **there anything wrong with the outline topics that**

22   **we marked as Exhibit A with respect to fall**

23   **protection?  Without telling me, well, it doesn't**

24   **say how much detail there was or there wasn't, but**

25   **the topics conveyed in there I want you to take a**

Page 115

1      **look at and tell me whether the topics are at**

2      **least addressed there?**

3          A.   Well, equipment selection, equipment

4      use, equipment inspection, equipment storage is

5      not there.  Equipment limitations is not there.

6      The fact of a guardrail height and the capacity is

7      not there, forty-two inches; and the load, it's

8      not there.  There's nothing about aerial lifts,

9      articulating lifts.  Nothing about ladders.  Yeah.

10     And they go back and forth from six foot or four

11     foot.  It's four foot.  Six foot is for

12     construction.

13          Safety techniques.  It doesn't say

14     how to wear your equipment, the angles your

15     equipment is good for, what a certified anchor

16     point is.

17          I mean, five thousand pounds is the

18     weight of an F-350 and most guys think that if I

19     fall, I weigh three hundred pounds, that is -- the

20     anchor point is good enough so I can connect to a

21     water pipe, I can connect to a guardrail where I

22     show them using watermelons and using M&M peanuts

23     the dynamic loading.  If you hover -- if you have

24     a baby scale and you hover a one pound bag of

25     M&M -- first of all, you just set it on there, it

1    would be one pound.  If you hover it, it's about

2    two pounds.  If you take it up about ten inches

3    and let it go, it's nineteen pounds.  So that's

4    nineteen times one pound.  So that's the dynamic

5    effect that an anchor point has to withstand, and

6    they don't get it until I do that.

7                And then they think well, if I fall

8    off a ladder, I'll just grab on.  So then we do an

9    egg test and I have my hand in a black shirt and

10   they can't see my muscles reflex and I say you

11   catch it.  You can't catch it.  So, in other

12   words, when you fall off a ladder, what you're

13   grabbing on to, this rail, is now five, six feet

14   up so when you grab on, your hand now becomes that

15   five thousand pound anchor point and you can't

16   hold on, you rip your arm off, you can't

17   physically hold on, and they say, oh, yeah, you're

18   right.  So those are the kind of things that --

19   demos -- you know, just field questions, macho, if

20   I fall, I'm going to catch myself, well, you

21   can't, that kind of stuff.

22          **Q.   Emphasizing the importance of using**

23   **the equipment?**

24          A.   Yeah, just drilling it in so it's

25   not -- like you're saying -- like I was saying,

Page 117

1    it's not common sense.  It's like, oh, yeah I

2    can't catch, or if I fall, I can't grab on,

3    because -- you know, you always hear the guys

4    well, if I fall, I'm going to grab on.  You can't.

5    Your mind won't let you grab on.

6                    Then I show them the medical -- I've

7    got an article that says medical response, you

8    know, if it's a half a second, a blink of an eye

9    is five-eighth of a second, the object that you're

10   trying to grab on is four or five feet away, you

11   can't do it.  So now I'm grabbing on something

12   with my body force on it.

13           Q.    **Not going to work?**

14           A.    Not going to work.

15           Q.    **Right.  So it's important that you**

16   **emphasize --**

17           A.    Practical --

18           Q.    **-- the use of the equipment?**

19           A.    And designing it out.  With

20   engineers, you've got to design it out, guys.  If

21   you can eliminate it or design it out, put

22   guardrails up there, change the process, put

23   platforms around, that's designing it out.  You've

24   got to make it basically at that level a qualified

25   person, you've got to make it idiot proof just so

1  the guys can't make a mistake.  Most accidents are

2  Fridays -- are Mondays and Fridays since 1970.

3          **Q.   Do you have a manual that you use for**

4  **fall protection training of OSHA competent**

5  **persons?**

6          A.   The manual that I use is like a Honda

7  manual or GM manual.  I give that to them.  I

8  customize it because they've got their own rules

9  and then I -- and they've got their own language

10  typically and then I give that to them so I don't.

11          **Q.   You've not written one yourself --**

12          A.   Oh, I write them all myself but --

13          **Q.   Do you have any?**

14          A.   I'd have to look in the archives.  I

15  doubt it because I give it to them.  Like Ford is

16  confidential when you do the contract.

17          **Q.   Well, here's the thing, I mean, I**

18  **don't know if your manual is seven pages long --**

19          A.   It's about that (indicating).

20          **Q.   -- plus the video.  On fall**

21  **protection?**

22          A.   Yes.

23          **Q.   Just on fall protection?**

24          A.   Yes.

25          **Q.   I haven't seen it so I don't know**

Page 119

1    that.  I appreciate you telling me that.

2          A.   Yeah.

3          Q.   I don't know if it has anything more

4    than this or if it just shows people trying to

5    catch eggs and people trying to do this and

6    discussion of dynamic forces.  But you wouldn't

7    expect your authorized workers to read a two inch

8    manual?

9          A.   No, that's totally different.

10          Q.   Right.

11          A.   Right.

12          Q.   So the document to be read by the

13    authorized worker, do you have documents you

14    produce for them, too?

15          A.   I might have an old Honda awareness

16    at-risk worker pocket manual that was designed for

17    them to keep it in their pocket or their toolbox.

18          Q.   So something even shorter than the

19    pages on Exhibit A?

20          A.   It's probably a seven page, three

21    inch by six inch, five inch, open up and it says

22    Honda, open it up, it probably gives you an

23    overview and may have some cartoons on it.

24          Q.   Do you have that with you?

25          A.   Oh, obviously not.  I don't even know

1    if I've got it.

2         **Q.    I mean, you brought with you, you**

3    **know, practically an office of information --**

4         A.    Yeah, a little bit.

5         **Q.    -- but you don't have that?**

6         A.    I could probably get that from a

7    Honda representative, but it would have to be what

8    you call confidential --

9         **Q.    That's okay.**

10         A.    -- or under seal.  I can give it to

11    Kevin.

12              MR. GOLDBERG:  Would that be

13    something you'd produce without a -- I mean, just

14    subject to the stipulated protective order you

15    have, Kevin, or are you going to --

16              MR. BOISSONEAULT:  I'm not sure

17    whether it's relevant or anything at this point in

18    time.

19              MR. GOLDBERG:  Well, the relevance

20    would be to compare it with other information

21    that's been shared here.  He's critical of the

22    information here, at some level, so I would like

23    to compare it with the information that he has

24    produced himself.  So that's all I'm thinking.

25              THE WITNESS:  Yeah.  It's like

1   pulling hen's teeth to get a corporation to let me

2   give it to somebody else.  They're always afraid

3   they're going to be used and they've already

4   paid -- like the amusement park industry, why

5   should I let you show Disney this because I

6   already paid you a hundred thousand dollars to

7   develop this?  So that's what they're afraid of.

8   BY MR. GOLDBERG:

9          **Q.   Okay.  Well, if you have a**

10  **confidentiality agreement with them --**

11         A.   I do.

12         **Q.   -- then I guess it could be a problem**

13  **for you and I.**

14         A.   Yeah.

15         **Q.   You could ask or you could not ask.**

16  **I'll leave that to you.**

17         A.   Yeah.  That's the problem.

18         **Q.   Would you be uncomfortable asking?**

19         A.   No.  I know the answer.

20         **Q.   I'd appreciate it if you would ask**

21  **and then get back to Kevin who will let us know --**

22         A.   Okay.

23         **Q.   -- if you can either get it or not.**

24         A.   Okay.

25                MR. GOLDBERG:  Is that fair?

MR. BOISSONEAULT: He can certainly ask.

MR. GOLDBERG: Okay. You're not going to tell him not to ask, that's what I mean?

MR. BOISSONEAULT: No.

MR. GOLDBERG: Okay. Thanks.

BY MR. GOLDBERG:

**Q. When proper fall protection training is given, then you agree with the proposition that somebody shouldn't fall?**

A. Well, it's --

MR. BOISSONEAULT: Objection. Form and foundation.

MR. GOLDBERG: Okay.

THE WITNESS: It's a program, and one of the elements is you've got to train the engineers not to keep designing in hazards, and then that's a qualified person level because most engineers are not trained to OSHA and ANSI safety requirements, almost all of them aren't right out of college, so that's what a safety engineer does. So I as a qualified person would train them this is a hazard, here's how you design it away. This is a hazard, here's how you eliminate it. Then you've got that program going.

1          Then you've got a competent person

2    program that deals with existing hazards.

3    Existing hazards are, okay, you've got to

4    basically play with the cards you're dealt.  This

5    is a hazardous area, the competent person has

6    identified it and done a job safety analysis which

7    they call a job breakdown analysis, and here's how

8    you do every step and here's a certified anchor

9    point.  The engineering department has certified

10   it.  Here's the seal on it.  This is the equipment

11   you use.  You use the JLG thirty-foot stainless

12   steel lanyard.  It's like a yo-yo, a safety belt

13   yo-yo, but you can get them up to a hundred and

14   fifty foot long, but on that particular case you

15   use a twenty-foot yo-yo called an SRL,

16   self-retracting lifeline, and then a full body

17   harness and then you do your work activity.  And

18   that's what a competent person would do.

19          Then he would verify that the

20   authorized person is doing it properly.  That's

21   the competent person training.  And also safety

22   inspections, to do the job safety analysis before

23   they do the work.  That's why it's much easier to

24   design it out because then you don't need the

25   second phase of competent person dealing with the

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 124

1   hazard and how to control the hazard while you're

2   working on it.

3              If I can get the engineer to see the

4   hazard, design it out, then you never have to

5   worry about it because you have guardrails, for

6   example, in this case and there's no hazard

7   because you're guardrail protected.  But you're

8   dealing with the cards you're played with so

9   here's the competent person's role is to control

10  the hazard.  But you've got a lot of control to do

11  and it's a lot easier moneywise to design it out

12  in the first place.

13  BY MR. GOLDBERG:

14         **Q.   You're aware that Mr. Lucio was**

15  **injured when he fell, right?**

16         A.   Yes.

17         **Q.   And if Mr. Lucio had a harness on**

18  **with the lanyard while he was standing on that**

19  **deck, that would have been impossible?**

20         A.   No, not with the scenario that was

21  there present that day of the accident.

22         **Q.   Well, at some point.  You say you**

23  **believe he was at eight to ten feet away at some**

24  **point based on an X, and you're estimating**

25  **distances?**

Page 125

1          A.    Ten to twelve, yeah.

2          **Q.    Ten to twelve feet.  But there is**

3    **some proximity that one could stand to the hole in**

4    **the beam that if that lanyard was hooked in that,**

5    **Mr. Lucio could have stood at someplace on the**

6    **screen deck without being detached from that hole?**

7          A.    I don't think so.

8          **Q.    Okay.  But your testimony is based on**

9    **not having gone and seen it?**

10         A.    My testimony is based on all the

11   photographs, the OSHA report, and the geometry and

12   my knowledge of fall protection equipment and my

13   training and my actual experience using the

14   equipment, I don't think so.

15         **Q.    Okay.  So if Mr. Lucio had hooked the**

16   **lanyard to the hole that was there and then it's**

17   **tied to his harness at someplace -- right?**

18         A.    His back dorsal D ring.

19         **Q.    -- that would give him, as you**

20   **understand it, six feet from the point of**

21   **attachment to the back of his dorsal D ring?**

22         A.    Right, which is very limited.

23         **Q.    To six feet?**

24         A.    Well, the hook --

25         **Q.    To six feet, right?**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 126

1        A.    Yes.

2             Q.    I mean, we don't need to qualify it.

3        A.    The hook is up in the air.

4             Q.    We have a number of feet.  It's six

5   feet between the hooking place and the dorsal D

6   ring on the back?

7                  MR. BOISSONEAULT:  Just note my

8   objection to the last question.

9                  MR. GOLDBERG:  That's okay.

10                 MR. BOISSONEAULT:  Foundation.

11  BY MR. GOLDBERG:

12            Q.    That's the limitation we have is six

13  feet?

14       A.    Yes.  What you described is unsafe

15  completely, but yes.

16            Q.    Okay.

17       A.    It's inherently unsafe.

18            Q.    Okay.  Thank you.  Do you know the

19  height from the hole in the beam down to the

20  nearest surface on the screen deck?

21       A.    From the photographs, it looks around

22  five feet.

23            Q.    Okay.  So if he was lying down on the

24  screen deck --

25       A.    Not the subject --

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 127

1          Q.    -- on his stomach --

2          A.    Not the subject screen deck.  From

3    the roof to the screen deck, not out where he was

4    at.  Just straight down it was around five feet.

