s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s

| | |
|---|---|
| Theodore Lucio, et al., | Case No.: 3:15-cv-00613-JJH |
| Plaintiffs, | (Hon. Jeffrey J. Helmick) |
| vs. | **DEFENDANT EDW. C. LEVY CO.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| Edw. C. Levy Co., et al., | |
| Defendants. | |

s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s-s

**I.      LEVY DID NOT BREACH ANY DUTY OWED TO PLAINTIFF.**

   **A.   Mr. Lucio Is Not An Intended Third-Party Beneficiary Of The "Performance And Payment Guaranty".**

Plaintiff acknowledges that it "is rudimentary that in order to establish actionable negligence, one must show the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom." (Doc. 57, Memo in Opp., p. 17.) As a matter of law, plaintiff cannot show the existence of a duty or a breach, and therefore cannot show any damages from a breach by Levy.

The linchpin of plaintiff's argument is that Mr. Lucio was a third-party beneficiary of a contract obligation of Levy. The record does not support that claim. Specifically, plaintiff

points to the "Performance and Payment Guaranty" signed by Levy, and guaranteeing performance of certain obligations to NSBS. As Levy showed in its initial brief at pages 12-15, Mr. Lucio can only claim a contractual duty owed to him if he is a party to the contract (which he was not) or an <u>intended</u> third-party beneficiary of that contract (which he cannot). In short, and as plaintiff acknowledges, an <u>incidental</u> beneficiary cannot claim rights under a contract. Mr. Lucio was not an intended beneficiary of the "Performance and Payment Guaranty" on which plaintiff relies. The "Performance and Payment Guaranty"[1] provides in pertinent part:

> A. NSBHP entered into a Slag Handling and Mill Services Agreement dated June 14, 1996 (the "Services Agreement") with Butler Mill Services Company, a Michigan corporation doing business as Fulton Mill Service Company ("FMS"), an affiliate of Guarantor;
>
> * * *
>
> 3. **Guaranty**. *Guarantor hereby unconditionally and irrevocably guarantees to NSBHP, its successors and assigns, the complete performance of all of the obligations of FMS under and in accordance with, and subject to, the terms of the Services Agreement to:*
>
>> *(a) provide the slag handling and mill services;*
>>
>> *(b) to pay all fees, utility charges, royalties and other charges, costs and expenses owed by FMS to NSBHP; and*
>>
>> *(c) to otherwise perform all other obligations, duties and responsibilities owed by FMS to NSBHP, including, without limitation, the indemnification obligations of FMS under Section 11 of the Services Agreement.*

---

[1] Mr. Scholz's affidavit and the contract documents were filed under seal and marked confidential. The contract documents were considered confidential because of their inclusion of some financial information. The portions of the Slag Handling and Mill Services Agreements and the Performance and Payment Guaranty cited in this brief do not include any of that financial information. The confidentiality of the financial information contained in those documents is expressly reserved.

points to the "Performance and Payment Guaranty" signed by Levy, and guaranteeing performance of certain obligations to NSBS. As Levy showed in its initial brief at pages 12-15, Mr. Lucio can only claim a contractual duty owed to him if he is a party to the contract (which he was not) or an <u>intended</u> third-party beneficiary of that contract (which he cannot). In short, and as plaintiff acknowledges, an <u>incidental</u> beneficiary cannot claim rights under a contract. Mr. Lucio was not an intended beneficiary of the "Performance and Payment Guaranty" on which plaintiff relies. The "Performance and Payment Guaranty"[1] provides in pertinent part:

> A. NSBHP entered into a Slag Handling and Mill Services Agreement dated June 14, 1996 (the "Services Agreement") with Butler Mill Services Company, a Michigan corporation doing business as Fulton Mill Service Company ("FMS"), an affiliate of Guarantor;
>
> * * *
>
> 3. **Guaranty**. *Guarantor hereby unconditionally and irrevocably guarantees to NSBHP, its successors and assigns, the complete performance of all of the obligations of FMS under and in accordance with, and subject to, the terms of the Services Agreement to:*
>
>> *(a) provide the slag handling and mill services;*
>>
>> *(b) to pay all fees, utility charges, royalties and other charges, costs and expenses owed by FMS to NSBHP; and*
>>
>> *(c) to otherwise perform all other obligations, duties and responsibilities owed by FMS to NSBHP, including, without limitation, the indemnification obligations of FMS under Section 11 of the Services Agreement.*

---

[1] Mr. Scholz's affidavit and the contract documents were filed under seal and marked confidential. The contract documents were considered confidential because of their inclusion of some financial information. The portions of the Slag Handling and Mill Services Agreements and the Performance and Payment Guaranty cited in this brief do not include any of that financial information. The confidentiality of the financial information contained in those documents is expressly reserved.

