UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | |
|---|---|
| Theodore Lucio, et al., | Case No. 15-cv-613 |
| Plaintiffs | |
| v. | MEMORANDUM OPINION |
| Edw. C. Levy Co, et al., | |
| Defendants | |

## I. INTRODUCTION

The matter before me arises out of an injury sustained by Plaintiff Theodore Lucio from a fall from an unguarded screen deck of a slag plant tower. Plaintiff Theodore Lucio asserts claims of negligent and defective design and construction, negligence, and products liability. (Doc. No. 23). Plaintiff Stephanie Lucio asserts a derivative claim of lack of consortium.

There are three motions pending: (1) Defendant Edw. C. Levy Co.'s motion to exclude Plaintiff's expert, Michael Wright (Doc. No. 64); (2) Defendant Edw. C. Levy Co.'s motion for summary judgment (Doc. No. 46); and (3) Defendant North Star Bluescope Steel, LLC's motion for summary judgment (Doc. No. 49). Plaintiffs have responded to all motions (Doc. Nos. 57, 59, 67), and Defendants have replied, in turn. (Doc Nos. 63, 65, 70).

For the reasons stated below, Levy's motion to exclude Wright's testimony is granted in part and both Defendants' motions for summary judgment are granted in full.

## II. BACKGROUND

On February 25, 2013, Plaintiff Theodore Lucio fell approximately 25 feet from the top of a slag tower while changing a screen during his course of employment. (Doc. No. 23 at 3-4). At the time, he was employed by Levy Environmental Services, doing business as Fulton Mill Service Company ("FMS"). *Id.* at 2-3. Lucio sustained serious injuries and filed suit against several parties, including FMS. *Lucio v. Levy Environmental Services Co.*, 173 F.Supp.3d 558 (N.D. Ohio 2016), aff'd *Lucio v. Levy Environmental Services Co.*, --Fed. App'x --, 2016 WL 6994230 (6th Cir. Nov. 30, 2016). Neither Defendant in this case was a party to the previous action. On March 22, 2016, Judge James G. Carr granted summary judgment to Levy Environmental Services (FMS) for the intentional tort claim asserted by Lucio. *Id.* As noted by all parties, the circumstances surrounding Lucio's fall from the tower were fully developed and explained during the previous case and I incorporate by this reference Judge Carr's summary. *See Lucio*, 173 F.Supp.3d at 561-63.

At issue now is the alleged liability of Defendants Edw. C. Levy Co. ("Levy") and North Star Bluescope Steel, LLC ("NSBS") with respect to Lucio's 2013 fall. The tower in question was a part of a slag plant designed and built by Levy on the property of NSBS. (Doc. No. 47). When construction of the plant was completed in 1996 or 1997, FMS took ownership of the slag plant pursuant to the *Slag Handling and Mill Services Agreement* ("*1996 Agreement*"). (Doc. Nos. 47, 47-1). The *1996 Agreement* established a business relationship between FMS and NSBS. *Id.* Two other documents were incorporated into the *1996 Agreement*: (1) *Performance and Payment Guaranty* ("*Guaranty*"); and (2) *Slag Handling and Mill Services Contract Specifications* ("*Contract Specifications*"). (Doc. Nos. 47-1, 47-3, 47-4).

The *Guaranty* designated Levy as the "Guarantor" of all of FMS's obligations to NSBS under the *1996 Agreement*. (Doc. No. 47-3). The *Contract Specifications* provided policy goals and a more detailed explanation of the obligations and purpose of the *1996 Agreement*. (Doc. No. 47-4). In 2010, FMS and NSBS executed the *First Amended and Restated Slag Handling and Mill Services Agreement*

("*Amended Agreement*"). (Doc. No. 47-2). The terms of the *Amended Agreement* were similar to that of the *1996 Agreement*, but did not reference the *Guaranty*. *Id.* Neither Defendant contends that the *Guaranty* was revoked by the *Amended Agreement*, which was in place at the time of Lucio's fall.

At that time of the fall, NSBS owned the compound of fenced-in property that held the FMS slag plant and NSBS's own steel mill. Pursuant to the *Amended Agreement*, FMS served as an independent contractor to NSBS, providing the NSBS steel mill with slag from its own plant on the property. (Doc. No. 47-1). Levy guaranteed FMS's performance of the contract to NSBS. (Doc. No. 47-3). FMS was an affiliate or subsidiary company of Levy. (Doc. No. 47, Doc. No. 60 at 11).