5          Q.    Well, where he was at is where he

6    fell?

7          A.    Okay.  So if you go five feet and

8    then you go that projection --

9          Q.    No, I'm just asking the nearest point

10   on the screen deck, if you know it from either a

11   measurement or geometry, what that distance is?

12   Is it five feet, three feet, six feet?

13         A.    It would be six to seven feet.

14         Q.    Okay.  And as a professional

15   engineer, structural engineer, you certainly know

16   geometry and physics and you should be able to do

17   a simple math calculation to figure that out,

18   right?

19         A.    Yes.

20         Q.    Have you ever consulted either for

21   the plaintiff or defendant where there's been a

22   fall despite the presence of a guardrail that was

23   of the right height and secured properly and

24   according to OSHA and ANSI?

25         A.    In other words, everything was proper

Page 128

1    and there was still a fall?

2            Q.   Yes.

3            A.   None come to my mind as I sit here

4    today.

5            Q.   Okay.  But as an engineer, you're

6    aware that a person can fall despite the presence

7    of a forty-two inch guardrail, right?

8            A.   They can willfully jump over it.

9            Q.   That's one way to go over.  Another

10   would be to fall?

11           A.   You can't fall without going over the

12   guardrail.  That's the idea of a guardrail.

13           Q.   Right.  But I guess that begs the

14   question is a person capable of falling over a

15   forty-two inch guardrail?

16           A.   Only if they intend to --

17           Q.   Okay.

18           A.   -- or under the influence.

19           Q.   An accident?

20           A.   Like football games.

21           Q.   Well, you said things have to be

22   idiot proof?

23           A.   Well, that was a different topic.

24   That was design engineers.

25           Q.   All right.  But that includes putting

1    in a guardrail?

2         A.    Guardrails have standards that's been

3    acceptable since 1960.  So it's been proven

4    through time that it's acceptable, and you

5    basically are under the influence or you got

6    knocked down and rolled between the guardrails.

7    I've done one case that happened.

8         **Q.    Okay.  So you did have a case where**

9    **somebody fell underneath a guardrail?**

10        A.    Got knocked out and then rolled

11   underneath the guardrail.

12        **Q.    Knocked out how?**

13        A.    With a drill.

14        **Q.    What happened?  He fell or --**

15        A.    No.  Well, he got knocked out with

16   the drill.

17        **Q.    How did he get knocked out with the**

18   **drill?  Was he holding it?**

19        A.    Yeah.  He was using the drill and

20   then -- improperly and at the wrong settings, high

21   torque instead of low torque and leaning into it

22   and it got away from him and it went up and

23   smashed him in the head --

24        **Q.    Okay.**

25        A.    -- knocked him out, fell down,

1    rolled, and then fell eighty-six feet.

2           **Q.   Did you consult on that case?**

3           A.   Yeah.

4           **Q.   For?**

5           A.   The drill manufacturer.

6           **Q.   And you said there was no defect in**

7    **the drill --**

8           A.   No.

9           **Q.   -- or what did you say?**

10          A.   The drill was fine.  No defect in the

11   drill.

12          **Q.   That was your --**

13          A.   Right.  She was using it --

14          **Q.   That was basically your testimony in**

15   **the case?**

16          A.   She was using the drill improperly,

17   and her employer said that, too.

18          **Q.   Okay.  And there was not a lawsuit**

19   **against the employer or the designer of the**

20   **platform?**

21          A.   Same one; and no, it's Workmen's Comp

22   then, it's just employer.

23               MR. GOLDBERG:  Let's take a two

24   minute break.

25               (Pause in proceedings.)

1    BY MR. GOLDBERG:

2           Q.   I'm going to ask you just a couple

3    more questions, Mr. Wright.  On fall protection

4    training, if it's done right, people don't fall if

5    you have the right systems in place?

6           A.   If you have the right competent

7    person, that competent person was properly

8    trained, you have the right equipment, you have

9    the right qualified person engineering for anchor

10   points and the whole program is in place, then

11   people will not get injured.

12          Q.   Right.  And you for many of these

13   companies have helped design entire programs --

14          A.   Yes.

15          Q.   -- to avoid precisely the sort of

16   thing that happened to Mr. Lucio?

17          A.   Yes.  Falls.

18          Q.   And if there is a fall, you say

19   there's a failure on the part of the trainer?

20          A.   It's the competent person, qualified

21   person, that combination, that's usually where the

22   error is at.

23          Q.   And the trainer of the competent

24   person and qualified person, right?

25          A.   Right.  Whoever trains the competent

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 132

1    person has to do it very thoroughly --

2         Q.    Right.

3         A.    -- and watch and make sure they're --

4    that the competent person absorbs what they

5    trained them.

6         Q.    Right.  And then --

7         A.    And then go on and watch and then

8    inspect and then review and then have refreshers,

9    if necessary, on a frequent and regular basis.

10        Q.    Right.  And then the authorized

11   workers, the laborers I'll call them, they're

12   involved, too?  They need to do -- assuming it was

13   communicated well, if you're the guy who's trained

14   the trainer and then watched the trainer train,

15   there are some guys who will not follow training

16   because they're a cowboy or they're going to think

17   in spite of what Mr. Wright said, I don't believe

18   that I'm like that watermelon, I'm going to be

19   held up or I'm going to be able to catch myself,

20   whatever, but there are people who will not listen

21   to the training?

22        A.    Then they get a pink slip.

23   Enforcement.

24        Q.    If they don't fall first?

25        A.    Enforcement.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 133

1        Q.    And if they don't fall first?

2        A.    They don't even get up there if they

3   have that kind of attitude.  The competent person

4   has to enforce the entire program.  He's the

5   sergeant.

6        Q.    Okay.  And if it happens that

7   **somebody has been doing stuff for fifteen to**

8   **seventeen or eighteen years, whatever the number**

9   **is that Mr. Deeds was involved, and he chose when**

10  **to use his lanyard up on Tower 2 based on what he**

11  **thought the weather conditions were, the extent of**

12  **slipperiness, I know you're critical of him for**

13  **that, right?**

14       A.    Well, I'm more critical of the

15  program -- the competent person, like Rock Miller,

16  for example, he's the competent person, he comes

17  and does the training, he has a duty to do

18  inspections and to watch those guys.  He has a

19  duty to evaluate the hazard and make his

20  organization we've got to have guardrails up here.

21       Q.    Did you understand that --

22            MR. BOISSONEAULT:  Wait.  Go ahead

23  and finish, please.

24            THE WITNESS:  That's what a competent

25  person does.

Page 134

1    BY MR. GOLDBERG:

2        **Q.   Did you understand that Rock Miller**

3    **did the training on fall protection in December of**

4    **2012?**

5        A.   Yes.  I understand he's been there

6    for a long period of time.  He's been at the site

7    only once or twice a year.  He should have been at

8    the site monthly, and he should have already did a

9    safety analysis -- job safety analysis, found all

10   those hazards and abated those hazards and put in

11   those anchor points, put in those guardrails, and

12   then retrained his competent persons at that plant

13   to understand fall protection and hands on.  OSHA

14   requires retraining if they don't get it the first

15   time.  Him as the competent person trainer, he

16   goes into that facility and needs to retrain and

17   abate and have safety meetings and refresher

18   meetings, all that stuff is what he should do as a

19   defendant Levy representative.  That's his role.

20   He's the competent person.  That plant reported to

21   him.  Any safety issues goes through the competent

22   person.

23       **Q.   You understand there were safety**

24   **people at Fulton Mill as well?**

25       A.   I understand that.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 135

```
 1          Q.   Okay.

 2          A.   And then he trained them.

 3          Q.   Understood.

 4          A.   So he didn't train them very well.

 5          Q.   Okay.  Because, as you said, if you

 6    train your people well, then bad things don't

 7    happen?

 8          A.   Right.

 9               MR. GOLDBERG:  Okay.  That's all I

10    have for right now.  Thanks.

11               THE WITNESS:  You're welcome.

12               MR. TICKNOR:  Mr. Wright, good

13    afternoon now.

14               THE WITNESS:  Yes.

15               MR. TICKNOR:  My name is Chuck

16    Ticknor.  I represent North Star BlueScope Steel

17    in this case.

18               THE WITNESS:  Okay.

19               MR. TICKNOR:  I only have -- I have a

20    few questions for you.

21                    CROSS-EXAMINATION

22    BY MR. TICKNOR:

23          Q.   I think you've introduced a new term

24    from this case, to my recollection, and that's the

25    term grizzly?
```

1          A.    It's in the depositions.

2          Q.    **Okay.  It may be in the first case's**

3    **depositions.  In any event --**

4          A.    The documents I read, it's in there.

5    Sorry.

6          Q.    **In any event, the grizzly is part of**

7    **the screen deck; is that correct?**

8          A.    Yeah.

9          Q.    **Okay.**

10         A.    It does the separation of all the

11   particles.

12         Q.    **And the screens themselves sit on the**

13   **grizzly?**

14         A.    Yes.

15         Q.    **Okay.  Is the footing on the grizzly**

16   **different than the footing on the screens in this**

17   **particular situation for Mr. Lucio?**

18         A.    From the documents I read, the screen

19   is soft and it deflects to the grizzly.  So the

20   footing is coming from the grizzly and that's the

21   working surface.

22         Q.    **When the screen -- so what I'm -- let**

23   **me try to clarify.  Part of what was going on at**

24   **the time of the accident and what Mr. Lucio had**

25   **engaged in a couple of times before in his work**

1    was the changing of the screens, you understand

2    that?

3            A.   Changing of the grizzlies, yeah.

4            Q.   But --

5            A.   They were taking the whole thing

6    down.

7            Q.   Changing of the grizzlies or changing

8    of the screens?

9            A.   I think they're mixing words.

10   They're calling the screen and the grizzly the

11   same thing because they say the screen is two

12   inches by two inches.  That's the grizzly.  So I

13   think they're interchanging words.

14           Q.   So with respect to the surface of

15   either the grizzly -- with respect to the surface

16   of the grizzly and the screens --

17           A.   Yeah.

18           Q.   -- they're two separate things,

19   are --

20           A.   I don't know if they are.

21           Q.   Well, when the screens are removed,

22   what's left?

23           A.   A hole.  A hole.

24           Q.   A complete hole?

25           A.   Yes.  According to the photographs,

Page 138

1    there's a hole.  I think they're interchanging

2    screen and grizzly the same.

3         Q.   When the screens are being removed

4    and before the new ones come up and are

5    replaced --

6         A.   Yes.

7         Q.   -- what does the worker, like

8    Mr. Lucio, stand on?

9         A.   Very small geometry steel.

10        Q.   What does that mean?

11        A.   It means it's not a proper working

12   surface.  It's not a guarded working surface.

13   It's what is called unguarded surfaces by OSHA's

14   definition, and it's very thin.  Very narrow so

15   it's hard to balance, and it was done -- there's

16   documents to say it's either frosty or icy at the

17   time of the accident, and it's 7:00 in the morning

18   in February so you can barely start seeing.  And

19   it was twenty degrees that day.

20        Q.   Is the -- is the footing -- at that

21   time when the screens are being removed but not

22   brought back up, the new ones are not brought back

23   up, is that a -- in your opinion, a dangerous

24   situation, that footing scenario at that moment?

25        A.   Yes.  You're walking steel and you're

1    twenty-five feet elevated and anything above four

2    feet is dangerous defined by OSHA as a recognized

3    hazard -- nationally recognized hazard.

4         **Q.   I'm trying to understand.  Maybe even**

5    **at this point in time I don't have a full**

6    **understanding of the footing that Mr. Lucio was**

7    **likely -- his footing at the moment or at about**

8    **the time that he fell.  Was he on a -- was he on a**

9    **thin piece of steel and the rest of what was**

10   **inside the box area, was it all just an open hole?**

11        A.   The photograph shows inside it's an

12   open hole.  The photograph shows there's flat

13   forms outside.  And the X shows he's on a very

14   narrow piece of steel, from OSHA.

15        **Q.   Can you describe for me, based on**

16   **what your understanding is of the situation that**

17   **morning when Mr. Lucio fell, what the -- not so**

18   **much the processes part that led to it being a**

19   **dangerous situation, but what were the actual**

20   **physical circumstances that you would have**

21   **considered dangerous with that time when he fell?**

22        A.   The time up to the fall?

23        **Q.   Yes.**

24        A.   Climbing -- free climbing the side of

25   the machine is dangerous.  Going over the top of

Page 140

1    the machine, going out to unloosen the bolts

2    around the edges is dangerous.  Working in icy,

3    frosty conditions, twenty degrees, is dangerous

4    without fall protection, being guardrails, safety

5    net, or proper fall arrest equipment, including

6    the proper anchor point.  All those would be

7    considered dangerous activities.