> *Sections 3(a), (b) and (c) are hereinafter collectively referred to as the "Guaranteed Obligations".*
>
> * * *
>
> 5. **Guaranty of Payment and Performance**. The liability of Guarantor under this Guaranty is a guarantee of payment and performance and not of collectability, . . . . However, NSBHP agrees *Guarantor shall be entitled to all other rights and defenses available to FMS under the Services Agreement.*
>
> * * *
>
> 10. **Binding Effect**. This Guaranty shall be binding on, Guarantor, its successors and assigns, and shall inure to the benefit of NSBHP, its successors and assigns.

(See Doc. 47, Scholz Aff., Exhibit C, emphasis added ["Ex. C"].)

The clear language of the Guaranty demonstrates that it was meant expressly to benefit NSBS, and there is no indication that it was intended to benefit Mr. Lucio. The "Guaranteed Obligations" are defined: To "provide the slag handling and mill services"; "to pay all fees, utility charges, royalties and other charges [etc.]"; and "to otherwise perform all other obligations, duties and responsibilities *owed by FMS to NSBHP*". (Id., emphasis added.) Each of the "Guaranteed Obligations" is specifically for the benefit of NSBS, and none therefore can possibly make Mr. Lucio the beneficiary of obligations owed by Levy *to* NSBS.

More importantly, the Guaranty language states that "NSBHP [NSBS] agrees *Guarantor shall be entitled to all other rights and defenses available to FMS under the Services Agreement*." (Id., emphasis added.) Plaintiff's claims against FMS are barred by workers' compensation immunity and by Judge Carr's opinion cited in Levy's initial brief. (Doc. 46, Levy's Memo in Support, p. 2.) Since the "Performance and Payment Guaranty" grants Levy "all other rights and defenses available to FMS under the Services Agreement", and because FMS prevailed on those defenses as a matter of law, plaintiff's claims against Levy are likewise

3

barred. In other words, since FMS is entitled to the defenses afforded to an employer, the terms of the contract(s) relied on by Mr. Lucio grant the same defenses to Levy and require the same result, summary judgment.

### B. Levy Does Not Owe Any Common Law Duty To Mr. Lucio.

Plaintiff tries to establish a common law duty of care, by claiming Mr. Lucio was an employee of a subcontractor (FMS), and that Levy is "the owner and/or general contractor" of the slag plant tower from which Mr. Lucio fell. (Doc. 57, Memo in Opp., p. 14.) This is not true. Levy was not the owner of the slag plant tower from which plaintiff fell. As has been affirmatively established, FMS was and remained the owner of the FMS improvements. (Doc. 47, Scholz Aff., ¶¶5, 6.) Plaintiff cites and we find no authority for the proposition that by issuing a guaranty, a guarantor becomes either an owner or a general contractor.

Plaintiff then tries to manufacture a duty by claiming that Levy was the "project manager" with respect to the ongoing operation of the slag plant. (Doc. 57, Memo in Opp., p. 14.) Neither the original nor the amended "Slag Handling and Mill Services Agreement" supports the proposition that the operator or "manager" of the slag plant was an entity other than FMS. Paragraph 16 of the Slag Handling and Mill Services Agreements provides "***FMS shall* maintain and repair the FMS improvements at its cost and expense.**" (Doc. 47, Scholz Aff., ¶¶5, 6, emphasis added.) While the Performance and Payment Guaranty make Levy a guarantor of certain "Guaranteed Obligations" to NSBS, no provision makes it an ongoing owner, operator, general contractor or project manager. The term "project manager" was manufactured solely for plaintiff's brief in an attempt to establish some kind of duty where none exists.