### III. MOTION TO EXCLUDE EXPERT TESTIMONY

A witness must be qualified "by knowledge, skill, experience, training, or education" to testify. Fed. R. Evid. 702. Before admitting expert testimony, the court "must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) (alteration in original)). In this case, Michael Wright is a licensed Professional Engineer, Certified Safety Professional, and Certified Plant Engineer. (Doc. No. 57-1). There is no dispute that he is qualified to testify about matters involving those disciplines.

Testimony of a qualified witness is admissible only if it is both relevant and reliable. *See* Fed R. Evid. 702; *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208 (6th Cir. 2015); *United States v. Cunningham*, 679 F.3d 355, 379-80 (6th Cir. 2012). Relevant testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed R. Evid. 702 (a); *Daubert*, 509 U.S. at 591; *Cunningham*, 679 F.3d at 380. Reliability depends on "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. An expert's knowledge need not be "scientific" in nature, but could also be "technical" or "other[wise] specialized." *Kumho Tire, Ltd.*, 526 U.S. at 141. As noted by the Supreme Court, the test of reliability is "flexible," and

3

"the law grants a district court…broad latitude when it decides *how* to determine reliability." *Kumho Tire, Ltd.*, 526 U.S. at 141-42 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)); *see also Daubert*, 509 U.S. at 594.

As a gatekeeper, the court must determine whether the party offering the expert as a witness has proven the expert's proposed testimony admissible. *Daubert*, 509 U.S. at 592 n.10. "But 'rejection of expert testimony is the exception rather than the rule.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (quoting Fed. R. Evid. 702 advisory committee's notes, 2000 amend.).

Levy asserts that Wright's testimony should be excluded because: (1) it contradicts statements Lucio made in his reply to Levy's motion for summary judgment; (2) the statements regarding OSHA are irrelevant to negligence; (3) the testimony improperly renders legal conclusions about the interpretation of contracts; and (4) the testimony improperly renders opinions on Levy's intent. (Doc. No. 64-1).

A. Sections (A)(1) and (B)(2)

At the outset, Levy asserts that certain portions of these sections are inadmissible as improper testimony of intent. I agree. As noted by Judge Carr in Lucio's previous case,

> Expert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case. The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury.

*Lucio*, 173 F. Supp.3d at 565 (citation omitted); *see also CMI-Trading, Inc. v. Quantum Air, Inc.*, 98 F.3d 887, 890 (6th Cir. 1996) ("The intent of the parties is an issue within the competence of the jury and expert opinion testimony will not assist the jury, within the meaning of Federal Rule of Evidence 702, in determining the factual issue of intent."). Accordingly, I find all statements within Wright's testimony regarding state of mind or intent to be irrelevant and inadmissible.

4

With respect to the remaining content of Sections (A)(1) and (B)(2), it is true that Wright's testimony does not support a finding that the slag mill is a product for purposes of products liability. But, as with any witness, the testimony given need not support the calling party's case in full. Additionally, the mere fact that Wright is admittedly unqualified to determine whether the slag mill is a product or an improvement does not negate his ability to testify about industry regarding safety and design. (Doc. No. 67-1). The issue of inconsistency among the claims will be addressed below, but I do not find it to be grounds to exclude Sections (A)(1) or (B)(2) of Wright's expert report. Further, Levy has failed to cite any legal authority to support this argument. Therefore, Sections (A)(1) and (B)(2) may only be excluded if they are either irrelevant or unreliable; Levy argues irrelevance.

Section (A)(1), entitled, "Standard and Industry Practice of a Normal Contractor, Including a Design-Building Entity," provides information about the industry standards with respect to safety considerations. Wright articulated industry standards and practices and referenced state and federal law. Wright applied these standards to form his opinion on Levy's compliance with industry safety standards. The statements made in this section assist the trier of fact in determining whether Levy's conduct was negligent or within the bounds of industry standards.

Section (B)(2) discusses the design and construction of the slag plant. Wright specifically describes the safety features that were not—and could or should have been—included in the design of the tower. To form his opinion, Wright analyzed the facts in light of state and federal law and industry standards. These matters aid the trier of fact in determining whether the plant was negligently designed and constructed.

Both Sections (A)(1) and (B)(2) are within Wright's expertise as an engineer and safety professional. Since I find both sections to be relevant and Levy has not made any argument that the sections are unreliable, I find the sections admissible with the exception of statements of state of mind or intent.