8         **Q.   I could not tell -- I -- you read the**

9    **second deposition for Mr. Lucio --**

10        A.   Yes.

11        **Q.   -- and I was involved in that one.**

12        A.   Yes.

13        **Q.   And I got somewhat of a description**

14   **of the lighting conditions at that time.  Do you**

15   **have a feel for what the lighting was based on**

16   **what you've gathered from your review of this**

17   **situation?**

18        A.   It was like dawn in February, 7:00

19   o'clock in the morning.  You can see but barely --

20   it's dawn setting so here you're twenty-five feet

21   up so the crane operator is twenty-five feet down

22   and at an angle, frosty, twenty-five degrees --

23   twenty degrees, sun is not up, just coming up,

24   frost, ice on the surfaces.  If there was proper

25   competent person training, then that competent

1    person at the time of the accident would have

2    said, hey, it's too dangerous, stay down.

3           **Q.   I know that -- from the description**

4    **of what Mr. Lucio told me and some of the other**

5    **documents in the case that the screens that were**

6    **being removed --**

7           A.   Yes.

8           **Q.   -- were fairly heavy.  Is that your**

9    **recollection -- or your understanding?**

10          A.   It ranges.  The engineer says six,

11   seven thousand and the other documents say around

12   three hundred.  So it ranges.

13          **Q.   And Mr. Lucio's guess was at least**

14   **maybe a hundred?**

15          A.   Yeah.

16          **Q.   Did the -- and I understand, see if**

17   **this is consistent with your understanding, that**

18   **when the screens are removed, it's not like the**

19   **worker is actually trying to pick up the screens**

20   **themselves, they're just guiding it because**

21   **they're already attached to the crane?**

22          A.   That's correct.  They're guiding it.

23   It's attached to the crane, but there is some

24   physical effort of pushing -- lightly pushing into

25   position and getting out of the position when the

1    crane pulls it out.

2          Q.    Does the -- does that -- that action,

3    that is the action of the lifting of the screens

4    and the moving the screens, does that add, in your

5    opinion, to the -- any aspect of the danger of the

6    work?

7          A.    Yes.

8          Q.    And in what way?

9          A.    Well, the time of day, the crane

10   operator has a visual only, no radio

11   communication, and the crane operator is pulling

12   it out.  And this has been done quite frequently

13   since '97, this is why it should have been abated

14   by the competent person, Rock Miller, and other

15   competent persons from Levy should have abated

16   that and identified it and put in the proper

17   anchor points.  All those things should have been

18   done.  But when you're pulling out something and

19   you're not properly tied off and you don't have a

20   guardrail behind you, you're trying to get out of

21   the way, but, you know, you're a rookie, even if

22   you're senior, the crane operator is doing his

23   best, can't see very well, wind conditions we

24   don't know, we do know the temperature conditions,

25   so all those things add into a potential danger,

1    no tag line, no rope on the swinging object to

2    control it from wind or sudden movements so you

3    could easily be knocked off.  It's very

4    foreseeable for that.

5           **Q.   Do you believe that your lack of**

6    **having actually been to the site inhibits or**

7    **lessens your opinions in any way in this case?**

8           A.   No.

9           **Q.   Not at all?**

10          A.   No.  Photographs, documents.  Most of

11   the time I don't go to the cases -- go to the site

12   until well after all the issues have been changed,

13   modified, guardrails put on, all the hazards have

14   been controlled or eliminated.  But the

15   photographs were great.  The investigation

16   reports, VSSR, the OSHA, it all shows the

17   different angles.  It shows the blow-out hole, it

18   shows the location of the blow-out hole, gives me

19   a perspective of the height, how far out it was.

20   So that gives me everything.

21          **Q.   You've reviewed the actual complaint**

22   **in this case?**

23          A.   Yes.

24          **Q.   Do you understand that the -- do you**

25   **have a general understanding that the claims that**

1    **are being made against -- by Mr. Lucio against**

2    **North Star are negligence claims?**

3              A.    It's negligence -- gross negligence

4    or reckless negligence, yeah, somewhere along that

5    line.

6              **Q.    And is it your understanding that**

7    **those claims are -- at least as their source are**

8    **because North Star BlueScope Steel owns the real**

9    **estate on which the Fulton Mill slag plant sits?**

10             A.    Well, they own the real estate.  They

11   also have enforcement people, patrol they call

12   them, enforcement patrol.  They do selective

13   enforcement, as you saw in the plaintiff's second

14   volume where they say smoking issues.  They do

15   safety training, awareness training, violation

16   training, but it's selective.  It's not

17   consistent.  They said that the contractor has to

18   be in compliance with OSHA, but they do go past it

19   but they don't consistently enforce all issues.

20             Also, there was enforcement issues, I

21   think it was by -- in the deposition of Gary, the

22   safety representative of Fulton, said that --

23   maybe it was him, maybe it was somebody else, that

24   said that they -- a couple of the workers were

25   expelled for two days because they were not in

Page 145

1    compliance with North Star safety requirements.

2    So there's omissions by not being consistent with

3    inspections, not being consistent with training,

4    not being consistent with enforcement that I glean

5    from the documents.

6            **Q.   Going back, but at its core, isn't it**

7    **your understanding that the basis of that**

8    **responsibility, to the extent that it exists, is**

9    **because North Star BlueScope Steel is the owner of**

10   **the real estate?**

11           MR. BOISSONEAULT:  Objection.

12   Foundation.

13           THE WITNESS:  It's my understanding,

14   it's within their guarded, fenced area, yes.

15   BY MR. TICKNOR:

16           **Q.   Have you seen any evidence in this**

17   **case that tells you that North Star BlueScope**

18   **Steel actually took control of the Fulton Mill**

19   **slag plant site?**

20           A.   Well, if you have authority to stop

21   work and you actively participate in stopping

22   work, enforcing smoking, for example, and you're

23   actively participating and you have authority to

24   do that, then that is, in OSHA's mind, taking

25   control.

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 146

1          Q.   Okay.   Other than the -- I saw some

2     testimony here, I think it was Mr. Lucio, but

3     other than the smoking, are you aware of any other

4     enforcement that North Star BlueScope Steel did

5     with respect to anything at the slag -- at -- let

6     me finish just briefly -- at the slag mill site?

7          A.   From the depositions that I read,

8     there was one place where they said we had to --

9     Fulton had to suspend two of their workers for a

10    period of time because of a violation of North

11    Star safety requirements.

12         Q.   Do you know if that was at the slag

13    mill site or was that -- strike that.

14              Do you understand from the record,

15    the records of what you've reviewed, that Fulton

16    Mill provided workers in the actual steel mill and

17    also at the slag mill site?

18         A.   Yes.   The workers would go in and out

19    and North Star trained them in safety policies,

20    requirements, and North Star enforced them whether

21    they're at the mill or at the slag mill.   They

22    were watching them and enforcing them randomly.

23         Q.   That's the part that I want to ask

24    you about.   What evidence are you aware of that

25    North Star enforced rules of any sort at the slag

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                Michael C. Wright

Page 147

1    plant site?

2            A.   The only thing I have is the

3    documents.  The documents say that people were

4    suspended for a couple days from -- Fulton

5    employees were suspended a couple days for not

6    following North Star's safety rules and they were

7    enforced for smoking.  They stopped them smoking.

8    They actually did additional training for the

9    smoking.  Those are the only two places where I

10   see they had authority, they took authority, and

11   they enforced it.  That's the only two places.

12           Q.   But you don't know where that conduct

13   actually occurred?

14           A.   I do not.  The record that I have

15   doesn't make that clear.

16           Q.   Okay.  Have you ever spoken with

17   Mr. Lucio?

18           A.   No.

19           Q.   Your written report, with respect to

20   North Star BlueScope, speaks to two different

21   types of responsibilities generally.  One is a

22   contract safety responsibility --

23           A.   Yes.

24           Q.   -- and the other one -- and that's

25   your language?

1          A.    Yes.

2          Q.    And then the other one is an ordinary

3    reasonable care safety responsibility; is that

4    correct?

5          A.    Yes.

6          Q.    With respect to anything that North

7    Star BlueScope did or didn't do, in your opinion,

8    is there any part of that conduct or lack of

9    conduct that applies to one of those types of

10   responsibility but not the other?  I'm trying to

11   understand what the differences may be.

12         A.    Well, industry -- when you have a

13   subcontractor working, whether it's a plant or

14   construction site, the plant would be the owner

15   and their operation and they would hire a

16   contractor to do some functions.  You have -- you

17   have what is in the industry standards and

18   practices in construction or general industry

19   where the general or the owner has authority to

20   have control, have -- enforce safety policies, set

21   safety policies.

22               And then at OSHA it's under the

23   multiemployer act.  As a controlling entity, you

24   have a responsibility to maintain and ensure a

25   safe work site, whether it's a construction site

1    or a plant industry site, and you have authority

2    to take action.  I gave you examples how they did

3    take action, and the contract as well as OSHA

4    industry standards would also agree that they have

5    authority to take action.  They do -- they did.

6    And they have authority to stop, correct, retrain,

7    and they did both in OSHA and industry standards

8    and practices and ANSI 810.33, for example.

9           **Q.    Those types of standards that you're**

10   **talking about, are those what you're referring to**

11   **as the ordinary reasonable care safety**

12   **responsibilities?**

13          A.   Yes.  Then OSHA has a directive to

14   help the compliance officers when they write the

15   citations.  In actual practice -- if this

16   controlling entity in actual practice is

17   controlling, is actively participating in what's

18   going on, whether it's completely or partially

19   selective and have authority to stop it, correct

20   it, then OSHA calls that a controlling entity.

21          **Q.    OSHA did not cite North Star**

22   **BlueScope in this case, correct?**

23          A.   Correct.

24          **Q.    Are you critical of OSHA in that**

25   **regard?**

1          A.   I'm not critical.  It's very common

2    that OSHA doesn't have the documents that I have.

3    They don't see the documents that I have.  They

4    can only -- basically they have six months to get

5    the report done.  They interview the people at the

6    site.  They really don't have much authority to

7    dig deeper than that.  And if they're told or

8    misled or don't ask the right questions, I've seen

9    it where at least fifty percent of the time, if

10   not more than that, they don't site the employer.

11          **Q.   From what you've seen so far in this**

12   **case, what you reviewed, is it your opinion that**

13   **OSHA should have cited North Star BlueScope Steel?**

14          A.   If OSHA had the information I have

15   today, they probably would have.

16          MR. GOLDBERG:  Objection.

17   BY MR. TICKNOR:

18          **Q.   Does -- so let's start with the**

19   **things that -- not the omissions but the specific**

20   **things that you believe that North Star BlueScope**

21   **affirmatively did wrong.**

22          A.   Did wrong?

23          **Q.   Affirmatively did wrong?**

24          A.   Okay.

25          **Q.   Actions that they affirmatively took.**

1   **What of those actions would be contract safety**

2   **responsibility violations and what would be**

3   **ordinary reasonable care safety responsibility**

4   **violations?**

5          A.   They're similar.  Where they started

6   doing enforcement and inspections with the smoking

7   example.  OSHA requires nobody work at heights

8   above six feet.  They saw people working at

9   heights.

10         **Q.   Pardon me for interrupting you.  Have**

11  **you identified two things now?**

12         A.   Well --

13         **Q.   The starting to enforce but then not**

14  **enforcing?**

15         A.   Correct.

16         **Q.   Now, is that a contract safety**

17  **responsibility violation and ordinary reasonable**

18  **care safety responsibility violation?  Is it both?**

19         A.   It's both.  With the contract, your

20  vice president of operations said that we expect

21  Fulton to be in OSHA compliance and we expect them

22  to have a safe site, and that's contract.  Then in

23  their actual -- in practice, North Star is a

24  controlling entity so OSHA expects North Star to

25  maintain a safe site, which is a very high duty.

1    So then they -- North Star needs to frequently do

2    regular inspections, make sure it's being done.