Despite plaintiff's attempts to complicate the record, the relationships between the parties are clear. First, there was no contract between Levy and Mr. Lucio. Mr. Lucio was required to

4

answer to his employer, FMS. Second, while there were agreements in place between FMS and NSBS (the Slag Handling and Mill Services Agreements), and Levy and NSBS (the Performance and Payment Guaranty), there was no written agreement between FMS and Levy on which to establish a general contractor/subcontractor relationship. Despite the absence of any contract, Levy provided input with respect to the safety programs of its affiliate, FMS. And, FMS made use of safety training materials, including training on fall protection which called for employees to use safety harnesses and lanyards when working at height. The record is undisputed that Mr. Lucio was given the training on use of fall protection in this very circumstance, but he simply failed to wear the proper safety harness and lanyard on the day in question.

To the extent that Levy had a role in developing and giving fall protection training to FMS's employees, including Mr. Lucio, there is no question but that if Mr. Lucio followed that training and wore a harness and secured it to the hole in the beam as Mr. Deeds had previously, Mr. Lucio would not have fallen. As an affiliate of Mr. Lucio's employer, Levy cannot be responsible for an injury because it failed to make sure that Mr. Lucio wore the safety harness and lanyard that FMS had trained him to use. Certainly, plaintiff cited no case law to support such a conclusion.

Levy finds itself a defendant despite Mr. Lucio admitting he was given fall protection training two months before his fall. Plaintiff's expert, Michael Wright, testified he does not know whether Mr. Lucio "understood" the training he was given, but he admits that if an employee is given safety training, he is duty-bound to follow it. (Doc. 61, Wright depo., pp. 16, 59.) Mr. Lucio acknowledged he understood the fall protection instruction given to him and how to put on a safety harness. (Doc. 51, Lucio I depo., p. 19.) Mr. Lucio admitted he went over lots of JBSAs before his fall and he knew where to find them if he had any questions. (Id., pp. 48-

50.) The supporting documents on training submitted by plaintiff with his brief show the use of fall protection was appropriate for the screen change operation, and the JBSA specifically called out harness and lanyard as safety equipment for that job.

Plaintiff also points to the term "Personnel Health" contained in the contract specifications to argue the "goal" of personnel health establishes a contract duty owed to Mr. Lucio. In context, the reference states:

> ***It is the goal*** *of the management of North Star-BHP Steel to operate a site where there are no lost time injuries to any personnel associated with the operation, nor does the operation cause longer term deterioration in personnel health.* ***We will expect the successful contractor to share this goal and implement operating philosophies and practices in line with this goal.*** [Doc. 47, Scholz Aff., Exhibit D.]

Agreeing to "share this goal" and to "implement operating philosophies and practices in line with this goal" set forth aspirational expectations, not contract terms on which a breach of contract could be asserted by NSBS, let alone by its employees or FMS's employees if they had been intended third-party beneficiaries. In any event, the fact that the "Performance and Payment Guaranty" grants Levy the same defenses as FMS means that Mr. Lucio cannot make a claim on the basis of contract specifications, whether the terms are aspirational or of binding effect.

Plaintiff argues that Levy exerted control over jobsite safety and was therefore an employer to whom the Occupational Safety and Health Act ("OSHA") applies. He then continues to argue that because Levy did *not* exert control over the jobsite, it is therefore not entitled to immunity under R.C. 4123.74 and Section 35, Article II of the Ohio Constitution. Plaintiff cannot have it both ways.

Because Levy was not plaintiff's employer, OSHA, which "enforces the duty of employers," does not apply. *Bazdar v. Koppers Co.*, 524 F. Supp. 1194 (N.D. Ohio 1981) (citing

*Russell v. Bartley*, 494 F.2d 334 (6th Cir. 1974)). The purpose of OSHA is to enforce the employer's duty to create and maintain safe working conditions through the imposition of civil and criminal penalties. *Id.* Further, OSHA most certainly "does not, directly or impliedly, create any type of civil remedy in favor of employees." *Id.*, *see Minichello v. U.S. Industries, Inc.*, 756 F.2d 26 (6th Cir. 1985) (holding that OSHA can never provide a basis for liability). Accordingly, using OSHA cannot supply a basis for negligence against Levy.