5

B.     OSHA Testimony in Section (A)

Levy moved to exclude "Section (A)(2)" of Wright's report by way of heading in its memorandum. (Doc. No. 64-1 at 8). But after review of the argument, I believe the argument under the heading encompasses both the Policy articulated in Section (A)(2) and Wright's analysis and conclusion based on the policy in Sections (A)(3)- (A)(11). As Sections (A)(3)- (A)(11) are dependent upon the inclusion of Section (A)(2), I will address all as one.

Wright's expertise extends to engineering and safety management. While Section (A)(2) is an OSHA policy, it does not relate to engineering principles or safety requirements. Instead it describes the allocation of duty and responsibility among employers at a multi-employer work site. Wright concluded that, based on this policy, Levy was a prime and controlling entity who actively participates. Relying on this conclusion, Wright determined that Levy both had and failed to fulfill its safety obligations at the slag plant. I do not find Wright is qualified to make these assertions. Though he may have had experience with multi-employer work sites, the interpretation of the OSHA policy and allocation of duty and fault is a matter of law, not engineering or plant safety.

Assuming for the sake of argument that Wright was qualified to give these opinions, Section (A)(2) and the following analysis is irrelevant. In addressing the issuance of relevance Lucio asserts, "the existence of applicable OSHA violations do not establish a duty," acknowledging that there is no private cause of action under OSHA. (Doc. No. 67 at 11-13). Instead, he contends "[t]he various regulatory schemes analyzed by Mr. Wright serve to provide context." *Id.* at 12. But if not to speak to the issue of duty of care, I do not see the "context" those sections are intended to provide. Since Lucio has failed to establish that these sections would help the trier of fact determine any fact in issue, Sections (A)(2)- (A)(11) are irrelevant.

Even if the testimony were relevant to any fact at issue and Wright was qualified to give it, I find the unreliable nature of the testimony grounds for exclusion. In forming his opinions, Wright reviewed "available discovery documents, depositions, witness accounts, case photographs and other

6

related documents, along with applicable ANSI construction safety standards, OSHA construction regulations, and other possible federal and construction industry safety regulations." Rather than supporting his conclusion with technical or specialized knowledge, Wright paraphrased depositions and facts already in evidence. Wright's reiteration of the record and brief conclusions do not evince any specialized knowledge, but instead simply act to include inapplicable state and federal law. I find these conclusions unhelpful and, at times, potentially confusing to a trier of fact.

Although I have no doubt that Wright is qualified to testify as to certain topics, I do not find an analysis of Levy's control to be within the bounds of his expertise. In addition to finding Wright unqualified to make these assertions, Lucio has failed to point to any fact at issue to which these sections relate. Because Sections (A)(2)-(A)(11) are not relevant or reliable, they are inadmissible.

C.  Section (B)(1)

In Section (B)(1), Wright opines on the contractual obligations of Levy. Experts are permitted to testify on contract interpretation only when there is a "need to clarify or define terms of art, science, or trade." *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549 (6th Cir. 1981); *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997). Since that is not the case here and Lucio makes no argument to contest the exclusion, Section (B)(1) is excluded.

D.  Section (C)

Section (C) of the report concludes Wright's report with respect to Levy. The contents of the section are primarily dedicated to Wright's opinion of Levy's control of the slag plant. Since I previously determined Sections (A)(2)-(A)(11) regarding control to be inadmissible, Section (C) must be excluded as well.

### IV.  MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare*

*Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

A.  Products Liability

By definition, a product is an object: (1) "capable of delivery itself, or as an assembled whole in a mixed or combined state, or as a component or ingredient;" (2) "produced, manufactured, or supplied for introduction into trade or commerce;" and (3) "intended for sale or lease to persons for commercial or personal use." O.R.C. § 2307.71(A)(12)(a). Under O.R.C § 2307.75(A), in order to succeed on a products liability claim, the object must be a product and have "left the control of its manufacturer." At the outset, I note this claim is at odds with Lucio's remaining claims which depend upon Levy's alleged control of the slag plant. Nevertheless, I will analyze the products liability claim independently.