3    They are contracted to them so they -- just like

4    on the construction site or general industry site,

5    they're an in-house contractor so they demand them

6    to be safe and then they have to verify they're

7    safe.  And they have the authority to verify

8    they're safe and they have the authority to stop

9    work until they become safe by contract and by

10   OSHA.

11          Q.   So on that -- on that --

12          A.   Overview.

13          Q.   -- overview, you're saying North Star

14   **has violated its -- has not fulfilled its**

15   **responsibility from a contract safety**

16   **responsibility perspective and from an ordinary**

17   **reasonable care safety perspective?**

18          A.   Your vice -- the vice president of

19   North Star said we expect them through our

20   contract to have a safe site.  We expect them to

21   have a safe site.  We don't inspect them but we

22   inspect -- we expect them to do it.

23          Q.   Right.  I'm just asking is that

24   **failure you're referring to, in your opinion, is**

25   **that both a contract failure and an ordinary care**

Lucio, Thoedore, et al. v. Edw. C. Levy Co., et al.                    Michael C. Wright

Page 153

1    failure?

2         A.   Yes.

3         Q.   Okay.  That's what I'm trying to get

4    at ultimately.  I'm trying to find is there

5    anything --

6         A.   It's kind of both.

7         Q.   -- is there anything that North Star

8    BlueScope did affirmatively that is not, in your

9    opinion, both a contract safety responsibility

10   violation and an ordinary reasonable care safety

11   violation, or are they -- or does everything that

12   they did or didn't do fall under both, in your

13   opinion?

14        A.   From the contract, they had to be in

15   compliance with OSHA.  Fulton had to be in

16   compliance with OSHA.  Then from OSHA, since they

17   were a contractor to North Star, North Star had to

18   maintain a safe site by OSHA.  So, therefore,

19   they're both.

20        Q.   So is there anything that North Star

21   BlueScope --

22        A.   Did do.

23        Q.   -- did or didn't do that is not both,

24   in your opinion?

25        A.   No.  I think they're -- I'm not a

Page 154

1    lawyer, but I think from what I can understand,

2    no.

3            Q.    I'm just asking for your opinions.

4            A.    Yeah.

5            Q.    You said earlier that -- I think you

6    said as a matter of statistics that most

7    accidents --

8            A.    Oh.

9            Q.    -- are Mondays and Fridays?

10           A.    Yes.

11           Q.    Is that workplace accidents or is

12   that just accidents in the country or what are you

13   referring to?  What statistic are you referring

14   to?

15           A.    OSHA.

16           Q.    Workplace accident?

17           A.    From 1972 on.

18           Q.    And when you say most --

19           A.    Well, there's a few Tuesday,

20   Wednesday, Thursday.

21           Q.    I mean -- sure.  Is there an actual

22   percentage that is reported generally?  I mean --

23   I'm not looking for a specific.  Do you recall?

24           A.    It's not -- Bureau of Labor

25   Statistics shows the trend and they don't keep it

Page 155

1    clean enough to get a nice tight percentage, but

2    it -- I explained to my kids who are in

3    construction, it's when you're thinking about what

4    you're doing on the weekend or what you did over

5    the weekend, Friday, Monday is when it happens.

6    And then you have new hirees that may get hurt or

7    may cause the accident.  That's throughout the

8    week.

9           Q.    Any failures on the part of Mr. Lucio

10   here that you hold him accountable for?

11          A.    No.

12          Q.    None?

13          A.    No.

14               (Thereupon, an off-the-record

15   discussion was had.)

16   BY MR. TICKNOR:

17          Q.    In your conclusion section with

18   respect to North Star BlueScope, there's just --

19   there's some terminology where you say North Star,

20   by their conduct, did permit the subject unsafe

21   workplace conditions and/or dangerous workplace

22   conditions.  What's the distinction between those

23   two types?

24          A.    OSHA would say it's unsafe.  ANSI

25   would say it's dangerous.

Page 156

1          Q.    Okay.

2          A.    It's basically the same thing.

3          Q.    And then you use the language invited

4    business guests.

5          A.    Well, they're on your property and

6    the plaintiff is an employee of the contractor,

7    and I see that as an employee but I also see he's

8    an invited guest; but I don't know if that is

9    legally the right way.

10              MR. TICKNOR:  I don't have any other

11    questions.

12              MR. GOLDBERG:  Give me just a second.

13                  FURTHER CROSS-EXAMINATION

14    BY MR. GOLDBERG:

15          Q.    Did you have any correspondence with

16    counsel about the writing of your report, what you

17    were writing, the opinions you were giving?

18          A.    Yes.

19          Q.    Are there e-mails back and forth that

20    talk about different drafts of the report?

21          A.    There's e-mails where I sent him the

22    draft.  No talking about the draft.

23          Q.    Okay.  And were there any

24    recommendations given back to you about things to

25    cover differently?

1          A.    No.

2          **Q.    Okay.  So the draft that you sent**

3    **was, other than form or typos, turned into your**

4    **report?**

5          A.    There may have been -- I think the

6    answer is a hundred percent yes, but there may

7    have been please consider this action or please

8    consider -- all I remember is please consider

9    something.

10               MR. GOLDBERG:  All right.  If we

11   could get a copy of that invoice, I didn't look at

12   it, but why don't we --

13               MR. BOISSONEAULT:  You want to mark

14   it?

15               MR. GOLDBERG:  Is that all right to

16   mark and then you can keep the original one after

17   we get a copy?

18               (Thereupon, Defendant's Exhibit F,

19   invoice, was marked for purposes of

20   identification.)

21   BY MR. GOLDBERG:

22         **Q.    Exhibit F is a true and correct copy**

23   **of your statement for services rendered through --**

24         A.    Up at the top.

25         **Q.    -- February of -- well --**

1          A.    It should say at the top.

2          Q.    **Well, it says five percent finance**

3    **charge added if paid after March 10th, so it was**

4    **probably through February 8th of 2014?**

5          A.    Right here.  February 9.

6          Q.    **Okay.**

7          A.    That's a billing period.

8          Q.    **Okay.  Did you do work before January**

9    **20th or is this the whole of the work that you**

10   **performed?**

11         A.    It looks like I started work on

12   January 25th.

13         Q.    **All right.  Perfect.  Okay.  So this**

14   **is everything that you did --**

15         A.    Yes.

16         Q.    **-- up until --**

17         A.    Today.

18         Q.    **-- up until today other than --**

19         A.    As far as I sit here today.

20               MR. GOLDBERG:  Very good.  Thank you

21   so much.

22               THE WITNESS:  You're welcome.

23               MR. GOLDBERG:  You know about your

24   right to review the transcript.

25               MR. BOISSONEAULT:  We'll reserve.

Page 159

1                    (Thereupon, the deposition was

2   concluded at 12:57 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 160

1           I, MICHAEL C. WRIGHT, do hereby certify

2    that the foregoing is a true and accurate

3    transcription of my testimony.

4

5

6                    _ _ _ _ _ _ _ _ _ _ _ _ _ _

7

8           Dated _ _ _ _ _ _ _ _ _ _ _ _ _

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 161

1    STATE OF OHIO            )

2    COUNTY OF MONTGOMERY )  SS: CERTIFICATE

3                    I, Kathy S. Wysong, a Notary

4    Public within and for the State of Ohio, duly

5    commissioned and qualified,

6                    DO HEREBY CERTIFY that the

7    above-named MICHAEL C. WRIGHT, was by me first

8    duly sworn to testify the truth, the whole truth

9    and nothing but the truth.

10                    Said testimony was reduced to

11   writing by me stenographically in the presence

12   of the witness and thereafter reduced to

13   typewriting.

14                    I FURTHER CERTIFY that I am not a

15   relative or Attorney of either party, in any

16   manner interested in the event of this action,

17   nor am I, or the court reporting firm with which

18   I am affiliated, under a contract as defined in

19   Civil Rule 28(D).

20

21

22

23

24

25

Page 162

1          IN WITNESS WHEREOF, I have hereunto set my

2   hand and seal of office at Dayton, Ohio, on this

3   18th day of April, 2016.

4

5

6                    *Kathy S. Wysong*
                    _____
                    KATHY S. WYSONG, RPR
7                    NOTARY PUBLIC, STATE OF OHIO
                    My commission expires 12-1-2018
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# FALL PROTECTION

I. OSHA requirements.
    A. Duty to have fall protection.
        1. Unprotected sides or edges.
            a) Each employee on a walking/working surface with an unprotected side or edge which is 6 feet or more above a lower level shall be protected from falling by the use of a guardrail system or Personal Fall Arrest System.
        2. Hoist areas.
            a) Each employee in a hoist area shall be protected from falling 6 feet or more to lower levels by guardrail systems or Personal Fall Arrest System. If a portion of the guardrail is removed and the employee has to lean out over the opening, that employee MUST wear and use Personal Fall Arrest System.
        3. Dangerous Equipment.
            a) Each employee working less than 6 feet above dangerous equipment shall be protected from falling into or onto the dangerous equipment by guardrail systems or by equipment guards.
            b) Each employee working 6 feet or more above dangerous equipment shall be protected from fall hazards by guardrail systems or Personal Fall Arrest System.
            c) Each employee reaching more than 10 inches below the level of the walking/working surface on which they are working, shall be protected from falling by a guardrail system or Personal Fall Arrest System.

    B. Protection from falling objects.
            a) When an employee is exposed to falling objects, the employer shall have each employee wear a hard hat and shall implement one of the following measures.
                (1) Erect toeboards, screens or guardrail systems to prevent objects from falling from higher levels; or,
                (2) Erect a canopy structure and keep potential fall objects far enough from the edge of the higher level so that those objects would not go over the edge if they were accidentally displaced; or,
                (3) Barricade the area to which objects could fall, prohibit employees from entering the barricaded area, and keep objects that may fall far enough away from the edge of a higher level so that those objects would not go over the edge




DEFENDANT'S EXHIBIT

A

Kw 4/7/16

Levy-000035

II. Protection against hazards.
    A. Guardrails.
        1. Barrier between employee and an open upper level.
        2. 42 inches high.
        3. Mid rail at 21 inches.
        4. Must be able to withstand side impact of 200 pounds.
        5. Can be removable - lift up only - to perform work on equipment or hoist materials to the platform.
        6. Must be made of materials that won't snag clothes or puncture skin.
        7. Must be solid, no steel or plastic bands.
    B. Personal Fall Arrest System (Full body harness with attached lanyard)
        1. Must be attached to a fixed anchor point by a lanyard, lifeline or deceleration device that can hold your weight.
        2. Attach in the center of your back near your shoulders or over your head, they distribute the fall arrest forces around your mid-body.
        3. Belts are prohibited.
        4. Designed to work after a fall of six feet and come into action before you contact any lower level.
        5. Must bring a falling person to a complete stop after falling no more than 3 1/2 feet.
        6. The only purpose of a Personal Fall Arrest System is to protect you. DO NOT use it to hoist anything.
        7. Use only ANSI approved Personal Fall Arrest System.
        8. Equipment manufacture.
            a) Snaphook.
                (1) Use only self-locking and self-closing snaphooks.
            b) Anchor.
                (1) Must be able to support 5,000 pounds per employee attached to it.
                (2) Never anchor to a guardrail, hoist or anything used to support or suspend a platform.

III. Safety techniques.
    A. Wear sturdy shoes with non-skid soles. Be sure that the shoes have short laces or buckles or straps.
    B. Avoid wearing loose clothing.
    C. Walk slowly and watch where you are going - don't run.
    D. Clean up all spills promptly.
    E. Take special care on wet or icy surfaces.
    F. Carry only the tools and material you need to upper levels.
    G. Stay away from edges, even if guarded, unless you are performing a specific task.
    H. Don't enter a controlled access zone without authorization.