Plaintiff tries to bootstrap an argument based on OSHA through Mr. Wright's expert report by claiming that the "controlling employer" concept applies and that Levy should have been cited by OSHA (it wasn't) and that Levy could have had liability under OSHA as the result of its OSHA violation. That argument is also unsupportable. Indeed, the Multi-Employer Citation Policy Directive, CPL 02-00-124 does not at all state or imply that its provisions are applicable to a third party private cause of action, and the directive specifically states it is a "continuation of basic policy" and does not contain new duties. In *Johnson v. Koppers Co.*, 524 F. Supp. 1182, 1189 (S.D. Ohio 1981) the district court specifically rejected the plaintiff's argument that the Multi-Employer Citation Policy Directive created a duty in a negligence action, and held "the Occupational Safety and Health Act enforces the duty of employers to supply safe working conditions via civil and criminal sanctions but it does not, directly or impliedly, create any type of civil remedy in favor of employees." *Id.*, citing *Russell v. Bartley*, 494 F.2d 334 (6th Cir. 1974).

**II.  OHIO REVISED CODE §2305.131(A)(1) IS CONSTITUTIONAL AND BARS PLAINTIFF'S CLAIM WITH RESPECT TO THE DESIGN AND CONSTRUCTION OF THE SUBJECT SLAG MILL.**

Plaintiff claims that since "the Ohio Supreme Court struck down a nearly identical statute of repose" in *Brennaman v. R.M.I. Co.*, 70 Ohio St.3d 460, 466-467, 639 N.E.2d 425 (1994), the

Court would likely strike down the current version of R.C. 2305.131.[2] (Doc. 57, Memo in Opp., p. 18.) Plaintiff's wishful thinking does not hold up. See *McClure v. Alexander*, 2nd Dist. Greene No. 2007CA98, 2008-Ohio-1313, citing *Groch v. GMC*, 117 Ohio St.3d 192, 883 N.E.2d 377 (2008), and holding that the former version and the current version of R.C. 2305.131 are significantly dissimilar and that the current version is Constitutional:

> ¶50 The previous version of the statute provided in part, 'no action . . . shall be brought,' while the current version, like the constitutional statute of repose in *Groch*, provided in part, 'no cause of action . . . shall accrue.' We agree with Alexander, the 'current version of R.C. 2305.131 recognizes that a true statute of repose actually prevents a cause of action from accruing rather than preventing a plaintiff from bringing an action after accrual,' like a statute of limitation. As noted by the *Groch* Court, the legislature is free to modify or abolish common law actions in which no one has a vested right, by its language, the current version of R.C. 2305.131 'can prevent claims from ever vesting [if the improvement was substantially completed] more than ten years before the injury occurred.' Id., at ¶149. In other words, McClure's cause of action against Alexander never accrued, and it accordingly never became a vested right. As in *Groch*, 'this feature of the statute triggers the portion of *Sedar's* fundamental analysis concerning Section 16, Article I that is dispositive of our inquiry.'
>
> ¶51 Another different between the current version of the statute and the one before the Court in *Sedar* and *Brennaman* is that the current version allows a plaintiff to bring a claims beyond the ten-year period of the claim was discovered within that period but less than two years before its expiration. The current version further makes exceptions where the defendant has engaged in fraud and where an express guarantee of workmanship has been given that exceeds the ten-year period.
>
> ¶52 Having carefully reviewed the particular features of R.C. 2305.131, we conclude that it is sufficiently different from the previous version considered in *Brennaman* 'to avoid the blanket application of stare decisis.' *Groch*, at ¶106, quoting *Arbino*. In other words, *Brennaman* is not directly controlling.[3] McClure's sole assignment of error is overruled, and the decision of the trial court is affirmed.

---

[2] Plaintiff fails to elaborate on this argument, however.

3563299 .4

> [3] While the *Groch* Court expressly declined to overrule *Brennaman*, we note that the majority in effect accomplished a 'de facto overruling' of a decision which 'has morphed from a case worth of citation as part of this court's well-settled jurisprudence to an object of derision . . . .' *Groch*, Pfeifer, J., concurring in part and dissenting in part.

2008-Ohio-1313 at ¶¶50-52. See also *Bailey v. Smart Papers LLC*, Case No. 1:06cv463, 2009 U.S. Dist. LEXIS 27619 (S.D. Ohio, W.D. 2009) (granting summary judgment on the basis of R.C. 2305.131).