The purpose of a products liability cause of action is to "promote product safety" by providing "manufacturers [with] a strong incentive to design, manufacture, and distribute safe products." *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 73 Ohio St. 3d 609, 621 (1995). As a matter of policy, a manufacturer who designs and distributes a product is in a better position to assume and mitigate risks than the general consumer. *Id.* In addition, the strict liability nature of this cause of action is intended to protect multiple consumers in the general public from the cost of litigating against a large manufacturer who has put the defective product into the stream of commerce. *Id.* The purpose is not realized when a "product" is designed not for sale to the general public, but instead "coaxed into the market by its consumers." *Id.* at 622.

8

In *Queen City*, the consumer was involved throughout the manufacturing process of the custom-made product produced to meet its needs alone. *Id.* Because of the consumer's heavy involvement in the manufacturing process and unique nature of the product made for only one consumer, the court held the situation was not within the purpose of the cause of action and the consumer was not protected by strict products liability. *Id.* at 623; *see also Estep v. Rieter Auto. N. Am.., Inc.*, 148 Ohio App.3d 546, 553 (Ohio Ct. App. 2002) ("A product which is custom-made at the express request and design of the purchaser and which is not launched into the stream of commerce to consumers is not a 'product' for purposes of imposing strict liability upon the maker.").

Since *Queen City*, courts have encountered similar situations, determining the issue on a case-by-case basis. Two such cases are *Estep*, *supra*, and *Zuniga v. Norplas Indus. Inc.*, 2012-Ohio-3414, 974 N.E.2d 1252 (Ohio Ct. App. 2012). In each, a company had ordered a piece of machinery to fit their needs. In *Estep*, the court held products liability did not apply because the piece of machinery "was a custom-made unit, designed primarily by [the consumer]" and the parties involved were not "in the business of constructing the particular components installed." *Estep*, 148 Ohio App.3d at 553. Citing *Estep*, the court in *Zuniga* upheld the products liability claim finding the consumer had not micro-managed the design and construction process, but instead ordered it from a manufacturer who was "in the business of designing and building machinery." *Zuniga*, 974 N.E.2d at 1560. In holding the piece of machinery to be a product, the court stated that though it was made to fit the customer's needs, it was not "the 'rare circumstance' in which a purchaser's involvement in the design or manufacture of a product is so integrated as to deem the result outside the definition of a product." *Id.*

Here, Levy admits to designing and constructing slag plants for the use of its subsidiaries and affiliates, including the plant at issue here. (Doc. No. 47). But, while Levy may have built other slag plants before the one at issue, it was not in the business of constructing slag plants for sale. *Id.*

9

Levy never intended to place the slag plant into the stream of commerce, but built them for the sole use of its affiliates and subsidiaries. *Id.* Further, though other slag plants had been constructed, the topographical variation of real estate requires each plant to be custom-built to the terrain. Because the slag plant was one-of-a-kind and never intended for sale, I find no reasonable mind could find the slag plant to be a product or Levy to be a manufacturer pursuant to O.R.C. § 2307.75.

B.  Negligence

To succeed on his negligence claim, Lucio must prove duty, breach, causation, and damages. The issue at hand is whether either Defendant owed Lucio a duty. He asserts each owe him a duty under contract or the traditional principles of tort law.

1.  Contractual Duty of Care

Though third parties are often affected by a contract, only intended beneficiaries may enforce a contract. *Norfolk & W. Co. v. United States*, 641 F. 2d 1201, 1208 (6th Cir. 1980); *Hill v. Sonitrol of Sw. Ohio, Inc.*, 36 Ohio St. 3d 36, 40 (1988). To determine whether a third-party is an intended beneficiary, Ohio court's apply the "intent to benefit" test. Under the test:

> if the promisee… intends that a third party should benefit from the contract, then that third party is an "intended beneficiary" who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an "incidental beneficiary", who has no enforceable rights under the contract.

*Norfolk*, 641 F.2d at 1208. Further, "the mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary." *Id.*

As stated above, *1996 Agreement* established a business relationship between NSBS and FMS. (Doc No. 47-1). The *Guaranty* incorporated into the *1996 Agreement* designated Levy as the "Guarantor" and states in part:

> Guarantor hereby unconditionally and irrevocably guarantees to NSBHP, its successors and assigns, the complete performance of all of the obligations under and in accordance with, and subject to, the terms of the Services Agreement to: provide

> the slag handling and mill services…and to otherwise perform all other obligations, duties and responsibilities owed by FMS to NSBHP, including, without limitation, the indemnification obligations of FMS under Section 11 of the Services Agreement.