Levy-000036

# FMS Monthly Safety Meeting
## 18-Dec-12

| Print Name | Sign Name |
|---|---|
| Adams Marvin | *(signature)* |
| Alcenius Bill | *(signature)* |
| Allg Robert | *(signature)* |
| Beaverson Andrew | *(signature)* |
| Beers Sam | *(signature)* |
| Boyd Mike | *(signature)* |
| Bryant Jacob | *(signature)* |
| Deeds, Justin | *(signature)* |
| Deeds Tim | *(signature)* |
| Deeds Tyler | *(signature)* |
| Deeds Walter | *(signature)* |
| Frisinger Gary | *(signature)* |
| Gomoll, Jake | *(signature)* |
| Griffin Shawn | *(signature)* |
| Heath Mike | *(signature)* |
| Hobson Russell | Vacation |
| Hodges Daryl | *(signature)* |
| Kunkle Ruben | *(signature)* |
| Kunkle Gahlon | *(signature)* |
| Leininger John | *(signature)* |

Levy-000037

# FMS Monthly Safety Meeting
## 18-Dec-12

| Print Name | Sign Name |
| --- | --- |
| Lytle Larry | *(signature)* |
| Lucio Ted | *(signature)* |
| Manley, Ethan | *(signature)* |
| Patterson Mike | *(signature)* |
| Rearick Mark | *(signature)* |
| Rodriguez Rich | Excused |
| Shoemaker Chris | *(signature)* |
| Shoemaker Ron | Ron Shoemaker |
| Smith Brian | *(signature)* |
| Smith Greg A | *(signature)* |
| Stein Neil | *(signature)* |
| Walz Austin | *(signature)* |
| Yantis Dave | *(signature)* |
| | |
| Lambert Greg | *(signature)* |
| Knapp, Shawn | Shawn *(signature)* |
| Snyder Cheryl | Cheryl Snyder |
| McKibben Rick | Rick McKibben |
| Wolfram, Stacy | Stacy Wolf *(signature)* |

Levy-000038

# FMS MONTHLY SAFETY MEETING
## December 18, 2012

| Visitors & Temps   Print Name | Sign Name |
|---|---|
| Tylor Yantis | |
| Nathan Cox | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Levy-000039

Quiz

Name _TED WEIR_  Date _12/18/12_

1. A guardrail section on a platform can be removed to hoist objects to that platform.
   True or False

2. The guardrail must be replaced as soon as the hoist is done.
   True or False

3. Wear sturdy shoes with skidding soles.
   True or False

4. Don't enter a controlled access zone without authorization.
   True or False

5. Install guardrails, screens or toeboards at least 1/2 inches high.
   True or False

6. Anchor to a guardrail, hoist or anything used to support or suspend a platform.
   True or False

7. Use only ANSI approved Personal Fall Arrest System.
   True or False

8. Attach a Personal Fall Arrest System in the center of your back near your shoulders or over your head.
   True or False

9. Guardrails barrier should be 42 inches high and mid rails should be at 21 inches.
   True or False

Levy-000040

# EDW. C. LEVY CO.

## MINI MILL DIVISION

### UNIFORM RULES AND REGULATIONS

### January 2008

## 1. ACCIDENTS

A. Major chargeable accident after full investigation
- Subject to discharge

B. Minor chargeable accidents
- 1st Offense- Written Reprimand
- 2nd Offense- Final Written
- 3rd Offense- Subject to Discharge

C. Failure to report all accidents promptly and personal injury (to self or others) or major accidents immediately
- 1st Offense- Final Written
- 2nd Offense- Subject to Discharge

D. Failure to report unsafe actions/conditions promptly to management
- 1st Offense- Written Reprimand
- 2nd Offense- Final Written
- 3rd Offense- Subject to Discharge

## 2. EQUIPMENT

A. Failure to keep equipment in neat and proper running order (fuel, grease, proper oil levels, etc.)
- 1st Offense- Written reprimand
- 2nd Offense- Final Written
- 3rd Offense- Subject to Discharge

B. Operating equipment in unsafe and/or negligent manner
- Subject to Discharge

C. Unauthorized use of Company premises or Company owned motor vehicles or equipment
- Subject to Discharge

D. Unauthorized carrying of passengers
- Subject to Discharge

## 3. GENERAL RULES

A. Dishonesty, deliberate falsification of reports or timesheets, punching or tampering with own or another employee's time card
- Discharge

B. Deliberate abuse or destruction of company equipment, tools, or property; or the property of any employee
- Subject to Discharge



DEFENDANT'S
EXHIBIT
B
Kw  4/7/16
PENGAD 800-631-6989

C. Assaulting, striking, or threatening another individual, initiating a fight, or possession of a weapon while on duty or on company and/or customer property

- Subject to Discharge

D. Wasting time, horse play, or interfering with production or others while on duty

- Subject to Discharge

E. Employees off work as a result of disciplinary action shall refrain from entering company and/or customer property without a scheduled appointment with a company representative

- Subject to Discharge

F. Flagrant disobeying of orders and/or Insubordination (defined as less than refusing work assignment)

- 1st Offense- Final Written
- 2nd Offense- Immediate Discharge

G. Conviction for driving recklessly while on duty.

- 1st Offense- Final Written
- 2nd Offense- Discharge.

H. Refusal to perform assigned work

- Voluntary Quit.

I. Sleeping while on duty

- 1st Offense- Final Written
- 2nd Offense- Immediate Discharge.
- 

J, Any type of sexual harassment (i.e. pictures, language, touching). (Refer to Company Policy on Sexual Harassment)

- Subject to Discharge

## 4. WORK PERFORMANCE

A. Failure to follow posted Company Safety Rules

- 1st Offense- Final Written
- 2nd Offense- Subject to Discharge

B. Quality of work does not meet Company Standards

- 1st Offense- Written Reprimand
- 2nd Offense- Final Written
- 3rd Offense- Subject to Discharge

C. Time required for specific jobs does not meet Company Standards

- 1st Offense- Written Reprimand
- 2nd Offense- Final Written
- 3rd Offense- Subject to Discharge

## DRUG/ALCOHOL POLICY
See attached policy

## ATTENDANCE POLICY
See attached policy

## CARDINAL RULES

### Failure to follow these rules will lead to discipline up to and including discharge.

1. Lockout, tag-out, and tryout, and the release of stored energy must be performed before beginning any maintenance or servicing activity on equipment. This includes mobile equipment.

2. When working on or near hydraulic and mechanical equipment, the equipment and implements must be properly brought to rest. Examples are, but are not limited to: on the ground, set on appropriate jack stands, set on adequate blocking or cribbing etc.

3. Confined space entry procedures and policy must be followed for all confined space entry.

4. Fall protection must be utilized where required.

5. Safety devices and/or warning signs must never be tampered with or made inoperable or unreadable.

6. Tools and equipment must be inspected prior to use. Report any defective equipment to your Supervisor immediately.

7. Never cross railroad tracks if flashing lights, gates, or other warning signals are activated unless signaled by an uniformed representative of the railroad or the steel mill. Crossing tracks in areas where no lights or signals are present must be done with extreme caution and as spelled out in applicable written job procedures or rules.

## 5. SUNDRY

A. Penalty for three (3) minor offenses in separate categories in a sixty (60) day period. (See Note 2).
- Final Written

B. Penalty for three (3) major offense in separate categories in a nine (9) month period. (See Note 3).
- Subject to Discharge

Note 1: It is recognized that extenuating circumstances alter conditions and time elements. Each case to be heard on its own merits.

Note 2: A minor offense is defined as one for which the penalty is a reprimand.

Note 3: A major offense is defined as one for which the penalty is final written warning.

Note 4: Offenses that are over 12 months old shall not be used towards progressive disciplinary actions. A prompt warning notice in writing must be given for infractions of any rules or regulations. Discharge must be by proper written notice.

I have received the January 2008 Mini Mill Uniform Rules and Regulations for my file. I understand and will comply with all provisions. I also understand that if I am in violation of this policy, the Company could apply discipline up to and including discharge.

_____      __11/30/08__
Employee Signature                  Date

_____      __11-30-09__
Supervisor Signature             Date

Levy-000421

## Hot Work Permit



**HOT WORK PERMIT**

**Hot Work Permits are required for any temporary operation involving open flames or producing heat and/or sparks. Examples include:**

**brazing cutting, grinding, soldering, torch-applied roofing and welding.**

## Fire Protection & Prevention



- Temporary Measures
- Emergency Equipment
- Storage
  - refuse
  - flammable liquid
  - compressed gases
- Temporary Heating Devices
- Hot Work

## Emergency Response



- Small Fires
- Large Fires
- Explosions
- Inclement Weather
- Emergency Evacuation
- Medical Emergencies
  - Burns
  - Environmental Emergencies
  - Foreign Bodies to the Eye
  - Strains and Sprains

## Utility Identification / Protection



- Notification
- Underground utilities
- Shoring
- Warning of openings

## Fall Protection Requirements



- Unprotected heights > 4'
- Man lifts / baskets
- Ladder Safety
- Requirements
  - 100% tie off
  - full body harness
  - Retractable Lifeline
  - vertical/horizontal lifelines
  - anchor points (5000 lbs. / person)

Continued

## Fall Prevention Hierarchy of Controls



Do the work on the ground

Use a scaffold, man lift, scissor lift, etc.

Install a guardrail or barrier at the fall edge

If you are not sure or can't

Don't Do The Job

Use a Travel Restraint System    See your Team Leader!

Use a Fall Arrest System



**DEFENDANT'S EXHIBIT**

C

PENGAD 800-631-6989

kw  4|7|16

5

## Proper Harness



## Confined Space Entry

- Trained Entrants / Attendants
- Entry Supervisor
- Area Supervisor
- Ensure lock out is complete
- Complete Permit / Obtain Authorization
- Atmospheric Monitoring
- Emergency Response

## Confined Space Entry Permit



## Lock Out

Required for:
- service or maintenance
- removing / bypassing guard or safety device
- exposure to point of operation

Procedures:
- We perform primary lockout
- Each contract employee locks out
- One lock – one key
- Each lock labeled
- Locks must be removed at the end of each shift

## Lock Out Sign In/Out Sheet





Group Lockout Box

6

# MICHAEL C. WRIGHT
# STEEL MILL EXPERT WITNESS CASE HISTORY

Case:      Theodore Lucio et al. v. Edw. C. Levy Co. et al.

Attorney(s): Jonathan M. Ashton, Ohio

Side: Plaintiff

Date: January 2016

---

Case:      Bryan Olszewski v. A. Finkl & Sons Co.

Attorney(s): Mark Nazarof, Illinois

Side: Defendant

Date: June 2015

---

Case:      John Goforth v. IPSCO Steel Alabama, Inc. et al.

Attorney(s): Roger Lucas, Alabama

Side: Plaintiff

Date: June 2015

---

Case:      Ryan Babjak et al. v. ArcelorMittal USA et al.

Attorney(s): David Kawala and Matt VerSteeg, Indiana

Side: Defendant

Date: April 2015

---

Case:      Estate of Michael Samuelson. v. ArcelorMittal USA et al.

Attorney(s): David Kawala and Matt VerSteeg, Indiana

Side: Defendant

Date: April 2015

---

Case:      Estate of Gregory D. Barnes v. Minteq International, Inc. et al.

Attorney(s): William E. Santen Jr., Ohio

Side: Plaintiff

Date: December 2014

---

Case:      Christian DeMarco v. Heritage Steel et al.

Attorney(s): Michael Fitzpatrick, Ohio

Side: Defendant

Date: July 2014

---

Case:      Donald Powell v. Commercial Metals Company et al.

Attorney(s): Jeffrey C. Rickard, Alabama

Side: Plaintiff

Date: May 2013

---

Case:      Yolanda Cantu et al. v. Irondale Industrial Contractors Inc. et al.

Attorney(s): David T. Andrews, Ohio

Side: Defendant

Date: June 2011

---

Case:      Timothy Feltner v. Republic Engineered Products et al.

Attorney(s): Benjamin F. Barrett Sr., Ohio

Side: Plaintiff

Date: August 2010

---



DEFENDANT'S EXHIBIT

D

KW 4|7|16


STE **SAFETY** **ENGINEERING**
SUSTAINABLE SAFETY®

Michael C. Wright
President
PE, CSP, CPE

Case: John Brown et al. v. Alliance Castings Co. et al.       Side: Defendant
Attorney(s): Mark Snyder and Mike Reidy, Ohio       Date: November 2009

---

Case: Kelly E. Stamps et al. v. Mittal Steel USA, Inc. et al.       Side: Plaintiff
Attorney(s): Jeffrey S. Wrage, Indiana       Date: May 2008

---

Case: Jolliffe Thompson v. Republic Engineered Products et al.       Side: Plaintiff
Attorney(s): Don Kral, Ohio       Date: May 2008

---

Case: Jeffrey J. Przytulski et al. v. Republic Engineered Products et al.       Side: Defendant
Attorney(s): Thomas Connick, Ohio       Date: December 2007

---

Case: Craig Woodruff et al. v. Alcoa, Inc.       Side: Defendant
Attorney(s): Gary P. Connelly, Pennsylvania       Date: February 2006

---

Case: James Hodgeson v. Republic Technologies International       Side: Plaintiff
Attorney(s): Tim Collins and Kristie Weibling, Ohio       Date: January 2006

---

Case: Department of Labor v. CF and I Steel, L.P., a subsidiary of       Side: Plaintiff
Oregon Steel Mills, Inc., Pueblo, CO
Attorney(s): Toby Fritz, Colorado       Date: August 1998

---

# PROFESSIONAL EXPERIENCE
(General Experience History)

## Aerial and Scissor Lifts

Fully trained in the regulations and standards governing aerial and scissor lifts and knowledgeable of their proper application. Past experience includes the selection, use and inspection of equipment and the qualifications to determine if equipment is being used as intended by the manufacturer, OSHA and ANSI. Knowledge of structural engineering, the operation of aerial and scissor lifts on construction and general industry sites, and training adds to expertise.