Chief Justice Moyer's dissent in *Brennaman*, *supra* foretold the workaround or blueprint for the statute of repose enacted a decade later:

> As succinctly stated in *Sedar* [*v. Knowlton Construction Co.*, 49 Ohio St. 3d 193, 551 N.E.2d 938, (1990)], 'unlike a true statute of limitations, which limits the time in which a plaintiff may bring suit after the cause of action accrues, a statute of repose, such as R.C. 2305.131, potentially bars a plaintiff's suit before the cause of action arises.' *Sedar*, supra, 49 Ohio St.3d at 195, 551 N.E.2d at 941. A statute of repose does not deny a remedy for a vested cause of action but, rather, bars the action before it ever arises. *Id*. at 201, 551 N.E.2d at 946. Therefore, no right of action ever accrued to appellants in which their constitutional rights to damages or jury determination arose.

*Brennaman v. R.M.I. Co.*, 70 Ohio St.3d 460-468. Chief Justice Moyer's observations led to the current statute of repose in place at the time of Mr. Lucio's injury. It kept a cause of action from arising, rather than denying a cause of action to a person where a cause of action had arisen. *McClure v. Alexander*, *supra*.

Plaintiff makes a claim for negligent maintenance against Levy, arguing Levy "agreed [in the Performance and Payment Guaranty] to be bound by all of Fulton Mill Services' obligations, including maintenance". (Doc. 57, Memo in Opp., p. 18, n. 34.) Once again, the flaw in plaintiff's argument is that even if the "Guaranteed Obligations" included maintenance (they did

9

not), any Guaranteed Obligation owed *to* NSBS came with Levy's right to the same defenses as FMS, and since Mr. Lucio cannot state a claim against FMS for the reasons already stated, plaintiff likewise cannot sue Levy for negligent maintenance.

For the warranty exception to R.C. 2305.131 to apply under R.C. 2305.131(D), a designer or builder of the improvement must have given an express written warranty for the improvement for longer than ten years. That did not happen in this case.

A written warranty implies that there has been a sale or a lease of property, and that the warrantor makes a promise to the buyer or lessee as to the performance of that which was purchased or leased. There was no sale or lease (of the slag plant) by Levy to NSBS, with which FMS contracted. In fact, the agreement stated "FMS shall remain the owner of the FMS improvements." (Doc. 47, Scholz Aff., ¶¶5, 6.) There was not any written warranty given by FMS to NSBS,[3] and it is nonsensical to claim that FMS was warranting the slag plant to NSBS, when FMS remained the only owner of the slag plant, and its exclusive user. Closing the loop on this point, FMS did not warrant the slag plant to itself, did not warrant it to a non-user (NSBS), and it certainly did not warrant the slag plant to its own employees, from whom it would have immunity under workers' compensation. The Performance and Payment Guaranty makes sure that the responsibility undertaken by Levy does not exceed any responsibility of FMS under the Slag Handling and Mill Services Agreement(s).

Plaintiff claims liability could also attach based on Levy's alleged *control* over training and maintenance. Once again, those claims would be barred by the same defenses language in the Performance and Payment Guaranty. Furthermore, <u>actual control</u> (which is required by the statute of repose exception) rested with the slag plant's owner, FMS, not Levy. (Id.)

---

[3] FMS's obligations are set forth in its agreement with NSBS. There, FMS agrees to comply with all "laws and regulations", but that is hardly a warranty of the slag plant tower. (Doc. 47, Scholz Aff., Exhibit B, ¶3.(f).)

10

In an effort to get past the statute of repose, plaintiff claims that Levy's performance of annual inspections of the slag plant (Doc 57, Memo in Opp., p. 7) establishes "control" over the slag plant. Levy performed inspections because it was an affiliate of and advisor *to* FMS, not because it owed any duty to Mr. Lucio separate from the one owed by his employer. Levy did not owe a greater duty to Mr. Lucio than did his employer, and the Performance and Payment Guaranty makes that undisputable.