*Id.* at 2-3. The *Contract Specifications* was also incorporated into the *1996 Agreement* and states "personnel health" as a goal.

Because of the requirement that the parties to the contract intend to directly benefit the third party, that intent "[g]enerally…will be found in the language of the agreement." *Huff v. FirstEnergy Corp.*, 130 Ohio St.3d 196, 200 (2011). When interpreting the language "to adequately safeguard all persons…from injury," the *Huff* court held that purpose of the contract governed and that the statement did not evince an intent by either party "to give the general public the benefit of a promise to perform." 130 Ohio St.3d at 200-02. By the four corners of the contracts, the purpose of the *1996 Agreement* and *Guaranty* is to establish a business relationship, including obligations and benefits, between NSBS, FMS, and Levy. A single mention of "personnel health" as a goal in the *Contract Specifications* does not establish a duty owed to Lucio nor does it lead to any inference that safety of FMS employees was a *purpose* of the contract. *Id.* at 3. While FMS was charged with the duty to supervise and ensure safety compliance of its employees, it was a duty owed to NSBS, not the employees themselves. Since the language of the contract does not indicate the parties' intent to benefit FMS employees, I find Lucio to be an incidental beneficiary with no contractual right of enforcement.

2.  Duty of Care in Tort Law

In tort law, the duty of care owed depends on the relationship of the alleged tortfeasor to the injured party. Here, Lucio in an employee of FMS and works at a plant owned by FMS. FMS is an affiliate or subsidiary company of Levy and independent contractor of NSBS. The FMS slag plant is located within a compound of land owned by NSBS, on which NSBS owns a steel mill.

11

i. NSBS

NSBS owned the land on which FMS's slag plant was located and hired FMS as an independent contractor to provide slag to its steel mill located within the same fenced-in area of land. (Doc. No. 47-2). Under Ohio law,

> where an independent contractor undertakes to do work for another in the very doing of which there are elements of real or potential danger and one of such contractor's employees is injured as an incident to the performance of the work, no liability for such injury ordinarily attaches to the one who engaged the services of the independent contractor.

*Wellman v. E. Gas Co.*, 160 Ohio St. 103, 108 (1953). In short, when a property owner hires an independent contractor to do work that is inherently dangerous, the property owner "ordinarily owes no duty of protection to the employees of such contractor, in connection with the execution of the work." *Id.*; *see also Sopkovich v. Ohio Edison Co.*, 81 Ohio St. 3d 628, 636-37 (1998). The property owner has a duty only to warn the independent contractor of dangers on the premises; the independent contractor has the duty to relay the information to its employees. *Schwartz v. Gen. Elec. Realty Corp.*, 163 Ohio St. 354, 361 (1955).

While Lucio concedes he was an employee of independent contractor FMS, he argues the "no duty" rule does not apply because changing the screen on the top of the tower was not an inherently dangerous activity. In Ohio, "[w]ork is inherently dangerous when it creates a peculiar risk of harm to others unless special precautions are taken." *Pusey v. Bator*, 94 Ohio St.3d 275, 279 (2002). The standard requires only that "the work involves *a* risk, recognizable in advance, of physical harm to others, which is inherent in the work itself." *Id.* at 280 (emphasis added). Here, the tower was located 25 feet above the ground. (Doc. No. 23). When the screens were being changed, the workers had to straddle on crossbars. (Doc. No. 51-1 at 10, Doc. No. 52-1 at 10). Lucio himself recognized that the task was not free of risk, stating, "You had to be careful with your footing." (Doc. No. 52-1 at 10). Lucio's very contention that the work was only dangerous because of the lack of guardrails and proper safety procedures reaffirms the fact that "special precautions"

12

were necessary. (Doc. No. 57 at 14). Because the act of changing the screens on the tower would reasonably require special precautions to ensure the safety of those performing the task, it is an inherently dangerous activity.

Generally, NSBS would owe no duty to Lucio as an employee of an independent contractor engaged in inherently dangerous work. But, a property owner does owe a duty when it has been an "active participant." *See Hirschbach v. Cincinnati Gas & Elec. Co.*, 6 Ohio St. 3d 206, 206-08 (1983); *Michaels v. Ford Motor Co.*, 72 Ohio St.3d 475, 478-80 (1995). Active participation occurs when the property owner: (1) "directs or exercises control over the work activities of the independent contractor's employees," or (2) "retains or exercises control over a critical variable in the workplace." *Sopkovich*, 81 Ohio St. 3d at 643.