- Developed criteria for continuous monitoring program
- Developed safety training program, including customized manuals
  - ➤ Construction industry
    - ◇ Awareness
    - ◇ User
    - ◇ Competent person
  - ➤ General industry
    - ◇ Awareness
    - ◇ User
    - ◇ Competent person
- Evaluation of hazard identification programs
- Has written policies, program and procedures
- Performed job hazard analysis
- Recommendations for use and training

### Courses
- Aerial and Scissor Lift Operator Certified
- OSHA Course—Aerial Platform Lifts for Construction and General Industry (1997)
- Overhead Lifting and Rigging Safety (1997)

### Instruction
- Aerial and Scissor Lift Requirements by OSHA and ANSI
- Overhead Lifting and Rigging Safety (1997)

## Anchorage Points for Fall Arrest Programs

### Companies
- Boeing Corporation
- Daimler Chrysler Corporation
- Delphi Automotive Systems
- Department of Defense
- Department of Labor
- Ford Motor Company
- General Motors
- Honda
- Lockheed Martin
- Navistar
- United States Navy
- Pacific Gas and Electric
- Procter and Gamble Company
- Saturn Corporation
- United States Air Force



# Maritime Safety

- American Bureau of Shipping—Interwaterway Requirements
  - SOLAS Cargo Ship Safety Equipment Requirements
  - Mobile Offshore Drilling Unit Safety Requirements
  - American National Standards Institute (ANSI)
  - Code of Federal Regulations
  - Title 33: Navigation and Navigable Waters
  - Title 46: Shipping, Part 8—Vessel Inspection Alternatives, Subpart D—Alternate Compliance Program
- Lighthouses and Other Navigational Aids
  - Barges
  - Jones Act
  - River vessels
  - Tugboats
- Maritime (Standards 29 CFR)
  - Part 1915: Occupational Safety and Health Standards for Shipyard Employment
  - Part 1917: Marine Terminals
  - Part 1918: Safety and Health Regulations for Long Shoring
  - National Institute for Occupational Safety and Health (NIOSH)
  - Occupational Safety and Health Administration (OSHA)
  - U.S. Coast Guard
  - USCG Office of Design and Engineering Standards
- U.S. Coast Guard Approved Supplements
  - ABS Rules for Steel Vessels for Vessels Certificated for International Voyages (1 June 2003)
  - ABS Rules for Steel Vessels Under 90 Meters (295 Feet) in Length for Vessels Certificated for International Voyages (1 June 2003)
  - ABS Rules for Steel Vessels for Vessels on International Voyages (1 November 1999)
  - ABS Rules for Steel Vessels Under 90 Meters (295 Feet) in Length for Vessels on International Voyages (29 March 1999)
  - ABS Rules for Building and Classing Mobile Offshore Drilling Units and the 1989 IMO MODU Code (1 November 1998)
  - ABS Rules for Steel Vessels for Vessels on International Voyages (1 August 1997)
  - DNV Supplement, Revision 10 (October 2003)
- U.S. Coast Guard Publications
  - Navigation and Vessel Inspection Circular No. 2-95 "Alternate Compliance Program"
  - Marine Safety Manual Vol. II, Section B, CH. 9
  - Federal Register Vol. 60 No. 23 (February 3, 1995) "ACP and ABS Pilot Program"
  - Federal Register Vol. 61 No. 250 (December 27, 1996) "ACP and Recognized Societies"
  - Federal Register Vol. 63 No. 30 (February 13, 1998) "ACP Supplement Development Process"
  - Supplement Review and Revision Process
- U.S. Department of Homeland Security

# Safety and Engineering Services for Steel Manufacturing and Processing Facilities

### Steel Mills

- Alro Steel, Dayton, OH (1995)
  - Structural analysis
  - Structural and safety renovations
  - Structural bolt torque check of the connections
  - Structural reinforcements
- AK Steel, Middletown, OH (1995–2003)
  - Confined space safety audits
  - Fall hazard abatement options for safe access to overhead cranes

- ➤ Fall hazard risk assessment
- ➤ Machine guarding safety audits
- ➤ Roof deck safety audit
- ➤ Safety lockout/tagout audits
- ➤ Safety policy and safety manual review
- ➤ Safety work procedures
- ➤ Structural analysis
- ➤ Structural and safety renovations
- ➤ Structural reinforcements
- ✎ Ford, Detroit, MI (1996–2002)
  - ➤ Confined space safety audits
  - ➤ Fall hazard risk assessment
  - ➤ Fall protection for roof, building and machinery
  - ➤ Fall protection training programs
  - ➤ Lockout/tagout safety audits
  - ➤ Lockout/tagout safety training programs
  - ➤ Machine guarding safety audits
  - ➤ Machine guarding safety training programs
  - ➤ Safety hazard analysis
  - ➤ Safety policy and safety manual review
  - ➤ Safety work procedures
  - ➤ Structural analysis
  - ➤ Structural and safety renovations
  - ➤ Structural reinforcements
- ✎ Gary Works, Gary, IN (1993)
  - ➤ Structural analysis
  - ➤ Structural engineering design for entire mixer plant
  - ➤ Structural reinforcements
  - ➤ Structural and safety renovations
- ✎ General Motors, Defiance, OH (1993–2004)
  - ➤ Confined space safety audits
  - ➤ Fall protection training programs
  - ➤ Machine guarding safety audits
  - ➤ Machine guarding safety training programs
  - ➤ Lockout/tagout safety audits
  - ➤ Lockout/tagout safety training programs
  - ➤ Safety abatement of platforms and factory roofs
  - ➤ Safety hazard analysis
  - ➤ Safety policy and safety manual review
  - ➤ Safety work procedures
  - ➤ Steel pouring safety process
  - ➤ Structural analysis
  - ➤ Structural and safety renovations
  - ➤ Structural design of crane system and machine foundations
  - ➤ Structural reinforcements
- ✎ General Motors, Saginaw, MI (1993–2004)
  - ➤ Confined space safety audits
  - ➤ Fall protection training programs
  - ➤ Machine guarding safety audits
  - ➤ Machine guarding safety training programs
  - ➤ Lockout/tagout safety audits
  - ➤ Lockout/tagout safety training programs
  - ➤ Roof fall protection
  - ➤ Safety abatement of platforms and factory roofs
  - ➤ Safety hazard analysis
  - ➤ Safety policy and safety manual review

- ➤ Safety work procedures
- ➤ Steel pouring safety process
- ➤ Structural analysis
- ➤ Structural and safety renovations
- ➤ Structural design of crane system and machine foundations
- ➤ Structural reinforcements
- ✎ General Motors, Decatur, IL (1993–2004)
  - ➤ Confined space safety audits
  - ➤ Fall protection training programs
  - ➤ Lockout/tagout safety audits
  - ➤ Lockout/tagout safety training programs
  - ➤ Machine guarding safety audits
  - ➤ Machine guarding safety training programs
  - ➤ Safety abatement of platforms and factory roofs
  - ➤ Safety hazard analysis and design
  - ➤ Safety policy and safety manual review
  - ➤ Safety work procedures
  - ➤ Steel pouring safety process
  - ➤ Structural analysis
  - ➤ Structural and safety renovations
  - ➤ Structural design of crane system and machine foundations
  - ➤ Structural reinforcements
- ✎ Nova Steel Processing, Inc., Tipp City, OH (1991)
  - ➤ Fall hazard safety audits
  - ➤ Fall protection work procedures
  - ➤ Performed contractor performance reviews and inspections
  - ➤ Provided crane runway design reinforcement and inspection
  - ➤ Renovated multiple buildings
  - ➤ Safety hazard training programs
  - ➤ Safety policy and safety manual review
  - ➤ Safety training program
- ✎ PKM Steel, Salina, KS (2007–2008)
  - ➤ Fall hazard safety abatement of platforms and factory roofs
  - ➤ Lockout/tagout safety audits
  - ➤ Machine guarding safety audits
  - ➤ Safety hazard analysis
  - ➤ Safety policy and safety manual review
  - ➤ Safety work procedures
  - ➤ Structural analysis
  - ➤ Structural and safety renovations
  - ➤ Structural design of crane system and machine foundations
  - ➤ Structural reinforcements
- ✎ PTC Alliance (2007–2012)
  - ➤ Alliance, OH—Performed a fall hazard assessment
  - ➤ Beaver Falls, PA —Designed a fall protection restraint system for accessing the top of a machine
  - ➤ Beaver Falls, PA; Darlington, PA; Alliance, OH— Provided crane tie off fall protection
  - ➤ Darlington, PA; Beaver Falls, PA; Alliance, OH— Provided Qualified Person services for fall protection
  - ➤ Darlington, PA; Beaver Falls, PA; Alliance, OH—Provided anchorage design drawings for accessing the various crane trolleys
  - ➤ Hopkinsville, KY—Provided Qualified Person services for a specialized fall protection system that utilized the crane trolleys to gain access to elevated equipment

- Steel Dynamics, Fort Wayne, IN (2012–2014)
  - Developed a comprehensive fall protection program for corporate review
  - Discussed the safety culture, level of training, observed behaviors, typical fall hazard activities and other data
  - Provided modifications and additions to the safety program
  - Reviewed existing safety program language
- Steel of West Virginia, Huntington, WV (2010–2015)
  - Fall protection audit
  - Machine guarding safety audits
  - Reinforced existing crane runway
  - Reviewed previous evaluations
  - Safety hazard analysis
  - Safety work procedures
  - Structural analysis of the existing casting structure
  - Structural and safety renovations
  - Structural evaluation of crane rail systems
- Superior Forge and Steel, Lima, OH (2008–2009)
  - Confined space safety audits
  - Fall hazard abatement options for safe access to furnace and overhead cranes
  - Fall protection safety training program
  - Lockout/tagout safety audits
  - Machine guarding safety audits
  - Safety hazard analysis
  - Safety policy and safety manual review
  - Safety work procedures
  - Steel pouring safety process
  - Structural analysis
  - Structural and safety renovations
  - Structural design of crane system and machine foundations
  - Structural reinforcements
- Timken Company/Faircrest Steel Plant, Canton, OH (2008–2009)
  - Confined space safety audits
  - Fall hazard abatement options for safe access to overhead cranes
  - Fall protection safety training program
  - Lockout/tagout safety audits
  - Machine guarding safety audits
  - Safety hazard analysis
  - Safety policy and safety manual review
  - Safety work procedures
  - Steel pouring safety process
  - Structural analysis
  - Structural and safety renovations
  - Structural design of crane system and machine foundations
  - Structural reinforcements

### *Aluminum Mills*
- Reynolds Metal Company, Muscle Shoals, AL (1997)
  - Anchor points—standard details
  - Documentation video—script, editing, technical consultant for "Horizontal Lifeline Test and Verification of Design Procedures"
  - Fall protection safety training
  - Lockout/tagout safety audits
  - Machine guarding safety audits
  - Safety hazard analysis
  - Safety policy and safety manual review
  - Safety training programs

➤ Customized fall protection systems for machinery and buildings
➤ Fall arrest horizontal lifelines

### *Types of Services Provided*

✎ Anchorage points, including but not limited to fall arrest, fall restraint, positioning and rescue
✎ Conducted structural evaluation of crane rail systems
✎ Confined space safety audits
✎ Designed fall protection restraint systems
✎ Developed comprehensive fall protection program
✎ Developed comprehensive lockout/tagout program
✎ Developed comprehensive machine guarding program
✎ Fall hazard abatement options for safe access to equipment and cranes
✎ Fall hazard risk assessment
✎ Lockout/tagout safety audits
✎ Machine guarding safety audits
✎ Performed contractor performance reviews and inspections
✎ Performed safety training, including lockout/tagout, machine guarding, fall arrest, fall restraint, positioning and rescue
✎ Provided comprehensive fall protection services
✎ Provided crane runway design reinforcement and inspection
✎ Provided modifications and additions to safety programs and training
✎ Provided structural analysis of the existing structures
✎ Reinforced existing crane runway systems
✎ Renovated buildings and structures
✎ Reviewed existing safety programs and provides updated revisions
✎ Reviewed previous evaluations
✎ Roof deck safety audit, including fall protection procedures
✎ Safety abatement of platforms and factory machinery
✎ Safety audits
✎ Safety hazard analysis
✎ Safety policy and manual review
✎ Safety protocols during steel operations
✎ Structural analysis and design of buildings and structures
✎ Structural and safety renovations
✎ Structural design of crane systems and machine foundations
✎ Structural engineering design for machine guarding
✎ Structural reinforcements of building, mezzanines, and structures