Even if the performance of annual inspections established a duty owed by Levy to Mr. Lucio, plaintiff's criticism of Levy for inspecting but "never [having] identified or repaired the obvious fall hazards that they created" (*id.*) would be misplaced. There was not an *unaddressed* "obvious fall hazard" with tower 2. The fall hazard was addressed by the availability of fall protection harnesses and lanyards to FMS's employees, and by the training given to Mr. Lucio on when and how to use a safety harness and lanyard, which he successfully completed two months before his fall. Further, the JBSA available to Mr. Lucio called for him to use a safety harness and lanyard when doing a screen change, and tower 2 of the slag plant had a place in a beam where employees could tie off to perform the job. Clamps were also available to permit employees to tie off directly to the I-beam overhead. (Doc 55, Deeds depo., pp. 19, 43.) It cannot be over-emphasized that Mr. Lucio's fall was the first ever fall in many years of year-round operation at FMS. There is always a hazard when working at height, but the hazard was addressed; safety training was given and fall protection was available. Mr. Lucio simply did not use that training or the available fall protection.

In the final analysis, the slag plant is an improvement that was designed and constructed by Levy *well over* ten years before plaintiff fell. Consequently Mr. Lucio never had a cause of action which could accrue against Levy for the design or construction of the slag plant and

tower; and there are no other claims available to him for anything set forth in the contract documents, both because plaintiff is not an intended third-party beneficiary, and because the Performance and Payment Guaranty grants FMS's defenses to Levy, chiefly workers' compensation immunity and the finding as a matter of law that there was not an employer intentional tort.

### III. THE SLAG PLANT IS NOT A "PRODUCT" UNDER THE OHIO PRODUCT LIABILITY ACT.

Plaintiff claims that the slag plant tower was a "product" according to the Ohio Product Liability Act,[4] but he cites nothing in the record to support that fact. He simply claims that Levy admitted that the "company has designed and built multiple slag mills for various subsidiary companies, including Fulton Mill Services." (Doc. 57, Memo in Opp., p. 20.) That does not make it a "product". A product must be "tangible personal property" which is "produced *** for introduction into trade or commerce." R.C. 2307.71(A)(12)(a). Levy reiterates that the slag plant is an improvement, described as such in the contract with NSBS and an "improvement" as the term has been used in case law. (Doc. 46, Levy's Memo in Support, pp. 15-16.) Mr. Scholz's affidavit testimony provides undisputed evidence that the slag plant has not been "produced *** for introduction into trade or commerce". Levy "is not and has never been in the business of producing, manufacturing or supplying slag plants for sale. The slag plant at NSBS was designed and built solely for use by [] Levy's affiliate, FMS." (Doc. 47, Scholz Aff., ¶9.) Thus, while Levy made slag plants for affiliates and subsidiaries, there is no evidence in the record that Levy designed or constructed slag plants for sale or lease to any unrelated companies. Accordingly, the slag plant is not a "product", and even if it was, the absence of an "express written warranty as to the safety of the product" would cause the product liability statute of

---

[4] Plaintiff's own expert apparently disagrees with this claim, as his report continually refers to the slag plant as "construction."

12

repose to prevent a cause of action from arising for Mr. Lucio in this case. See R.C. 2305.10(C)(3).[5] Undisputedly, NSBS has no ownership rights in the FMS improvements and was neither a buyer nor a lessee of those improvements. Since no express written warranty as to safety was given to a buyer or lessee of the product, the statute of repose set forth in R.C. §2305.10(C) would preclude plaintiff's claim, as would the defenses in the Performance and Payment Guaranty.

## IV. CONCLUSION

For all of the foregoing reasons and for the reasons set forth in Levy's initial brief, the court is urged to grant summary judgment in favor of Levy as to each of plaintiff's claims.

EASTMAN & SMITH LTD.


 /s/ Stuart J. Goldberg
Stuart J. Goldberg (0029469)
Lynn Vuketich Luther (0075166)
One SeaGate, 24th Floor
P. O. Box 10032
Toledo, Ohio 43699-0032
Telephone: (419) 241-6000
Fax: (419) 247-1777
Email: sjgoldberg@eastmansmith.com
       lvluther@eastmansmith.com

Attorneys for Defendant
Edw. C. Levy Co.

---

[5] The express warranty exception would fail in the context of the product liability statute of repose, R.C. 2305.10(C)(3), for the same reason the argument fails in the context of the statute of repose for improvements to real property, R.C. 2305.131(D), which was already discussed on p. 10 of this brief.

**PROOF OF SERVICE**

I hereby certify that on May 10, 2016, a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

     /s/ Stuart J. Goldberg
Attorney for Defendant
Edw. C. Levy Co.