"Active participation" is not merely ancillary, such as inspection of the work site, but instead requires *actual* participation in the job being performed. *See Bond v. Howard Corp.*, 72 Ohio St.3d 332, 420-21 (1995) ( "'[A]ctively participated' means that the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project."). In *Cafferkey v. Turner Const. Co.*, 21 Ohio St. 3d 110 (1986), the court held the general contractor was not an active participant because it had "not actively participate in any action or decision that led to the fatal injuries." 21 Ohio St. 3d at 112. Under contract, the general contractor had reserved the right to retain "control over safety procedures at the project site" and "the ability to monitor and coordinate the activities of all subcontractors in order to ensure compliance." *Id.* at 113.

But since the contract did not give the general contractor the right "to control the means or manner of [the independent contractor's] performance," it owed no duty to the employees of the independent contractor as an active participant. *Id.*; *see also Bond*, 72 Ohio St.3d at 336-37 ("The general contractor's retention of the authority to monitor and coordinate activities of subcontractors and the retention of control over safety policies and procedures do not rise to the level of active

13

participation, thereby extending a duty of care from a general contractor to a subcontractor's employees.").

In comparison to *Cafferty*, NSBS's "control" of the work site is rather minimal. NSBS required FMS employees to complete a single training program when starting at the facility. (Doc. No. 52-1 at 2; Doc. No. 56-1 at 13-14; Doc. No. 60 at 72-73). NSBS personnel also patrolled the grounds occasionally to ensure employee compliance, by both FMS and NSBS employees, with property rules such as the non-smoking policy. (Doc. No. 52-1 at 4-5; Doc. No. 56-1 at 8-9). NSBS had no contractual rights to monitor any of FMS's activities, nor did it do so. Lucio asserted no facts that would indicate NSBS controlled or made decisions regarding the means or manner by which FMS conducted its business activities, or had any right to do so. He certainly has not established NSBS played any role in the specific task of changing the screen on the tower. There is no factual basis to support a finding of active participation; NSBS owed Lucio no duty under either contract or tort law principles.

ii.     Levy

Lucio asserts the same standard applies to Levy, but on the face of the contracts on which Lucio depends, Levy is merely the guarantor of FMS's contractual obligations *not* a general contractor or a property owner. Levy admits its participation in the operations of FMS, but Lucio has failed to cite a legal basis to establish a duty. Levy concedes that it may be a third-party consultant, as was the case in *Hunley v. Commercial Enters., Inc.*, 2003 WL 929541 (Ohio Ct. App. March 10, 2003). In *Hunley*, a company was hired by the injured party's employer to provide safety training to the employees. *Id.* at *1. The court held that merely providing training was not grounds to establish a duty. *Id.* at *2-*3. Instead, the employer itself had "the statutory duty to provide a safe work environment." *Id.* at *2.

Here, Levy provided safety procedures and training materials to FMS. (Doc. No. 60 at 47). The materials included a safety manual requiring fall protection when employees were working at

14

heights of more than six feet in areas with unprotected sides. (Doc. No. 57-3 at 1; Doc. No. 60 at 47, 55, 215-20). Levy also provided FMS with documents called job safety breakdown analysis, which outlined the safety equipment needed, procedure involved, and hazards associated with the tasks performed at the slag plant. (Doc. No. 57-3 at 6; Doc. No. 60 at 21). One JBSA was devoted the task of changing the screen on the tower and mandated the use of a "Manlift Harness & Lanyard" and listed slips, tips, and falls as a hazard. (Doc. 57-3 at 6). While Levy provided these materials, FMS had the duty to train its employees in their contents. (Doc. No. 47-2).

With respect to the slag plant site itself, Levy personnel inspected the slag plant twice a year, the inspections were to ensure employee compliance with the training materials and were limited to places that were "running" at the time of the inspection. (Doc. No. 60 at 66, 70-71). There is no evidence that Levy personnel inspected the building itself for safety compliance. While Levy had safety personnel available for questions, FMS employed safety personnel to train other employees and ensure safety compliance in the course of the day-to-day operations. Levy's role in safety appears to be similar to that of the company in *Hunley*; it provided safety materials to FMS, but it was FMS's duty to ensure employees were adequately trained and the worksite was safe. FMS's failure to follow Levy's safety guidelines does not establish a duty.