## Safety Programs: Training, Manuals, Audits, OSHA Compliance

✎ Aerial and scissor lifts programs
✎ Amusement parks programs
✎ Confined space programs
✎ Design liaison between owners and manufacturers/contractors
✎ Fall protection programs—200 million square feet
✎ Ladder and stepladder safety—portable and fixed
✎ Lockout/tagout programs—3 million square feet
✎ Machine guarding programs—3 million square feet
✎ Rescue programs
✎ Roof deck structural integrity—33 million square feet
✎ Rope rescue programs
✎ Safety regulations, standards and industry safety practices
✎ Scaffolding
✎ Suspended crane loads
✎ Suspended scaffolding
✎ Systems design and analysis



9363 Detrick Jordan Pike
New Carlisle, OH 45344-9140
Office: 937-964-1900
Fax: 937-964-8457
Corporate Tax ID: 51-0465604

**STE** | **SAFETY**
T H R O U G H
ENGINEERING
SUSTAINABLE SAFETY®

| | |
|---|---|
| **Amount Due:** | **$24,515.00** |
| **5% finance charge added if paid after 03/10/16:** | **$25,740.75** |

Invoice Number: 1
Invoice Date: 2/9/16
Billing Period: 1/20/16 to 2/9/16

TO:     Mr. Jonathan M. Ashton
        Gallon, Takacs, Boissoneault & Schaffer Co., L.P.A.
        3516 Granite Circle
        Toledo, OH 43617

RE:     Expert Witness Services for Lucio et al. v. Levy Environmental Services et al.
        Case No. 3:15-CV-00613

## INVOICE

| Date | Description | Hours | Amount |
|---|---|---|---|
| **SERVICE:** | Review and Analysis of Documents to Develop Basis for Opinions | | |
| | **Case Documents** | | |
| 1/25–28/16 | First Amended Complaint with Jury Demand Endorsed Hereon. August 21, 2015 | 0.3 | $ 105.00 |
| 1/25–28/16 | Complaint with Jury Demand Endorsed Hereon | 0.2 | $ 70.00 |
| 1/25–28/16 | VSSR Investigative Report. January 16, 2014 | 0.1 | $ 35.00 |
| 1/25–28/16 | VSSR Ex 1: Affidavit of Theodore Lucio. December 17, 2013 | 0.2 | $ 70.00 |
| 1/25–28/16 | VSSR Ex 2: Photo Report | 0.3 | $ 105.00 |
| 1/25–28/16 | VSSR Ex 3: Levy Incident Details. February 25, 2013 | 0.2 | $ 70.00 |
| 1/25–28/16 | VSSR Ex 4: Redacted OSHA Report. March 5, 2013 | 0.9 | $ 315.00 |
| 1/25–28/16 | Defendant's Rule 26(A) Disclosures | 0.5 | $ 175.00 |
| 1/25–28/16 | Defendant Levy Environment Services Company's Motion for Summary Judgment. August 31, 2015 | 0.5 | $ 175.00 |
| 1/25–28/16 | Affidavit of Malcom Dunbar. August 31, 2015 | 0.3 | $ 105.00 |
| 1/25–28/16 | Plaintiff's Memorandum in Opposition to Defendant Levy Environmental Services Company's Motion for Summary Judgment. November 25, 2015 | 0.4 | $ 140.00 |
| 1/25–28/16 | Defendant Edw. C. Levy Co.'s Responses to Plaintiffs' First Set of Requests for Production of Documents Directed to Defendant and Defendant Edw. C. Levy Co. November 25, 2015 | 0.1 | $ 35.00 |



DEFENDANT'S
EXHIBIT
F
KW  4/7/16

Page 1 of 9

## INVOICE

| Date | Description | Hours | Amount |
|------|-------------|-------|--------|
| 1/25–28/16 | Edw C Levy confidential discover response attachments (Edw.C.Levy-000001–000170 | 1.5 | $ 525.00 |
| 1/25–28/16 | North Star Discovery Responses (broken down below) | N/C | N/C |
| 1/25–28/16 | Request 1 - Slag Handling and Mill Services Agreement (1996) (NSBS_000001–000084) | 0.9 | $ 315.00 |
| 1/25–28/16 | First Amended and Restated Slag Handling and Mill Services Agreement (2010) (NSBS_000084–000140) | 0.9 | $ 315.00 |
| 1/25–28/16 | Second Amended and Restated Slag Handling and Mill Services Agreement (2015) (NSBS_000141–000161) | 0.5 | $ 175.00 |
| 1/25–28/16 | Request 2 - Drawing (NSBS_000162) | 0.1 | $ 35.00 |
| 1/25–28/16 | Request 3 - Contractor Guide (NSBS_000163–000207) | 0.5 | $ 175.00 |
| 1/25–28/16 | Contractor Induction Power Point (NSBS_000208–000215) | 0.4 | $ 140.00 |
| 1/25–28/16 | Request 5 - Email Correspondence (NSBS_000216–000241) | 0.5 | $ 175.00 |
| 1/25–28/16 | Incident Cause Analysis Method Report. (NSBS_000242–000259) Duplicate of Levy-000117–000134 | 0.3 | $ 105.00 |
| 1/25–28/16 | Levy disc responses (broken down below) | N/C | N/C |
| 1/25–28/16 | Incident Cause Analysis Method Report. (Levy-000117–000134) | 0.3 | $ 105.00 |
| 1/25–28/16 | Safety meeting paperwork (Levy-000142–000295) | 1.5 | $ 525.00 |
| 1/25–28/16 | OSHA Form 300 (Levy-000422–000435) | 0.2 | $ 70.00 |
| 1/25–28/16 | Fulton Mill Service Drawing List (Levy-000436–000489) | 1.2 | $ 420.00 |
| | **Total Michael C. Wright at $350/hour:** | **12.8** | **$ 4,480.00** |

Photos

| Date | Description | Hours | Amount |
|------|-------------|-------|--------|
| 1/25–28/16 | 10-16-14 Inspection photos | 0.1 | $ 35.00 |
| | **Total Michael C. Wright at $350/hour:** | **0.1** | **$ 35.00** |

Depositions: Review, make markings on documents, relate to code and standard requirements, making reference notes for Deposition and/or Report

| Date | Description | Hours | Amount |
|------|-------------|-------|--------|
| 1/25–28/16 | Theodore Lucio. February 20, 2015 | 2.0 | $ 700.00 |
| 01/22/16 | T. Lucio. Ex 1 | N/C | N/C |
| 01/21/16 | Shawn Griffin. February 24, 2015 | 2.0 | $ 700.00 |
| 01/22/16 | Walter Deeds. February 24, 2015 | 1.0 | $ 350.00 |
| 01/22/16 | Gregory J. Lambert, Jr. w/exhibits. June 22, 2015 | 1.2 | $ 420.00 |
| 01/22/16 | Gary Frisinger. June 23, 2015 | 1.0 | $ 350.00 |
| 01/22/16 | Rock Miller. November 6, 2015 | 1.9 | $ 665.00 |
| 01/22/16 | R. Miller Ex 1 | N/C | N/C |
| 01/22/16 | R. Miller Ex 2 | N/C | N/C |
| 01/22/16 | R. Miller Ex 3 | N/C | N/C |
| 01/22/16 | R. Miller Ex 4 (Levy-000303–000417) | 0.6 | $ 210.00 |
| 01/22/16 | R. Miller Ex 5 (Levy-000025–000028 & 000418–000421) | N/C | N/C |
| 01/22/16 | R. Miller Ex 6 | N/C | N/C |

| Date | Description | Hours | Amount |
|------|-------------|-------|--------|
| 01/22/16 | R. Miller Ex 7 (Levy-000296–000302) | 0.1 | $ 35.00 |
| 01/22/16 | R. Miller Ex 8 | N/C | N/C |
| 01/22/16 | R. Miller Ex 9 (Levy-000135–000141) | 0.2 | $ 70.00 |
| 01/22/16 | Malcom Dunbar. November 6, 2015 | 0.4 | $ 140.00 |
| 02/08/16 | Brij Sapru. January 15, 2016 | 1.3 | $ 455.00 |
| 02/08/16 | B. Sapru Ex. A–H (photos) | 0.1 | $ 35.00 |
| 02/08/16 | Jeffrey Joldrichsen. January 18, 2016 | 1.5 | $ 525.00 |
| 02/08/16 | J. Joldrichsen Ex. A | 0.1 | $ 35.00 |
| 02/08/16 | J. Joldrichsen Ex. 1 | 0.1 | $ 35.00 |
| 02/08/16 | J. Joldrichsen Ex. 2 | 0.1 | $ 35.00 |
| 02/08/16 | J. Joldrichsen Ex. 3 | 0.1 | $ 35.00 |
| 01/22/16 | Plaintiff Exhibits 1–10 (listed separate because they match up with multiple depositions) | N/C | N/C |
| | **Total Michael C. Wright at $350/hour:** | 13.7 | $ 4,795.00 |
| | **ANSI Standards** | | |
| 1/25–28/16 | ANSI/ASSE A10.39-1996. American National Standard for Construction Safety and Health Audit Program – American National Standard for Construction and Demolition Operations | 0.1 | $ 35.00 |
| 1/25–28/16 | ANSI/ASSE A10.33-1998 (R2004). American National Standard for Construction and Demolition Operations – Safety and Health Program Requirements for Multi-Employer Projects | 0.5 | $ 175.00 |
| 1/25–28/16 | ANSI/ASSE A1264.1-2007. American National Standard: Safety Requirements for Workplace Walking/Working Surfaces and Their Access; Workplace, Floor, Wall and Roof Openings; Stairs and Guardrail Systems | 0.5 | $ 175.00 |
| 1/25–28/16 | ANSI Z490.1-2001. American National Standard: Criteria for Accepted Practices in Safety, Health, and Environmental Training | 0.4 | $ 140.00 |
| 1/25–28/16 | ANSI/ASSE Z359.1-2007. American National Standard: Safety Requirements for Personal Fall Arrest Systems, Subsystems and Components | 0.5 | $ 175.00 |
| | **Total Michael C. Wright at $350/hour:** | 2.0 | $ 700.00 |
| | **ASME Standards** | | |
| 1/25–28/16 | ANSI/ASME B30.5-2007. Mobile and Locomotive Cranes. (Revision of ASME B30.5-2004) | 0.4 | $ 140.00 |
| 1/25–28/16 | ASME Safety Division. An Instructional Aid for Occupational Safety and Health in Mechanical Engineering Design. New York: American Society of Mechanical Engineers, 1984 | 0.6 | $ 210.00 |
| | **Total Michael C. Wright at $350/hour:** | 1.0 | $ 350.00 |

| INVOICE | | | |
|---|---|---|---|
| **Date** | **Description** | **Hours** | **Amount** |
| | U.S. Department of Labor: OSHA Regulations | | |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart A. Subpart Title: General. Standard Number: 1910.6. Title: Incorporation by reference | N/C | N/C |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart B. Subpart Title: Adoption and Extension of Established Federal Standards. Standard Number: 1910.12. Title: Construction work | N/C | N/C |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart D. Subpart Title: Walking-Working Surfaces. Standard Number: 1910.21. Title: Definitions | 0.1 | $ 35.00 |
| 1/25–28/16 | Standards –29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart D. Subpart Title: Walking-Working Surfaces. Standard Number: 1910.22. Title: General requirements | 0.2 | $ 70.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart D. Subpart Title: Walking-Working Surfaces. Standard Number: 1910.23. Title: Guarding floor and wall openings and holes | 0.3 | $ 105.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart D. Subpart Title: Walking-Working Surfaces. Standard Number: 1910.24. Title: Fixed industrial stairs | 0.1 | $ 35.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart D. Subpart Title: Walking-Working Surfaces. Standard Number: 1910.27. Title: Fixed Ladders | 0.1 | $ 35.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart D. Subpart Title: Walking – Working Surfaces. Standard Number: 1910.30. Title: Other Working Surfaces | 0.1 | $ 35.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart F. Subpart Title: Powered Platforms, Manlifts, and Vehicle-Mounted Work Platforms. Standard Number: 1910.68. Title: Manlifts | 0.2 | $ 70.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart I. Subpart Title: Personal Protective Equipment. Standard Number: 1910.132. Title: General requirements | 0.2 | $ 70.00 |