Lucio has failed to assert any legal basis for his claim of negligence. Since Levy owed Lucio no duty, an analysis of Levy's defense of immunity under Ohio Workers' Compensation Law is unnecessary.

C.      Negligent Design and Construction

Levy admits to designing and building the slag plant where Lucio was injured, but asserts Ohio's statute of repose bars Lucio's claim of negligent design and construction. (Doc. Nos. 46, 47). In response, Lucio asserts that the statute of repose is unconstitutional or, in the alternative, a statutory exception applies. (Doc. No. 57). Pursuant to Lucio's request, oral argument was held on the matter. (Doc. No. 71).

15

As noted in the oral argument, the usual procedure by which to challenge the constitutionality of a state statute is to "certify such fact to the attorney general of the State, and [ ] permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality." 28 U.S.C. § 2403(b). Lucio has chosen not to do this, but found that the court could reach the merits of the claim without answering this question. Therefore, before turning to Lucio's defense of unconstitutionality, I will assess whether the statute of repose acts to bar the cause of action.

The statute of repose states:

> no cause of action to recover damages for bodily injury…that arises out of a defective and unsafe condition of an improvement to real property … shall accrue against a person who performed services for the improvement to real property or a person who furnished the design, planning, supervision of construction, or construction of the improvement to real property later than ten years from the date of substantial completion of such improvement.

O.R.C. § 2305.131(A)(1). "'[S]ubstantial completion' means the date the improvement to real property is first used by the owner or tenant of the real property or when the real property is first available for use after having the improvement completed in accordance with the contract or agreement covering the improvement." O.R.C. § 2305.131(G).

To determine whether something is an improvement to real property, courts consider factors such as "the enhanced value created when the item is put to its intended use, the level of integration of the item within any manufacturing system, whether the item is an essential component of the system, and the item's permanence." *Brennaman v. R.M.I. Co.*, 70 Ohio St.3d 460, 465 (1994); *see also Adais v. Koppers Co., Inc.*, 741 F.2d 111, 113-14 (6th Cir. 1984). The slag plant is permanently affixed to the land of NSBS and is integral to the operations of both companies. Without the plant, not only would FMS have no place to conduct their day-to-day operations and make a profit, but the business relationship by which FMS provides slag material to the NSBS steel mill, located within the same compound, may not exist. Because the plant is essential to the profit generating operations of

16

both companies and is permanently affixed to the land, I find it to be an improvement to real property. Lucio does not contest this point or the fact that the plant was completed in 1997. Therefore, under Ohio's statute of repose, any claims accrued after 2007 are barred unless a statutory exception applies.

There are three statutory exceptions to the general rule. To maintain his claim which accrued in 2013, Lucio asserts the following two statutory exceptions:

> (B) Division (A) of this section does not apply to a civil action commenced against a person who is an owner of, tenant of, landlord of, or other person in possession and control of an improvement to real property and who is in actual possession and control of the improvement to real property at the time that the defective and unsafe condition of the improvement to real property constitutes the proximate cause of the bodily injury, injury to real or personal property, or wrongful death that is the subject matter of the civil action.
> …
> (D) Division (A)(1) of this section does not prohibit the commencement of a civil action for damages against a person who has expressly warranted or guaranteed an improvement to real property for a period longer than the period described in division (A)(1) of this section and whose warranty or guarantee has not expired as of the time of the alleged bodily injury, injury to real or personal property, or wrongful death in accordance with the terms of that warranty or guarantee.

O.R.C. § 2305.131.

At the outset, as with the issue of contractual duty discussed above, the exception in O.R.C. § 2305.131(D) will only apply if Lucio was an intended beneficiary to the contracts. Again, the purpose of the *Guaranty* was to guarantee Levy would fulfill FMS's duties to NSBS if FMS could or did not. (Doc. No. 47-3). The brief mention of "personnel health" as a goal in an incorporated document does not make Lucio an intended beneficiary. (Doc. No. 47-4). Since Levy made no express warranty or guarantee to Lucio, O.R.C. § 2305.131(D) does not apply. (Doc. No. 47).

In the alternative, Lucio asserts that by Levy's actions or contractual guaranty, O.R.C. § 2305.131(B) applies. The exception only applies when the person has *actual* possession or control of the improvement that was the proximate cause of the injury—in this case, the tower. First, I must note as above, Lucio's assertion of actual control for the purpose of this claim is at odds with his

17

products liability claim. But as with the previous claim, I will evaluate the issue of control independently for purposes of this claim.