## INVOICE

| Date | Description | Hours | Amount |
|------|-------------|-------|--------|
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart J. Subpart Title: General Environmental Controls. Standard Number: 1910.145. Title: Specifications for accident prevention signs and tags | 0.2 | $ 70.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart N. Subpart Title: Materials Handling and Storage. Standard Number: 1910.179. Title: Overhead and gantry cranes | 0.2 | $ 70.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart N. Subpart Title: Materials Handling and Storage. Standard Number: 1910.180. Title: Crawler locomotive and truck cranes | 0.2 | $ 70.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1910. Part Title: Occupational Safety and Health Standards. Subpart N. Subpart Title: Materials Handling and Storage. Standard Number: 1910.184. Title: Slings | 0.2 | $ 70.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1926. Part Title: Safety and Health Regulations for Construction. Subpart M. Subpart Title: Fall Protection. Standard Number: 1926.500. Title: Scope, application and definitions applicable to this subpart | 0.1 | $ 35.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1926. Part Title: Safety and Health Regulations for Construction. Subpart M. Subpart Title: Fall Protection. Standard Number: 1926.501. Title: Duty to have fall protection | 0.2 | $ 70.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1926. Part Title: Safety and Health Regulations for Construction. Subpart M. Subpart Title: Fall Protection. Standard Number: 1926.502. Title: Fall protection systems criteria and practices | 0.3 | $ 105.00 |
| 1/25–28/16 | Standards – 29 CFR. Part Number: 1926. Part Title: Safety and Health Regulations for Construction. Subpart M. Subpart Title: Fall Protection. Standard Number: 1926.503. Title: Training requirements | 0.1 | $ 35.00 |
| 1/25–28/16 | Occupational Safety and Health Act of 1970. General Duty Clause. Section 5. Duties. Specifically Clause 5(a)(1) | N/C | N/C |
| | Total Michael C. Wright at $350/hour: | 2.8 | $ 980.00 |
| | **U.S. Department of Labor: OSHA Letters of Interpretation** | | |
| 1/25–28/16 | Standard Interpretations. Standard Number: 1910.23; 1910.269. General industry standard as it applies to the electric utility industry. December 18, 1997 | 0.4 | $ 140.00 |
| 1/25–28/16 | Standard Interpretations. Standard Number: 1910.261; 1926.56. OSHA accepts employers' use of the ANSI/IES-RP-7-1991 incorporated by reference or adopted into OSHA standards. June 17, 1996 | N/C | N/C |

## INVOICE

| Date | Description | Hours | Amount |
|------|-------------|-------|--------|
| 1/25–28/16 | Standard Interpretations. Standard Number: 1926.16. Determining the controlling employer with the role of providing general supervisory authority when using multi-employer two-step analysis citation policy. December 13, 2001 | 0.2 | $ 70.00 |
| 1/25–28/16 | Standard Interpretations. Elements necessary for a violation of the General Duty Clause. December 18, 2003 | 0.2 | $ 70.00 |
| 1/25–28/16 | Standard Interpretations. Standard Number: 1926.16(a). Application of OSHA Act and Multi-Employer Citation Policy rather than CWHSSA to ensure subcontractors meet construction occupational safety and health responsibilities. March 15, 2005 | 0.1 | $ 35.00 |
| 1/25–28/16 | Standard Interpretations. Standard Number: 1910.144; 1910.145; 1910.145(d). ANSI standards regarding accident prevention signs and physical hazard marking. February 22, 2011 | 0.1 | $ 35.00 |
| | **Total Michael C. Wright at $350/hour:** | **1.0** | **$ 350.00** |

### U.S. Department of Labor: OSHA Federal Registers

| Date | Description | Hours | Amount |
|------|-------------|-------|--------|
| 1/25–28/16 | Federal Register. Publication Date: January 26, 1989. Publication Type: Notice. Federal Register Number: 54:3904–3916. Standard Number: 1910; 1910.1200; 1915; 1917; 1918; 1926. Title: Safety and Health Program Management Guidelines; Issuance of Voluntary Guidelines | 0.2 | $ 70.00 |
| 1/25–28/16 | Federal Register. Publication Date: January 26, 1995. Publication Type: Final Rules. Federal Register Number: 60:5131–5133. Standard Number: 1926. Title: Safety Standards for Fall Protection in the Construction Industry | 0.3 | $ 105.00 |
| 1/25–28/16 | Federal Register. Publication Date: May 2, 2003. Publication Type: Proposed Rule. Federal Register Number: 68:23527–23568. Standard Number: 1910. Title: Walking and Working Surfaces; Personal Protective Equipment (Fall Protection Systems) | 0.3 | $ 105.00 |
| 1/25–28/16 | Federal Register. Publication Date: May 24, 2010. Publication Type: Proposed Rule. Federal Register Number: 75:28861–29153. Standard Number: 1910. Title: Walking and Working Surfaces; Personal Protective Equipment (Fall Protection Systems) | 0.5 | $ 175.00 |
| | **Total Michael C. Wright at $350/hour:** | **1.3** | **$ 455.00** |

### U.S. Department of Labor: OSHA Directives

| Date | Description | Hours | Amount |
|------|-------------|-------|--------|
| 1/25–28/16 | Directives. Record Type: Instruction. Directive Number: STD 01-01-013. Old Directive Number: STD 1-1.13. Title: Fall Protection in General Industry 29 CFR 1910.23(c)(1), (c)(3), and 29 CFR 1910.132(a). Information Date: April 16, 1984 | 0.4 | $ 140.00 |

| INVOICE | | | |
|---|---|---|---|
| **Date** | **Description** | **Hours** | **Amount** |
| 1/25–28/16 | Directives. Record Type: Instruction. Directive Number: CPL 02-00-124. Old Directive Number: CPL 2-0.124. Title: Multi-Employer Citation Policy. Information Date: Dec. 10, 1999 | 0.5 | $ 175.00 |
| 1/25–28/16 | Directives. Record Type: Instruction. Directive Number: STD 01-01-013. Old Directive Number: STD 1-1.13. Title: Fall Protection in General Industry 29 CFR 1910.23(c)(1), (c)(3), and 29 CFR 1910.132(a). Information Date: April 16, 1984 | 0.2 | $ 70.00 |
| | Total Michael C. Wright at $350/hour: | 1.1 | $ 385.00 |
| | **U.S. Department of Labor: OSHA Publications** | | |
| 1/25–28/16 | Fall Protection in Construction. OSHA 3146-1998 (Revised) | 0.2 | $ 70.00 |
| 1/25–28/16 | Job Hazard Analysis. OSHA 3071-2002 (Revised) | 0.2 | $ 70.00 |
| | Total Michael C. Wright at $350/hour: | 0.4 | $ 140.00 |
| | **NIOSH Publications** | | |
| 1/25–28/16 | DHHS (NIOSH) Publication No. 90-100. Preventing Worker Deaths and Injuries from Falls Through Skylights and Roof Openings. NIOSH Alert: December 1989 | 0.2 | $ 70.00 |
| | Total Michael C. Wright at $350/hour: | 0.2 | $ 70.00 |
| | **U.S. Army Corps of Engineers: Safety and Health Requirements Manual** | | |
| 1/25–28/16 | Publication Number: EM 385-1-1. Title: Safety – Safety and Health Requirements. Proponent: CESO-ZA. Publication Date: November 3, 2003 | 0.3 | $ 105.00 |
| 1/25–28/16 | Publication Number: EM 385-1-1. Title: Safety – Safety and Health Requirements. Proponent: CESO-ZA. Publication Date: September 15, 2008 | 0.3 | $ 105.00 |
| | Total Michael C. Wright at $350/hour: | 0.6 | $ 210.00 |
| | **NSC: National Safety Council** | | |
| 1/25–28/16 | National Safety Council. Accident Prevention Manual for Business & Industry: Engineering & Technology. Edited by Philip Hagan, Gary R. Kreiger, John F. Montgomery, and James T. O'Reilly. 12th edition. Itasca, IL: National Safety Council Press, 2000 | 0.2 | $ 70.00 |
| | Total Michael C. Wright at $350/hour: | 0.2 | $ 70.00 |
| | **OAC: Ohio Administrative Codes** | | |
| 1/25–28/16 | 4123:1-5-02 Guarding floor and wall openings and holes | 0.3 | $ 105.00 |
| 1/25–28/16 | 4123:1-5-25 Vehicle-mounted elevating and rotating work platforms | 0.3 | $ 105.00 |
| | Total Michael C. Wright at $350/hour: | 0.6 | $ 210.00 |

| Date | Description | Hours | Amount |
|------|-------------|-------|--------|
| | **INVOICE** | | |
| | ORC: Ohio Revised Code | | |
| 1/25–28/16 | ORC 4101.11 Duty of employer to protect employees and frequenters | 0.2 | $ 70.00 |
| 1/25–28/16 | ORC 4101.12 Duty of employer to furnish safe place of employment | 0.2 | $ 70.00 |
| | Total Michael C. Wright at $350/hour: | 0.4 | $ 140.00 |
| | OSHRC: Occupational Safety and Health Review Commission | | |
| 1/25–28/16 | Secretary of Labor v. Unarco Commercial Products. OSHRC Docket No. 89-1555. December 16, 1993 | 0.9 | $ 315.00 |
| | Total Michael C. Wright at $350/hour: | 0.9 | $ 315.00 |
| | IBC: International Building Code | | |
| 1/25–28/16 | 2003 International Building Code. Country Club Hills, IL: International Code Council | 0.4 | $ 140.00 |
| 1/25–28/16 | 2006 International Building Code. Country Club Hills, IL: International Code Council | 0.2 | $ 70.00 |
| 1/25–28/16 | 2009 International Building Code. Country Club Hills, IL: International Code Council | 0.2 | $ 70.00 |
| | Total Michael C. Wright at $350/hour: | 0.8 | $ 280.00 |
| | Books/Articles | | |
| 1/25–28/16 | MacCollum, David V. Construction Safety Planning. New York: John Wiley & Sons, 1995 | 0.2 | $ 70.00 |
| 1/25–28/16 | MacCollum, David V. Construction Safety Engineering Principles: Designing and Managing Safer Job Sites. McGraw-Hill Construction Series. New York: McGraw-Hill, 2007 | 0.3 | $ 105.00 |
| | Total Michael C. Wright at $350/hour: | 0.5 | $ 175.00 |
| SERVICE: | Creation of the Expert Witness Report | | |
| 01/29/16 | Preparation of Expert Witness Report | 5.2 | $ 1,820.00 |
| 02/02/16 | Preparation of Expert Witness Report | 4.3 | $ 1,505.00 |
| 02/03/16 | Preparation of Expert Witness Report | 8.0 | $ 2,800.00 |
| 02/04/16 | Preparation of Expert Witness Report | 8.0 | $ 2,800.00 |
| 02/05/16 | Preparation of Expert Witness Report | 3.5 | $ 1,225.00 |
| 02/06/16 | Preparation of Expert Witness Report | 5.5 | $ 1,925.00 |
| 02/08/16 | Preparation of Expert Witness Report | 2.0 | $ 700.00 |
| 02/09/16 | Preparation of Expert Witness Report | 2.0 | $ 700.00 |
| | Total Michael C. Wright at $350/hour: | 38.5 | $ 13,475.00 |

| | INVOICE | | |
|---|---|---|---|
| **Date** | **Description** | **Hours** | **Amount** |
| SERVICE: | Technical Writer & Editor: Editing & Formatting the Expert Witness Report | | |
| 02/05/16 | Preparation of Expert Witness Report | 4.0 | $ 600.00 |
| 02/09/16 | Preparation of Expert Witness Report | 2.0 | $ 300.00 |
| | Total Technical Writer & Editor Assoc. at $150/hour: | 6.0 | $ 900.00 |
| | | | |
| SERVICE: | Administrative Associate: Invoice Preparation | | |
| 02/09/16 | Invoice Preparation | N/C | N/C |
| | Total Administrative Associate at $85/hour: | N/C | N/C |

Subtotal: $ 28,515.00

Less Retainer: $ 4,000.00

Amount Due: $ 24,515.00

5% finance charge added if paid after 03/10/16: $ 25,740.75

*Payment is due upon receipt per the signed agreement.*

Make checks payable to Safety Through Engineering, Inc. Thank you!