Pursuant to the terms of the contracts on which Lucio relies, FMS is the owner of the plant and charged with all responsibilities associated with the plant's operations, not Levy. (Doc. Nos. 47-1, 47-2). Levy merely guaranteed performance of the duties FMS owes to NSBS, including operation of the plant. (Doc. No. 47-3). There is no evidence that Levy was in "exclusive control" of the slag plant itself or even the safety operations of it as asserted by Lucio. (Doc. No. 57 at 19). As noted above, while Levy provided safety protocols and training materials to FMS, it was FMS's very non-compliance with those protocols and materials that contributed to Lucio's fall. FMS exercised discretion in enforcing the rules outlined in Levy's safety manual and training materials. The evidence overwhelmingly supports a finding that FMS, not Levy, was in *actual* control and possession of the slag plant. Accordingly, O.R.C. § 2305.131(B) does not apply to Lucio's claim against Levy.

Since neither statutory exception applies, the claim is barred by the statute of repose. The only remaining issue is Lucio's defense that the statute itself is unconstitutional. In *Bailey v. Smart Papers LLC*, 2009 WL 891749 (S.D. Ohio Mar. 30, 2009), the plaintiff raised the same defense. The *Bailey* court dismissed the defense because the plaintiff had failed to comply with two procedural requirements: (1) moving to certify the constitutional question; and (2) opposing the defendant's motion to dismiss the constitutional question. *Id.* This case is somewhat different in that Lucio has complied with all other procedural requirements. But as the question was not certified to the state and Lucio makes no argument that the statute is in violation of the United States Constitution, I limit my analysis to one of precedent.

Lucio premises his constitutional argument on the holding in *Brennaman* that the previous versions of O.R.C. § 2305.131 violated the Ohio Constitution. But, the court in *Groch v. Gen. Motors Corp.*, 117 Ohio St.3d 192 (2008), stated,

> We confine *Brennaman* to its particular holding that *former* R.C. 2305.131, the *prior* statute of repose for improvements to real property, was unconstitutional. It is entitled to nothing more. To the extent that *Brennaman* stands for the proposition that all statutes of repose are repugnant to Section 16, Article I, we expressly reject that conclusion.

117 Ohio St.3d at 218 (emphasis added). The *Groch* court cited the "deficiencies in *Brennaman*," emphasizing the policy concerns articulated by the *Brennaman* dissent including the plaintiff's alternative available remedies and the importance of balancing "the rights of injured parties and the rights of architects and engineers and guarded against the risk of stale litigation." *Id.* at 217-18 (citing *Brennaman*, 70 Ohio St. 3d at 468-69 (Moyer, C.J., concurring in part and dissenting in part)). When evaluating the constitutionality of the current version of O.R.C. § 2305.131, the court in *McClure v. Alexander*, 2008 WL 754800 (Ohio Ct. App. March 21, 2008), relied on *Groch*. The *McClure* court held that the language of the current version of the statute was "sufficiently different from the previous version considered in *Brennaman*" and was constitutional. *Id.* at *10-*11. Since the Ohio Supreme Court has explicitly limited *Brennaman* to the former O.R.C. § 2305.131 and the only Ohio court to address the issue found the current version constitutional, I find no grounds to support Lucio's defense. Therefore, O.R.C. § 2305.131 bars Lucio's claim, as a matter of law.

5. Loss of Consortium

Plaintiff Stefanie Lucio asserts a claim of loss of consortium against both Defendants. Under Ohio law, loss of consortium is a derivative claim and a spouse may only recover for loss of consortium if the defendant has "committed a legally cognizable tort upon the spouse who suffers bodily injury." *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 93 (1992); *see also Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 633 (6th Cir. 2009). Since there is no dispute of material fact with respect to any of Theodore Lucio's tort law claims against the Defendants, Stefanie Lucio's derivative claim of loss of consortium must also fail.

## V. CONCLUSION

Levy's motion to exclude Wright's testimony is granted with respect to Sections (A)(2)-(A)(11), (B)(1), and (C).  (Doc. No. 64).  All statements made in the remaining Sections (A)(1) and (B)(2) regarding intent or state of mind are also inadmissible.  Both Defendants motions for summary judgment are granted.  (Doc. Nos. 46, 49).

So Ordered.

<u>s/ Jeffrey J. Helmick</u>

United States District Judge